IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>MARSHALL BROADCASTING GROUP, INC.,[1]<br><br>Debtor. | § § § § § § § § § Chapter 11<br><br>Case No. 19-36743 (DRJ) |

## DECLARATION OF PLURIA MARSHALL, JR. IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Pluria Marshall, Jr. declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. My name is Pluria Marshall, Jr. I am an African American media executive and civic activist with extensive experience in the media industry (including print, radio and TV station operations). As of the filing of this chapter 11 case, I was the sole shareholder and CEO of Marshall Broadcasting Group, Inc. ("MBG" or the "Debtor"), the above-captioned debtor and debtor in possession.

2. On December 3, 2019 (the "Petition Date"), the Debtor filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. I am familiar with the Debtor's operations, business affairs, and books and records. In order to enable the Debtor to operate effectively, to smooth the transition into chapter 11, and to avoid any potential adverse effects as a result of the commencement of this chapter 11 case, the

---

[1] The last four digits of Debtor's federal tax identification number are (7805).

Debtor has requested various types of relief in several pleadings filed with the Court (the "First Day Motions").

4. I submit this Declaration in support of the First Day Motions and to otherwise provide the Court with the background facts of this chapter 11 case. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with the Debtor's professionals, and my review of relevant documents. If I were called to testify, I could and would testify competently to the facts set forth herein.

## THE DEBTOR'S BUSINESS

5. MBG is the licensee of three television stations: KMSS-TV, Shreveport, Louisiana, KPEJ-TV, Odessa, Texas and KLJB, Davenport, Iowa (the "MBG Stations"). MBG is a small minority-owned company that provides programming through its affiliation agreements with FOX broadcasting corporation in all markets. MBG has 22 full time employees, comprised of sales and technical personnel located in each of the markets.

6. As of the Petition Date, the value of the MBG Stations is approximately $70 million and, once added to accounts receivable of approximately $5 million and cash of approximately $5 million, total assets are approximately $80 million. In addition, MBG asserts claims against Nexstar, which are pending in New York, in excess of $20 million. MBG's secured liabilities total approximately $49 million and unsecured debt, including approximately $15 million of disputed debt to Nexstar, total approximately $70 million.

## EVENTS LEADING TO THE CHAPTER 11 CASES

**a.    The Dispute with Nexstar Broadcasting, Inc.**

7. MBG acquired the MBG Stations from Nexstar Broadcasting, Inc. ("Nexstar") on January 1, 2015. In 2013, Nexstar was planning to purchase multiple television stations in multiple markets from three other broadcasters. But, to secure Federal Communications Commission

("FCC") approval and comply with FCC rules, regulations and policies, Nexstar had to divest the MBG Stations. Originally, Nexstar tried to spin off the MBG Stations to its longtime business partner, Mission Broadcasting, Inc. ("Mission"). As part of the transaction, Nexstar and Mission would have entered into two additional agreements with respect to each of the MBG Stations, also subject to FCC approval: a joint sale agreement ("JSA"), whereby Nexstar would sell advertising time on the same-market Mission station, and a shared services agreement ("SSA"), whereby Nexstar would provide back office services to assist Mission in operating the station. Together, the JSAs and SSAs would have allowed Nexstar to manage most, if not all, of the MBG Stations' day-to-day operations, and sell all of the stations' commercial advertising. The practical reality of this "divestiture transaction" was that after closing, Nexstar would nonetheless run the MBG Stations as if they were owned by Nexstar.

8. However, under FCC regulations, at the time, if a station operator owned one station in a market, and entered into a JSA allowing the operator to sell 100% of a second station's advertising time, the operator would be treated as owning both of those stations in the market (the "attribution rule"), and thereby would be in violation of FCC rules and regulations that generally limit station ownership in the same market. Nexstar therefore had to find a different path to have its larger purchase transaction approved while, at the same time, "divesting" itself of the MBG Stations.

9. In 1978, the FCC adopted "Statement of Policy on Minority Ownership of Broadcast Facilities," to combat the lack of minority ownership in the broadcast media. Since that time, the FCC has continued to adopt policies and enact programs to promote minority ownership and diverse programming in the broadcast media space. As a result, through an intermediary, I was contacted by Nexstar.

10.     For some time, I had been seeking to acquire television stations. My status as an African American presented an opportunity for Nexstar to leverage the FCC into approving a transaction that would facially further the FCC's goal of minority ownership in broadcast media while, at the same time, allowing Nexstar to maintain effective control over the MBG Stations.

11.     First, Nexstar was to help obtain the necessary financing to purchase and operate the MBG Stations, and guarantee that financing for five years. Nexstar further promised both myself and the FCC that it would provide technical knowledge and other financial resources to produce new, minority-oriented programming. That programming was to include up to 40 hours per week of new, locally-produced news, sports and public affairs programming, including a minority-oriented public affairs program that Nexstar would syndicate.

12.     Nexstar drafted the relevant agreements to facilitate the transaction with MBG. In effect, MBG would be substituted into the agreements originally drafted for Mission, and MBG would assume Mission's role. Pursuant to the transaction, MBG agreed to pay $27 million for KMSS and KPEJ, and $15.3 million for KLJB, the same purchase price as Mission would have paid. After MBG signed the assignment agreement, however, Nexstar insisted on an amendment that raised the purchase price for KMSS and KPEG to $43.3 million – a $16.3 million increase. Allegedly, the increase was due to additional assets to be transferred to MBG that were not originally slated to be transferred to Mission. MBG believed Nexstar was operating in good faith, relied upon Nexstar's explanation, agreed to the increased purchase price and proceeded with the transaction. As it ultimately turned out, however, additional assets valued at $16.3 million were not actually transferred to MBG.

13.     Further, as with the Mission transaction, the sale to MBG included execution of JSAs and SSAs. The JSAs contemplated that Nexstar would sell all of the advertising for the

MBG Stations and receive a commission for those sales. Under the SSAs, Nexstar would provide back-office services for the MBG Stations for a combined $185,000 per month.

14. After various meetings with the FCC, the parties were informed the transaction would not be approved given that the JSAs called for 100% of the advertising to be sold by Nexstar, thereby rendering the MBG Stations insufficiently independent. The JSAs were thus amended, to limit the amount of commercial advertising time Nexstar would sell to 15%. The FCC approved the transaction which, as stated earlier, closed on January 1, 2015.

15. After FCC action and approval of the foregoing agreements by the FCC, and on the eve of sale closing, Nexstar required an amendment to the SSAs, effectively to allow Nexstar to capture the revenue it was losing from having to "give up" 85% of the advertising under the JSA. Now, rather than $185,000 per month, the SSAs required MBG to pay Nexstar approximately $535,000 per month, with a 2.5% increase every year for the term of the SSAs. These revised terms were not submitted to the FCC for approval.

16. From the time the sale to MBG closed, Nexstar has continually acted in a manner that has interfered with the operations of the MBG Stations. Indeed, pursuant to the transaction, MBG acquired only the MBG Stations' physical assets and accompanying FCC licenses. Nexstar retained the MBG Stations' capital accounts, accounts receivable and other revenue streams. MBG thus had no ability to meet its immediate cash flow demands and requirements, and had to draw down on its existing line of credit.

17. Furthermore, Nexstar has falsely communicated to the market (including potential advertisers) that it continues to own the MBG Stations, which has resulted in Nexstar taking clients from MBG and otherwise prevented clients from advertising on the MBG Stations. Nexstar has also, among other things, misrepresented the nature of the Nexstar-MBG relationship, interfered

with programming and sales, refused to pay MBG sales staff advertising sales commissions, and refused to include MBG in critical discussions affecting operations, sales and financing. Other actions or inactions taken or failed to be taken by Nexstar include, but are not limited to, the following:

    a.    Nexstar employees interfering with MBG's operations;

    b.    Nextstar's failure to provide the promised financial and technical assistance to allow MBG to create minority-oriented programming;

    c.    Nexstar's refusal to honor its promise to syndicate the minority-oriented public affairs program independently produced by MBG;

    d.    Nexstar wrongfully withholding millions of dollars owing to MBG, including retransmission fees paid to Nexstar by multichannel video programming distributors;[2] and

    e.    Nexstar's refusal to agree to an extension of the maturity date in MBG's credit facility, or to reaffirm its existing guarantee, in breach of the credit facility and Nexstar's guarantee thereof.

18. MBG has made repeated requests for Nexstar to comply with its contractual obligations, but Nexstar has refused. Therefore, on April 3, 2019, MBG sued Nexstar in New York State Supreme Court in the action captioned *Marshall Broadcasting Group, Inc. v. Nexstar Broadcasting, Inc.*, Index No. 651943/2019 (the "NY Action"). Therein, MBG seeks actual and punitive damages against Nexstar pursuant to eight asserted causes of action, and also seeks an accounting. The NY Action remains pending.[3]

---

[2] MBG transmits a digital broadcast signal over-the-air to certain multi-channel video programming distributors ("MVPDs"). In exchange for the right to broadcast MBG's programming, these MVPDs pay a fee to MBG. Prepetition, MBG demanded that Nexstar turn over all of these fees, but Nexstar refused to do so. Shortly following the commencement of this case, MBG made another demand on Nexstar. So far, no response has been forthcoming.

[3] The claims asserted in the NY Action are as follows: Breach of Contract (SSA); Breach of Contract (Guarantee Agreements); Breach of Implied Covenant of Good Faith and Fair Dealing (SSA); Breach of Implied Covenant of Good Faith and Fair Dealing (Guarantee Agreements); Intentional Interference with Contractual Relations; Tortious Interference with Economic Relations; Conversion; Accounting; and Fraudulent Misrepresentation. Ruling on Nexstar's motion to dismiss, the court in the NY Action dismissed all claims except for Breach of Contract (SSA); Breach of Contract (Guarantee Agreements); and Conversion. MBG is appealing the dismissal of its other claims.

19. Thereafter, MBG filed a complaint ("Complaint") against Nexstar before the FCC on June 12, 2019, and a supplement ("Supplement") to the Complaint on September 6, 2019. In the Supplement, MBG quantifies the damages caused by Nexstar's actions, including $18,662,000 for an inflated purchase price, $600,000 in refinancing and legal fees incurred by MGB, Nexstar's retention of revenue streams from the MGB Stations, resulting in over $20 million in damages to MGB, and the overpayment of approximately $16 million in SSA fees. Through the Complaint and the Supplement, MBG has requested that the FCC investigate Nexstar's misconduct and subject Nexstar to disciplinary action and penalty, and review Nexstar's qualifications as broadcast licensee. The Complaint is currently pending with the FCC. Nexstar's conduct has effectively crippled MBG's ability to operate the MGB Stations and serve its viewers and clients. This chapter 11 case has been filed as a result.

**B.    The MGB Financing**

20. MBG entered into a Credit Agreement with certain lenders and Bank of America ("BofA") as administrative and collateral agent on or about January 17, 2017 (the "Credit Agreement"), which Credit Agreement refinanced a December 1, 2014 credit facility. The Credit Agreement is the subject of two amendments. MBG and BofA also entered into a Guarantee and Security Agreement and a Pledge Agreement on or about January 17, 2017. Nexstar, along with Nexstar Digital LLC and Yashi, Inc. (the "Nexstar Guarantors") entered into a Guarantee and Security Agreement under which the Nexstar Guarantors guaranteed the MBG debt (the "Guarantee"). The Nexstar Guarantors transferred the Guarantee to Mission (the business partner to whom Nexstar originally tried to spin off the MBG stations) pursuant to the Guarantee Designation Agreement dated November 27, 2019. All of the agreements referenced in this paragraph are referred to as the "Loan Documents".

21. MBG's obligations under the MBG Credit Agreement, as amended, matured on November 29, 2019, and the debt was not paid by MBG at that time. On November 30, 2019, the MBG Board of Directors conducted a properly noticed board meeting and authorized the filing of this chapter 11 case.

22. On December 2, 2019, Mission sent correspondence to MBG advising that Mission paid the MBG debt, with an asserted balance due of $49,013,808.90, alleged various events of default under the Credit Agreement, and further alleged that as a result of paying MBG's debt, Mission was subrogated under applicable law to the rights of the lenders under the Loan Documents. Mission appointed itself as replacement collateral agent, and demanded immediate payment of the MBG debt. The Mission letter also asserts that, pursuant to the Pledge Agreement, (i) Mr. Marshall's rights as the sole shareholder in the Debtor have ceased and have vested with Mission, (ii) Mission has executed an irrevocable proxy appointing Mission as proxy to vote and to take any other action on behalf of MBG, and (iii) Mission has taken steps to commence a public foreclosure sale under New York law. MBG disputes that the MBG stock and related rights have vested with Mission in accordance with applicable federal and state law and, in particular, as a result of FCC rules and regulations governing a change of control with respect to an FCC licensee.

**C.     MBG's Sale Efforts**

23. In the months preceding the filing of this chapter 11 case, MBG and its advisors have held discussions with several buyers interested in acquiring the MBG stations. Significant interest was indicated, and MBG went so far as to negotiate and agree to terms with one buyer for an Asset Purchase Agreement consistent with MBG's valuation of the MBG Stations, as discussed above. The agreed purchase price was $67 million, with MBG retaining all of its cash and accounts receivable. The successful completion of this transaction would have resulted in realization of

approximately $72 million in cash plus approximately $5 million in accounts receivable, which amount would have allowed for MBG's repayment of all bank debt and all amounts currently owing to Nexstar, with remaining net proceeds payable to MBG of approximately $17 million.

24. One of the conditions of the agreement reached with the proposed buyer was that Nexstar would agree to terminate the existing JSAs and SSAs upon the closing of the transaction. Since the buyer would not require any of the services provided under these agreements, and would be paying off the debt currently guaranteed by Nexstar, MBG believed that Nexstar would consent to this requirement. In fact, Nexstar had always advised MBG that the JSAs and SSAs would be cancelled upon the payoff of MBG's debt and/or the sale of its assets to a third party. However, when MBG requested that Nexstar agree to terminate the JSAs and SSAs upon completion of the sale of the MBG Stations, with full payment of all amounts due to Nexstar and cessation of MBG's litigation against Nexstar, Nexstar simply said "no". As a result, the proposed purchaser has declined to move forward with the transaction.

25. Nexstar's response has made it abundantly clear that its intent is to take back the MBG Stations, and at prices that do not fairly compensate MBG for the transfer of the MBG Stations.

26. There are at least three (3) other parties interested in acquiring the MBG Stations. However, in light of Nexstar's refusal to terminate the JSA and the SSA upon payment of all obligations owing to Nexstar and the secured creditor, it is unlikely that MBG would be able to effectuate a sale transaction outside of bankruptcy. A Chapter 11 process, therefore, is necessary to run and complete a robust sale process and sell assets free and clear of certain encumbrances including, without limitation, the JSA and SSA executory contracts.

**THE DEBTOR'S FIRST DAY MOTIONS**

27. Concurrently with the filing of this Declaration, the Debtor has filed two "first day" motions: (i) *Emergency Motion for Interim and Final Orders (A) Authorizing Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code and (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "Cash Collateral Motion"); and (ii) *Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain Employee Benefit Programs, and (II) Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related Thereto* (the "Wages Motion"). The relief requested in each of those motions is critical to the on-going operations of MBG, and to ensure that value is maximized and that MBG may continue as a going-concern.

28. Additionally, the Debtor filed a motion to reject the JSAs with Nexstar, effective as of today. The Debtor does not seek emergency consideration of the rejection motion.

**a.    Cash Collateral Motion**

29. The Debtor generates accounts, general intangibles, instruments, monies, payments and other rights arising out of its business, which likely constitute cash collateral of Mission within the meaning of Section 363 of the Bankruptcy Code (the "Cash Collateral"). Without the use of the Cash Collateral, the Debtor does not have sufficient available working capital with which to operate the MBG Stations, pay its employees, pay licensing fees and otherwise operate the business. As a result, access to Cash Collateral is absolutely critical to the Debtor's continuing survival as going concerns and ability to reorganize. Accordingly, the Debtor has an immediate need to use Cash Collateral to manage and preserve the assets of its estate and to maximize recovery to creditors.

30. As set forth more fully in the Cash Collateral Motion, the Debtor seeks authority to use Mission's Cash Collateral to operate its business while this case is pending, and otherwise fund this chapter 11 case. The Cash Collateral Motion seeks an emergency hearing to consider interim approval to use Mission's Cash Collateral on an interim basis through December 31, 2019, pending a final hearing, in accordance with the terms of the Interim Budget, which is annexed to the proposed interim order attached to the Cash Collateral Motion.

31. Mission asserts liens on the Debtor's Cash Collateral. As adequate protection for the Debtor's use of the Cash Collateral, the Debtor proposes to provide Mission with the following forms of adequate protections (the "Adequate Protection"), to the extent of any diminution in value of Mission's pre-Petition Date security interests in the Debtor's pre-petition collateral, if any:

   a. Mission shall be granted a security interest in the Debtor's post-petition assets with the same nature, extent, priority, and validity as the pre-petition security interest held by Mission.

   b. Mission shall be granted, from and after the Petition Date, replacement liens and security interests in all accounts and inventory acquired by the Debtor after the Petition Date, specifically including all cash proceeds arising from such accounts and inventory acquired by the Debtor after the Petition Date, with the same nature, extent, priority, and validity that any such liens asserted by Mission existed on the Petition Date.

   c. As of the Petition Date, said replacement liens and security interests granted to Mission shall be valid, perfected, enforceable and effective against the Debtor, its successors and assigns, including any trustee or receiver in this or any superseding chapter 7 case, without any further action by Debtor or Mission and without the execution, delivery, filing or recordation of any promissory notes, financing statements, security agreements or other documents. Notwithstanding the foregoing, the Interim Order shall be deemed a security agreement and may be filed as a financing statement and the Debtor shall execute and deliver such notes, security agreements, assignments, financing statements and other documents that Mission shall reasonably request to further evidence the liens and security interests granted hereby.

   d. Mission shall have all the rights and remedies of a secured creditor in connection with the liens and security interests granted by the Interim Order in all collateral, except to the extent that such rights and remedies may be affected by the Bankruptcy Code, and otherwise.

 32. I believe the proposed Adequate Protection is sufficient to secure the Debtor's projected use of Cash Collateral because the projected diminution in value, if any, from the use of Cash Collateral is less than the value of the Adequate Protection proposed to Mission.

 33. The Debtor has no outside sources of funding available and must rely on the use of Cash Collateral to continue to operating. Without the use of Cash Collateral, the Debtor will be unable to perform many of the tasks which are necessary to maximize the value of its assets and maintain the viability of the Debtor's operations. Accordingly, I believe approval of the immediate use of Cash Collateral, on an interim basis, as requested in the Cash Collateral Motion is necessary to avert immediate and irreparable harm to the Debtor's business and its estate.

**B. Wages Motion**

 34. As set forth more fully in the Wages Motion, the Debtor seeks relief (a) authorizing the Debtor to pay prepetition wages, salaries, employees benefits, other compensation; (b) maintain employee benefit programs; (c) directing financial institutions to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests related thereto; (d) pay all prepetition payroll taxes and withholding obligations related to the prepetition payroll; and (e) granting related relief.

 35. The Debtor's prepetition employee obligations include the following:

   a. **Wages**. The Debtor has approximately 22 employees (the "Employees"), who are paid every two weeks. As of the Petition Date, the Debtor has a payroll due on December 13, 2019, which covers the pay period of November 22, 2019 to December 6, 2019. The approximate amount of accrued and unpaid wages earned prior to the Petition Date is $83,000. No individual's pay exceeds the priority cap established by the Bankruptcy Code.

        b.     **Payroll Taxes**. The Debtor estimates that the prepetition payroll taxes and other withholding payments associated with the unpaid prepetition payroll total approximately $7,950.

        c.     **Employee Benefits**. The Debtor provides medical, dental, prescription drug plans, life insurance, ADD, and vision insurance (the "Health Insurance Programs"), and workers' compensation benefits. As of the Petition Date, the Debtor estimates that approximately $11,900 is accrued and outstanding on account of the Health Insurance Programs, all of which will become due within the first 21 days of these chapter 11 cases.

        d.     **Reimbursable Expenses**. In the ordinary course of business, the Debtor reimburses employees for certain expenses, including, airfare, car rental, lodging, cellular telephones, and meal expenses, incurred in performing their employment duties, government application fees, and internet fees. Based on historical practice, the Debtor estimates roughly that, as of the Petition Date, Employees were owed approximately $5,900 in unpaid reimbursable expenses (including reimbursable expenses for which employees have not yet requested reimbursement).

36. Based on discussions with counsel, I believe that many of these prepetition employee obligations constitute priority claims under sections 507(a)(4), 507(a)(5) and 507(a)(8) of the Bankruptcy Code, and the Debtor will be required to pay such claims in full to confirm a chapter 11 plan. Thus, granting the relief sought in the Wages Motion would only affect the timing of such payments.

37. The relief sought in the Wages Motion is essential to maximize value to the Debtor's estate. It is critical that the employees be paid without interruption and that the Debtor continues to honor its existing practices and policies for the pecuniary benefit of the employees. Such payments are necessary to prevent irreparable harm to the morale of the employees at the very time when their dedication, confidence, and cooperation are vital to this chapter 11 case. In addition, the Debtor will not pay any amount in excess of the priority caps under the Bankruptcy Code.

38. I believe the relief requested in the Wages Motion is in the best interest in the Debtor's estate, its creditors and all other parties in interest and constitute a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Wages Motion should be granted.

## CONCLUSION

39. I respectfully request that the Court grant all relief requested in the First Day Motions, along with any and all other and further relief that the Court may deem to be just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of December, 2019.

*/s/ Pluria Marshall, Jr.*
Pluria Marshall, Jr.
CEO and Sole Shareholder