IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| MARSHALL BROADCASTING GROUP, INC.,[1] | § § § | Case No. 19-36743 (DRJ) |
| Debtor. | § § § § | |

**DEBTOR'S MOTION FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND CERTAIN BID PROTECTIONS, (B) SCHEDULING BID DEADLINE, AUCTION DATE, AND SALE HEARING AND APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (C) APPROVING CURE PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS**

> **THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS MOTION WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Marshall Broadcasting Group, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), for its Motion (the "Motion"), for (i) entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), (a) approving bidding procedures (the "Bidding Procedures") and certain bidding protections set forth therein to be used for the proposed sale (the "Proposed Sale") of substantially all of the Debtor's assets (the "Assets"), (b)

---

[1] The last four digits of Debtor's federal tax identification number are (7805).

scheduling the bid deadline, auction date and sale hearing and approving the form and manner of notice thereof; and (c) approving procedures for the potential assumption and assignment of executory contracts and unexpired leases to cure any default pursuant to section 365(b)(1) of the Bankruptcy Code and the form and manner of notice thereof; and (ii) following a subsequent hearing (the "Sale Hearing"),[2] the entry of an order (the "Sale Order"), substantially in the form attached hereto as **Exhibit B**, (a) approving the sale of the Assets under and pursuant to an asset purchase agreement (the "APA"), a draft of which is attached to the Sale Order as **Exhibit 1**, to the successful purchaser (the "Successful Bidder") to be determined at auction (the "Auction"), free and clear of liens, claims and interests, (b) approving the APA and the obligations incurred by the Successful Bidder thereunder, and (c) granting related relief.  In support of the Motion, the Debtor respectfully represents:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## PROCEDURAL HISTORY

4.      On December 3, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

---

[2] As set forth below and in the Bidding Procedures, the Debtor reserves the right to cancel the Sale Hearing if at, or prior to, the Auction, a Plan Transaction (as defined in the Bidding Procedures) is accepted and will be pursued.

5.     Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor remains in possession of its property and is managing its business as a debtor in possession. No trustee, examiner or official committee has been appointed.

**THE PROPOSED SALE**

6.     The Debtor owns and operates three television stations: KMSS-TV, Shreveport, Louisiana, KPEJ-TV, Odessa, Texas and KLJB, Davenport, Iowa (the "MBG Stations").  The Debtor is a small minority-owned company that provides programming through its affiliation agreements with FOX Broadcasting Corporation in all markets.  A detailed description of the Debtor and its businesses, and the facts and circumstances supporting the Debtor's chapter 11 cases, are set forth in greater detail in the *Declaration of Pluria Marshall, Jr. in Support of Chapter 11 Petition and First Day Motions* [Docket No. 18].

7.     The Court's *Final Order (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Certain Protections to Prepetition Lender, and (III) Modifying the Automatic Stay* [Docket No. 107] (the "Final Cash Collateral Order") sets forth certain sale milestones (the "Milestones") to which the Debtor agreed in conjunction with reaching an agreement for the consensual interim and final use of cash collateral with its prepetition secured party, Mission Broadcasting, Inc. ("Mission").[3]  *See* Final Cash Collateral Order ¶ 10(a). At a hearing on January 21, 2020, the Court approved the Debtor's retention of PVB Advisors, LLC ("PVB") as its investment banker.[4]

---

[3] The milestones were originally agreed to in the Interim Cash Collateral Order [Docket No. 44].  The milestones were slightly modified in the Final Cash Collateral Order.

[4] Originally, the Debtor also sought to retain Paramount Media Advisors, Inc. ("PMA") as co-investment banker. However, pursuant to the *Term Sheet for Resolution of Investment Banker Retention Application and Cash Collateral Motion*, attached as Exhibit B to the Final Cash Collateral Order, the Debtor and Mission reached an agreement to resolve Mission's objections to PVB's retention.  As part of this agreement, the Debtor sought to retain PVB only and no longer sought to employ PMA as investment banker.

8.      As contemplated by the APA, the Proposed Sale of the Assets is subject to a competitive Auction process that will help to ensure maximum value for the Assets will be realized for the Debtor's estate and its creditors. Accordingly, the Debtor has filed this Motion seeking approval of the Bidding Procedures and, following a subsequent hearing (the Sale Hearing), approval of the Proposed Sale of the Assets to the Successful Bidder.

9.      Once the Bidding Procedures are approved, the Debtor and PVB will continue to market the Assets to hopefully generate one or more qualified bids.  Indeed, PVB has already begun the marketing process.  Prior to the Petition Date, PVB prepared marketing materials, created a data room, and assisted the Debtor in preparing the Assets for sale.  The Debtor received several expressions of interest, including one bona fide offer and term sheet for $67 million.  Unfortunately, the transaction could not be consummated outside of bankruptcy.  Post-petition, PVB will continue to work with the Debtor and interested third parties to procure a transaction that maximizes the value of the Assets.

10.     Pursuant to the procedures described below, among other things, potential bidders will receive notice of the Bidding Procedures, will be informed how to qualify as a bidder, and how to submit a qualified bid. In addition, creditors and other parties in interest will receive reasonable notice of the Sale Hearing to consider the Proposed Sale and have an opportunity to object thereto, and parties will also be afforded reasonable notice and an opportunity to object to the assumption and assignment of executory contracts and unexpired leases, if any, as part of the Proposed Sale.

### **RELIEF REQUESTED**

11.     This Motion seeks relief in two stages.  First, the Debtor seeks an order, substantially in the form attached hereto as **Exhibit A**, approving the Bidding Procedures,

4816-9786-4367.5

authorizing the Auction and scheduling the Sale Hearing.  Second, the Debtor seeks an order,

substantially in the form attached hereto as **Exhibit B**, approving the Proposed Sale and related

transactions at the Sale Hearing.

A.     **Proposed Sale Timeline**

12.     The Debtor proposes to solicit bids, conduct the Auction, and have a Proposed Sale

approved on the following timeline:[5]

| | |
|---|---|
| Deadline to file notice of Stalking Horse Bidder | February 5, 2020 |
| Deadline to file initial Cure Notice: | February 28, 2020 |
| Deadline to submit bids (the "Bid Deadline"): | March 12, 2020 at 4:00 p.m. (CT) |
| Notifications to Qualified Bidders: | March 16, 2020 |
| Return of Deposits to non-Qualified Bidders: | By March 19, 2020 |
| Auction (if one or more Qualified Bids is received and a Plan Transaction is not pursued): | March 19, 2020 at 10:00 a.m. (CT) |
| Deadline to object to Sale: | March 20, 2020 at 4:00 p.m. (CT) |
| Deadline to object to assumption and assignment of the Assumed Contracts, to the Cure Notice, and any Cure Amount: | March 20, 2020 |
| Deadline to file final Cure Notice: | March 24, 2020 |
| Sale Hearing, to approve the results of the Auction: | March 24, 2020 at 2:00 p.m. (CT)[6] |
| Deadline for Successful Bidder to seek approval of Sale from the FCC: | March 24, 2020 |

13.     The Debtor believes that the above timeline is reasonable, and otherwise complies

with the Milestones.  PVB's retention is effective as of the Petition Date, and PVB began its

marketing efforts prior to the Petition Date.  Thus, by the time the Bid Deadline arrives, marketing

---

[5] As previously stated and as set forth in the Bidding Procedures, a Plan Transaction will be subject to the plan and disclosure statement process and timeline, and if the Debtor determines to pursue a Plan Transaction, the Debtor will not seek approval of a plan or disclosure statement at the Sale Hearing.

[6] If the Debtor ultimately decides to pursue a Plan Transaction, the Sale Hearing will be cancelled, and the Debtor will promptly file a chapter 11 plan and pursue confirmation thereof.

4816-9786-4367.5

will have been under way for no less than four months, and the proposed Auction date will be approximately three months after the Petition Date. These deadlines are consistent with deadlines often established for asset sales in other chapter 11 cases.

**B.**      **Bidding Procedures**

14.      The Debtor requests that the Court approve the Bidding Procedures, attached to the Bidding Procedures Order as **Exhibit 1**.[7] The Bidding Procedures are designed to maximize value for the Debtor's estate while ensuring an orderly process. The Bidding Procedures describe, among other things, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any Auction, the ultimate selection of the Successful Bidder, and the Court's approval thereof. The Bidding Procedures also address the various combinations and permutations that may occur during the process, *to wit*, an all-asset going concern sale, a piecemeal sale of various assets to multiple bidders, and a restructuring pursuant to a chapter 11 plan. To the extent the Debtor decides to pursue a Plan Transaction, the Sale Hearing, and/or the Auction will be cancelled.

15.      The proposed Bidding Procedures provide, in summary fashion, as follows :[8]

(a)      *Sale of Assets or Going Concern Transaction: The Debtor is entertaining bids for a proposed (A)(i) sale of all or a portion of its assets or (ii) going concern sale, or (B) restructuring transaction under a confirmed chapter 11 plan of reorganization (a "Plan Transaction"). The Debtor may enter into one Transaction or several Transactions with multiple parties, depending upon the bids received.*

*Any Successful Bidder(s) will be obligated to assume the assumed liabilities as may be set forth in any purchase agreement and the Debtor will assume and assign the assumed*

---

[7] The decisions and determinations to be made by the Debtor under and pursuant to the Bidding Procedures are subject, in all respects, to the terms and conditions of Exhibit B attached to the Final Cash Collateral Order [Docket No. 107].

[8] This summary is qualified in its entirety by reference to the provisions of the Bidding Procedures themselves. In the event of any inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern. Unless otherwise defined, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

4816-9786-4367.5

contracts to the Successful Bidder(s), as may be set forth in any purchase agreement(s) accepted by the Debtor.

      (b)    _"As Is, Where Is"_: Any Transaction(s) entered into with the Debtor will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents, or its estate, except as may be set forth in a purchase agreement(s) with a Successful Bidder(s) or chapter 11 plan approved by the Bankruptcy Court.

      (c)    _Free of Any and All Claims and Interests_: Any Transaction entered into with the Debtor will be free and clear of all liens, claims, interests, and encumbrances (collectively, the "_Claims and Interests_"), with such Claims and Interests shall attach to the net proceeds of the sale.

      (d)    _Participation and Bid Requirements_: Any person or entity who wishes to participate in the Bidding Process (a "_Potential Bidder_") must become a Qualified Bidder as indicated within the Bidding Procedures.

      (e)    _Due Diligence_: Following execution of a Confidentiality Agreement, the Debtor will afford each Potential Bidder an opportunity to perform due diligence with respect to its business and assets.  The Debtor has designated PVB to coordinate all reasonable requests for additional information and due diligence access from Potential Bidders about the business or the Assets.  After the Bid Deadline, the Debtor and PVB are not required to furnish any information of any kind related to the business or the Assets to any person that is not a Qualified Bidder.

      (f)    _Bid Deadline_: A Qualified Bidder (other than a potential Stalking Horse Bidder and Mission) who desires to make a bid must deliver written copies of its bid, along with the Required Bid Documents (as defined within the Bidding Procedures) to the Debtor, PVB, Mission, and any statutory committee at the addresses contained within the Bidding Procedures no later than 4:00 p.m. Central Time on March 12, 2020 (the "_Bid Deadline_").

      (g)    _Qualified Bids_: Mission is deemed to be a Qualified Bidder.  A bid (other than any bid proposed by a potential Stalking Horse Bidder or Mission) will be deemed a "Qualified Bid" and considered by the Debtor only if the bid:

            i.    is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Debtor than, those contained in the APA;

            ii.    contains no contingencies of any type, other than Bankruptcy Court approval of the Transaction and any applicable regulatory conditions, including but not limited to FCC approval;

iii.      *other than any Stalking Horse Bid(s) that may be designated by the Debtor, is not conditioned upon any bid protections (such as a topping fee, termination fee, expense reimbursement, or similar type of payment);*

iv.      *contains the acknowledgements and representations as listed in the Bidding Procedures;*

v.      *includes a list of assumed contracts and assumed liabilities (if any), and a commitment to consummate the Transaction and the assumption of the assumed liabilities (if any) within not more than ten (10) days after entry of an order by the Bankruptcy Court approving such Transaction (subject to FCC approval);*

vi.      *discloses (i) the identity of the Potential Bidder and each entity participating in connection with the Potential Bidder and the complete terms of such participation, and (ii) any other term sheets and other written or oral understandings between the Potential Bidder and its affiliates on one hand, and any insider (as defined in section 101(31) of the Bankruptcy Code) of the Debtor, on the other;*

vii.      *is received by the Bid Deadline; and*

viii.      *contemplates payment in cash, in full, upon the closing of the Transaction (other than a credit bid), unless the Debtor agrees otherwise, after consultation with Mission and any statutory committee that may be appointed.*

(h)      *Auction: If the Debtor receives more than one Qualified Bid, an auction (the "Auction") will be conducted, upon notice to all Qualified Bidders who have submitted Qualified Bids, at 10:00 a.m. Central Time on March 19, 2020, at the offices of Gray Reed & McGraw LLP, 1300 Post Oak Boulevard, Suite 2000, Houston Texas 77056, in accordance with the terms of the Bidding Procedures.*

(i)      *Closing of Auction Selection of Successful Bid: The Auction will continue until there is only one bid that the Debtor determines, in its business judgment and in consultation with the Independent Director, after consultation with Mission and any statutory committee, is the highest or otherwise best Qualified Bid for each asset or group of assets (such bid being the "Successful Bid" and the bidder making such bid, the "Successful Bidder").[9]*

(j)      *Back-Up Bidder. If there is an Auction, the Qualified Bidder that submits the second highest Bid at the Auction shall be required to serve as the back-up bidder (the "Back-Up Bidder") and keep such Back-Up Bidder's last Bid (the "Back-Up Bid") open and irrevocable until the earlier of (i)(A) if a Proposed Sale, 5:00 p.m. Central Time on the date which is five days after FCC approval of the sale to the Successful Bidder becomes final and non-appealable or (B) if a Plan Transaction, the date of entry of an order approving a disclosure statement for a chapter 11 plan (the "Disclosure Statement Approval Date"), and (ii) the closing of the Transaction with the Successful Bidder (the "Outside Back-Up Date").*

---

[9] Exhibit B to the Final Cash Collateral Order shall govern with respect to any inability of the Debtor's directors to reach unanimous consent on bidding- or auction-related matters.

*If (x) after the Sale Hearing but prior to the Outside Back-Up Date for a Proposed Sale or (y) after the conclusion of the Auction but prior to the Outside Back-up Date for a Plan Transaction, the Successful Bidder fails to consummate or proceed with the relevant Transaction because of a breach or failure to perform on the part of such Successful Bidder, or if the FCC fails to grant the initial application to approve Sale within six (6) months of entry of the Sale Order, the Back-Up Bidder will be deemed to have the new Successful Bid, and the Debtor will be authorized, without further order of the Bankruptcy Court, to consummate the Transaction with the Back-Up Bidder.  The Debtor will provide notice to the Mission and any statutory committee of any failure by the Successful Bidder to close the Transaction and the election to proceed to close a Transaction with the Back-Up Bidder.*

(k)     *Right to Credit Bid.  Any creditor that has a valid, perfected, unavoidable, and enforceable security interest (a "Security Interest") in the Debtor's assets (any such creditor, a "Secured Party") may make one or more credit bids for all or any portion of the secured claim(s) held by such Secured Party at the Auction, subject to the requirements of section 363(k) of the Bankruptcy Code (a "Credit Bid").  In order to qualify to Credit Bid, a Secured Party must be a Qualified Bidder and a Credit Bid must qualify as a Qualified Bid.  Mission shall be deemed a Qualifier Bidder and permitted to Credit Bid in an amount up to the full amount of the outstanding MBG Secured Obligations and the Adequate Protection Obligations (each as defined in the Final Cash Collateral Order), pursuant to paragraph 10(e) of the Final Cash Collateral Order.*

(l)     *All bidders will be deemed to have consented to the core and exclusive jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any and all disputes relating to, arising from or connected with the Auction, the marketing process, the Transaction, and the construction and enforcement of any purchase agreement.*

(m)     *If the Debtor chooses to move forward with a Plan Transaction, in consultation with the Independent Director, the Auction and Sale Hearing may be cancelled.*

(n)     *Reservation of Rights:  Notwithstanding any term to the contrary in the Bidding Procedures, the Debtor, in consultation with Mission and any statutory committee, reserves the right to: (i) modify the Bidding Procedures at any time; (ii) determine which Qualified Bid, if any, is the highest or otherwise best offer; (iii) reject at any time, any bid that is: (a) inadequate or insufficient ; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the APA; or (c) contrary to the best interests of the Debtor, its estate, and creditors as determined by the Debtor in its sole discretion; and (iv) pursue a sale or other transaction through a chapter 11 plan.*[10]

---

[10] Subject, in all respects, to the terms and conditions of Exhibit B attached to the Final Cash Collateral Order.

4816-9786-4367.5

C.     **Stalking Horse and Bid Protections**

16.     In the exercise of its business judgment, and subject to the governance provisions contained in Exhibit B attached to the Final Cash Collateral Order, the Debtor may, without any obligation to do so, select one or more bidders to act as a stalking horse (each being a "Stalking Horse Bidder" with the relevant bid being a "Stalking Horse Bid"), after consultation with Mission and any statutory committee; *provided*, that there shall not be more than one Stalking Horse Bid for each of the Debtor's TV stations.  Further, as contemplated by the Bidding Procedures Order, the Debtor will be permitted, but not directed, to incur and pay a break-up fee in an amount not to exceed 3.0% of the cash component of a Stalking Horse Bid and, in the Debtor's discretion, an expense reimbursement (together, the "Break-Up Fee").

17.     If the Debtor declares one or more Stalking Horse Bidders, it will promptly file a notice of the same with the Court, along with a copy of the Stalking Horse Bid(s).  Thereafter, the related Break-Up Fee will be paid either upon closing of a sale or sales to a bidder or bidders who are not the Stalking Horse Bidder(s), or following approval of a disclosure statement, as set forth below.

D.     **The Sale Notice, Auction and APA**

18.     Within three (3) business days after entry of the Bidding Procedures Order, the Debtor will serve copies of the Motion and Bidding Procedures Order, including (i) a copy of the Bidding Procedures attached thereto as **Exhibit 1**, and (ii) the notice of Bid Deadline, Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice") (collectively the "Bid Package").  The Debtor will serve the Bid Package by U.S. first-class mail, postage prepaid, upon the following (collectively, the "Bid Notice Parties"): (a) all potential buyers previously identified or solicited by the Debtor or PVB and any additional parties

who have previously expressed an interest to the Debtor or PVB in potentially acquiring the Assets, (b) other potentially interested parties identified by the Debtor or its advisors; (c) the U.S. Trustee; (d) counsel to any statutory committee; (e) counsel to Mission; (f) counterparties to the Debtor's executory contracts and unexpired leases; (g) all parties who have requested notice in this case; and (h) the Federal Communications Commission (the "FCC").[11]

19.     At the Auction, to the extent a Stalking Horse Bidder has been named, the initial overbid must exceed such Stalking Horse Bid by the amount of the Break-Up Fee plus an additional $350,000.  Thereafter, or in the event no Stalking Horse Bidder has been named, the minimum bidding increment (the "Subsequent Bids" and each a "Subsequent Bid") shall be $350,000.  The amount of the Subsequent Bids may be increased or decreased by the Debtor, in its discretion, in consultation with Mission and any statutory committee.  The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.

20.     Attached to the Sale Order as **Exhibit 1** is a general form APA for use by potential bidders.  The Debtor seeks approval of the APA, subject to such modifications as may be submitted by potential bidders and accepted by the Debtor, after consultation with Mission and any statutory committee in connection with the Proposed Sale and in the exercise of the Debtor's business judgment.

---

[11] All such entities will also be served by electronic mail to the extent the Debtor and PVB have electronic mail addresses for such parties.

4816-9786-4367.5

**E.**     **Potential Assumed Contracts and Cure Notice**

21.     The Debtor may seek to assume and assign to the Successful Bidder certain executory contracts and unexpired leases to be designated by the Successful Bidder.  On February 28, 2020, the Debtor proposes to file with the Court an initial schedule of executory contracts and unexpired leases that may be assumed and assigned as part of the Proposed Sale (the "Potential Assumed Contracts").  Concurrently therewith, the Debtor will serve a cure notice substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Cure Notice") upon each counterparty to the Potential Assumed Contracts (each, a "Counterparty").  The Cure Notice shall identify the amounts, if any, that the Debtor believes are owed to each Counterparty to a Potential Assumed Contract in order to cure any defaults that may exist under such contract (the "Cure Amount"). Pursuant to the Bidding Procedures Order, the Cure Notice shall also state the applicable date, time and place of the Auction and Sale Hearing, and provide the date and time by which any objection (the "Cure Objection") to (i) the assumption and assignment of the applicable Potential Assumed Contract on the basis of lack of adequate assurance of future performance under section 365(b)(1) or (ii) the Cure Amount must be filed and served by the Counterparty. If a contract or lease is assumed and assigned under the Proposed Sale, then unless a Counterparty properly and timely files and serves a Cure Objection pursuant to the Cure Notice, the Counterparty will receive payment from the Successful Bidder of the Cure Amount (if any) as set forth in the Cure Notice consistent with the terms and procedures set forth in the APA approved by the Court.

22.     Prior to the commencement of the Sale Hearing, the Debtor shall file with the Court a final schedule (the "Assumed Contract Schedule") of executory contracts and unexpired leases elected to be assumed by the Successful Bidder (the "Assumed Contracts").  At the Sale Hearing, the Debtor shall seek authority to assume and assign the Assumed Contracts to the Successful

Bidder effective as of the closing of the Proposed Sale; *provided, however*, that the Debtor and the Successful Bidder together may agree to remove any Assumed Contract from the Assumed Contract Schedule at any time up to the closing of the Proposed Sale.  The Counterparty to any deleted Assumed Contract will be notified of such deletion by written notice via U.S. first-class mail by no later than two (2) business days from such determination.

## ARGUMENT AND AUTHORITIES

**A.      The Bidding Procedures are appropriate and ensure that the bidding process is fair, reasonable, and will yield the maximum value to the Debtor, its estate, creditors, stakeholders, and other parties in interest.**

23.      The Debtor respectfully submit that the Bidding Procedures meet the standard set forth in 363(b) for sales outside of the ordinary course of a debtor's business.  Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

24.      This Court's power under Bankruptcy Code section 363 is supplemented by section 105(a), which provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  As set forth below, the Debtor submits that it has satisfied the requirements of sections 105 and 363 as those sections have been construed by courts in the Fifth Circuit.

25.      To approve a sale under section 363(b)(1) of the Bankruptcy Code, the Fifth Circuit requires a debtor to show that the decision to sell the property outside of the ordinary course of business was based on the debtor's business judgment.  *See Inst'l Creditors of Cont'l Airlines, Inc. v Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).  A bankruptcy court is to give deference to the business judgment of the trustee or debtor in possession when it deems the

sale to be appropriate.  *See Esposito v. Title Ins. Co. of Pa.* (*In re Fernwood*), 73 B.R. 616, 621 n.2

(Bankr. E.D. Pa. 1987); *see also In re Rodriguez*, 353 B.R. 144, 149 (Bankr. N.D. Tex. 2006).

26.     Once the Debtor articulates a valid business justification, its decision to sell

property out of the ordinary course of business enjoys a strong presumption "that in making a

business decision the directors of a corporation acted on an informed basis, in good faith and in an

honest belief that the action taken was in the best interests of the company."  *Official Comm. of

Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656

(S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Therefore, any

party objecting to the Debtor's proposed asset sale must make a showing of "bad faith, self-interest,

or gross negligence."  *See id*. at 656; *see also In re Idearc Inc.*, 423 B.R. 138, 162 (Bankr. N.D.

Tex. 2009) ("In the absence of a showing of bad faith or an abuse of business discretion," a court

will not alter a debtor's business judgment while analyzing a debtor's decision to assume/reject

contracts).

27.     The paramount goal in any proposed sale of property of a debtor's estate is to

maximize the proceeds received by the estate.  *See Cadle Co. v. Moore (In re Moore)*, 608 F.3d

253, 263 (5th Cir. 2010) (debtor in possession "has the duty to maximize the value of the estate");

*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) (same).  Thus, it is

appropriate to approve bidding procedures that benefit a debtor's estate by maximizing the value

of the debtor's assets.  *See In re TM Vill., Ltd.*, No. 18-32770, 2019 WL 1004571, at *10 (Bankr.

N.D. Tex. Feb. 28, 2019) ("As long as the sale appears to enhance a debtor's estate, court approval

of a debtor-in-possession's decision to sell should only be withheld if the debtor's judgment is

clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code"); *In re*

4816-9786-4367.5

*Edwards*, 228 B.R. 552, 561 (Bankr. N.D. Pa. 1998); *In re Tex. Rangers Baseball Partners*, 431 B.R. 706, 711 (Bankr. N.D. Tex. 2010); *Integrated Res. Inc.*, 147 B.R. at 659.

28.     The Debtor has sound business justifications for pursuing a Transaction and seeking approval of the Bidding Procedures at this time.  The Debtor believes that the Bidding Procedures will set the parameters by which the value of the Debtor's assets and the overall transaction value may be established and tested.  The Bidding Procedures will thus create a competitive and fair bidding process and increase the likelihood that the value of the Assets are maximized.

29.     The Debtor also believes that the Bidding Procedures will promote active bidding from seriously interested parties, and will dispel any doubt as to the highest and best offer reasonably available for the Debtor's assets (or the business, to the extent there is a going concern transaction or a Plan Transaction).  The Bidding Procedures will allow the Debtor to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate an ability to close the Proposed Sale.  The Debtor believes that the Bidding Procedures will encourage bidding, are consistent with other procedures previously approved by courts in this and other districts, and are appropriate under the relevant legal standards. *See generally, e.g.*, *In re Walker County Hospital Corp.*, Case No. 19-36300 (Bankr. S.D. Tex. Nov. 14, 2019) [Docket No. 67]; *In re Epic Companies, LLC*, Case No. 19-34752 (Bankr. S.D. Tex. Oct. 3, 2019) [Docket No. 227]; *In re Lockwood Holdings, Inc.*, Case No. 18-30197 (Bankr. S.D. Tex. Jul. 17, 2018) [Docket No. 513].

**B.      The form and manner of notice of the Bidding Procedures, the Auction, and the Sale Hearing are reasonable, adequate, and appropriate.**

30.     The Debtor requests that the Court schedule two hearings in connection with this Motion: first, a hearing to consider and approve the Bidding Procedures and schedule the Auction, Sale Hearing, and related deadlines; and second, the Sale Hearing itself.

31.     As set forth above, the Debtor will serve the Bid Package and Sale Notice on the Bid Notice Parties within three (3) days of entry of the Bidding Procedures Order.  The date proposed for the Sale Hearing — March 24, 2020 at 2:00 p.m. (CT) — complies with Bankruptcy Rules 2002(a)(2), 6004, and 6006(c), as such date will be more than twenty one (21) days after service of the Bid Package.  Further, the materials in the Bid Package will comply with Bankruptcy Rules 2002(c)(1) and 6004(f)(1), as the same will contain the information required by such Bankruptcy Rules.  As a result, the Debtor respectfully submits that the Bid Package and the Sale Notice satisfy the notice and information requirements of Bankruptcy Rules 2002, 6004 and 6006(c), and section 363 of the Bankruptcy Code, and that such notice is good and sufficient that no other or further notice is required.

**C.     The Break-Up Fee is reasonable and necessary to ensure maximum value for the Debtor's assets.**

32.     As has been demonstrated over the years, obtaining a stalking horse bidder is often key to a successful, efficient, and value-maximizing sale process.  The presence of a stalking horse sets a floor for the auction and encourages bidding, thereby maximizing the seller's return.  To receive this benefit, however, the Debtor needs to be able to compensate a Stalking Horse Bidder for the risk it takes by (i) entering into an agreement that is subject to higher and better offers without any assurances that its transaction will ultimately be consummated, (ii) exposing its bid to the market, and (iii) standing by its bid commitment while the marketing and sale process plays itself out.  The Debtor, therefore, requests that the Court approve the Break-Up Fee, in the event that the Debtor declares one or more Stalking Horse Bidders.

33.     Break-up fees and other bid protections are a normal and customary—and sometimes necessary—component of sales outside the ordinary course.  *Integrated Res.*, 147 B.R. at 659-60 ("[B]ecause the directors of a corporation have a duty to encourage bidding, break-up

16

fees can be *necessary* to discharge the directors' duties to maximize value.") (emphasis in original); *See, e.g., In re Lockwood Holdings, Inc.*, Case No. 18-30197 (DRJ) (Bankr. S.D. Tex. July 17, 2018) (approving break-up fee of 3% for potential stalking horse(s) to be named later); *In re Stone Energy Corp.*, Case No 16-26390 (MI) (Bankr. S.D. Tex. Jan. 18, 2017) [Docket No. 316] (approving a break-up fee in the amount of $10,800,00, or 3% of the purchase price); *In re CXM, Inc.,* 307 B.R. 94, 104 (Bankr. N.D. Ill. 2004) (approving a $200,000 break-up fee protecting stalking horse bidder); *In re Outboard Marine Corp.*, Case No. 00-37405-EIK-11 (Bankr. N.D. Ill. Jan. 10, 2001) [Docket No. 217] (authorizing payment of a 3% break-up fee to potential bidders); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28-29 (Bankr. S.D.N.Y. 1989) (finding that $500,000 break-up fee was not unreasonable absent evidence that it chilled the bidding).

34.     To warrant approval of break-up fees and expenses, the Fifth Circuit in *Asarco* required a showing that the requested fees and expenses are supported by a sound business justification. *Asarco, Inc., v. Elliot Mgmt. (In re Asarco, LLC)*, 650 F.3d 593, 597-98, 602-03 n. 9 (5th Cir. 2011) (favoring business judgment standard governing use of assets outside of ordinary course of business, rather than the standard for administrative expenses, in assessing propriety of fees and expenses incurred by bidders).

35.     Here, the proposed Break-Up Fee of up to 3.0% is well within the range of reasonableness and supported by a sound business justification.  Generally speaking, courts have found break-up fees to be reasonable, and approved the same, ranging up to approximately five percent (5%) of the consideration to be received.  *See Integrated Res.*, 147 B.R. at 662 (noting expert testimony that 3.3% is industry average for break-up fees); *see also, e.g.*, *In re Stone Energy Corp.*, No. 16-36390 (MI) (Bankr. S.D. Tex. Jan. 18, 2017) (approving 3% break-up fee); *In re UGHS Senior Living, Inc.*, No. 15-80399 (DRJ) (Bankr. S.D. Tex. Nov. 24, 2015) (approving 3%

break-up fee and 1% expense reimbursement); *In re Enron Corp.*, No. 01-16034 (AJG) (Bankr. S.D.N.Y., Apr. 8, 2004) (approving break-up fee equal to 5% of the purchase price); *In re TransCom USA Mgmt Co., L.P.*, No. 01-35158 (KKB) (Bankr. S.D. Tex., Feb. 12, 2002) (approving a break-up fee of more than 3.6% of the purchase price for the assets).

36.     If one or more Stalking Horse Bids is submitted and accepted by the Debtor, the Break-Up Fee will be beneficial to the Debtor's estate and creditors, as such Stalking Horse Bid(s) will set a floor for further bidding, and establish a metric against which all other bids may be measured. The Debtor, in its business judgment, believes it is reasonable and appropriate to provide the requested Break-Up Fee, which is consistent with other break-up fees approved in this District, as set forth above.

**D.      The APA is typical, customary, and reasonable and entering into the APA is an exercise of the Debtor's reasonable business judgment.**

37.     The APA attached hereto is a basic form of asset purchase agreement for a sale of the Debtor's assets, modified to account for the unique nature of selling assets subject to FCC rules and regulations. It provides a base from which interested parties may work when formulating the terms of their respective bids, and is a form with which the Debtor is comfortable and which the Debtor believes is fair to both the Debtor and prospective bidders. The APA provides that consummation of the Proposed Sale is subject to prior FCC approval.

38.     The Debtor further believes, and respectfully submits, that the terms of the APA are typical, customary, and reasonable under the circumstances, in the exercise of its business judgment. Given that there is no current Stalking Horse Bidder, however, the Debtor presumes that modifications will be submitted not only by potential Stalking Horse Bidders, but also by general bidders. The Debtor thus requests authorization to accept such modifications and edits to

the form of APA as may be submitted by potential bidders and as the Debtor may agree to in its

discretion and business judgment, after consultation with Mission and any statutory committee.

**E.     Any Proposed Sale Should be Approved Free and Clear of Liens, Claims, Interests and Encumbrances.**

39.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell

property free and clear of any lien, claim, interest or encumbrance in such property if, among other

things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

40.     Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five

requirements will suffice for approval of the proposed sale.  *See, e.g., In re Partners Oil Co.*, 216

B.R. 399, 401 (Bankr. S.D. Tex. 1998) (allowing a sale free and clear of liens when just one of the

subsections of 363(f) were met); *In re Collins*, 180 B.R. 447, 449-50 (Bankr. E.D. Va. 1995)

("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions

must be met in order for the Court to approve the proposed sale"); *Scherer v. Fed. Nat'l Mortg.*

*Ass'n (In re Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 827 (N.D. Ill. 1993) (sale extinguishes liens

under section 363(f) as long as one of the five specified exceptions applies).

41.     Section 363(f) permits the Proposed Sale to proceed free and clear of all liens,

claims, interests, and encumbrances, except for any liabilities specifically assumed by the

Successful Bidder.  Each lien, claim, interest or encumbrance that is not the result of an assumed

4816-9786-4367.5

liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code. Indeed, the Debtor believes that its primary secured lender with a valid lien on substantially all of its assets, Mission, will likely not oppose the underlying Sale at the Sale Hearing, because Mission will either be paid in full in cash from the sale proceeds (or will be paid an agreed upon amount), or Mission will be the Successful Bidder.  Assuming such, any proposed sales of Mission's collateral free and clear of liens, claims, mortgages, encumbrances, and other interests would satisfy the requirements of section 363(f)(2) of the Bankruptcy Code.  To the extent the Debtor seeks to sell any Assets on which an entity other than Mission has a lien, such party will receive the Sale Notice and will have an opportunity to object.  Further, to the extent Mission or any other entity with a lien on any assets to be sold has an objection to the Sale, but the Debtor nonetheless decides to proceed with the Proposed Sale over such objection, the Debtor will present appropriate evidence and lay the necessary foundation at the Sale Hearing to support approval of the Proposed Sale.

42.     The Debtor further submits that any lien, claim, interest, or encumbrance will be adequately protected by attachment to the net proceeds of the Sale, in the same order of priority as existed prior to the Petition Date, and all parties' rights to object to such Sale are preserved. Accordingly, the Debtor requests that the Proposed Sale to the Successful Bidder be free and clear of all liens, claims, interest and encumbrances, with such liens, claims, and encumbrances to attach to the proceeds of the Proposed Sale.

**F.     The Stalking Horse, or the Successful Bidder, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code, and the Proposed Sale should be deemed not avoidable pursuant to section 363(n) of the Bankruptcy Code.**

43.     Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale

4816-9786-4367.5

or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

44.    While the Bankruptcy Code does not define "good faith," the Fifth Circuit has held that a good faith purchaser is one who "purchases the assets for value, in good faith, and without notice of adverse claims."  *Hardage v. Herring Nat'l Bank,* 837 F.2d 1319, 1323 (5th Cir. 1988) (quoting *Willemain v. Kivitz (In re Willemain),* 764 F.2d 1019, 1023 (4th Cir. 1985)). Furthermore, the good faith status of a purchaser can be destroyed with evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *TMT Procurement Corp. v. Vantage Drilling Co.* (*In re TMT Procurement Corp.*), 764 F.3d 512, 521 (5th Cir. 2014).

45.    The Debtor submits, and will present evidence at the Sale Hearing that, the Proposed Sale is an arms' length transaction, in which the Successful Bidder and the Debtor at all times acted in good faith.  In connection with approval of the proposed Sale, the Debtor requests that the Court make a finding that the Successful Bidder is a good faith purchaser and entitled to the protections of section 363(m) of the Bankruptcy Code.

**G.    The assumption, assignment, and cure relating to the Assumed Contracts are appropriate and should be approved.**

46.    In connection with the Proposed Sale, the Debtor seeks authority to assume and assign the Assumed Contracts (if any) to the Successful Bidder.  In the event the Debtor seeks to assume and assign any contracts or leases, the Debtor will file and serve the Cure Notice no later than February 28, 2020, subject to amendment and supplementation prior to the Sale Hearing.  The Debtor requests that objections, if any, to the assumption and assignment of the Assumed Contracts or to the Cure Notice and any Cure Amount be filed and served so as to be actually received no later than March 20, 2020.  If an objection to the assumption and assignment of the Assumed

21

Contracts or to the Cure Notice and any Cure Amount cannot be resolved consensually among the parties, then the Debtor requests that the Court set a hearing to determine such matters as soon thereafter as is practicable, with notice only to the objecting party and those parties who have filed a notice of appearance.  The Cure Amounts set forth in the Cure Notice shall be binding on all parties unless an objection thereto is timely filed and served.  The failure to timely file and serve an objection shall be deemed consent to the assumption and assignment of the Assumed Contracts and to the Cure Amount, and any and all objections thereto shall be deemed forever released and waived as of the date of the Sale Hearing.

47.     Section 365(f)(2) of the Bankruptcy Code provides that:

[t]he trustee may assign an executory contract or unexpired lease of the debtors only if –

(A)     the trustee assumes such contract or lease in accordance  with  the provisions of this section; and

(B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

48.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."   11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject executory contracts or unexpired leases of nonresidential real property is whether the debtor's reasonable business judgment supports assumption or rejection. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *see also Tex. Health Enters. Inc. v. Lytle Nursing Home (In re Tex. Health Enters. Inc.)*, 72 F. App'x 122, 127 (5th Cir. 2003) ("[T]he bankruptcy code makes it clear that it is the choice of the debtor-in-possession, and not the bankruptcy court, to assume or reject an executory contract"); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (Bankr D. Del. 2006).

22

49.     Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for

assuming an unexpired lease or executory contract of a debtor:

> (b)(1)   If there has been a default in an executory contract or unexpired lease of the
> debtor, the trustee may not assume such contract or lease unless, at the time of
> assumption of such contract or lease, the trustee –
>
>> (A)     cures, or provides adequate assurance that the trustee will promptly
>> cure, such default . . . ;
>>
>> (B)     compensates, or provides adequate assurance that the trustee will
>> promptly compensate, a party other than the debtor to such contract or lease,
>> for any actual pecuniary loss to such party resulting from such default; and
>>
>> (C)     provides adequate assurance of future performance under such
>> contract or lease.

50.     Courts give the phrase "adequate assurance of future performance" in section

365(b)(1) a "practical, pragmatic construction."  *See, e.g., Appeal of Ill. Inv. Tr. v. Allied Waste

Indus., Inc. (In re Res. Tech. Corp.)*, 624 F.3d 376, 383-84 (7th Cir. 2010) (adequate assurance

required showing that performance was more likely to occur than not); *EBG Midtown S. Corp. v.

McLaren/Hart Envtl Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y.

1992) (the presence of adequate assurance should be "determined under the facts of each particular

case"); *In re Fifth Ave. Originals*, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate

assurance was furnished on two separate grounds).  The phrase "adequate" assurance is not

synonymous with "total" assurances.  *See, e.g., In re Prime Motor Inns Inc.*, 166 B.R. 993, 997

(Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required

assurance will fall considerably short of an absolute guarantee of performance"); *Carlisle Homes,

Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1988) ("the required

assurance will fall considerably short of an absolute guarantee of performance"); *In re Natco

Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that

the debtor will thrive and make a profit").

51.     To the extent the Successful Bidder desires the Debtor assume and assign some or all of the Debtor's executory contracts or unexpired leases, the Debtor has determined that such assumption and assignment is an exercise of sound business judgment and is in the best interest of the Debtor, its estate, and its creditors.  To the extent that any defaults exist under any Assumed Contract, the Debtor will cure, or make provisions for the cure of, any such default, as set forth in the Cure Notice.

## NOTICE

52.     The Debtor will provide notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to Mission Broadcasting, Inc. as administrative agent under the Debtor's credit agreement; (c) the holders of the 20 largest unsecured claims against the Debtor; and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002.

## WAIVER OF BANKRUPTCY RULE 6004(h)

53.     In light of the Milestones and the need to comply therewith, as well as the need and desire to move swiftly towards closing of the sale and the required FCC approval (which could take several months after the Sale is approved),[12] the Debtor requests the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h).

## NO PRIOR REQUEST

54.     No prior request for the relief sought in this Motion has been made to this or any other court.

---

[12] Once the Successful Bidder applies for approval of the Sale with the FCC, there is a mandatory 30-day public notice period during which comments and protests for and against the Sale can be filed with the FCC.  Once the FCC grants the application, it is appealable for 30 days after publication of the grant, and the FCC may reconsider the grant on its own motion for an additional 10 days.  Once the grant becomes non-appealable and non-reversible (by operation of law with the passing of the appeal deadlines or by an FCC appellate or federal court appeal ruling), the grant is deemed final.

## CONCLUSION

**WHEREFORE**, the Debtor respectfully request that the Court: (A) enter an Order (i) approving the Bidding Procedures and the Break-Up Fee; (ii) scheduling the Auction, Sale Hearing, and associated deadlines; and (iii) approving the form and manner of notice of the Auction and the Sale Hearing and certain bidding protections as described herein; (B) enter a second Order, at the Sale Hearing (to the extent a Sale Hearing occurs), (x) authorizing and approving the Proposed Sale free and clear of liens, claims, interests, and encumbrances to the Successful Bidder, (y) approving the assumption and assignment of the Assumed Contracts, and (z) approving the assumption of the assumed liabilities by the Successful Bidder; and (C) grant such other and further relief as may be just and proper.

Respectfully submitted this 22nd day of January, 2020.

**GRAY REED & McGRAW LLP**

By:  _/s/ Jason S. Brookner_
    Jason S. Brookner
    Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:    jbrookner@grayreed.com

    -and-

    Lydia R. Webb
    Texas Bar No. 24083758
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:    lwebb@grayreed.com

    -and-

4816-9786-4367.5

David B. Golubchik (*pro hac vice*)
Eve H. Karasik (*pro hac vice*)
**LEVENE NEALE BENDER YOO**
**    & BRILL L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: dbg@lnbyb.com
        ehk@lnbyb.com

**COUNSEL TO THE DEBTOR**

**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that on January 22, 2020 a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this case.

*/s/ Jason S. Brookner*
Jason S. Brookner

**Exhibit A**

**Proposed Bidding Procedures Order**

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| MARSHALL BROADCASTING GROUP, INC.,[1] | § § § | Case No. 19-36743 (DRJ) |
| Debtor. | § § § § | |

**ORDER (A) APPROVING BIDDING PROCEDURES AND CERTAIN BID PROTECTIONS, (B) SCHEDULING BID DEADLINE, AUCTION DATE, AND SALE HEARING AND APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (C) APPROVING CURE PROCEDURES AND THE FORM AND MANNER OF NOTICE THEREOF**
**[Relates to Docket No. --]**

Upon the motion [Docket No. --] (the "Motion"),[2] filed by Marshall Broadcasting Group, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), for entry of an order pursuant to 11 U.S.C. §§ 363 and 365 and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (a) approving bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures") and certain bidding protections, (b) scheduling the bid deadline, auction date and sale hearing (the "Sale Hearing") and approving the form and manner of notice thereof; and (c) approving procedures to cure any default pursuant to section 365(b)(1) of the Bankruptcy Code and the form and manner of notice thereof; and the Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and this being a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O); and it appearing that notice of the Motion and the Bidding Procedures Hearing was sufficient under the circumstances, and that no other or further notice is required; and the Court having determined that the relief requested in the Motion is in the best

---

[1] The last four digits of Debtor's federal tax identification number are (7805).

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Motion.

interests of the Debtor and its estate, and good and sufficient cause having been shown, the Court hereby further finds as follows:

A.      The Debtor has articulated good and sufficient reasons for (i) approving the Bidding Procedures, (ii) the grant of certain bid protections in favor of one or more potential Stalking Horse Bidders, (iii) approving the manner of notice of the Motion, and establishing the Bid Deadline, the Auction, the Sale Hearing, and the assumption and assignment of the Assumed Contracts and proposed cure relating thereto, and (iv) scheduling the Sale Hearing.

B.      The Debtor's payment to a Stalking Horse Bidder (if any) of the Break-Up Fee on the terms set forth in this Order (i) is an actual and necessary cost and expense of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code, (ii) is of substantial benefit to the Debtor's estate, (iii) is reasonable and appropriate, in light of the size and nature of the Proposed Sale and the efforts that have been and will be expended by a potential Stalking Horse Bidder notwithstanding that the Proposed Sale is subject to higher or better offers, (iv) was negotiated by the parties at arms' length and in good faith, and (v) is necessary to ensure that a potential Stalking Horse Bidder will continue to pursue its proposed acquisition of the Debtor's assets.

C.      The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Debtor's assets in part, in total, or as a going concern transaction.

**IT IS HEREBY ORDERED THAT**:

1.      The Motion (as it pertains to approval of the matters set forth herein) is **GRANTED** as set forth herein.  Any objections that have not been previously resolved or withdrawn are overruled on the merits.

4816-9786-4367.5

**Notice Procedures**

2.        Within three (3) business days after entry of this Order, the Debtor shall serve copies of the Motion and this Order, including (i) a copy of the Bidding Procedures attached hereto as **Exhibit 1**, and (ii) the notice of Bid Deadline, Auction and Sale Hearing, substantially in the form attached hereto as **Exhibit 2** (the "Sale Notice") (collectively the "Bid Package"), via U.S. first-class mail, postage prepaid, upon the following (collectively, the "Bid Notice Parties"): (a) all potential buyers previously identified or solicited by the Debtor or PVB and any additional parties who have previously expressed an interest to the Debtor or PVB in potentially acquiring the Assets, (b) other potentially interested parties identified by the Debtor or its advisors; (c) the U.S. Trustee; (d) counsel to any statutory committee; (e) counsel to Mission; (f) counterparties to the Debtor's executory contracts and unexpired leases; (g) all parties who have requested notice in this case; and (h) the Federal Communications Commission (the "FCC").

3.        On February 28, 2020, the Debtor shall file with the Court an initial schedule of executory contracts and unexpired leases that may be assumed and assigned as part of the Proposed Sale (the "Potential Assumed Contracts").   Concurrently therewith, the Debtor will serve a cure notice substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Cure Notice") upon each counterparty to the Potential Assumed Contracts (each, a "Counterparty"). The Cure Notice shall identify the amounts, if any, that the Debtor believes are owed to each Counterparty to a Potential Assumed Contract in order to cure any defaults that may exist under such contract (the "Cure Amount"). Pursuant to the Bidding Procedures Order, the Cure Notice shall also state the applicable date, time and place of the Auction and Sale Hearing, and provide the date and time by which any objection (the "Cure Objection") to (i) the assumption and assignment of the applicable Potential Assumed Contract on the basis of lack of adequate assurance

3

of future performance under section 365(b)(1) or (ii) the Cure Amount must be filed and served by the Counterparty.

4.       Prior to the commencement of the Sale Hearing, the Debtor will file with the Court a final schedule (the "Assumed Contract Schedule") of executory contracts and unexpired leases elected to be assumed by the Successful Bidder (the "Assumed Contracts"). At the Sale Hearing, the Debtor shall seek authority to assume and assign the Assumed Contracts to the Successful Bidder effective as of the closing of the Proposed Sale; *provided, however*, that the Debtor and the Successful Bidder together may agree to remove any Assumed Contract from the Assumed Contract Schedule at any time up to the closing of the Proposed Sale. The Counterparty to any deleted Assumed Contract shall be notified of such deletion by written notice via U.S. first-class mail by no later than two (2) business days from such determination.

**Bidding Procedures and Auction**

5.       The Bidding Procedures attached hereto as **Exhibit 1** and incorporated herein by reference as if fully set forth herein, are hereby approved and shall govern the bidding and Auction proceedings.

6.       The Bid Deadline shall be **March 12, 2020 at 4:00 p.m.** (prevailing Central Time), Qualified Bidders will be notified by March 16, 2020, and deposits will be returned to non-Qualified Bidders by March 19, 2020.

7.       An Auction is scheduled to take place on **March 19, 2020** commencing at **10:00 a.m.** (prevailing Central Time) at the offices of Gray Reed & McGraw LLP, 1300 Post Oak Blvd., Suite 2000, Houston, TX 77056. Immediately following the conclusion of the Auction (if any), the Debtor shall file with the Court a notice setting forth the results of the Auction.

8.      The Debtor is authorized to terminate the bidding process or the Auction at any time if it determines, in its business judgment, that the bidding process will not maximize value for the Debtor's estate, with notice of such termination to be filed of record with the Court.

**Sale Hearing and Objections to the Proposed Sale**

9.      The Court shall commence the Sale Hearing on March 24, 2020 at 2:00 p.m. (prevailing Central Time) in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Courtroom 400, Houston, Texas 77002, at which time the Court shall consider the Motion, the proposed Sale, and confirm the results of the Auction, if any.[3]

10.     Objections to the Motion and the Proposed Sale shall be filed with the Bankruptcy Court and served on the following parties so as to be actually received no later than 4:00 p.m. (prevailing Central Time) on March 20, 2020 (one day after the Auction) (the "Objection Deadline"): (i) counsel to the Debtor, Levene, Neale, Bender, Yoo & Brill LLP, 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067, Attn: David B. Golubchik and Eve H. Karasik (dbh@lnbyb.com and ehk@lnbyb.com), and Gray Reed & McGraw LLP, 1300 Post Oak Blvd., Suite 2000, Houston, TX 77056, Attn: Jason S. Brookner and Lydia R. Webb (jbrookner@grayreed.com and lwebb@grayreed.com); (ii) counsel to the Secured Party, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: David M. Hillman and Lucy F. Kweskin (dhillman@proskauer.com and lkweskin@proskauer.com), and Jackson Walker LLP, 1401 McKinney Street, Suite 1900, Houston, TX 77010 Attn: Matthew D. Cavenaugh and Bruce J. Ruzinsky (mcavenaugh@jw.com and bruzinsky@jw.com); and (iii) Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, TX 77002, Attn:

---

[3] As set forth in the Bidding Procedures, the Debtor may cancel the Sale Hearing if the Plan Transaction is ultimately accepted.

Hector   Duran,   Jr.   and   Stephen   Douglas   Statham   (hector.duran.jr@usdoj.gov   and stephen.statham@usdoj.gov).

11.     The failure to timely file and serve an objection by the Objection Deadline shall be a bar to the assertion, prior to, at the Sale Hearing, or thereafter, of any such objection to the Motion, the Sale, the Debtor's consummation of the Proposed Sale, or the proposed assumption and assignment of any executory contracts or unexpired leases.  Notwithstanding the foregoing, the Objection Deadline shall not apply to any objection based upon any event occurring at the Auction.

12.     The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment made in open court.

## Bid Protections

13.     The Break-Up Fee to be paid to a Stalking Horse Bidder, as more fully described in the Motion and the Bidding Procedures, is hereby approved pursuant to the terms and conditions set forth in the Motion and Bidding Procedures, and shall be paid pursuant to the terms of an order approving a Proposed Sale, or a confirmation order approving a Plan Transaction, as applicable; *provided, however*, that notwithstanding any term to the contrary set forth in the APA, the Bidding Procedures, or this Order, any potential Stalking Horse Bidder shall only be entitled to receive the Break-Up Fee either upon closing of a sale or sales to a bidder or bidders who are not the Stalking Horse Bidder(s), or following approval of a disclosure statement.

## Additional Provisions

14.     The terms and conditions of this Order are immediately effective and enforceable upon its entry.

6

15.     The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

16.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.


**Signed: _____, 2020**

                                              _____
                                              **DAVID R. JONES**
                                              **UNITED STATES BANKRUPTCY JUDGE**

7

## __Exhibit 1__

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| MARSHALL BROADCASTING | § | |
| GROUP, INC.,[1] | § | Case No. 19-36743 (DRJ) |
| | § | |
| Debtor. | § | |
| | § | |

**BIDDING PROCEDURES[2]**

Set forth below are the bidding procedures (the "Bidding Procedures") to be used with respect to a proposed transaction ("Transaction") of: (A)(i) a sale of all or a portion of the assets of Marshall Broadcasting Group, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), or (ii) a going concern sale (together, a "Proposed Sale"), or (B) a restructuring transaction under a confirmed chapter 11 plan of reorganization (a "Plan Transaction"). The Transaction contemplated by these Bidding Procedures is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined herein) pursuant to either (x) Sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") or (y) a confirmed chapter 11 plan of reorganization.

On January 22, 2020, the Debtor filed its *Motion for (I) an Order (A) Approving Bidding Procedures and Certain Bid Protections, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof; and (II) an Order Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims and Interests* [Docket No. --] (the "Sale Motion").  On February __, 2020, the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") entered its *Order (A) Approving Bidding Procedures and Certain Bid Protections, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof* [Docket No. --] (the "Bidding Procedures Order") approving these Bidding Procedures.

The Bidding Procedures set forth herein describe, among other things, the manner in which bidders and bids become "Qualified Bidders" and "Qualified Bids," respectively, the receipt and negotiation of bids received, the conduct of any Auction (as defined herein), the ultimate selection of the Successful Bidder (as defined herein) and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process").

---

[1] The last four digits of Debtor's federal tax identification number are (7805).

[2] The decisions and determinations to be made by the Debtor under and pursuant to these Bidding Procedures are subject, in all respects, to the terms and conditions of Exhibit B attached to the Final Cash Collateral Order [Docket No. 107].

Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Sale Motion.

# I.
# Key Dates

The Debtor and PVB (defined below), have already begun the marketing process. Before being provided with any diligence materials, interested parties must sign and return a confidentiality agreement, in a form acceptable to the Debtor in its sole discretion (a "Confidentiality Agreement"). **Requests for a Confidentiality Agreement should be made to Philip de Roziere, PVB Advisors, LLC ("PVB"), 161 S. Roscoe Blvd., Ponte Vedra Beach, FL 32082, pderoziere@pvbadvisors.com.** Once an interested party signs and returns a Confidentiality Agreement, it will receive access to an electronic data room. Further diligence information is set forth in Section VIII, below.

The deadlines and target dates are as follows:

| | |
|---|---|
| Deadline to file initial Cure Notice: | February 28, 2020 |
| Bid Deadline: | March 12, 2020 at 4:00 p.m. (CT) |
| Notifications to Qualified Bidders: | March 16, 2020 |
| Return of Deposits to non-Qualified Bidders: | March 19, 2020 |
| Auction: | March 19, 2020 at 10:00 a.m. (CT) |
| Deadline to object to Sale: | March 20, 2020 at 4:00 p.m. (CT) |
| Deadline to object to assumption and assignment of the Assumed Contracts, to the Cure Notice, and any Cure Amount: | March 20, 2020 |
| Deadline to file final Cure Notice: | March 24, 2020 |
| Sale Hearing, to approve the results of the Auction: | March 24, 2020 at 2:00 p.m. (CT)[3] |
| Deadline for Successful Bidder to seek approval of Sale from the FCC: | March 24, 2020 |

# II.
# Sale of Assets or Going Concern Transaction

The Debtor is entertaining bids for (A)(i) a going concern transaction, (ii) a sale of all or substantially all of its assets, and (iii) a sale of such smaller portion of the Debtor's assets as may be subject to a purchase agreement and as may be bid upon at Auction; and (B) a Plan Transaction. The Debtor may enter into one Transaction or several Transactions with multiple parties, depending upon the bids received.

---

[3] If the Debtor ultimately decides to pursue a Plan Transaction, the Sale Hearing will be cancelled, and the Debtor will promptly file a chapter 11 plan and pursue confirmation thereof.

In addition, (i) the Successful Bidder(s) in any Proposed Sale shall assume the assumed liabilities as may be set forth in any purchase agreement and (ii) the Debtor shall assume and assign the assumed contracts to such Successful Bidder(s), as may be set forth in any purchase agreement(s) accepted by the Debtor.

## III.
## "As Is, Where Is"

Any Transaction(s) entered into by the Debtor shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents, or estate, except as may be set forth in a purchase agreement(s) with a Successful Bidder(s) or chapter 11 plan, approved by the Bankruptcy Court.

## IV.
## Free of Any and All Claims and Interests

Any Transaction entered into by the Debtor shall be free and clear of all liens, claims, interests, and encumbrances (collectively, the "Claims and Interests"), with such Claims and Interests to attach to the net proceeds of the sale.

## V.
## Participation and Bid Requirements

Any person or entity who wishes to participate in the Bidding Process (a "Potential Bidder") must become a Qualified Bidder. As a prerequisite to becoming a Qualified Bidder, a Potential Bidder must deliver the following documents to the Debtor, Mission Broadcasting, Inc. (as administrative agent under the Debtor's credit agreement) ("Mission"), PVB, and counsel to any statutory committee, at the addresses set forth below, no later than the Bid Deadline (as defined below), in a form and substance acceptable to the Debtor and its advisors (the "Required Bid Documents"):

(a)    Evidence of the Potential Bidder's financial ability to close a Transaction, in a form and substance acceptable to the Debtor in its discretion in consultation with Mission and any statutory committee. Such evidence may take the form of, among other things, current audited financial statements, bank statements, evidence of a non-contingent financing commitment, or such other documentation as the Debtor may accept in its sole discretion;

(b)    A letter stating that the Potential Bidder's offer is irrevocable until immediately following the closing of the Sale or confirmation of a chapter 11 plan, as applicable, and setting forth (i) the nature of the proposed Transaction, and if a Proposed Sale, whether such is a going concern or asset sale, which specifically identifies the assets or groups of assets to be purchased, and which includes the proposed consideration and the liabilities (if any) to be assumed, (ii) any assets expected to be excluded from the Sale, and (iii) the structure and financing of the Transaction (including, but not limited to, the sources of financing);

(c)      If a Proposed Sale, a binding, executed, and definitive copy of the form Asset Purchase Agreement attached to the Sale Motion (the "APA"), together with all schedules thereto marked to show changes to the APA and schedules that the Potential Bidder proposes (a "Marked APA"), including the purchase price in U.S. dollars for each asset or group of assets subject to the applicable bid, and a specific allocation of consideration among the groups of assets being bid upon (all asset bids must also contain an allocation);

(d)      If a Plan Transaction, an executed binding term sheet (the "Term Sheet"), together with such additional information as may be necessary to fully describe the elements of the proposed Plan Transaction, including the consideration to be paid;

(e)      A good faith earnest money cash deposit (the "Deposit") in an amount equal 10% of the total purchase price of the proposed Transaction;

(f)      Evidence of corporate authority to enter into the Transaction;

(g)      An executed Confidentiality Agreement; and

(h)      Any additional information reasonably requested by the Debtor.

## VI.
## Qualified Bidders and Qualified Bids

A Potential Bidder (i) who delivers the documents described in Section V above, (ii) whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Transaction if selected as the Successful Bidder, (iii) who the Debtor determines is likely (based on availability of financing, experience, and other considerations) to be able to consummate the Transaction within the time frame provided by the APA or otherwise applicable in the above-captioned chapter 11 cases (the "Cases"), and (iv) whose bid constitutes a "**Qualified Bid**" pursuant to these Bidding Procedures, shall be deemed a "**Qualified Bidder**."  The Debtor will determine whether a Potential Bidder is a Qualified Bidder after such consultation with Mission and any statutory committee.  By March 16, 2020, the Debtor will notify Potential Bidders if they are Qualified Bidders, and will provide copies of all Qualified Bids to counsel to Mission and any statutory committee.  Mission is deemed to be a Qualified Bidder.

A bid will be deemed a "Qualified Bid" and considered by the Debtor only if the bid:

(a)      is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Debtor than, those contained in the APA;

(b)      contains no contingencies of any type, other than Bankruptcy Court approval of the Transaction and any applicable regulatory conditions, including but not limited to Federal Communications Commission ("FCC") approval;

4

(c)      other than any Stalking Horse Bid(s) that may be designated by the Debtor, is not conditioned upon any bid protections (such as a topping fee, termination fee, expense reimbursement, or similar type of payment);

(d)      contains an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Debtor and its assets and business prior to making its offer, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the business and assets of the Debtor in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Debtor's business or assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the APA, the Marked APA or the Term Sheet;

(e)      includes a list of assumed contracts and assumed liabilities (if any), and a commitment to consummate the Transaction and the assumption of the assumed liabilities (if any) within not more than ten (10) days after entry of an order by the Bankruptcy Court approving such Transaction;

(f)      discloses (i) the identity of the Potential Bidder and each entity participating in connection with the Potential Bidder and the complete terms of such participation, and (ii) any other term sheets and other written or oral understandings between the Potential Bidder and its affiliates on one hand, and any insider (as defined in section 101(31) of the Bankruptcy Code) of the Debtor, on the other; and

(g)      is received by the Bid Deadline.

In order to comply with FCC requirements for transfer of the Debtor's FCC licenses, a Qualified Bidder must not:

(a)      be a citizen or representative of a foreign government(s);

(b)      be more than 20% directly or 25% indirectly owned or controlled by foreign citizens or companies;

(c)      own media properties, or have officers, directors, or attributable shareholders or members with attributable interests in media properties in the relevant markets which, when combined with the Debtor's stations, would exceed the FCC's multiple ownership limits in 47 CFR 73.3555;

(d)      own media properties with a national audience share, or have officers, directors, or attributable shareholders or members with attributable interests in media properties with a national audience share which, when combined with the Debtor's stations, would exceed the FCC's national audience cap limit in 47 CFR 73.3555;

(e)      have had a broadcast or other spectrum license revoked by the FCC or a license revocation hearing designated on character qualifications of the Potential Bidder or any officers, directors, or attributable shareholders or members with attributable interests of the

Potential Bidder or having found bidder guilty of fraud or misrepresentation to the FCC so as to call into question the Potential Bidder's qualifications to be an FCC licensee; and

(f)      be subject to the denial of federal benefits pursuant to the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 862.

***All bids for a Transaction must contemplate payment in cash, in full, upon the closing of the Transaction (other than a Credit Bid), unless the Debtor agrees otherwise, after consultation with Mission and any statutory committee.***  Any bid that is not for cash, and does not otherwise comply with the above requirements, shall not be deemed to be a Qualified Bid.

Notwithstanding the foregoing, the Debtor shall have the right, in its discretion, after consultation with Mission and any statutory committee, to entertain bids that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.  A Qualified Bid will be valued, among other things, based upon factors such as the net value provided by such bid, the likelihood and timing of consummating the Transaction in question, and any other factors that the Debtor may deem relevant to the Transaction. Mission shall be deemed a  Qualified Bidder and shall be entitled to bid on a dollar-for-dollar basis the full amount of the outstanding MBG Secured Obligations and the Adequate Protection Obligations (each as defined in the Final Cash Collateral Order).

Between the times the Debtor notifies a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtor may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Debtor, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by the Qualified Bid, or otherwise enhance the terms of the Qualified Bid.

The Debtor reserves the right to cancel, and not conduct, the Auction (as defined below) if the Debtor does not receive any Qualified Bids by the Bid Deadline.  In such event, the Debtor will file a Notice of No Auction with the Bankruptcy Court.

By submitting a bid, a Potential Bidder warrants and represents that it is a principal acting on its own behalf, and not as a broker, finder or agent acting on another's behalf.  Such Potential Bidder acknowledges that it will not look to the Debtor or PVB for the payment of any fee or commission.  In addition, the Potential Bidder agrees to be responsible for the payment of any fee, commission, or other compensation payable to any broker, finder, or agent who alleges it has dealt with or through the Potential Bidder.

## VII.
## Bid Deadline and Bid Recipients

A Qualified Bidder (other than a potential Stalking Horse and Mission) who desires to make a bid shall deliver written copies of its bid to each of the following, **no later than 4:00 p.m. Central Time on March 12, 2020** (the "Bid Deadline"):

1.   **Debtor's Counsel:**

Levene Neale Bender Yoo & Brill L.L.P.
10250 Constellation Boulevard
Suite 1700
Los Angeles, CA 90067
Attn: David B. Golubchik
     Eve H. Karasik
Email: dbg@lnbyb.com
     ehk@lbbyb.com

-and-

Gray Reed & McGraw LLP
1300 Post Oak Blvd.
Suite 2000
Houston, TX 77056
Attn.: Jason S. Brookner
     Lydia R. Webb
Email: jbrookner@grayreed.com
     lwebb@grayreed.com

2.   **Debtor's Investment Banker:**

PVB Advisors, LLC
161 S. Roscoe Blvd.
Ponte Vedra Beach, FL 32082
Attn: Philip de Roziere
Email: pderoziere@pvbadvisors.com

3.   **Counsel to Mission:**

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attn: David M. Hillman
     Lucy F. Kweskin
Email: dhillman@proskauer.com
     lkweskin@proskauer.com

-and-

Jackson Walker LLP
1401 McKinney Street, Suite 1900
Houston, TX 77010
Attn: Matthew D. Cavenaugh
     Bruce J. Ruzinsky
Email: mcavenaugh@jw.com
     bruzinsky@jw.com

### VIII.
### Due Diligence

Following execution of a Confidentiality Agreement, the Debtor shall afford each interested party an opportunity to perform due diligence with respect to its business and assets. Due diligence access may include management presentations as may be scheduled by the Debtor, on-site inspections, and such other matters which an interested party may reasonably request and as to which the Debtor, in its sole discretion, may agree. The Debtor shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from interested parties. No due diligence shall continue after the Bid Deadline. The Debtor may, in its discretion, coordinate diligence efforts such that multiple interested parties have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.

**All diligence requests should be made to Philip de Roziere of PVB, 161 S. Roscoe Blvd., Ponte Vedra Beach, FL 32082, pderoziere@pvbadvisors.com.**

Each Qualified Bidder shall be deemed to acknowledge and represent that (i) it has had an opportunity to conduct any and all due diligence regarding the Debtor's business and assets prior to making its offer, (ii) it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the business and assets in making its bid, (iii) it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business or assets, or the completeness of any information provided in connection therewith, the Bidding Process or the Auction (as defined herein), except, as to any Stalking Horse, as expressly stated in the APA, and as to a Successful Bidder other than a potential Stalking Horse, as expressly stated in the definitive agreement with such Successful Bidder approved by the Bankruptcy Court, and (iv) that it has not engaged and will not engage in collusion in connection with the bidding process at any time.

## IX.
## Stalking Horse Declaration and Break-Up Fee

In the exercise of its business judgment, the Debtor may, without any obligation to do so after consulting with Mission and any statutory committee, select one or more bidders to act as a stalking horse (each being a "Stalking Horse Bidder" with the relevant bid being a "Stalking Horse Bid"). The Debtor may, but is not required to incur and pay a break-up fee in an amount not to exceed 3% of the cash component of the Stalking Horse Bid and, in the Debtor's discretion, an expense reimbursement (together, the "Break-Up Fee"); *provided that* the Break-Up Fee shall only be paid pursuant to the terms of an order approving a Proposed Sale or a confirmation order approving a Plan Transaction, as applicable. The Break-Up Fee shall only be payable either upon closing of a sale or sales to a bidder or bidders who are not the Stalking Horse Bidder(s), or following approval of a disclosure statement if the Debtor pursues a Plan Transaction.

To the extent a determination is made to provide a Break-Up Fee, the Debtor will file notice of the same with the Bankruptcy Court, and such Break-Up Fee may be paid without further action or order of the Bankruptcy Court, other than an order approving the transaction that gave rise to payment of the Break-Up Fee.

## X.
## Auction

If the Debtor receives more than one Qualified Bid, an auction (the "Auction") will be conducted, upon notice to all Qualified Bidders who have submitted Qualified Bids, at **10:00 a.m. Central Time on March 19, 2020**, at the offices of Gray Reed & McGraw LLP, 1300 Post Oak Boulevard, Suite 2000, Houston Texas 77056, in accordance with the following procedures:

(a)     Only the following persons shall be entitled to attend the Auction: (i) professionals and principals or members of the Debtor, (ii) PVB, (iii) counsel to, and business persons from, Mission, (iv) counsel to any statutory committee and a committee representative, (v) the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), and (vi) professionals and principals or members of any Qualified Bidder who has timely submitted a Qualified Bid (collectively, the "Participating Parties"). Only Qualified Bidders will be entitled to make any Subsequent Bids (as defined below) at the Auction.

8

(b)      At the commencement of the Auction, Qualified Bidders in attendance will be informed of which Qualified Bid or combination of Qualified Bids the Debtor believes is the highest or otherwise best offer(s), and from which bidding will begin.

(c)      All Participating Parties shall be entitled to be present for all Subsequent Bids (as defined below) with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid shall be fully disclosed to all Participating Parties throughout the entire Auction.

(d)      The Debtor may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make Subsequent Bids) for conducting the Auction, *provided that* such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, and after consulting with Mission and any statutory committee regarding the same.

(e)      Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids as identified by the Debtor at the onset of the Auction (the "Baseline Bid").  To the extent a Stalking Horse Bidder has been named, the initial overbid must exceed the Baseline Bid by the amount of the Break-Up Fee plus and additional $350,000.  Thereafter, or in the event no Stalking Horse Bidder has been named, the minimum bidding increment (the "Subsequent Bids" and each a "Subsequent Bid") shall be $350,000 (which increments may be increased or decreased by the Debtor, in its discretion, in consultation with Mission and any statutory committee, depending on the nature of the Transactions presented).  The Auction shall continue in one or more rounds of bidding and shall conclude after each Participating Party has had the opportunity to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids.

The Debtor reserves the right, in the exercise of its business judgment in consultation with Mission and any statutory committee, to adjourn the Auction at one or more times to, among other things (i) facilitate discussions among the Debtor and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) allow Qualified Bidders the opportunity to provide the Debtor with such additional information or evidence, as the Debtor may require in the exercise of its business judgment, that the Qualified Bidder has sufficient resources and sufficient non-contingent debt and/or equity funding commitments to consummate the Transaction at the then-prevailing Subsequent Bid amount.

The Debtor shall maintain a transcript of the proceedings at the Auction, including the Baseline Bid, all Subsequent Bids, and the Successful Bid (as defined below).

## XI.
## Closing of Auction and Selection of Successful Bid

The Auction shall continue until there is only one bid that the Debtor determines, in its business judgment, after consultation with Mission and any statutory committee, is the highest or otherwise best Qualified Bid for a Transaction or multiple Transactions, after taking into account

9

factors such as the speed and certainty of consummating the transaction (such bid being the "<u>Successful Bid</u>" and the bidder making such bid, the "<u>Successful Bidder</u>").[4]

All bidders will be deemed to have consented to the core and exclusive jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any and all disputes relating to, arising from, or connected with the Auction, the marketing process, the Transaction, and the construction and enforcement of any purchase agreement.

## XII.
## <u>Back-Up Bidder</u>

If there is an Auction, the Qualified Bidder that submits the second highest Bid at the Auction shall be required to serve as the back-up bidder (the "<u>Back-Up Bidder</u>") and keep such Back-Up Bidder's last Bid (the "<u>Back-Up Bid</u>") open and irrevocable until the earlier of (i) (A) if a Proposed Sale, 5:00 p.m. Central Time on the date which is five days after FCC approval of the sale to the Successful Bidder becomes final and non-appealable or (B) if a Plan Transaction, the entry of an order approving a disclosure statement for a chapter 11 plan (the "<u>Disclosure Statement Approval Date</u>"), and (ii) the closing of the Transaction with the Successful Bidder (the "<u>Outside Back-Up Date</u>").  If, (x) after the Sale Hearing but prior to the Outside Back-Up Date for a Proposed Sale or (y) after the conclusion of the Auction but prior to the Outside Back-up Date for a Plan Transaction, the Successful Bidder fails to consummate or proceed with the relevant Transaction because of a breach or failure to perform on the part of such Successful Bidder, or if the FCC fails to grant the initial application to approve Sale within six (6) months of entry of the Sale Order, the Back-Up Bidder will be deemed to have the new Successful Bid, and the Debtor will be authorized, without further order of the Bankruptcy Court, to consummate the Transaction with the Back-Up Bidder.  The Debtor will provide notice to Mission and any statutory committee of any failure by the Successful Bidder to close the Transaction and the election to proceed to close a Transaction with the Back-Up Bidder.

## XIII.
## <u>Right to Credit Bid</u>

Any creditor that has a valid, perfected, unavoidable, and enforceable security interest (a "<u>Security Interest</u>") in the Debtor's assets (any such creditor, a "<u>Secured Party</u>") may make one or more credit bids for all or any portion of the secured claim(s) held by such Secured Party at the Auction, subject to the requirements of section 363(k) of the Bankruptcy Code (a "<u>Credit Bid</u>"). Mission shall be permitted to Credit Bid on a dollar-for-dollar basis in an amount up to the full amount of the outstanding MBG Secured Obligations and the Adequate Protection Obligations (each as defined in the Final Cash Collateral Order), pursuant to paragraph 10(e) of the Final Cash Collateral Order.

In order to qualify to Credit Bid, a Secured Party must be a Qualified Bidder and a Credit Bid must qualify as a Qualified Bid.  Mission is deemed to be a Qualified Bidder.

---

[4] Exhibit B to the Final Cash Collateral Order shall govern with respect to any inability of the Debtor's directors to reach unanimous consent on bidding- or auction-related matters.

## XIV.
## The Sale Hearing and Return of Deposits

In the event one or more Proposed Sales are accepted by the Debtor, a hearing to approve the Sale(s) will take place before the Honorable David R. Jones, Chief United States Bankruptcy Judge, **on March 24, 2020 at 2:00 p.m. Central Time**, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Courtroom 400, Houston, Texas 77002.  The Sale Hearing may be adjourned or rescheduled by the Debtor without notice other than by an announcement made at the Sale Hearing.

The Debtor will not be bound by a Successful Bid for a Proposed Sale or a Back-Up Bid for a Proposed Sale unless and until the Bankruptcy Court has approved the same.  Following Bankruptcy Court approval of a Proposed Sale with the Successful Bidder, if the Successful Bidder fails to consummate the Proposed Sale for any reason, then the Back-Up Bidder will be deemed to be the Successful Bidder and the Debtor will enter into a Sale with the Back-Up Bidder on the terms of the Back-Up Bid without any further order of the Bankruptcy Court, and the Debtor may pursue any and all available remedies against the Successful Bidder in connection with its failure to consummate the Sale.

If the Debtor chooses to move forward with a Plan Transaction, the Sale Hearing will be cancelled and notice of the same will be filed with the Bankruptcy Court.

The Deposit (together with interest, if any, thereon) of the Back-Up Bidder for a Proposed Sale will not be returned until two (2) business days following the closing of the Sale to the Successful Bidder.  The Deposit (together with interest, if any, thereon) of all other Qualified Bidders will be returned within 48 hours of the Auction concluding.  The Deposit of the Successful Bidder (together with interest, if any, thereon) shall be applied against the payment of the Proposed Sale consideration upon the closing of the Sale.  In the event a Bidder fails to close as a result of its own default, its Deposit shall be released to, and retained by, the Debtor.

The Deposit (together with interest, if any, thereon) of the Back-Up Bidder for a Plan Transaction will not be returned until two (2) business days following the Disclosure Statement Approval Date.  The Deposit (together with interest, if any, thereon) of all other Qualified Bidders will be returned within 48 hours of the Auction concluding.  The Deposit of the Successful Bidder for a Plan Transaction (together with interest, if any, thereon) shall be applied against the payment of the Plan Transaction consideration at the time a chapter 11 plan is confirmed.  In the event a Bidder fails to close as a result of its own default, its Deposit shall be released to, and retained by, the Debtor.

Deposits made by Potential Bidders who are not determined to be Qualified Bidders will be returned within five (5) business days after the Bid Deadline.

## XV.
## Reservation of Rights and Fiduciary Obligation

Notwithstanding any term to the contrary herein, the Debtor, in consultation with Mission and any statutory committee, reserves the right to: (i) modify the Bidding Procedures at any time; (ii) determine which Qualified Bid, if any, is the highest or otherwise best offer; (iii) reject at any

time, any bid that is: (a) inadequate or insufficient ; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the APA; or (c) contrary to the best interests of the Debtor, its estate, and creditors as determined by the Debtor in its sole discretion; and (iv) pursue a sale or other transaction through a chapter 11 plan.

Nothing in these Bidding Procedures shall require the Debtor, the board of directors or similar governing body of the Debtor, or any individual board member or officer of the Debtor to take any action, or to refrain from taking any action, with respect to these Bidding Procedures or the Auction, to the extent such persons or entities determine, on the advice of counsel, that taking or refraining from taking such action, is required to comply with applicable law or its fiduciary obligations.

**<u>Exhibit 2</u>**

**Sale Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| MARSHALL BROADCASTING | § | |
| GROUP, INC.,[1] | § | Case No. 19-36743 (DRJ) |
| | § | |
| Debtor. | § | |
| | § | |

## NOTICE OF BID DEADLINE, AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE** that on January 22, 2020, the Debtor filed its *Motion for (I) an Order (A) Approving Bidding Procedures and Certain Bid Protections, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof; and (II) an Order Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims and Interests* [Docket No. --] (the "Sale Motion").

**PLEASE TAKE FURTHER NOTICE** that on February __, 2020, the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") entered its *Order (A) Approving Bidding Procedures and Certain Bid Protections, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof* [Docket No. --] (the "Bidding Procedures Order") approving certain bidding procedures attached thereto as Exhibit 1.

**PLEASE TAKE FURTHER NOTICE** that all interested parties are invited to seek to become a Qualified Bidder and submit a Qualified Bid to purchase all or a portion of the Debtor's business and assets in accordance with the terms of the Bidding Procedures Order and the bidding procedures.  The deadline for Potential Bidders to submit Qualified Bids is **March 12, 2020 at 4:00 p.m.**

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the Bidding Procedures Order, unless cancelled, an Auction will take place on **March 19, 2020** commencing at **10:00 a.m.** (prevailing Central Time) at the offices of Gray Reed & McGraw LLP, 1300 Post Oak Blvd., Suite 2000, Houston, TX 77056.  The Auction will proceed, and be conducted, pursuant to the terms of the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the sale of the Debtor's assets, including the assumption and assignment of any executory contracts (the "Sale Hearing"), will take place on **March 24, 2020 at 2:00 p.m.** (prevailing Central Time) in the United States

---

[1] The last four digits of Debtor's federal tax identification number are (7805).

Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Courtroom 400, Houston, Texas 77002.  As set forth in the Bidding Procedures, the Auction and the Sale Hearing may be cancelled, with a notice of cancellation to be filed by the Debtor with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that any objection to the assumption and assignment of any executory contract or unexpired lease, or any cure amount related thereto, shall be filed by **March 20, 2020** and served upon the Notice Parties designated below.  To the extent any such objection is filed, a subsequent hearing will be scheduled with notice to the objecting party.

**PLEASE TAKE FURTHER NOTICE** that the deadline for filing objections to the Sale(s) is **March 20, 2020 at 4:00 p.m.** (prevailing Central Time).  Objections, if any, must (a) be in writing, (b) state with specificity the nature of such objection, (c) comply with the Federal Rules of Bankruptcy Procedure, and (d) be filed with the Court and served on undersigned counsel for the Debtor, the United States Trustee for the Southern District of Texas, and Mission Broadcasting, Inc. (as administrative agent under the Debtor's credit agreement) at the addresses listed below (the "Notice Parties").

1.  **Debtor's Counsel:**

Levene Neale Bender Yoo & Brill L.L.P.
10250 Constellation Boulevard
Suite 1700
Los Angeles, CA 90067
Attn: David B. Golubchik
        Eve H. Karasik
Email: dbg@lnbyb.com
        ehk@lbbyb.com

-and-

Gray Reed & McGraw LLP
1300 Post Oak Blvd.
Suite 2000
Houston, TX 77056
Attn.: Jason S. Brookner
        Lydia R. Webb
Email: jbrookner@grayreed.com
        lwebb@grayreed.com

2.  **United States Trustee for the Southern District of Texas:**

Office of the United States Trustee
515 Rusk Street
Suite 3516
Houston, Texas 77002
Attn: Hector Duran
Email: Hector.Duran.Jr@usdoj.gov

2

**3.** **Counsel to Mission:**

| | | |
|---|---|---|
| Proskauer Rose LLP | | Jackson Walker LLP |
| Eleven Times Square | | 1401 McKinney Street, Suite 1900 |
| New York, NY 10036 | | Houston, TX 77010 |
| Attn: David M. Hillman | -and- | Attn: Matthew D. Cavenaugh |
| Lucy F. Kweskin | | Bruce J. Ruzinsky |
| Email: dhillman@proskauer.com | | Email: mcavenaugh@jw.com |
| lkweskin@proskauer.com | | bruzinsky@jw.com |

**PLEASE TAKE FURTHER NOTICE** that copies of pleadings related to the proposed sale(s), including the Bidding Procedures Order (and attached Bidding Procedures) approved by the Bankruptcy Court, are available on the Bankruptcy Court's website at http://ecf.txs.uscourts.gov/ or by contacting Debtor's counsel via email at the addresses listed above.

Respectfully submitted this __th day of February, 2020.

**GRAY REED & McGRAW LLP**

By:  */s/ Jason S. Brookner*
    Jason S. Brookner
      Texas Bar No. 24033684
    1300 Post Oak Blvd., Suite 2000
    Houston, Texas 77056
    Telephone:  (713) 986-7000
    Facsimile:  (713) 986-7100
    Email:     jbrookner@grayreed.com

     -and-

    Lydia R. Webb
      Texas Bar No. 24083758
    1601 Elm Street, Suite 4600
    Dallas, Texas 75201
    Telephone:  (214) 954-4135
    Facsimile:  (214) 953-1332
    Email:     lwebb@grayreed.com

     -and

4816-9786-4367.5

David B. Golubchik (*pro hac vice*)
Eve H. Karasik (*pro hac vice*)
**LEVENE NEALE BENDER YOO
& BRILL L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: dbg@lnbyb.com
        ehk@lnbyb.com

**COUNSEL TO THE DEBTOR**

## CERTIFICATE OF SERVICE

I hereby certify that on February __, 2020, a true and correct copy of this *Notice of Bid Deadline, Auction, and Sale Hearing* has been served (i) electronically via CM/ECF on all parties who have subscribed for electronic notice in this case, (ii) via U.S. first-class mail on all parties listed on the Debtor's Official Service List and (iii) via U.S. first-class mail or email if available to (a) all potential buyers previously identified or solicited by the Debtor or its advisors and any additional parties who have previously expressed an interest to the Debtor or PVB in potentially acquiring the Assets; (b) counterparties to the Debtor's executory contracts and unexpired leases; and (c) the Federal Communications Commission.

*/s/ Jason S. Brookner*
Jason S. Brookner

4

**<u>Exhibit 3</u>**

**Cure Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | § |
| | § |
| | §    Chapter 11 |
| MARSHALL BROADCASTING | § |
| GROUP, INC.,[1] | §    Case No. 19-36743 (DRJ) |
| | § |
| Debtor. | § |
| | § |

**NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES SUBJECT TO**
**POSSIBLE ASSUMPTION AND ASSIGNMENT AND PROPOSED CURE AMOUNTS**

**PLEASE TAKE NOTICE** that pursuant to the terms of that certain *Order (A) Approving Bidding Procedures and Certain Bid Protections, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof* [Docket No. --] (the "Bidding Procedures Order"), Marshall Broadcasting Group, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), may hold an Auction for the sale of substantially all of its assets on March 19, 2020 at the Houston office of Gray Reed & McGraw LLP.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures Order, the Debtor hereby provides its notice (the "Cure Notice") of proposed cure amounts (each a "Cure Amount" and collectively, the "Cure Amounts") for all contracts and leases subject to potential assumption and assignment to the successful bidder(s) at Auction.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** are schedules of the executory contracts and unexpired leases (collectively, the "Potential Assumed Contracts and Leases") that may be included as part of the sale of the Debtor's assets and the proposed Cure Amount for each such lease or contract.

**PLEASE TAKE FURTHER NOTICE** that any objection to a Cure Amount must be filed with the Bankruptcy Court and served on the undersigned counsel so as to be actually received by March 20, 2020 (the "Cure Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures Order, the Cure Amounts set forth in the Cure Notice shall be binding on all parties unless an objection thereto is timely filed and served. If an objection to the assumption and assignment of the Potential Assumed Contracts and Leases or to the Cure Notice and any Cure Amount cannot be resolved consensually among the parties, the Court will set a hearing to determine such matters as soon thereafter as is practicable, and the Debtor is permitted to give notice only to the objecting party and those parties who have filed a notice of appearance.  The failure to timely file and serve an

---

[1] The last four digits of Debtor's federal tax identification number are (7805).

objection shall be deemed consent to the assumption and assignment of the Potential Assumed Contracts and Leases and to the Cure Amounts, and any and all objections thereto shall be deemed forever released and waived.

**PLEASE TAKE FURTHER NOTICE** that the inclusion of any contracts or leases on **Exhibit A** hereto shall not constitute or be deemed to be a determination or admission by the Debtor that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

Respectfully submitted this ___ day of February, 2020.

**GRAY REED & McGRAW LLP**

By: _/s/ Jason S. Brookner_
    Jason S. Brookner
    Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:      jbrookner@grayreed.com

        -and-

    Lydia R. Webb
    Texas Bar No. 24083758
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:      lwebb@grayreed.com

        -and

David B. Golubchik (*pro hac vice*)
Eve H. Karasik (*pro hac vice*)
**LEVENE NEALE BENDER YOO**
    **& BRILL L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: dbg@lnbyb.com
         ehk@lnbyb.com

**COUNSEL TO THE DEBTOR**

2

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the ___ day of February, 2020, he caused a true and correct copy of the foregoing document to be served via CM/ECF on all parties who have subscribed for electronic notice in this case, and via email (if email addresses are available) and first class U.S. mail on each counterparty listed in **Exhibit A**.

*/s/ Jason S. Brookner*
Jason S. Brookner

**Exhibit A**

**Schedule of Executory Contracts and Unexpired Leases**

**<u>Exhibit B</u>**

**Proposed Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| MARSHALL BROADCASTING | § | |
| GROUP, INC.,[1] | § | Case No. 19-36743 (DRJ) |
| | § | |
| Debtor. | § | |
| | § | |

**ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS**
[Relates to Docket No. --]

Upon the motion [Docket No. --] (the "Motion"),[2] filed by Marshall Broadcasting Group,

Inc., the above-captioned debtor and debtor in possession (the "Debtor"), for entry of an order

pursuant to 11 U.S.C. §§ 363 and 365 and Rules 2002, 6004, and 6006 of the Federal Rules of

Bankruptcy Procedure approving (a) the proposed sale of substantially all of the Debtor's assets

under the terms of a proposed asset purchase agreement (the "APA"), a true and correct copy of

which is attached hereto as **Exhibit 1**, free and clear of all liens, claims and interest (other than the

Assumed Liabilities set forth in the APA), and (b) the assumption and assignment of executory

contracts and unexpired leases of the Debtor as may be requested by the Successful Bidder and the

proposed cure amounts with respect thereto (the "Cure Amount"), all as more fully set forth in the

Motion; and the Court being satisfied that the relief requested in the Motion is necessary and in

the best interests of the Debtor and its estate and creditors; and it appearing that sufficient notice

of the Motion has been given, and that no other or further notice is required; and this Court having

reviewed the Motion and having considered the evidence and arguments presented at hearing on

---

[1] The last four digits of Debtor's federal tax identification number are (7805).

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Motion.

March 24, 2020 (the "Sale Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, the Court hereby finds as follows:[3]

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

B.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

C.      The relief requested in the Motion is in the best interests of the Debtor, its estate, creditors, and other parties in interest.

D.      Proper, timely, adequate, and sufficient notice of (a) the Motion, (b) the auction held on March 19, 2020 (the "Auction") pursuant to the Bid Procedures Order (as defined below) (c) the sale of the Purchased Assets (as defined below) to Buyer (as defined below) pursuant to (i) the bidding procedures authorized by the Court in the Bid Procedures Order (the "Bidding Procedures") and (ii) the APA and the transactions contemplated in connection therewith (the "Sale"), (d) the assumption and assignment to the Buyer of certain executory contracts and unexpired leases as described and identified more fully in the APA (the "Assumed Contracts"), (e) the Cure Amounts, (f) the Sale Hearing, and (g) all deadlines related thereto, has been provided by the Debtor in its (i) *Notice of Bid Deadline, Auction and Sale Hearing* [Docket No. --] (the "Sale Notice"), the Cure Notice (as defined below) and the Notice of Successful Bidder (as defined below), as relevant, in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, 9008, and 9014, and in compliance with the *Order (A) Approving Bidding Procedures and Certain Bid Protections, (B) Scheduling Bid Deadline, Auction*

---

[3] The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

*Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof* [Docket No. --] (the "<u>Bid Procedures Order</u>"), to each party entitled thereto.  A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities.

E.      The Debtor further filed with the Court and served upon the non-Debtor counterparties to the Assumed Contracts a *Notice of Executory Contracts and Unexpired Leases Subject to Possible Assumption and Assignment and Proposed Cure Amounts*, identifying, among other things, the Cure Amounts [Docket No. --] (the "<u>Cure Notice</u>"), in accordance with the Bid Procedures Order.  The service of the Cure Notice was sufficient under the circumstances and in full compliance with the Bid Procedures Order, and no further notice need be provided in respect of the Debtor's assumption and assignment to the Buyer of the Assumed Contracts, the Cure Amounts, or the Sale.  All non-Debtor counterparties to the Assumed Contracts have had an adequate opportunity to object to the assumption and assignment of the Assumed Contracts and the Cure Amounts.

F.      The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Sale (and the transactions contemplated in connection therewith), the assumption and assignment to the Buyer of the Assumed Contracts, the Cure Amounts, the Sale Hearing, and all deadlines related thereto is or shall be required.

G.      The assets being sold to Buyer (the "<u>Purchased Assets</u>" as defined in the APA), as more fully described in the APA, including all schedules attached thereto and all other documents contemplated thereby, collectively, the "<u>APA</u>") between the Debtor and [•] (the "<u>Buyer</u>") whereby the Debtor has agreed to sell the Purchased Assets to Buyer, constitute property of the Debtor's

bankruptcy estate and title thereto is vested in the Debtor's estate, within the meaning of section 541 of the Bankruptcy Code.

H.     The Sale is duly authorized pursuant to sections 363(b)(1) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 6004(f). As demonstrated by (i) the testimony and other evidence adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor has marketed the Purchased Assets and conducted all aspects of the sale process at arms' length, in good faith, and in compliance with the Bidding Procedures and Bid Procedures Order. The marketing process undertaken by the Debtor and its professionals, agents, and other representatives with respect to the Purchased Assets has been adequate and appropriate and reasonably calculated to maximize value for the benefit of all stakeholders. The Bidding Procedures were duly noticed, were substantively and procedurally fair to all parties, and the Auction was conducted in a diligent, non-collusive, fair, and good faith manner. The APA constitutes the highest and best offer for the Purchased Assets.

I.     The Bid Deadline passed on March 12, 2020 at 4:00 p.m. (Central Time) in accordance with the Bidding Procedures and Bid Procedures Order. The Debtor conducted the Auction commencing at 10:00 a.m. (Central Time) on March 19, 2020 in accordance with the Bidding Procedures and Bid Procedures Order. At the conclusion of the Auction, the Debtor, after consultation with its prepetition secured party Mission Broadcasting, Inc. ("Mission"), determined in a valid and sound exercise of its business judgment that the transactions contemplated by the APA were the highest or otherwise best bid and, therefore, Buyer's bid was designated as the successful bid (the "Successful Bid"). On March [•], 2020, the Debtor filed its *Notice of Successful Bidders* [Docket No. --] (the "Notice of Successful Bidder"), identifying the Buyer as the Successful Bidder for the Purchased Assets in accordance with the Bid Procedures Order. As

established by the record of the Sale Hearing, the Bid Procedures Order has been complied with in all material respects by the Debtor and the Buyer. The Bidding Procedures and the Auction afforded a full, fair, and reasonable opportunity for any entity or person to make a higher or otherwise better offer to purchase the Purchased Assets.

J.      The Debtor (i) has full corporate power and authority to execute the APA, and the Sale by the Debtor to the Buyer has been duly and validly authorized by all necessary corporate action, (ii) has all of the corporate power and authority necessary to consummate the Sale and all transactions contemplated by the APA, (iii) has taken all corporate action necessary to authorize and approve the APA and the consummation by the Debtor of the Sale and all transactions contemplated thereby, and (iv) requires no consents or approvals that have not been obtained, other than the Court's entry of this Order and those expressly provided for in the APA to consummate such transactions, including but not limited to, approval by the Federal Communications Commission.

K.      Approval of the APA and consummation of the Sale are in the best interests of the Debtor, its creditors, its estate, and other parties in interest.

L.      The Debtor has demonstrated both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for this Court to approve the APA and consummation of the Sale pursuant to section 363(b) of the Bankruptcy Code prior to and outside of a plan of reorganization because of the Debtor's current financial position.

M.      The APA was negotiated, proposed, and entered into by the Debtor and the Buyer without collusion, in good faith, and on an arms'-length basis. Neither the Debtor, nor the Buyer, nor any affiliate of the Buyer has engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code.

4816-9786-4367.5

N.     The Buyer is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

O.     The Buyer is not an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

P.     The consideration provided by the Buyer for the Purchased Assets pursuant to the APA is (a) reasonably equivalent value under the Bankruptcy Code and any Uniform Fraudulent Transfer Act, (b) fair consideration under any Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration, fair salable value, and fair value under any such laws as applicable or any other applicable laws of the United States, any state, territory, or possession thereof, or the District of Columbia.

Q.     As of the Closing, pursuant and subject to the terms of the APA, the transfer of the Purchased Assets and the Sale will effect a legal, valid, enforceable, and effective transfer of the Purchased Assets and will vest the Buyer with all of the Debtor's right, title, and interest in the Purchased Assets, free and clear of all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever.

R.     The Buyer is hereby substituted for all purposes as a party to all Assumed Contracts in the place of the Debtor.  Buyer shall have any and all rights and benefits of the Debtor under all such Assumed Contracts without interruption or termination of any kind, and all terms applicable to the Debtor shall apply to the Buyer as if such Assumed Contracts were amended to replace the Debtor with the Buyer.

S.     The Buyer would not have entered into the APA and would not have consummated the Sale, thus adversely affecting the Debtor, its estate, and its creditors, if both (i) the Sale and (ii)

the assumption and assignment of the Assumed Contracts to the Buyer were not free and clear of all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever.

T.      The Debtor may sell the Purchased Assets free and clear of all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. All parties in interest, including, without limitation, any holders of Liens, claims, encumbrances, and other interests and any other non-Debtor counterparties to the Assumed Contracts, that did not object, or who withdrew their objection, to the Sale, the Motion, the assumption and assignment of the applicable Assumed Contract or the associated Cure Amount have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code.  Those (x) holders of Liens and (y) non-Debtor parties to Assumed Contracts who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, if any, attach to the portion of the net Sale proceeds ultimately attributable to the property against or in which they assert an interest, in the order of their priority, with the same validity, force, and effect that they now have as against such property, subject to any claims and defenses the Debtor may possess with respect thereto.

U.      Neither the Buyer nor any of its affiliates are successors to the Debtor or its estate by reason of any theory of law or equity, and neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of the Debtor and/or its estate, except as otherwise expressly provided in the APA.

V.      The Debtor has demonstrated that the assumption and assignment of the Assumed Contracts to the Buyer in connection with the consummation of the Sale is an exercise of the Debtor's sound business judgment and is in the best interests of the Debtor, its estate and creditors,

4816-9786-4367.5

and other parties in interest.  The Assumed Contracts being assigned to the Buyer are an integral part of the APA and the Sale and, accordingly, the assumption and assignment of the Assumed Contracts is reasonable and enhances the value of the Debtor's estate.  Any non-Debtor counterparty to an Assumed Contract that has not actually filed with the Court an objection to such assumption and assignment in accordance with the terms of the Bid Procedures Order and Cure Notice is deemed to have consented to such assumption and assignment.

W.       The Debtor and the Buyer, as applicable under the APA, have, including by way of entering into the APA, and agreeing to the provisions relating to the Assumed Contracts therein, (i) cured, or provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Buyer has, based upon the record of these proceedings, provided adequate assurance of its future performance of and under the Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  No default exists in the Debtor's performance under the Assumed Contracts as of the Closing Date other than the failure to pay Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code. The Buyer's promise under the APA to perform the obligations under the Assumed Contracts after the Closing shall constitute sufficient adequate assurance of future performance under the Assumed Contracts being assigned to the Buyer within the meanings of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.  The Cure Amounts are hereby found to be the sole amounts

necessary to cure any and all defaults under the Assumed Contracts under section 365(b) of the Bankruptcy Code.

X.      Time is of the essence in consummating the Sale.  The consummation of the Sale as soon as practicable is necessary both to preserve and maximize the value of the Debtor's assets for the benefit of the Debtor, its estate, its creditors, interest holders and all other parties in interest in the chapter 11 case, and to provide the means for the Debtor to maximize creditor and interest holder recoveries.  Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion (as it pertains to approval of the matters set forth herein) is **GRANTED** as set forth herein and the Sale contemplated thereby and by the APA is approved as set forth in this Sale Order.  Any objections that have not been previously resolved or withdrawn are overruled on the merits.

## Approval of the APA

2.      The APA, and all other ancillary documents, including all of the terms and conditions thereof, is hereby approved.

3.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to execute and deliver, perform under, consummate, implement, comply with and close fully the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale, and consummate the Sale pursuant to and in accordance with the terms and conditions of the APA.  The Debtor is further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any expenses or

costs that are required to be paid in order to consummate the transactions contemplated by the APA or perform their obligations under the APA.

4.      The Debtor is authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the APA, together with all additional instruments, documents, and other agreements that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Purchased Assets, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA.

5.      This Order and the APA shall be binding in all respects upon the Debtor and its estate, successors, and assigns, all creditors of and equity holders in the Debtor, and any and all other parties in interest, including, without limitation, any and all holders of Liens, claims, encumbrances, and other interests (including holders of any rights or claims based on any putative successor or transferee liability) of any kind or nature whatsoever in the Purchased Assets, all non-Debtor parties to the Assumed Contracts, and any trustee or successor trustee appointed in these chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code. The APA and the Sale are not subject to rejection or avoidance (whether through any avoidance or recovery, claim, action, or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar state or federal Law or any other cause of action) by the Debtor, any chapter 7 or chapter 11 trustee of the Debtor's bankruptcy estates or any other person or entity. The APA, this Order, and the Debtor's obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in these bankruptcy cases, any order confirming any chapter 11 plan, or any subsequent order of this Court without the prior

written consent of the Buyer. Nothing contained in any chapter 11 plan confirmed in these chapter 11 cases or the confirmation order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the APA or this Order. This Sale Order and the APA shall inure to the benefit of the Debtor, its estate, its creditors, the Buyer, and their respective successors and assigns.

6.      The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in a writing signed by both parties, after consultation with Mission with respect to material modifications, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate.

### Transfer of the Purchased Assets

7.      Except as expressly permitted or otherwise specifically provided for in the APA or this Order, pursuant to sections 105(a), 363(b), 363(f), 365(b), 365(f) of the Bankruptcy Code or any other applicable section of the Bankruptcy Code, upon the Closing, the Purchased Assets shall be transferred to the Buyer, and such transfer shall constitute a legal, valid, binding and effective transfer of the Purchased Assets free and clear of all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever pursuant to section 363(f) of the Bankruptcy Code. Upon the Closing, the Buyer shall take title to and possession of the Purchased Assets subject only to the Assumed Liabilities and Permitted Exceptions.

8.      Except as expressly permitted or otherwise specifically provided by the APA or this Order, all persons and entities (as defined in section 101(15) of the Bankruptcy Code), including, but not limited to, all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to executory contracts and unexpired leases, creditors holding

4816-9786-4367.5

Liens or claims of any kind or nature whatsoever against or in the Debtor or any of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) arising under or out of, in connection with, or in any way relating to, the Debtor, the Purchased Assets, the operation of the Debtor's business prior to the Closing, or the transfer of the Purchased Assets to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting any Liens or claims of any kind or nature whatsoever, against the Buyer and its successors, designees, assigns, or property, or the Purchased Assets conveyed in accordance with the APA.  On the Closing Date, each of the Debtor's creditors is authorized to execute such documents and take all other actions as may be deemed by the Buyer to be necessary or desirable to release Liens or claims on the Purchased Assets, if any, as provided for herein, as such Liens or claims may have been recorded or may otherwise exist.

9.      The transfer of the Purchased Assets to the Buyer pursuant to the APA shall constitute a legal, valid, and effective transfer of the Purchased Assets on the Closing, and shall vest the Buyer with all of the Debtor's rights, title, and interests in the Purchased Assets free and clear of all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever.

10.     All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Buyer or its assignee as of the Closing Date.

11.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens in the Purchased Assets conveyed pursuant to the APA and this Order has not delivered to the Debtor, prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens which the person or entity has with respect to the

Purchased Assets or otherwise, then (a) the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets, and (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Purchased Assets of any kind or nature whatsoever.

12.     All liens on the Purchased Assets shall attach to the net proceeds of Sale in the same order of priority as existed prior to the sale.  The Debtor shall hold and retain the net sale proceeds pending either (i) confirmation of a chapter 11 plan or (ii) further order of the Court upon motion.  The rights of all secured parties in the net proceeds of sale are preserved and shall remain subject to the terms of this Court's *Final Order (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Certain Protections to Prepetition Lender, and (III) Modifying the Automatic Stay* [Docket No. 107] (the "Final Cash Collateral Order").

<u>**Assumption and Assignment of Assumed Contracts**</u>

13.     The Debtor is hereby authorized to and shall, in accordance with sections 105(a) and 365 of the Bankruptcy Code, (a) assume the Assumed Contracts, (b) assign the Assumed Contracts to the Buyer, effective upon and subject to the occurrence of the Closing, free and clear of all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever, which Assumed Contracts by operation of this Order, shall be deemed assumed and assigned effective as of the Closing, and (c) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Buyer.  The Buyer's assumption on the terms set forth in the APA of the Assumed Contracts, is hereby approved, and all requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the

assumption and assignment of the Assumed Contracts by the Debtor to the Buyer have been satisfied.

14.     Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract on the consent of the non-Debtor counterparty thereto or allow the non-Debtor party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, shall constitute unenforceable anti-assignment provisions that are void and of no force and effect.

15.     Upon assignment to the Buyer, (i) the Assumed Contracts shall remain in full force and effect for the benefit of the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, limits, or conditions such assignment or transfer and (ii) in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title, and interest of the Debtor in each Assumed Contract free and clear of Liens, claims, encumbrances, and other interests of any kind or nature whatsoever.

16.     The Buyer is hereby substituted for all purposes solely related to the Purchased Assets as a party to all Assumed Contracts in the place of the Debtor, and the Buyer shall have any and all rights and benefits of the Debtor related to the Purchased Assets under all such Assumed Contracts without interruption or termination of any kind, and all terms applicable to the Debtor solely related to the Purchased Assets shall apply to the Buyer as if such Assumed Contracts were amended to replace the Debtor with the Buyer.

17.    All defaults or other obligations of the Debtor under the Assumed Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) as to which no objections were interposed and remain pending as of the date of this Order are deemed satisfied by the payment of the proposed amount necessary, if any, to cure all monetary defaults, if any, under such Assumed Contract in those amounts set forth in **Exhibit 2** attached hereto (the "Cure Amounts") and in the Cure Notice, which was served in compliance with the Bid Procedures Order, and which were satisfied, or shall be satisfied as soon as practicable, as provided in the APA.  For all Assumed Contracts for which a Cure Notice was served, the Debtor or the Buyer, as applicable under the APA, are authorized and directed to pay all Cure Amounts required to be paid by such parties in accordance with the APA upon the later of (a) the Closing or (b) for any Assumed Contract for which an objection has been filed to the assumption and assignment of such agreement or the Cure Amounts relating thereto and such objection remains pending as of the date of this Order, the resolution of such objection by settlement or order of this Court.  The Buyer is authorized, in its sole discretion, to remove any contracts from Schedule [•], the list of those Contracts and Permits that Buyer elects to have assumed and assigned to Buyer, at any time prior to the date that is one (1) business day prior to the Closing Date.

18.    Each non-Debtor party to an Assumed Contract is hereby forever barred, estopped, and permanently enjoined from asserting against the Debtor, the Buyer, or any of their affiliates, or the property of any of them, any default, breach, claims of pecuniary losses existing as of the Closing or by reason of Closing, action, liability, or other cause of action existing as of the date of the Sale Hearing whether asserted or not, or, against the Buyer or any of its affiliates, any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtor.  Each

non-Debtor party to an Assumed Contract is hereby forever barred, estopped, and permanently enjoined from asserting any objection to the assumption and assignment of such non-Debtor party's Assumed Contract including, without limitation, that its consent is necessary for such assumption and assignment.

## **Additional Provisions**

19.     This Order (a) shall be effective as a determination that, upon the Closing, all Liens, claims, encumbrances, and other interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, foreign, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Purchased Assets.

20.     Any amounts that become payable by the Debtor to the Buyer pursuant to the APA and any related agreements executed in connection therewith shall (a) be entitled to administrative expense claim status under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code; (b) not be subordinate to any other administrative expense claim against the Debtor, (c) not be altered, amended, discharged or affected by any chapter 11 plan proposed or confirmed in these chapter 11 cases without the prior written consent of the Buyer, (d) be paid by the Debtor in the time and manner provided for in the APA without further order of this Court, and (e) not be subject to any

bar date in these chapter 11 cases or any requirement to file any request for allowance of administrative claim or proof of claim.

21.     At any time prior to the Closing, Buyer may assign the APA or its rights thereunder to one or more of its affiliates, which shall be entitled to assume and accede to the APA and to purchase and acquire any or some of the Purchased Assets in lieu of Buyer, and such affiliate(s) shall be deemed to be Buyer for all purposes under this Order.

22.     Neither the Buyer nor any of its affiliates are or shall be deemed, as a result of the consummation of the Sale contemplated herein, to: (a) be legal successors to the Debtor or its estate by reason of any theory of law or equity, (b) an affiliate of the Debtor, (c) have, *de facto* or otherwise, merged with or into the Debtor, or (d) be an alter ego or a mere continuation or substantial continuation or successor of the Debtor in any respect.  Except as expressly permitted or otherwise specifically provided for in the APA or this Order, neither the Buyer nor any of its affiliates shall (i) assume or in any way be responsible for any liability or obligation of any of the Debtor and/or its estate or (ii) have any liability or responsibility for any liability or other obligation of the Debtor's arising under or related to the Purchased Assets or otherwise.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the APA, the Buyer and its affiliates shall not be liable for any claims against the Debtor or its predecessors or affiliates, and the Buyer and its affiliates shall have no successor or vicarious liabilities of any kind or character including but not limited to any theory of warranty, product liability, environmental, successor or transferee liability, labor law, *de facto* merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in

17

connection with, or in any way relating to the operation of the Debtor's business prior to the Closing.

23.    Following the Closing, no holder of a Lien in the Purchased Assets shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to such Lien, or any actions that the Debtor may take in this chapter 11 case or any successor case.

24.    This Court retains jurisdiction to enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to:  (a) compel delivery of the Purchased Assets or performance of other obligations owed to the Buyer; (b) resolve any disputes arising under or related to the APA, except as otherwise provided therein; (c) interpret, implement, and enforce the provisions of this Order; and (d) protect the Buyer and its affiliates against (i) any Liens in the Debtor or the Purchased Assets of any kind or nature whatsoever and (ii) any creditors or other parties in interest regarding the turnover of the Purchased Assets that may be in their possession.

25.    The so-called "bulk sale" laws or any similar law of any applicable state or other jurisdiction are waived or inapplicable to the Sale.

26.    Except as otherwise expressly provided in the APA, the Buyer shall have no Liability to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees of the Debtor.  Except as otherwise expressly provided in the APA shall have no Liability with respect to any collective bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan to which the Debtor is a party and relating to the Purchased Assets (including,

without limitation, arising from or related to the rejection or other termination of any such agreement), and Buyer shall in no way be deemed a party to or assignee of any such agreement, and no employee of Buyer shall be deemed in any way covered by or a party to any such agreement, and except as otherwise expressly provided in the APA, all parties to any such agreement are hereby enjoined from asserting against Buyer any and all Claims arising from or relating to such agreement.

27.     The failure to specifically include any particular provision of the APA or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and other related documents be authorized and approved in their entirety.

28.     To the extent of any conflict between the APA and this Order, the terms and provisions of this Order shall govern.

29.     The provisions of this Order are non-severable and mutually dependent.

30.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any entity obtaining a stay pending appeal, the Debtor and the Buyer are free to close the Sale under the APA in accordance with its terms at any time.

Signed: _____, 2020

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>Exhibit 1</u>**

**APA**

**ASSET PURCHASE AGREEMENT**

**for**

**the SALE of TELEVISION-RELATED ASSETS**

**KMSS-TV, SHREVEPORT, LOUISIANA**
**KPEJ-TV, ODESSA, TEXAS**
**KLJB, DAVENPORT, IOWA**

**by and among**

**MARSHALL BROADCASTING GROUP, INC**

**and**

**[BUYER]**

**Dated as of _____**

Table of Contents

Page

**Article I DEFINITIONS**...................................................................................................1

    Section 1.1.    Definitions.............................................................................................1

**Article II PURCHASE AND SALE OF PURCHASED ASSETS** ............................7

    Section 2.1.    Purchase and Sale of Purchased Assets ................................7
    Section 2.2.    Excluded Assets ........................................................................8
    Section 2.3.    Assumption of Liabilities .........................................................9
    Section 2.4.    Closing Date ...............................................................................9
    Section 2.5.    Purchase Price ..........................................................................10
    Section 2.6.    Prorations and Adjustments .................................................10
    Section 2.7.    Closing Date Deliveries ..........................................................11
    Section 2.8.    Further Assurances .................................................................12
    Section 2.9.    Allocation of Purchase Price .................................................12

**Article III REPRESENTATIONS AND WARRANTIES OF THE SELLER**......................12

    Section 3.1.    Organization..............................................................................12
    Section 3.2.    Authority of the Seller............................................................13
    Section 3.3.    All Assets ...................................................................................14
    Section 3.4.    Governmental Permits; FCC Matters ..................................14
    Section 3.5.    Real Property Leases..............................................................15
    Section 3.6.    Title to Tangible Personal Property .....................................15
    Section 3.7.    Contracts ...................................................................................15
    Section 3.8.    No Violation, Litigation or Regulatory Action ....................16
    Section 3.9.    Insurance ...................................................................................16
    Section 3.10.    Employees.................................................................................16
    Section 3.11.    Environmental Protection .......................................................17
    Section 3.12.    Seller's Broker .........................................................................18

**Article IV REPRESENTATIONS AND WARRANTIES OF THE BUYER**......................18

    Section 4.1.    Organization..............................................................................18
    Section 4.2.    Authority of the Buyer ............................................................18
    Section 4.3.    Litigation....................................................................................19
    Section 4.4.    No Finder...................................................................................19
    Section 4.5.    Qualifications as FCC Licensee ...........................................19
    Section 4.6.    Financial Capacity; Solvency.................................................20

**Article V ACTION PRIOR TO THE CLOSING DATE** ........................................20

    Section 5.1.    Access to the Business ..........................................................20
    Section 5.2.    Notification of Certain Matters .............................................21
    Section 5.3.    FCC Consent; Other Consents and Approvals...................21
    Section 5.4.    Operations of the Stations Prior to the Closing Date ...........23
    Section 5.5.    Public Announcement.............................................................23
    Section 5.6.    Employees.................................................................................23

i

**Article VI ADDITIONAL AGREEMENTS** ..................................................................**24**

Section 6.1.     Control of Operations Prior to Closing Date ........................................ 24
Section 6.2.     Bulk Transfer Laws .............................................................................. 24
Section 6.3.     Use of Names ....................................................................................... 24

**Article VII CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER** ..........**25**

Section 7.1.     No Breach of Covenants and Warranties .............................................. 25
Section 7.2.     No Restraint ......................................................................................... 25
Section 7.3.     Certain Governmental Approvals ......................................................... 25
Section 7.4.     Closing Deliveries ................................................................................ 25

**Article VIII CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER** ..........**26**

Section 8.1.     No Breach of Covenants and Warranties .............................................. 26
Section 8.2.     No Restraint ......................................................................................... 26
Section 8.3.     Certain Governmental Approvals ......................................................... 26
Section 8.4.     Closing Deliveries ................................................................................ 26

**Article IX INDEMNIFICATION** ...............................................................................**26**

Section 9.1.     Indemnification by the Seller ............................................................... 26
Section 9.2.     Indemnification by the Buyer ............................................................... 27
Section 9.3.     Notice of Claims; Determination of Amount ........................................ 27
Section 9.4.     Third Person Claims ............................................................................ 28
Section 9.5.     Limitations; Subrogation; Exclusive Remedies .................................... 29
Section 9.6.     No Special Damages; Mitigation .......................................................... 30

**Article X TERMINATION** .......................................................................................**30**

Section 10.1.    Termination ......................................................................................... 30
Section 10.2.    Withdrawal of Certain Filings .............................................................. 32

**Article XI GENERAL PROVISIONS** ........................................................................**32**

Section 11.1.    Survival of Obligations ........................................................................ 32
Section 11.2.    Confidential Nature of Information ...................................................... 32
Section 11.3.    Governing Law .................................................................................... 32
Section 11.4.    Exclusive Jurisdiction; Court Proceedings ........................................... 33
Section 11.5.    Notices ................................................................................................ 33
Section 11.6.    Successors and Assigns; Third Party Beneficiaries .............................. 34
Section 11.7.    Access to Records after Closing ........................................................... 34
Section 11.8.    Entire Agreement; Amendments .......................................................... 35
Section 11.9.    Interpretation ...................................................................................... 35
Section 11.10.   Waivers ............................................................................................... 35
Section 11.11.   Expenses .............................................................................................. 36
Section 11.12.   Partial Invalidity ................................................................................. 36
Section 11.13.   Execution in Counterparts ................................................................... 36
Section 11.14.   Disclaimer of Warranties ..................................................................... 36
Section 11.15.   Specific Performance ........................................................................... 37

ii

**<u>EXHIBITS</u>**

Exhibit A   -   Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit B   -   Form of Assignment of Seller FCC Authorizations

**<u>SCHEDULES</u>**

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT**, dated as of _____ (this "Agreement"), by and among Marshall Broadcasting Group, Inc., a Texas corporation ("Seller") and _____, a _____ corporation (the "Buyer"). Buyer and Seller are each referred to herein individually as a "Party," and collectively as the "Parties."

### RECITALS:

A.    The Seller owns and operates television broadcast stations KMSS-TV, Shreveport, Louisiana, KPEJ-TV, Odessa, Texas and KLJB, Davenport, Iowa (the "Stations"), pursuant to certain authorizations issued by the Federal Communications Commission (the "FCC").

B.    On December 3, 2019 (the "Petition Date"), Seller filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing voluntary proceedings (the "Bankruptcy Case") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

C.    Buyer desires to purchase the Purchased Assets and assume the Assumed Liabilities, and the Seller desires to sell to the Buyer the Purchased Assets and transfer the Assumed Liabilities, on the terms and subject to the conditions contained in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Parties do hereby agree as follows:

### ARTICLE I

### DEFINITIONS

**Section 1.1.    Definitions**. As used in this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

"**Affiliate**" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. As used in this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning specified in the introductory paragraph hereof.

"**Ancillary Agreements**" means any certificate, agreement, document or other instrument to be executed and delivered in connection with the transactions contemplated by this Agreement.

1

"**Assignment of the Seller FCC Authorizations**" has the meaning specified in Section 2.7.

"**Assumed Liabilities**" has the meaning specified in Section 2.3(a).

"**Bid Procedures Order**" means the Bankruptcy Court's *Order (A) Approving Bidding Procedures and Certain Bid Protections, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof* [Docket No. ---], signed on _____, 2020.

"**Bill of Sale and Assignment and Assumption Agreement**" has the meaning specified in Section 2.7(a).

"**Business**" means the business of the Stations (and shall not include other businesses or assets of Seller).

"**Business Day**" means any day on which the principal offices of the Securities and Exchange Commission are open to accept filings and on which banks in the City of New York are not required or authorized to close.

"**Buyer**" has the meaning specified in the introductory paragraph hereof.

"**Buyer Ancillary Agreements**" has the meaning specified in Section 4.2(a).

"**Buyer Group Member**" means the Buyer, its Affiliates, and each of their successors and assigns, and their respective directors, officers, employees and agents.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., and any regulations promulgated thereunder.

"**Claim Notice**" has the meaning specified in Section 9.3(a).

"**Closing**" has the meaning specified in Section 2.4.

"**Closing Date**" has the meaning specified in Section 2.4.

"**Closing Date Adjustments**" has the meaning specified in Section 2.6(a).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Communications Act**" means the Communications Act of 1934, as amended, and the rules and regulations of the FCC promulgated under the foregoing, in each case, as in effect from time to time.

"**Confidentiality Agreement**" has the meaning specified in Section 5.1.

"**Cutoff Time**" means 11:59 P.M. (central time) on the date immediately prior to the Closing Date.

"**Encumbrance**" means any lien, claim, charge, security interest, mortgage, pledge, easement, conditional sale or other title retention agreement, defect in title, covenant or other restrictions of any kind, other than any license of, option to license, or covenant not to assert claims of infringement or misappropriation with respect to, Intellectual Property.

"**Environmental Law**" means all Requirements of Laws relating to or addressing the prevention of pollution, the environment, human health, occupational health or safety, including but not limited to CERCLA, OSHA, RCRA, the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300(f) et seq.; the Clean Air Act, as amended, 42 U.S.C. §§ 7401 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; and any state equivalents thereof.

"**Escrow Agent**" means Wells Fargo Bank, National Association, a national banking association organized under the laws of the United States.

"**Escrow Agreement**" means that certain Escrow Agreement, dated as of the date hereof, by and among the Seller, the Buyer and the Escrow Agent.

"**Escrow Deposit**" has the meaning specified in Section 2.5(b).

"**Excluded Assets**" has the meaning specified in Section 2.2.

"**Excluded Liabilities**" has the meaning specified in Section 2.3(b).

"**Expense**" means any and all expenses incurred in connection with investigating, defending or asserting any claim, action, suit or proceeding incident to any matter indemnified against hereunder (including court filing fees, court costs, arbitration fees or costs, witness fees, and reasonable fees and disbursements of legal counsel, investigators, expert witnesses, consultants, accountants and other professionals).

"**FCC**" has the meaning specified in the preamble.

"**FCC Applications**" has the meaning specified in Section 5.3(a).

"**FCC Consent**" means action by the FCC (including action by staff acting on delegated authority) granting its consent to the FCC Applications.

"**Governmental Body**" means any foreign, federal, state, local or other governmental authority, or judicial or regulatory body.

"**Governmental Consents**" means (i) the FCC Consent; (ii) the Sale Order; and (iii) all authorizations, consents, Orders and approvals of all Governmental Bodies, including any State Attorney General, that are or may become necessary for the execution, delivery and consummation of the transactions contemplated hereby.

"**Governmental Permits**" has the meaning specified in Section 3.4(a).

"**Hazardous Materials**" means any waste, pollutant, hazardous substance, toxic substance, hazardous waste, special waste, regulated or defined as "hazardous," "toxic" or words of similar import pursuant to any Environmental Law, including asbestos, asbestos containing material, petroleum or petroleum-derived substance or waste, or any constituent of any such substance or waste.

"**Indemnified Party**" has the meaning specified in Section 9.3(a).

"**Indemnitor**" has the meaning specified in Section 9.3(a).

"**Independent Accountant**" has the meaning specified in Section 2.6(b).

"**Intellectual Property**" means (a) patents, (b) Trademarks, (c) copyrights, (d) registrations and applications for registration of any of the foregoing in (a)-(c), and (e) trade secrets, including advertising customer lists, mailing lists, processes, know-how and other proprietary or confidential information.

"**Knowledge of the Seller**" means, as to a particular matter, the actual knowledge, after reasonable inquiry of the manager of the Stations, of the following persons: Pluria Marshall.

"**Laws**" means any and all domestic (federal, state or local) or foreign or provincial laws, statutes, ordinances, rules, published regulations, judgments, orders, injunctions, awards, or agency policies, procedures, requirements or decrees promulgated by any Governmental Body.

"**Loss**" means any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, damages, expenses, deficiencies or other charges.

"**Market**" means, with respect to the Stations, the "Designated Market Area," as determined by The Nielsen Company, of the Stations.

"**Material Adverse Effect**" means a material adverse effect on (i) the ability of the Seller to perform its obligations under this Agreement, or (ii) the assets of the Business, taken as a whole; provided, however, that for purposes of determining whether there has been or is reasonably likely to be a "Material Adverse Effect" for purposes of clause (ii), the results and consequences of the following events, occurrences, facts, conditions, changes, developments or effects shall not be taken into account: (a) any changes that generally affect the industries in which the Seller operates or the Markets of the Stations, (b) resulting from the announcement by the Seller of its intention to sell the Business, including the announcement or pendency of this Agreement or the transactions contemplated hereby, or the facts, circumstances or events relating to any of the Buyer or its Affiliates, or actions taken by any of them including the impact thereof on relationships, contractual or otherwise, with agents, customers, suppliers, vendors, licensees, licensors, lenders, partners, employees or regulators, including the FCC, (c) the taking of any action expressly required by, or the failure to take any action expressly prohibited by, this Agreement, or the taking of any action at the written request or the prior written consent of the Buyer, (d) any changes in the economy or capital, financial or securities markets generally, including changes in interest or exchange rates, (e) changes in Laws or generally accepted accounting principles (or the interpretation thereof) or in legal, regulatory or political conditions, (f) the commencement, escalation or worsening of any war or armed hostilities or the occurrence

of acts of terrorism or sabotage occurring after the date hereof and (g) earthquakes, hurricanes, floods or other natural disasters.

"**Nexstar Claims**" means the claims and causes of action that were or could have been asserted against Nexstar Media Group. Inc. and/or affiliated entities in any forum including but not limited to *Marshall Broadcasting Group, Inc. v Nexstar Broadcasting, Inc.*, Civ. A. No. 651943/2019 (N.Y. Sup. Ct.).

"**Order**" means any order, judgment, injunction, awards, stipulations, decree or writ handed down, adopted or imposed by, including any consent decree, settlement agreement or similar written agreement with, any Governmental Body.

"**OSHA**" means the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq., and any regulations promulgated thereunder.

"**Payment Date**" has the meaning specified in Section 2.6(b).

"**Permitted Encumbrance**" means (a) liens for Taxes, assessments or other governmental charges which are not yet due and payable or Taxes being contested in good faith by appropriate proceedings, (b) terms and conditions of any leases assumed by Buyer, (c) zoning laws and ordinances and similar Laws that are not materially violated by any existing improvement or that do not prohibit the use of the Real Property as currently used in the operation of the Business; (d) any right reserved to any Governmental Body to regulate the affected property; (e) in the case of any leased asset, (i) the rights of any lessor under the applicable lease agreement or any Encumbrance granted by any lessor or any Encumbrance that the applicable lease is subject to, (ii) any statutory lien for amounts that are not yet due and payable or are being contested in good faith, (iii) any subleases listed in any Schedule hereto and (iv) the rights of the grantor of any easement or any Encumbrance granted by such grantor on such easement property; (f) easements, rights of way, restrictive covenants and other encumbrances, encroachments or other similar matters affecting title that do not materially adversely affect title to the property subject thereto or materially impair the continued use of the property in the ordinary course of the Business; (g) inchoate materialmens', mechanics', workmen's, repairmen's or other like Encumbrances arising in the ordinary course of business for amounts that are not yet due and payable or that are being contested in good faith by appropriate proceedings; (h) minor defects of title, easements, rights-of-way, restrictions and other Encumbrances not interfering with the present use of the applicable assets subject thereto; (i) any state of facts that an accurate survey or physical inspection would show, provided such facts do not render title unmarketable or interfere with the present use of the applicable Real Property; (j) Encumbrances that will be released prior to or as of the Closing Date, including all mortgages and security interests securing indebtedness of Seller; (k) licenses of Intellectual Property granted in the ordinary course of business that, individually or in the aggregate, do not, and would not reasonably be expected to, materially detract from the value of such Intellectual Property, or interfere with the use thereof by the Stations; and (l) any other Encumbrance disclosed on any Schedule hereto.

"**Person**" means any person, employee, individual, corporation, limited liability company, partnership, trust, or any other non-governmental entity or any governmental or regulatory authority or body.

5

"**Purchase Price**" has the meaning specified in Section 2.5.

"**Purchased Assets**" has the meaning specified in Section 2.1.

"**RCRA**" means the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., and any regulations promulgated thereunder.

"**Real Property**" has the meaning specified in Section 3.5(a).

"**Real Property Leases**" has the meaning specified in Section 3.5(a).

"**Release**" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"**Requirements of Law**" means any foreign, federal, state or local law, rule or regulation, Governmental Permit or other binding determination of any Governmental Body.

"**Retained Names and Marks**" means all (a) Trademarks containing or incorporating the term "Marshall," (b) other Trademarks owned by Seller (other than Trademarks included in the Purchased Intellectual Property), (c) variations or acronyms of any of the foregoing, and (d) Trademarks confusingly similar to or dilutive of any of the foregoing.

"**Sale Order**" means the order of the Bankruptcy Court expressly authorizing delivery of the Stations and the Purchased Assets to the Buyer pursuant to Sections 105, 363, and 365 of the Bankruptcy Code free and clear of all liens, claims, and encumbrances, other than Permitted Encumbrances and the Assumed Liabilities.

"**Seller**" has the meaning specified in the introductory paragraph hereof.

"**Seller FCC Authorizations**" means those Governmental Permits issued to Seller by the FCC with respect to the Stations that are material to the Stations' operations.

"**Seller Group Member**" means the Seller, its Affiliates, each of their successors and assigns, and their respective directors, officers, employees, agents and representatives.

"**Solvent**" when used with respect to any Person or group of Persons on a combined basis, means that, as of any date of determination, (A) the amount of the "fair saleable value" of the assets of such Person (or group of Persons on a combined basis) will, as of such date, exceed (1) the value of all "liabilities of such Person (or group of Persons on a combined basis), including contingent and other liabilities," as of such date, as such quoted terms are generally determined in accordance with applicable Laws governing determinations of the insolvency of debtors, and (2) the amount that will be required to pay the probable liabilities of such Person (or group of Persons on a combined basis) on its existing debts (including contingent liabilities) as such debts become absolute and matured, (B) such Person (or group of Persons on a combined basis) will not have, as of such date, an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged following such date and (C) such Person (or group

6

of Persons on a combined basis) will be able to pay its liabilities, including contingent and other liabilities, as they mature.

"**Stations**" has the meaning specified in the first recital hereof.

"**Stations Agreements**" has the meaning specified in Section 3.7.

"**Tangible Personal Property**" has the meaning specified in Section 2.1(b).

"**Tax**" means any federal, state, local or foreign net income, alternative or add-on minimum, gross income, gross receipts, property, sales, use, transfer, gains, license, employment, payroll, capital stock, environmental, franchise, social security, stamp, registration and value-added taxes, withholding or minimum tax, or other tax, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Body.

"**Tax Return**" means any return, declaration, report, claim for refund or other document relating to Taxes, including any schedule or attachment thereto, and amendment thereof.

"**Termination Date**" has the meaning specified in Section 10.1(a)(v).

"**Third Person Claim Notice**" has the meaning specified in Section 9.4(a).

"**Trademarks**" means trademarks, service marks, Internet domain names, trade dress, trade names, and corporate names, all applications and registrations for the foregoing, and all goodwill connected with the use thereof and symbolized thereby.

## ARTICLE II

## PURCHASE AND SALE OF PURCHASED ASSETS

**Section 2.1.**   **Purchase and Sale of Purchased Assets**.  Upon the terms and subject to the conditions of this Agreement and pursuant to Section 363 of the Bankruptcy Code, at the Closing, the Seller shall sell, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase from the Seller pursuant to this Agreement, free and clear of all Encumbrances (except for Permitted Encumbrances and Assumed Liabilities), all of the right, title and interest of the Seller as of the Closing to the following assets, properties and business (excepting only the Excluded Assets) (herein collectively referred to as the "Purchased Assets"):

(a)     (x) The Seller FCC Authorizations, including the call signs KMSS-TV, KPEJ-TV and KLJB, and (y) all other assignable Governmental Permits exclusively related to the Stations, and including any applications therefor and renewals or modifications thereof between the date hereof and Closing;

(b)     All machinery, equipment auxiliary and translator facilities, transmitting towers, transmitters, broadcast equipment, antennae, supplies, and other tangible personal property set forth on Schedule 2.1(b) except for any retirements or dispositions thereof made between the date hereof and Closing in accordance with Section 5.4 ("Tangible Personal Property");

(c)     Other than the Nexstar Claims, all claims or causes of action of the Seller as applicable, against third parties solely to the extent that any such claims or causes of action arise out of the Purchased Assets or Assumed Liabilities; and

(d)     All books and records of the Seller that relate exclusively to the Business, including all files, logs, programming information and studies, technical information and engineering data, news and advertising studies or consulting reports and sales correspondence exclusively relating to the Business excluding records relating to Excluded Assets.

Section 2.2.    **Excluded Assets**.  Notwithstanding the foregoing, the Purchased Assets shall not include the following (herein referred to as the "Excluded Assets"):

(a)     Any cash or cash equivalents (including any marketable securities or certificates of deposit) of the Seller;

(b)     All accounts receivable of the Seller;

(c)     All bank and other depository accounts of the Seller;

(d)     All Tangible Personal Property of the Seller (x) not listed on Schedule 2.1(b) or (y) sold, transferred, retired or otherwise disposed of between the date of this Agreement and Closing in accordance with Section 5.4;

(e)     All reimbursements arising from the FCC repacking process;

(f)     The Nexstar Claims;

(g)     Any rights, claims or causes of action of the Seller against third parties relating to the assets, properties or operations of the Business prior to the Closing Date (including all amounts payable to the Seller, if any, from the United States Copyright Office or such arbitration panels as may be appointed by the United States Copyright Office that relate to the Business prior to the Closing that have not been paid as of the Closing);

(h)     All bonds held, contracts or policies of insurance and prepaid insurance with respect to such contracts or policies;

(i)     All records prepared in connection with or relating to the sale or transfer of the Stations, including bids received from others and analyses relating to the Stations and the Purchased Assets;

(j)     All rights and claims of Seller, whether mature, contingent or otherwise, against third parties with respect to the Stations and the Purchased Assets, to the extent arising during or attributable to any period prior to the Closing Date;

(k)     The items designated in Schedule 2.2(h) as "Excluded Assets";

(l)     The Retained Names and Marks;

(m)     All Intellectual Property of the Seller or any of its Affiliates;

(n)     All records and documents relating to Excluded Assets or to liabilities other than Assumed Liabilities;

(o)     All capital stock or other equity securities of Seller or subsidiaries of Seller or its Affiliates and all other equity interests in any entity that are owned beneficially or of record by Seller or its Affiliates; and

(p)     Any rights of or payment due to the Seller or its Affiliates, under or pursuant to this Agreement or the other agreements with the Buyer or any of its Affiliates contemplated hereby.

**Section 2.3.     Assumption of Liabilities**.

(a)     Upon the terms and subject to the conditions of this Agreement, as of the Closing, the Buyer shall assume and shall thereafter be obligated for, and shall agree to pay, perform and discharge in accordance with their terms, the following obligations and liabilities of the Seller, whether direct or indirect, known or unknown (except to the extent such obligations and liabilities constitute Excluded Liabilities):

(i)     the liabilities and obligations arising with, or relating to, the operation of the Stations, including the owning or holding of the Purchased Assets, on and after the Closing Date; and

(ii)     all liabilities and obligations relating to the Business or the Purchased Assets arising out of Environmental Laws, whether or not presently existing, except for liabilities and obligations that are required to be disclosed on Schedule 3.11, but which are not so disclosed.

All of the foregoing to be assumed by the Buyer hereunder are referred to herein as the "Assumed Liabilities."

(b)     The Buyer shall not assume or be obligated for any liabilities or obligations of any and every kind whatsoever, direct or indirect, known or unknown, absolute or contingent, not expressly assumed by the Buyer under Section 2.3(a) and, notwithstanding anything to the contrary in Section 2.3(a), none of the following (herein referred to as "Excluded Liabilities") shall be "Assumed Liabilities" for purposes of this Agreement:

(i)     Any intercompany payables of the Business owing to any of the Affiliates of the Seller; and

(ii)     any Seller liabilities or obligations under this Agreement or the Ancillary Agreements.

**Section 2.4.     Closing Date**.  Subject to any prior termination of this Agreement pursuant to Section 10.1 the purchase and sale of the Purchased Assets provided for in Section 2.1 (the "Closing") shall be consummated at 9:00 A.M., Central Time, five (5) Business Days after

the conditions set forth in <u>Articles VII</u> and <u>VIII</u> are satisfied or, if legally permissible, waived (other than those conditions that by their nature are to be satisfied (or validly waived) at the Closing, but subject to such satisfaction or waiver), at the offices of _____, unless such time or date is changed by mutual agreement of the Seller and the Buyer (the "<u>Closing Date</u>").

Section 2.5.   <u>Purchase Price</u>.

(a)   The purchase price for the Purchased Assets (the "<u>Purchase Price</u>") shall be equal to _____Dollars ($_____), subject to adjustment as provided in this Agreement.  Buyer shall pay, or cause to be paid, the Purchase Price at the Closing by wire transfer in immediately available funds to the account or account(s) designated by Seller.

(b)   As of the date hereof, Buyer has deposited, or has caused to be deposited, an amount of cash equal to _____ Dollars ($_____) with the Escrow Agent to be held as an earnest money deposit ("<u>Escrow Deposit</u>") pursuant to the Escrow Agreement.  At the Closing, the Buyer and the Seller shall deliver joint written instructions (pursuant to the Escrow Agreement) to the Escrow Agent to disburse the Escrow Deposit (less any interest earned thereon prior to Closing) to the Seller as a credit towards payment of the Purchase Price due at Closing to the Seller, other than any adjustments thereto as provided in this Agreement, and shall not, by any act or omission, delay or prevent such disbursement.

Section 2.6.   <u>Prorations and Adjustments</u>.

(a)   All expenses arising from the Business, including, without limitation, Assumed Liabilities and prepaid expenses, ad valorem and property taxes and assessments, annual regulatory fees payable to the FCC, power and utilities charges, and rents and similar prepaid and deferred items shall be prorated between Seller and Buyer to reflect the principle that Seller shall be responsible for all expenses arising from the Business through the Cutoff Time and Buyer shall be responsible for all expenses arising from the Business after the Cutoff Time; provided however, Buyer shall be obligated for all cure amounts required to be paid for the assignment of executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code that Seller assumes and assigns to Buyer (the "<u>Cure Amounts</u>").  The prorations and adjustments to be made pursuant to this <u>Section 2.6</u> are referred to as the "<u>Closing Date Adjustments</u>."

(b)   Three (3) Business Days prior to the Closing Date, Seller shall estimate all Closing Date Adjustments pursuant to this <u>Section 2.6</u> and shall deliver a statement of its estimates to Buyer (which statement shall set forth in reasonable detail the basis for those estimates).  At the Closing, the net amount due to Buyer or Seller as a result of the estimated Closing Date Adjustments shall be applied as an adjustment to the Purchase Price, as appropriate.  Within ninety (90) days after the Closing, Buyer shall deliver to Seller a statement of any adjustments to Seller's estimate of the Closing Date Adjustments, and no later than the close of business on the thirtieth (30) day after the delivery of such statements (the "<u>Payment Date</u>"), Buyer shall pay to Seller, or Seller shall pay to Buyer, as the case may be, any amount due as a result of the adjustment (or, if there is any good faith dispute, the undisputed amount).  Except with respect to items that Seller notifies Buyer that it objects to prior to the close of business on the date that is at least one (1) Business Day prior to the Payment Date, the adjustments set forth in Buyer's statement

shall be final and binding on the parties effective at the close of business on the Payment Date. If Seller disputes Buyer's determinations or Buyer disputes Seller's determinations, the parties shall consult with regard to the matter and an appropriate adjustment and payment shall be made as agreed upon by the parties within thirty (30) days after the Payment Date. If such thirty (30) day consultation period expires, and the dispute has not been resolved, then the parties shall select a mutually acceptable independent accounting firm that does not then have a relationship with Seller or Buyer (the "Independent Accountant"), to resolve the disagreement and make a determination with respect thereto as promptly as practicable. The determination by the Independent Accountant on the matter shall be binding. If an Independent Accountant is engaged pursuant to this Section 2.6, the fees and expenses of the Independent Accountant shall be borne by Seller and Buyer in inverse proportion as such parties may prevail on the resolution of the disagreement which proportionate allocation also will be determined by the Independent Accountant and be included in the Independent Accountant's written report, and an appropriate adjustment and payment shall be made within three (3) Business Days of the resolution by the Independent Accountant, which resolution shall be rendered within thirty (30) days after such submission.

Section 2.7.    **Closing Date Deliveries**.

(a)    At the Closing, the Seller shall deliver or cause to be delivered to the Buyer (i) a bill of sale and assignment and assumption agreement from the Seller in substantially the form of Exhibit A (the "Bill of Sale and Assignment and Assumption Agreement"), providing for the conveyance of all of the Purchased Assets (other than the Seller FCC Authorizations) and the assumption of all of the Assumed Liabilities, (ii) an assignment of the Seller FCC Authorizations from the Seller, in substantially the form of Exhibit B (the "Assignment of the Seller FCC Authorizations"), assigning to the Buyer the Seller FCC Authorizations, (iii) all of the documents and instruments required to be delivered by the Seller pursuant to Article VIII, (iv) specific assignment and assumption agreements duly executed by the Seller relating to any agreements included as Purchased Assets that the Buyer or the Seller have determined to be reasonably necessary to assign such agreements to the Buyer and for the Buyer to assume the Assumed Liabilities thereunder pursuant to Section 365 of the Bankruptcy Code and (v) such other documents and instruments as the Buyer has determined to be reasonably necessary to consummate the transactions contemplated hereby.

(b)    At the Closing, the Buyer shall deliver to the Seller (i) the Purchase Price, (ii) the Bill of Sale and Assignment and Assumption Agreement, (iii) all of the documents and instruments required to be delivered by the Buyer pursuant to Article VII, (iv) specific assignment and assumption agreements duly executed by the Buyer relating to any agreements included as Purchased Assets that the Buyer or the Seller have determined to be reasonably necessary to assign such agreements to the Buyer and for the Buyer to assume the Assumed Liabilities thereunder pursuant to Section 365 of the Bankruptcy Code, and (v) such other documents and instruments as the Seller has determined to be reasonably necessary to consummate the transactions contemplated hereby.

(c)    Schedule **Error! Reference source not found.**7 sets forth a good faith estimate of all Cure Amounts for each assignment of executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code that Seller assumes and assigns to Buyer ("Cure Schedule"). All contracts on the Cure Schedule shall be "Assumed Contracts" and assumed by

11

Seller and assigned to Buyer pursuant to the Sale Order and Section **Error! Reference source not found.**.  Buyer agrees to promptly satisfy all Cure Amounts in respect of each Assumed Contract as and when such Cure Amount become due under the Sale Order.

Section 2.8.    **Further Assurances**.

(a)    From time to time following the Closing, the Seller shall execute and deliver, or cause to be executed and delivered, to the Buyer such other instruments of conveyance and transfer as the Buyer may reasonably request or as may be otherwise necessary to effectively convey and transfer to, and vest in, the Buyer and put the Buyer in possession of, any part of the Purchased Assets.

(b)    From time to time following the Closing, the Buyer shall execute and deliver, or cause to be executed and delivered, to the Seller such other undertakings and assumptions as the Seller may reasonably request or as may be otherwise necessary to effectively evidence the Buyer's assumption of and obligation to pay, perform and discharge the Assumed Liabilities.

Section 2.9.    **Allocation of Purchase Price**.  Following the Closing Date, the Seller shall provide to the Buyer an allocation of the applicable portions of the Purchase Price in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provisions of state, local, or non-U.S. Law, as appropriate).  The Buyer shall provide the Seller with any comments to such allocation within fifteen (15) days after the date of receipt by the Buyer, and the Buyer and the Seller shall negotiate in good faith to finalize such allocation no later than sixty (60) days prior to the earliest due date (taking into account, for these purposes, any applicable extension of a due date) for the filing of a Tax Return to which such allocation is relevant (unless the Buyer does not provide any comments within such fifteen-day period, in which case the Seller's allocation shall be deemed final). If the parties are unable to mutually agree to such allocation then the parties shall have no further obligation under this Section 2.9, and each party shall make its own determination of such allocation for financial and tax reporting purposes, which determination, for the avoidance of doubt, shall not be binding on the other party.

# ARTICLE III

# REPRESENTATIONS AND WARRANTIES OF THE SELLER

As an inducement to the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, the Seller represents and warrants to the Buyer as follows:

Section 3.1.    **Organization**.  Seller is organized, validly existing and in good standing under the laws of the State of Texas. Seller has the requisite organizational power and authority to operate the Stations as now operated by it, to use the Purchased Assets as now used by it and to carry on the Business as now conducted by it.

**Section 3.2.    Authority of the Seller**.

(a)    Seller has the requisite organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements to be executed and delivered by it pursuant hereto, to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and thereof, subject to and after giving effect to the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code.

(b)    Subject to and after giving effect to FCC Consent and the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code, the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller has been duly authorized and approved by all necessary organizational action on the part of the Seller and does not require any further authorization or consent on the part of the Seller. This Agreement is, and each other Ancillary Agreement when executed and delivered by the Seller will be, a legal, valid and binding agreement of the Seller, subject to entry of the Sale Order by the Bankruptcy Court, enforceable in accordance with its respective terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)    Subject to receipt of the FCC Consent, the Sale Order, and as set forth in Schedule 3.2, none of the execution, delivery and performance by the Seller of this Agreement or the Ancillary Agreements, the consummation by the Seller of the transactions contemplated hereby or thereby or compliance by the Seller with or fulfillment by the Seller of the terms, conditions and provisions hereof or thereof will:

(i)    conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon any of the Purchased Assets under, (A) the certificate of incorporation, bylaws or other organizational documents of the Seller, (B) any Stations Agreement, (C) any Governmental Permit, (D) any judgment, order, award or decree to which such Person is a party or any of the Purchased Assets is subject or by which such Person is bound, or (E) any material indenture, note, mortgage, lease, guaranty or material agreement to which the Seller is a party, except, in the case of each of the foregoing clauses (B), (C), (D) or (E), as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect; or

(ii)    require the approval, consent, authorization or act of, or the making by Seller of any declaration, filing or registration with, any third Person or any foreign, federal, state or local court or Governmental Body, except for such of the foregoing as are necessary pursuant to the HSR Act, and except, in any case, as

13

would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

Section 3.3.    **All Assets**.  Except for the Excluded Assets, the Purchased Assets constitute all the assets and properties whether tangible or intangible, whether personal, real or mixed, wherever located, that are used by the Seller exclusively in the operation of the Stations.

Section 3.4.    **Governmental Permits; FCC Matters**.

(a)    As of the date of this Agreement, the Seller holds or possesses all registrations, licenses, permits, approvals and regulatory authorizations from a Governmental Body that are reasonably necessary to entitle it to own or lease, operate and use the assets of the Stations and to carry on and conduct the Business substantially as conducted immediately prior to the date of this Agreement (herein collectively called "Governmental Permits"), except for such Governmental Permits as to which the failure to so own, hold or possess would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect. Schedule 3.4(a) sets forth a list of each of the Seller FCC Authorizations, held by the Seller as of the date of this Agreement. The Seller FCC Authorizations constitute all material registrations, licenses, franchises, and permits issued by the FCC to the Seller in respect of the Stations and held by the Seller as of the date of this Agreement.

(b)    Seller has fulfilled and performed its obligations under each of the Governmental Permits except for noncompliance that, individually or in the aggregate, has not had and would not be reasonably likely to have a Material Adverse Effect. Each of the Governmental Permits is valid, subsisting and in full force and effect and has not been revoked, suspended, canceled, rescinded or terminated, other than those that the revocation, suspension, cancellation, rescission or termination of which, individually and in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

(c)    The Stations are being operated in accordance with the Seller FCC Authorizations and in compliance in all material respects with the Communications Act and all other Laws applicable to the Stations, except for such noncompliance that, individually or in the aggregate, has not had and would not be reasonably likely to have a Material Adverse Effect. Except as disclosed in Schedule 3.4(c), there is not (i) pending, or, to the Knowledge of the Seller, threatened, any material action or legal proceeding, other than actions or proceedings affecting broadcast television stations generally, by or before the FCC to revoke, suspend, cancel, rescind, terminate, materially adversely modify or refuse to renew in the ordinary course any Seller FCC Authorization (other than, in the case of modifications, proceedings to amend the FCC rules of general applicability), or (ii) issued or outstanding, by or before the FCC, any (A) order to show cause, (B) notice of violation, (C) notice of apparent liability or (D) order of forfeiture, in each case, against the Stations or Seller with respect to the Stations that has resulted or would reasonably be expected to result in any action described in the foregoing clause (i) with respect to such Seller FCC Authorizations. The Seller FCC Authorizations have been issued by the FCC for full terms customarily issued by the FCC for each of the Stations, and the Seller FCC Authorizations are not subject to any condition except for those conditions appearing on the face of the Seller FCC Authorizations and conditions applicable to broadcast licenses generally. Seller has (i) paid or caused to be paid all FCC regulatory fees due and payable by it in respect of the Stations, and (ii)

14

timely filed all material registrations and reports required to have been filed by it with the FCC relating to the Seller FCC Authorizations except where the failure to do so would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.  This Section 3.4 does not relate to Governmental Permits for environmental, health and safety matters which are the subject solely of Section 3.11.

Section 3.5.    **Real Property Leases**.

(a)    Schedule 3.5(a) sets forth a list of each material lease or similar contract or agreement under which Seller is a lessee of, or occupies, exclusively for use in the Business, any real property owned by any third Person (each such lease, contract or agreement, whether or not material, a "Real Property Lease," and the property leased under the Real Property Leases is referred to herein as the "Real Property") that is in effect as of the date of this Agreement.  Except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, Seller has a valid leasehold interest in, sub leasehold interest in, or other occupancy right with respect to, the leased or occupied premises under the Real Property Leases in effect as of the date hereof.

(b)    Except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, to the Knowledge of the Seller, no property leased by Seller under any Real Property Lease is subject to any pending or threatened suit for condemnation or other taking by any public authority.  Except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, Seller's use and occupancy of the Real Property complies with all regulations, codes, ordinances and statutes of all applicable Governmental Bodies.

Section 3.6.    **Title to Tangible Personal Property**.    Except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, Seller has good and valid title or a valid right to use all of the material Tangible Personal Property included in the Purchased Assets free and clear of all Encumbrances, except for Permitted Encumbrances.

Section 3.7.    **Contracts**.    Except as set forth in Schedule 3.7 or any other Schedule hereto, as of the date of this Agreement, Seller is not party to or bound by any contract exclusively relating to the Business.  Except as set forth in Schedule 3.7 or in any other Schedule hereto or as, individually or in the aggregate, has not had and would not be reasonably likely to have a Material Adverse Effect, each of the leases, contracts and other agreements listed in Schedule 3.7 (collectively, the "Stations Agreements") constitutes a valid and binding obligation of the Seller and, to the Knowledge of the Seller, the other parties thereto and is in full force and effect (in each case, subject to bankruptcy, insolvency, reorganization or other similar laws relating to or affecting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)).  Except as, individually or in the aggregate, has not had and would not be reasonably likely to have a Material Adverse Effect, (i) the Seller is not in breach of, or default under, any of the Stations Agreements and, to the Knowledge of the Seller, no other party to any Stations Agreement is in breach of, or default under, any of the Stations Agreements, and (ii) to the Knowledge of the Seller, no event has occurred which would result in a breach of,

or default under, any of the Stations Agreements (in each case, with or without notice or lapse of time or both). Copies of each of the Stations Agreements, together with all amendments thereto, have heretofore been made available to the Buyer by the Seller.

Section 3.8. **No Violation, Litigation or Regulatory Action**. Except as set forth in Schedule 3.8:

(a)     Seller is in compliance with all Laws and Orders which are applicable to the Purchased Assets, the Stations or the Business, except where the failure to comply would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect; and

(b)     Since January 1, 2016 and through the date of this Agreement, Seller has not has received any written notice of violation of any applicable Laws, except for such violations that, individually or in the aggregate, have not had and would not be reasonably likely to have a Material Adverse Effect; and

(c)     As of the date of this Agreement, except for the approval of the Bankruptcy Court and the FCC, there are no actions, suits or proceedings by or before any court or any Governmental Body which are pending or, to the Knowledge of the Seller, threatened against Seller in respect of the Purchased Assets, any of the Stations or the Business which would, individually or in the aggregate, be reasonably be likely to have a Material Adverse Effect.

Section 3.9. **Insurance**. Seller maintains, in respect of the Purchased Assets, the Stations and the Business, policies of fire and extended coverage and casualty, liability and other forms of insurance in such amounts and against such risks and losses as are in the judgment of the Seller prudent for the Business. Except as set forth in Schedule 3.9 with respect to the Business, there are no outstanding claims under any insurance policy or default with respect to provisions in any such policy which claim or default, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect.

Section 3.10. **Employees**. Seller has provided to Buyer a complete and accurate list of the following information for each current employee of Seller: current base salary or rate of pay; bonus, commission and other incentive compensation (if any) paid or payable for calendar year 2018; hire date, position and location of employment; and accrued and unused vacation and other paid time off.

(a)     Except as set forth on Schedule **Error! Reference source not found.**, there are no: (i) "employee benefit plans," as defined in Section 3(3) of ERISA, or other material employee benefit arrangements, including bonus plans, consulting or other compensation agreements, incentive, equity or equity-based compensation, or deferred compensation arrangements, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical insurance, life insurance, or scholarship programs currently maintained by Seller or to which Seller contributed or is obligated to contribute thereunder for current or former employees or to which Seller has any material Liability (contingent or otherwise) ("Employee Benefit Plans").

(b)     There are no "employee pension plans," as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code, maintained by Seller and any

16

trade or business (whether or not incorporated) which are or have been under common control in the past six years, or which are or have been treated as a single employer with Seller under Section 414(b), (c), (m) or (o) of the Code ("ERISA Affiliate") or to which Seller, or any ERISA Affiliate thereof, contributed or has been obligated in the past six years to contribute thereunder in the last six years or to which Seller has any material Liability (contingent or otherwise) ("Title IV Plans").

(c)    Each Employee Benefit Plan has been established, administered and funded in accordance with its terms, and in compliance in all material respects with the applicable provisions of ERISA, the Code and other applicable Laws. None of the Purchased Assets are subject to a Lien under Section 412 of the Code or Title IV of ERISA.

(d)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due, or increase the amount of any compensation or benefits due, to any current or former employee of Seller; (ii) result in the acceleration of the time of payment or vesting of any such compensation or benefits; or (iii) result in the payment of any amount that would, individually or in combination with any other such payment, be an "excess parachute payment" within the meaning of Section 280G of the Code.

(a)    Seller is not a party to or otherwise bound by any collective bargaining agreement or other labor union contract applicable to employees of Seller and, to Seller's Knowledge, there are not any activities or proceedings of any labor union to organize any such employees.  Additionally, (i) there is no unfair labor practice charge or complaint pending before any applicable Governmental Authority relating to Seller or any employee or other service provider thereof; (ii) there is no labor strike, material slowdown or material work stoppage or lockout pending or, to Seller's Knowledge, threatened against or affecting Seller, and Seller has not experienced during the past three years any strike, material slowdown or material work stoppage, lockout or other collective labor action by or with respect to its employees; and (iii) there is no representation claim or petition pending before any applicable Governmental Authority. Seller is, and during the past three years has been, in compliance in all material respects with all applicable Laws relating to employment of labor, including all applicable Laws relating to wages, hours, overtime, collective bargaining, employment discrimination, civil rights, safety and health, workers' compensation, pay equity, classification of employees and independent contractors, and the collection and payment of withholding and/or social security taxes.  Seller is not delinquent in payment to any of its current or former employees or other service providers for any wages, fees, salaries, commissions, bonuses, or other direct compensation for service performed by them. Seller has not effectuated a "plant closing" or "mass layoff" (as defined under the WARN Act) or taken any other action that would trigger notice or Liability under the WARN Act.  Seller is, and during the past three years has been, in compliance with the WARN Act.

Section 3.11.  Environmental Protection.  Except as set forth in Schedule 3.11:

(a)    As of the date of this Agreement, the Business is in compliance with all Environmental Laws, except where the failure to comply would not be reasonably likely to have a Material Adverse Effect;

17

(b)      Seller has, in respect of the Business, obtained all Governmental Permits required under Environmental Law necessary for its operation, except for such Governmental Permits as to which the failure to so own, hold or possess would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect. Seller is in compliance with all terms and conditions of such Governmental Permits except where failure to comply would not be reasonably likely to have a Material Adverse Effect; and

(c)      As of the date of this Agreement, Seller, with respect to the Business, is not the subject of any pending or, to the Knowledge of the Seller, threatened action, claim, complaint, investigation or notice of noncompliance or potential responsibility or other proceedings alleging any failure of the Business to comply with, or liability of the Business under, any Environmental Law, except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

(d)      The representations and warranties contained in this <u>Section 3.11</u> are the sole and exclusive representations and warranties relating to Environmental Law or Hazardous Materials.

**Section 3.12.  <u>Seller's Broker</u>**.    Seller has engaged PVB Advisors, LLC ("<u>PVB</u>")to serve as its broker in connection with this Transaction.  PVB shall be compensated from the sale proceeds pursuant to the *Agreed Order Granting Application to Employ PVB Advisors, LLC Effective as of the Petition Date* [Docket No. •].

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

As an inducement to the Seller to enter into this Agreement and to consummate the transactions contemplated hereby, the Buyer represents and warrants to the Seller as follows:

**Section 4.1.    <u>Organization</u>**. The Buyer is organized, validly existing and in good standing under the laws of the state of its organization. The Buyer has the requisite organizational power and authority to own, lease and operate the properties and assets used in connection with its business as currently being conducted or to be acquired pursuant hereto.

**Section 4.2.    <u>Authority of the Buyer</u>**.

(a)      The Buyer has the requisite organizational power and authority to execute and deliver this Agreement and all of the other agreements and instruments to be executed and delivered by the Buyer pursuant hereto (collectively, the "<u>Buyer Ancillary Agreements</u>"), to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and thereof.

(b)      The execution, delivery and performance of this Agreement and the Buyer Ancillary Agreements by the Buyer have been duly authorized and approved by all necessary organizational action on the part of the Buyer and its Affiliates and do not require any further authorization or consent on the part of the Buyer or any of its Affiliates. This Agreement is, and each other Buyer Ancillary Agreement when executed and delivered by the Buyer or any of its

18

Affiliates and the other parties thereto will be, a legal, valid and binding agreement of the Buyer or such Affiliates party thereto enforceable in accordance with its respective terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)     Except for the FCC Consent and as set forth in <u>Schedule 4.2</u>, none of the execution, delivery and performance by the Buyer of this Agreement, or by the Buyer or any of its Affiliates, as applicable, of the Buyer Ancillary Agreements to which it is a party, the consummation by the Buyer or its Affiliates, as applicable, of the transactions contemplated hereby or thereby or compliance by the Buyer or any of its Affiliates, as applicable, with or fulfillment by the Buyer or its Affiliates, as applicable, of the terms, conditions and provisions hereof or thereof will:

(i)     conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Encumbrance upon any assets of the Buyer under, (A) the certificate of incorporation, bylaws or other organizational documents of the Buyer, or (B) any material indenture, note, mortgage, lease, guaranty or material agreement, or any judgment, order, award or decree, to which the Buyer or any of its Affiliates is a party; or

(ii)     require the approval, consent, authorization or act of, or the making by the Buyer or any of its Affiliates of any declaration, filing or registration with, any third Person or any foreign, federal, state or local court or Governmental Body, except for such of the foregoing as are necessary pursuant to the HSR Act.

**Section 4.3.**     <u>**Litigation**</u>.     None of the Buyer or any of its Affiliates is a party to any action, suit or proceeding pending or, to the knowledge of the Buyer, threatened which, if adversely determined, would reasonably be expected to restrict the ability of the Buyer to consummate promptly the transactions contemplated by this Agreement. There is no order to which the Buyer or any of its Affiliates is subject which would reasonably be expected to restrict the ability of the Buyer to consummate promptly the transactions contemplated by this Agreement.

**Section 4.4.**     <u>**No Finder**</u>.     None of the Buyer or any of its Affiliates, or any party acting on any of their behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

**Section 4.5.**     <u>**Qualifications as FCC Licensee**</u>.     The Buyer is legally, financially and otherwise qualified to be the licensee of, and to acquire, own, operate and control, the Stations under the Communications Act, including the provisions relating to media ownership and attribution, foreign ownership and control, and character qualifications. There are no facts or circumstances that would, under the Communications Act or any other applicable Laws, (i) disqualify the Buyer as the assignee of the Seller FCC Authorizations with respect to the Stations

or as the owner and operator of the Stations, (ii) delay the FCC's processing of the FCC Applications, or (iii) cause the FCC to impose a material condition or conditions on its granting of the FCC Consent.  No waiver of or exemption from, whether temporary or permanent, any provision of the Communications Act, or any divestiture or other disposition by the Buyer or any of their respective Affiliates of any asset or property, is necessary for the FCC Consent to be obtained under the Communications Act.

Section 4.6.   **Financial Capacity; Solvency**.  The Buyer has, as of the date of this Agreement, and will have as of the Closing Date, on hand (or access through committed credit facilities to) adequate funds to perform all of its obligations under this Agreement (including, but not limited to, payment of the Purchase Price and all fees and expenses required to be paid by Buyer in connection with the transactions contemplated by this Agreement), and there is no restriction or condition on the use of such funds for such purposes or fact or circumstance that, individually or in the aggregate with all other facts and circumstances, could reasonably be expected to prevent or delay the availability of such funds at the Closing.  The Buyer is Solvent as of the date of this Agreement and will, immediately after giving effect to all of the transactions contemplated by this Agreement, including payment of the Purchase Price and all other amounts required to be paid, borrowed or refinanced in connection with the consummation of the transactions contemplated by this Agreement and all related fees and expenses, be Solvent at and after the Closing Date.

# ARTICLE V

# ACTION PRIOR TO THE CLOSING DATE

The respective parties hereto covenant and agree to take the following actions between the date hereof and the Closing Date:

Section 5.1.   **Access to the Business**.  Upon the written request of the Buyer and at the Buyer's sole expense, the Seller shall use reasonable efforts to afford to the officers and authorized representatives of the Buyer (including independent public accountants, attorneys and consultants; provided that Seller shall be given a reasonable opportunity to participate in any meetings or other discussions with such independent public accountants) reasonable access during normal business hours, and upon reasonable prior notice, to the properties and business and financial records of the Business to the extent reasonably necessary for Buyer's transition planning and shall furnish to the Buyer or its authorized representatives such additional information concerning the Business as shall be reasonably requested to the extent reasonably necessary for Buyer's transition planning; provided, however, that the Seller shall not be required to violate any obligation of confidentiality or other obligation under applicable Law to which the Seller is subject in discharging its obligations pursuant to this Section 5.1. The Buyer agrees that any such access shall be conducted in such a manner as not to interfere unreasonably with the operations of the Business or the Seller. Notwithstanding the foregoing, Seller shall not be required to (i) take any action which would constitute a waiver of attorney-client or other privilege or would compromise the confidential information of the Seller not related to the Business, (ii) supply the Buyer with any information which, in the reasonable judgment of the Seller, the Seller is under a contractual or legal obligation not to supply, (iii) permit the Buyer or any of its Affiliates to conduct any sampling of soil, sediment, groundwater, surface water or building material or (iv) execute or

deliver any certificate, document, instrument or agreement that is effective prior to the Closing or agree to any change or modification of any existing certificate, document, instrument or agreement that is effective prior to the Closing.

**Section 5.2.    Notification of Certain Matters.**

(a)    The Buyer, on the one hand, and the Seller, on the other hand, shall promptly notify the other upon becoming aware of any material breach of any representation or warranty contained in this Agreement including, in the case of the Buyer, upon any of its officers, employees or authorized representatives becoming aware of such a breach as a result of the access to the Business permitted by Section 5.1.

(b)    Each party shall promptly notify the other of any action, suit or proceeding that shall be instituted or threatened against such party to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement. The Seller shall promptly notify the Buyer, and the Buyer shall promptly notify the Seller, of any lawsuit, claim, proceeding or investigation that may be threatened, brought, asserted or commenced against the other which would have been listed in Schedule 3.8 or would be an exception to Section 4.3 if such lawsuit, claim, proceeding or investigation had arisen prior to the date hereof.

**Section 5.3.    FCC Consent; Other Consents and Approvals.**

(a)    As promptly as practicable after the date hereof, but in any event no later than five (5) Business Days after entry of the Sale Order, the Seller, the Buyer and their respective Affiliates, as applicable, shall file with the FCC the necessary applications requesting its consent to the Assignment of the Seller FCC Authorizations to the Buyer, as contemplated by this Agreement (the "FCC Applications"). The Seller and the Buyer shall, or shall cause their respective Affiliates to, cooperate in the preparation of such applications and will diligently take, or cooperate in the taking of, all necessary, desirable and proper steps, provide any additional information required by the FCC and shall use reasonable best efforts to obtain promptly the FCC Consent. The Seller, on the one hand, and the Buyer, on the other hand, shall bear the cost of FCC filing fees relating to the FCC Applications equally.  The Buyer and the Seller shall oppose any petitions to deny or other objections filed with respect to the FCC Applications to the extent such petition or objection relates to any such party. Neither Seller nor Buyer shall, and each shall cause its Affiliates not to, take any intentional action that would, or intentionally fail to take such action the failure of which to take would, reasonably be expected to have the effect of materially delaying the receipt of the FCC Consent.  The parties agree that they will cooperate to amend the FCC Applications as may be necessary or required to obtain the timely grant of the FCC Consent.  As may reasonably be necessary to facilitate the grant of the FCC Consent, in the event that in order to obtain the FCC Consent in an expeditious manner, it is necessary for the Buyer or any of its Affiliates to enter into a customary assignment, assumption, tolling, or other similar arrangement with the FCC to resolve any complaints with the FCC relating to the Stations, the Buyer shall enter, or cause its Affiliates, as applicable, to enter, into such a customary assignment, assumption, tolling or other arrangement with the FCC.

(b)    Subject to the terms and conditions herein, the Seller and the Buyer shall, use their respective reasonable best efforts to consummate and make effective the transactions

21

contemplated hereby and to cause the conditions set forth in <u>Article VII</u> and <u>Article VIII</u> to be satisfied as promptly as reasonably practicable after the date hereof, including (i) in the case of the Buyer, the obtaining of all necessary consents, approvals, waivers and authorizations of, actions or nonactions by, and making all required filings and submissions with, any Governmental Body or any third party required in connection with the transactions contemplated by this Agreement, (ii) cooperating with each other in (A) determining which filings are required to be made prior to the Closing with, and which consents, approvals, permits, notices or authorizations are required to be obtained prior to Closing from, Governmental Bodies or third parties in connection with the execution and delivery of this Agreement and related agreements, and consummation of the transactions contemplated hereby and thereby and (B) timely making all necessary filings and timely seeking all consents, approvals, permits, notices or authorizations, (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions performed or consummated by such party in accordance with the terms of this Agreement, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Body vacated or reversed and (iv) taking, or causing to be taken, all other actions and doing, or causing to be done, and cooperating with each other in order to do, all other things necessary or appropriate to consummate the transactions contemplated hereby as soon as practicable.  The Buyer agrees not to, and shall cause its Affiliates not to, take any action that would reasonably be expected to materially delay, materially impede or prevent receipt of the Governmental Consents.

(c)     The Seller and the Buyer shall, and shall cause their respective Affiliates to, use reasonable best efforts to obtain all consents and amendments from the parties to the Stations Agreements which are required by the terms thereof or this Agreement for the consummation of the transactions contemplated by this Agreement; provided, however, that neither the Seller, the Buyer nor any of their Affiliates shall have any obligation to offer or pay any consideration in order to obtain any such consents or amendments, including, with respect to the Seller and their Affiliates, any obligation to amend, modify or otherwise alter the terms of any contract or agreement with any such party that is not included in the Purchased Assets; and provided, further, that the parties acknowledge and agree that such third party consents are not conditions to Closing.

(d)     Buyer and Seller understand and agree that Seller has a case pending as debtor in possession, in the Bankruptcy Court.  The terms of this Agreement, the submission of the FCC Application and the consummation of the transaction contemplated herein all are subject to the review and approval by the Bankruptcy Court, and that such approval shall be a mutual Closing Condition in accordance with Articles VII and VIII hereto. In regard to Bankruptcy Court approval of this Agreement, the Parties agree that (i) the Sale Order shall expressly authorize delivery of the Stations and Acquired Assets pursuant to Sections 105, 363 and 365 of the Bankruptcy Code free and clear of liens, claims, and encumbrances, other than the Permitted Encumbrances and Assumed Liabilities, in a manner and form reasonably satisfactory to Buyer; and (ii) except to the extent filings must be made on an emergency basis in the reasonable judgment of Seller, Seller shall provide Buyer a draft of any motions, orders or other pleadings that Seller proposes to file with the Bankruptcy Court seeking approval of this Agreement, no later than one (1) Business Day prior to the filing thereof with the Bankruptcy Court.

**Section 5.4.** **Operations of the Stations Prior to the Closing Date**.

(a)     Subject to the restrictions set forth in the Bankruptcy Code or Orders of the Bankruptcy Court, prior to the Closing Date, except as approved by the Buyer (which approval shall not be unreasonably withheld, delayed or conditioned), the Seller shall use its commercially reasonable efforts to operate and carry on the Business in all material respects in the ordinary course of the Business, and to the extent consistent therewith keep and maintain the Purchased Assets in good operating condition and repair (wear and tear in ordinary usage excepted).

(b)     Notwithstanding Section 5.4(a) and subject to Section 6.1 regarding control of the Stations, except (w) as expressly contemplated by this Agreement, (x) as set forth in Schedule 5.4(b), (y) as required by applicable Laws or by any Governmental Body of competent jurisdiction, or (z) with the prior written consent of the Buyer (which consent shall not be unreasonably withheld, delayed or conditioned), the Seller shall not in respect of the Stations:

(i)     sell, lease (as lessor), transfer or otherwise dispose of or mortgage or pledge, or impose or suffer to be imposed any Encumbrance on, any of the material assets or properties relating to the Purchased Assets, other than the sale, lease (as lessor), transfer or other disposal of property in the ordinary course of the Business or pursuant to existing contracts or commitments, and other than Permitted Encumbrances;

(ii)     fail to use all commercially reasonable efforts to maintain in full force and effect in accordance with their respective terms and conditions, any of the material Seller FCC Authorizations, or to not take or fail to take any action that could reasonably be expected to cause the FCC or any other Governmental Body to institute proceedings for the suspension, revocation or adverse modification of any of the material Seller FCC Authorizations in any material respect; or

(iii)     agree or commit to do any of the foregoing.

**Section 5.5.** **Public Announcement**.  Neither the Seller, Buyer nor any of their Affiliates shall, without the approval of the other, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such party shall be so obligated by Laws or by the rules, regulations or policies of any national securities exchange or association.

**Section 5.6.** **Employees**.  Prior to and contingent upon the Closing, Buyer (or an Affiliate of Buyer) shall make offers of employment commencing on the Closing Date, on an at-will basis (except to the extent otherwise expressly agreed in a writing signed by Buyer and such employee) and on such other terms and conditions as Buyer may determine, in its sole discretion, to each of the employees of Seller designated by Buyer, in its sole discretion, who shall be employed by Buyer or an Affiliate of Buyer in connection with the Business; provided that Buyer shall extend offers of employment to at least a majority of the employees who are employed by Seller immediately prior to the Closing Date. Seller shall terminate the employment of each Seller employee who receives an offer of employment from Buyer effective as of the Closing Date. Each

4850-6291-3457.3

such employee accepting an offer of employment with the Buyer and commencing employment with the Buyer on the Closing Date shall be considered a "Hired Employee."

(a)      The Hired Employees shall be eligible to participate in the employee benefit plans and policies, if any, offered by Buyer from time to time.  Buyer shall not be responsible for any compensation or other benefits due from Seller to any Hired Employees on or prior to the Closing Date.

(b)      Buyer shall not be responsible for any severance Liabilities with respect to any employees of Seller whose employment is terminated on or prior to the Closing Date.

(c)      Buyer shall not be responsible for any WARN Act Liabilities with respect to any employees of Seller whose employment is terminated on or prior to the Closing Date.

(d)      Nothing expressed or implied in this Agreement is intended to confer upon any Person or his or her legal representatives any rights or remedies, including any rights of employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement.  Nothing contained in this section or elsewhere in this Agreement shall be construed to modify any employee benefit plan of Buyer or Seller (or any Person acting as a professional employer organization or employee leasing company) or prevent the termination of employment of any employee or any change in the employee benefits available to any employee.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

**Section 6.1.      Control of Operations Prior to Closing Date**.  Notwithstanding anything contained herein to the contrary, the sale of the Purchased Assets contemplated hereby shall not be consummated prior to the grant by the FCC of the FCC Consent. The Seller and the Buyer acknowledge and agree that at all times commencing on the date hereof and ending on the Closing Date, (x) nothing in this Agreement, including Section 5.4, shall be construed to give the Buyer any right to control, direct or otherwise supervise, or attempt to control, direct or otherwise supervise, any of the management or operations of any of the Stations and (y) the Seller shall have complete control and supervision of the programming, operations, policies and all other matters relating to the Stations.

**Section 6.2.      Bulk Transfer Laws**.  The Buyer hereby waives compliance by the Seller with the provisions of any so-called bulk sales or bulk transfer law of any jurisdiction in connection with the sale of the Purchased Assets to the Buyer hereunder.

**Section 6.3.      Use of Names**.  Seller is not conveying ownership rights or granting the Buyer a license to use any of the Retained Names and Marks and, after the Closing, the Buyer shall not and shall not permit any of its Affiliates to use in any manner the Retained Names and Marks or any word that is similar in sound or appearance to such names or marks. In the event the Buyer violates any of its obligations under this Section 6.3, the Seller may proceed against the Buyer in law or in equity for such damages or other relief as a court may deem appropriate.  The Buyer acknowledges that a violation of this Section 6.3 may cause the Seller irreparable harm, which may not be adequately compensated for by money damages.  The Buyer therefore agrees

24

that in the event of any actual or threatened violation of this <u>Section 6.3</u>, any of such parties shall be entitled, in addition to other remedies that they may have, to a temporary restraining order and to preliminary and final injunctive relief against the Buyer or any such Affiliate of the Buyer to prevent any violations of this <u>Section 6.3</u>, without the necessity of posting a bond.

## ARTICLE VII

### CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER

The obligations of the Seller under this Agreement to consummate the sale of the Purchased Assets contemplated hereby shall be subject to the satisfaction, fulfillment or, where legally possible, waiver, on or prior to the Closing Date, of the following conditions:

**Section 7.1.** **No Breach of Covenants and Warranties**.  (a) The Buyer shall have performed and complied in all material respects with its covenants and agreements contained herein required to be performed or complied with by it as of or prior to the Closing; and (b) each of the representations and warranties of the Buyer contained in this Agreement shall be true and correct on the  Closing Date as though made on the Closing Date (except to the extent that they expressly speak as of a specific date or time other than the Closing Date, in which case they need only have been true and correct as of such specified date or time), except where the failure of such representations and warranties to be true and correct (without giving effect to any qualifiers or exceptions relating to "materiality" set forth in such representations and warranties), individually or in the aggregate, has not had and would not be reasonably likely to have a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement. In addition, the Buyer shall have delivered to the Seller a certificate, dated as of the Closing Date, signed by an executive officer of the Buyer and certifying as to the satisfaction of the conditions specified in this <u>Section 7.1</u>.

**Section 7.2.** **No Restraint**.  There shall not be in effect any Order (whether temporary, preliminary or permanent) issued by any U.S. federal or state court of competent jurisdiction preventing the consummation of the sale of the Purchased Assets contemplated hereby.

**Section 7.3.** **Certain Governmental Approvals**.  The FCC Consent shall have been granted and shall be effective, and the Bankruptcy Court shall have approved the Sale Order. Such order shall be in form and substance satisfactory to Buyer.  At a minimum, the Sale Order shall (a) provide that the Purchased Assets are being sold to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code except for the Assumed Liabilities and Permitted Encumbrances, and (b) find that Buyer is a good faith purchaser entitled to the protection of Section 363(m) of the Bankruptcy Code.

**Section 7.4.** **Closing Deliveries.** The Buyer shall have made, or stands ready at the Closing to make, the deliveries contemplated by <u>Section 2.7</u> to the Seller.

# ARTICLE VIII

## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER

The obligations of the Buyer under this Agreement to consummate the sale of the Purchased Assets contemplated hereby shall be subject to the satisfaction, fulfillment or, where legally possible, waiver on or prior to the Closing Date, of the following conditions:

**Section 8.1.    No Breach of Covenants and Warranties**.  (a) The Seller shall have performed and complied with in all material respects its covenants and agreements contained herein required to be performed or complied with by it as of or prior to the Closing; and (b) each of the representations and warranties of the Seller contained in this Agreement shall be true and correct on the Closing Date as though made on the Closing Date (except to the extent that they expressly speak as of a specific date or time other than the Closing Date, in which case they need only have been true and correct as of such specified date or time), except where the failure of such representations and warranties to be true and correct (without giving effect to any qualifiers or exceptions relating to "materiality" or "Material Adverse Effect" set forth in such representations and warranties), would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect. In addition, the Seller shall have delivered to the Buyer a certificate, dated as of the Closing Date, signed by an executive officer of the Seller and certifying as to the satisfaction of the conditions specified in this Section 8.1.

**Section 8.2.    No Restraint**.  There shall not be in effect any Order (whether temporary, preliminary or permanent) issued by any U.S. federal or state court of competent jurisdiction preventing the consummation of the sale of the Purchased Assets contemplated hereby.

**Section 8.3.    Certain Governmental Approvals**.  The FCC Consent shall have been granted and shall be effective and the Bankruptcy Court shall have approved the Sale Order. Such order shall be in form and substance reasonably satisfactory to Buyer and Seller.  At a minimum, the Sale Order shall (a) provide that the Purchased Assets are being sold to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code except for the Assumed Liabilities and Permitted Encumbrances, and (b) find that Buyer is a good faith purchaser entitled to the protection of Section 363(m) of the Bankruptcy Code.

**Section 8.4.    Closing Deliveries**.  The Seller shall have made, or stand ready at the Closing to make, the deliveries contemplated by Section 2.7 to the Buyer.

# ARTICLE IX

## INDEMNIFICATION

**Section 9.1.    Indemnification by the Seller**.  From and after the Closing and subject to Section 11.1, the Seller agrees to indemnify and hold harmless the Buyer from and against any and all Losses and Expenses imposed upon, or incurred or suffered by, any Buyer Group Member as a result of or arising out of any breach by the Seller of, or any other failure of the Seller to perform, any of its covenants, agreements or obligations pursuant to this Agreement.

26

**Section 9.2.** <u>**Indemnification by the Buyer**</u>.  From and after the Closing and subject to <u>Section 11.1</u>, the Buyer agrees to indemnify and hold harmless Seller from and against any and all Losses and Expense imposed upon, or incurred or suffered by, any Seller Group Member as a result of or arising out of:

        (i)     any breach by the Buyer of, or any other failure of the Buyer to perform, any of its covenants, agreements or obligations in this Agreement; or

        (ii)     the failure of the Buyer to perform any of the Assumed Liabilities andthe Buyer's (or any successor's or assignee's) operation of the Business and/or the ownership and/or use of the Purchased Assets after the Closing Date.

**Section 9.3.** <u>**Notice of Claims; Determination of Amount**</u>.

(a)     Any party seeking indemnification hereunder (the "<u>Indemnified Party</u>") shall give promptly to the party or parties, as applicable, obligated to provide indemnification to such Indemnified Party (the "<u>Indemnitor</u>") a written notice (a "<u>Claim Notice</u>") describing in reasonable detail the facts giving rise to the claim for indemnification hereunder and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such claim, and a reference to the provision of this Agreement or any certificate delivered hereunder upon which such claim is based. Subject to <u>Section 11.1</u>, the failure of any Indemnified Party to give the Claim Notice promptly as required by this <u>Section 9.3</u> shall not affect such Indemnified Party's rights under this <u>Article IX</u> except to the extent such failure is actually prejudicial to the rights and obligations of the Indemnitor.

The indemnification provisions set out in this Article IX are intended to cover all Losses and Expenses arising within twelve (12) months of the Closing Date.  It shall not matter for the purposes of the parties' indemnity obligations under this Section whether suit is instituted or not and, if instituted, whether the suit is resolved or not during the twelve (12) month period, so long as the Indemnitor has received the Claim Notice as set forth in this Section 9.3 within twelve (12) months of the Closing Date.  Neither Seller nor Buyer shall be liable to the other in respect of any indemnification hereunder for any Loss or Expense, except to the extent that the aggregate Losses and Expenses of the Indemnified Party under this Agreement exceeds $ _____. The maximum liability of either Party under this Article IX shall be $_____, provided, however, that there shall be no such limit in connection with indemnity obligations for claims based on fraud committed by either Buyer or Seller.

(b)     In calculating any Loss or Expense there shall be deducted (i) any insurance recovery in respect thereof, (ii) any recovery in respect thereof which is obtained from any other third Person (and no right of subrogation shall accrue hereunder to any such insurer or other third Person) and (iii) any Tax benefit realized by the Indemnified Party arising from any such Loss or Expense.

(c)     After the giving of any Claim Notice pursuant hereto, the amount of indemnification to which an Indemnified Party shall be entitled under this <u>Article IX</u> shall be determined: (i) by the written agreement between the Indemnified Party and the Indemnitor; (ii) by a final judgment or decree of any court of competent jurisdiction; or (iii) by any other means to

which the Indemnified Party and the Indemnitor shall agree. The judgment or decree of a court shall be deemed final when the time for appeal, if any, shall have expired and no appeal shall have been taken or when all appeals taken shall have been finally determined. The Indemnified Party shall have the burden of proof in establishing the amount of Losses and Expenses suffered by it.

**Section 9.4.    Third Person Claims**.

(a)    Notwithstanding anything to the contrary contained in Section 9.3, in order for a party to be entitled to any indemnification provided for under this Agreement in respect of, arising out of or involving a claim or demand made by any third Person against the Indemnified Party, such Indemnified Party must notify the Indemnitor in writing, and in reasonable detail, of the third Person claim promptly, but in any event within ten (10) days, after receipt by such Indemnified Party of written notice of the third Person claim, which such notification must include a copy of the written notice of the third Person claim that was received by the Indemnified Party (the "Third Person Claim Notice"). Thereafter, the Indemnified Party shall deliver to the Indemnitor, promptly, but in any event within five (5) Business Days, after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the third Person claim. Notwithstanding the foregoing, should a party be physically served with a complaint with regard to a third Person claim, the Indemnified Party must notify the Indemnitor with a copy of the complaint promptly, but in any event within five (5) Business Days, after receipt thereof and shall deliver to the Indemnitor promptly, but in any event within seven (7) Business Days, after the receipt of such complaint copies of notices and documents (including court papers) received by the Indemnified Party relating to the third Person claim. Subject to Section 11.1, the failure of any Indemnified Party to promptly provide a Third Person Claim Notice as required by this Section 9.4 shall not affect such Indemnified Party's rights under this Article IX except to the extent such failure is actually prejudicial to the rights and obligations of the Indemnitor.

(b)    In the event of the initiation of any legal proceeding against the Indemnified Party by a third Person, the Indemnitor shall have the sole and absolute right after the receipt of a Third Person Claim Notice, at its option and at its own expense, to be represented by counsel of its choice and to control, defend against, negotiate, settle or otherwise deal with any proceeding, claim, or demand which relates to any loss, liability or damage indemnified against hereunder; provided, however, that the Indemnified Party may participate in any such proceeding with counsel of its choice and at its expense. The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such proceeding, claim or demand. Prior to the time the Indemnified Party is notified by the Indemnitor as to whether the Indemnitor will assume the defense of such proceeding, claim or demand, the Indemnified Party shall take all actions reasonably necessary to timely preserve the collective rights of the parties with respect to such proceeding, claim or demand, including responding timely to legal process. To the extent the Indemnitor elects not to defend such proceeding, claim or demand (or fails to confirm its election) within thirty (30) days after the giving by the Indemnified Party to the Indemnitor of a Third Person Claim Notice, the Indemnified Party may retain counsel, reasonably acceptable to the Indemnitor, at the expense of the Indemnitor, and control the defense of, or otherwise deal with, such proceeding, claim or demand. Regardless of which party assumes the defense of such proceeding, claim or demand, the parties agree to cooperate with one another in connection therewith. Such cooperation shall include providing records and information that are relevant to such proceeding,

28

claim or demand, and making each parties' employees and officers available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and to act as a witness or respond to legal process. Whether or not the Indemnitor assumes the defense of such proceeding, claim or demand, the Indemnified Party shall not admit any liability with respect to, or settle, compromise or discharge, such proceeding, claim or demand without the Indemnitor's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed). The Indemnitor shall not consent to a settlement of, or the entry of any judgment arising from, any such proceeding, claim or demand without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) unless such settlement or judgment (a) relates solely to monetary damages for which the Indemnitor shall be responsible and (b) includes as an unconditional term thereof the release of the Indemnified Party from all liability with respect to such proceeding, claim or demand, in which event no such consent shall be required. After any final judgment or award shall have been rendered by a court, arbitration board or administrative agency of competent jurisdiction and the time in which to appeal therefrom has expired, or a settlement shall have been consummated, or the Indemnified Party and the Indemnitor shall arrive at a mutually binding agreement with respect to each separate matter alleged to be indemnified by the Indemnitor hereunder, the Indemnified Party shall forward to the Indemnitor notice of any sums due and owing by it with respect to such matter and the Indemnitor shall pay all of the sums so owing to the Indemnified Party by wire transfer, certified or bank cashier's check within thirty (30) days after the date of such notice.

(c)     The party that has assumed the control or defense of any such proceeding, claim or demand made by a third Person against the other party shall (a) provide the other party with the right to participate in any meetings or negotiations with any Governmental Body or other third Person and reasonable advance notice of any such meetings or negotiations, (b) provide the other party with the right to review in advance and provide comments on any draft or final documents proposed to be submitted to any Governmental Body or other third Person, and (c) keep the other party reasonably informed with respect to such proceeding, demand or claim, including providing copies of all documents provided to, or received from, any Governmental Body or any other third Person in connection with such proceeding, demand or claim. The Buyer Group Members, on the one hand, and the Seller Group Members, on the other hand, covenant and agree to maintain the confidence of all such drafts and comments provided by the other.

### Section 9.5.     Limitations; Subrogation; Exclusive Remedies.

(a)     In any case where the Indemnified Party recovers from third Persons any amount in respect of a matter with respect to which the Indemnitor has indemnified it pursuant to this Article IX, the Indemnified Party shall promptly pay over to the Indemnitor the amount so recovered (after deducting therefrom the full amount of the expenses incurred by it in procuring such recovery), but not in excess of any amount previously so paid by the Indemnitor to or on behalf of the Indemnified Party in respect of such matter.

(b)     In the case where the Indemnitor makes any payment to the Indemnified Party in respect of any Loss, the Indemnitor shall, to the extent of such payment, be subrogated to all rights of the Indemnified Party against any third Person in respect of the Loss to which such payment relates. The Indemnified Party and the Indemnitor shall execute upon request all instruments reasonably necessary to evidence or further perfect such subrogation rights.

(c)     Except for remedies that cannot be waived as a matter of law and injunctive and provisional relief, if the Closing occurs, this <u>Article IX</u> shall be the exclusive remedy for breaches of this Agreement (including any covenant, obligation, representation or warranty contained in this Agreement or in any certificate delivered pursuant to this Agreement) or otherwise relating to the subject matter of this Agreement, including any claims arising under any Environmental Laws.

**Section 9.6.     No Special Damages; Mitigation**.  Notwithstanding anything to the contrary contained in this Agreement, none of the parties hereto shall have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including loss of future profits, revenue or income, damages based on any multiple of revenue or income, diminution in value or loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, regardless of whether such damages were foreseeable, except to the extent such damages are payable to a third Person. Each of the parties agrees to take all reasonable steps to mitigate their respective Losses and Expenses upon and after becoming aware of any event or condition which could reasonably be expected to give rise to any Losses and Expenses that are indemnifiable hereunder, including using its commercially reasonable efforts to obtain insurance proceeds or other recoveries from third Persons in respect thereof.

# ARTICLE X

# TERMINATION

**Section 10.1.  Termination**.

(a)     Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing:

(i)     by the mutual written consent of the Seller and the Buyer;

(ii)     by the Seller, if a breach or failure to perform any of the covenants or agreements of the Buyer contained in this Agreement shall have occurred, or there shall be any inaccuracy of any of the representations or warranties of the Buyer contained in this Agreement, and such breach, failure to perform or inaccuracy either individually or in the aggregate would, if occurring or continuing on the Closing Date, give rise to the failure of a condition set forth in <u>Section 7.1</u>, and such breach, failure to perform or inaccuracy if curable, is not cured by, on or before the earlier of (i) the Termination Date or (ii) thirty (30) days following receipt of written notice by Buyer, or which by its nature or timing cannot be cured prior to the Termination Date; provided, however, that the Seller shall not have the right to terminate this Agreement pursuant to this <u>Section 10.1(a)(ii)</u> if the Seller is then in breach of any of its covenants or agreements contained in this Agreement or any of the representations or warranties of the Seller contained in this Agreement shall be inaccurate, and, in any such case would give rise to the failure of a condition set forth in <u>Section 8.1</u>;

(iii)     by the Buyer, if a breach or failure to perform any of the covenants or agreements of the Seller contained in this Agreement shall have occurred, or there shall be any inaccuracy of any of the representations or warranties of the Seller contained in this Agreement, and such breach, failure to perform or inaccuracy either individually or in the aggregate would, if occurring or continuing on the Closing Date, give rise to the failure of a condition set forth in Section 8.1, and such breach, failure to perform or inaccuracy if curable, is not cured by, on or before the earlier of (i) the Termination Date or (ii) thirty (30) days following receipt of written notice by Buyer, or which by its nature or timing cannot be cured prior to the Termination Date: provided, however, that the Buyer shall not have the right to terminate this Agreement pursuant to this Section 10.1(a)(iii) if the Buyer is then in breach of any of its covenants or agreements contained in this Agreement or any of the representations or warranties of the Buyer contained in this Agreement shall be inaccurate, and, in any such case would give rise to the failure of a condition set forth in Section 7.1;

(iv)     by the Seller or the Buyer, if any U.S. federal or state court of competent jurisdiction shall have issued a final and nonappealable Order permanently enjoining or otherwise prohibiting the consummation of the sale of the Purchased Assets contemplated hereby;

(v)     by the Seller or the Buyer if the Closing shall not have been consummated on or before _____ (the "Termination Date"). Notwithstanding the foregoing, the right to terminate this Agreement under this Section 10.1(a)(v) shall not be available to any party if the failure of the Closing to occur by such date shall be due to the failure of such party to perform or observe the covenants and agreements of such party set forth in this Agreement.

(b)     The party desiring to terminate this Agreement pursuant to Section 10.1(a) (other than pursuant to Section 10.1(a)(i)) shall give written notice of such termination to the other party or parties, as applicable.

(c)     Subject to clause (d) below, in the event that this Agreement shall be terminated pursuant to Section 10.1(a), all further obligations of the parties under this Agreement (other than Section 5.5, this Article X and Article XI, and, for the avoidance of doubt, the Confidentiality Agreement, which, in each case, shall remain in full force and effect) shall be terminated without further liability of any party; provided that nothing herein shall relieve any party from liability for any breach of this Agreement.

(d)     If this Agreement is terminated either (x) by the Seller pursuant to Section 10.1(a)(ii) or (y) by either the Seller or the Buyer pursuant to Section 10.1(a)(v) and at any time prior to such termination the Seller had the right to terminate this Agreement pursuant to Section 10.1(a)(ii), then the Seller shall be entitled to the Escrow Deposit and any interest earned thereon and the Seller and Buyer shall immediately deliver joint written instructions (pursuant to the Escrow Agreement) to the Escrow Agent directing such disbursement.  The Seller shall, in addition, be entitled to prompt payment on demand from Buyer of the reasonable attorneys' fees actually incurred by the Seller in enforcing its rights under this Agreement.  For the avoidance of

doubt, the parties hereto expressly acknowledge and agree that this <u>Section 10.1(d)</u> in no way limits or restricts the Seller's ability to exercise its rights to specific performance pursuant to <u>Section 11.15</u> at any time prior to the termination of this Agreement in accordance with its terms.

(e)     If this Agreement is terminated prior to the Closing under the provisions of this <u>Section 10.1</u> for any reason other than by the Seller pursuant to <u>Section 10.1(a)(ii)</u> (and at no time prior to such termination did the Seller have the right to terminate this Agreement pursuant to <u>Section 10.1(a)(ii)</u>) then the Seller and the Buyer shall deliver joint written instructions (pursuant to the Escrow Agreement) to the Escrow Agent directing the disbursement of the Escrow Deposit (with all interest earned thereon) to the Buyer.

Section 10.2.   **Withdrawal of Certain Filings**.  In the event of termination under the provisions of this <u>Article X</u>, all filings, applications and other submissions relating to the transactions contemplated by this Agreement as to which termination has occurred shall, to the extent practicable, be withdrawn from the Governmental Body or other Person to which made.

# ARTICLE XI

# GENERAL PROVISIONS

Section 11.1.   **Survival of Obligations**.  None of the covenants, agreements or obligations shall survive the consummation of the Closing, except to the extent such covenants, agreements and obligations contemplate performance after the Closing, in which case each such covenant, agreement and obligation shall survive until performed.  No claim may be brought under this Agreement unless written notice describing in reasonable detail the facts giving rise to the claim is given on or prior to the last day of the applicable survival period. In the event such notice is given, the right to indemnification with respect thereto shall survive the applicable survival period until such claim is finally resolved and any obligations with respect thereto are fully satisfied.

Section 11.2.   **Confidential Nature of Information**.  Each party agrees that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other party or parties during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, each party will return to the other party or parties all copies of nonpublic documents and materials which have been furnished in connection therewith. Without limiting the right of either party to pursue all other legal and equitable rights available to it for violation of this <u>Section 11.2</u> by the other party, it is agreed that other remedies cannot fully compensate the aggrieved party for such a violation of this <u>Section 11.2</u> and that the aggrieved party shall be entitled to injunctive relief to prevent a violation or continuing violation hereof.

Section 11.3.   **Governing Law**.  This Agreement and all claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in

or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed and construed in accordance with the internal Laws of the State of Texas. The Bankruptcy Court shall have exclusive jurisdiction over the interpretation and enforcement of this Agreement. In the event the Bankruptcy Court declines to exercise jurisdiction over any dispute arising under, relating to or connected with this Agreement, the parties shall submit to jurisdiction in the federal and state courts sitting in Houston, Texas.

Section 11.4. **Exclusive Jurisdiction; Court Proceedings**. The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 11.5 shall be deemed effective service of process on such party. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER IN CONTRACT OR TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM INVOLVING ANY FINANCING SOURCE AND THEIR RESPECTIVE NONPARTY AFFILIATES)

Section 11.5. **Notices**. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (a) on the date of delivery if delivered personally or if sent via facsimile (with confirmation and same day dispatch by express courier utilizing next-day service), (b) on the earlier of confirmed receipt or the third (3rd) Business Day following the date of mailing if mailed by registered or certified mail (return receipt requested), (c) on the first (1st) Business Day following the date of dispatch if delivered utilizing next-day service by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice) or (d) on the date such notice is transmitted by e-mail to the e-mail addresses previously provided to the other parties:

If to the Seller:

Marshall Broadcasting Group, Inc.
Attn: Pluria Marshall Jr.
3731 Wilshire Boulevard
Suite 840
Los Angeles, CA 90010
Email: pluria@MBGroup.tv

with a copy to:

33

Levene Neale Bender Yoo & Brill L.L.P.
10250 Constellation Boulevard
Suite 1700
Los Angeles, CA 90067
Attn:  David B. Golubchik
        Eve H. Karasik
Email: dbg@lnbyb.com
        ehk@lbbyb.com

-and-

Gray Reed & McGraw LLP
1300 Post Oak Blvd.
Suite 2000
Houston, TX 77056
Attn.:  Jason S. Brookner
        Lydia R. Webb
Email: jbrookner@grayreed.com
        lwebb@grayreed.com

If to the Buyer, to:

[INSERT]

with a copy to:

[INSERT]

**Section 11.6.   Successors and Assigns; Third Party Beneficiaries**.

(a)     This Agreement and all of its terms shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, including any successor by a merger or conversion referenced below. Except as provided in this Section 11.6(a), this Agreement shall not be assigned by any party hereto. Any party (including, for this purpose, Seller) may assign or transfer any of its rights and obligations under this Agreement to any of its Affiliates with consent of the other party, provided that no such assignment or transfer materially delays the grant of the FCC Consent and, provided further, that no such assignment or transfer shall operate to relieve a party of any of its liabilities or obligations hereunder.

(b)     Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 11.6 any right, remedy or claim under or by reason of this Agreement.

**Section 11.7.   Access to Records after Closing**.

(a)     For a period of six (6) years after the Closing Date, the Seller and its representatives shall have reasonable access to all of the books and records of the Business transferred to the Buyer hereunder to the extent that such access may reasonably be required by

34

the Seller in connection with matters relating to or affected by the operations of the Business prior to the Closing Date. Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours. The Seller shall be solely responsible for any costs or expenses incurred by it pursuant to this <u>Section 11.7(a)</u>. If the Buyer shall desire to dispose of any of such books and records prior to the expiration of such six (6) year period, it shall, prior to such disposition, give the Seller a reasonable opportunity, at the Seller's expense, to segregate and remove such books and records as the other party may select.

(b)     For a period of six (6) years after the Closing Date, the Buyer and its representatives shall have reasonable access to all of the books and records relating to the Business which the Seller may retain after the Closing Date. Such access shall be afforded by the Seller upon receipt of reasonable advance notice and during normal business hours. The Buyer shall be solely responsible for any costs and expenses incurred by it pursuant to this <u>Section 11.7(b)</u>. If the Seller shall desire to dispose of any of such books and records prior to the expiration of such six-(6) year period, such party shall, prior to such disposition, give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such books and records as the other party may select.

**Section 11.8.   <u>Entire Agreement; Amendments</u>**.  This Agreement, the Exhibits and Schedules referred to herein and the other documents delivered pursuant hereto contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or intents between or among any of the parties hereto. The parties hereto, by mutual agreement in writing, may amend, modify and supplement this Agreement.

**Section 11.9.   <u>Interpretation</u>**.  Article titles and headings to Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. The Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. For purposes of this Agreement, (i) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation," (ii) the word "or" is not exclusive and (iii) the words "herein", "hereof", "hereby", "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein (a) to Articles, Sections, Exhibits and Schedules mean the Articles and Sections of, and the Exhibits and Schedules attached to, this Agreement and (b) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and by this Agreement. This Agreement, the Buyer Ancillary Agreements and the Ancillary Agreements shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. References to a "party hereto" or the "parties hereto" or similar phrases shall refer to the Seller and the Buyer.  An asset or right shall be deemed to be "exclusively related" to or "exclusively used in" the Business if in the ordinary course of the Business such asset or right is used solely in the Business and is not used by the other businesses and operations of the Seller.

**Section 11.10. <u>Waivers</u>**.  Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit

thereof. The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

Section 11.11. **Expenses**.  Except as otherwise expressly provided herein, each of Seller and the Buyer will pay all of its own respective costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

Section 11.12. **Partial Invalidity**.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

Section 11.13. **Execution in Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the parties and delivered to each of the Seller and the Buyer.

Section 11.14. **Disclaimer of Warranties**.  Seller makes no representations or warranties with respect to any projections, forecasts or forward-looking information provided to the Buyer. There is no assurance that any projected or forecasted results will be achieved. EXCEPT AS TO THOSE MATTERS EXPRESSLY COVERED BY THE REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT AND THE CERTIFICATES DELIVERED BY THE SELLER PURSUANT TO SECTION 8.1, THE SELLER IS SELLING THE BUSINESS AND THE PURCHASED ASSETS ON AN "AS IS, WHERE IS" BASIS AND SELLER DISCLAIMS ALL OTHER WARRANTIES, REPRESENTATIONS AND GUARANTIES WHETHER EXPRESS OR IMPLIED. THE SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND NO IMPLIED WARRANTIES WHATSOEVER. The Buyer acknowledges that neither the Seller nor any of its representatives or Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any memoranda, charts, summaries or schedules heretofore made available by the Buyer or its representatives or Affiliates or any other information which is not included in this Agreement or the Schedules hereto, and neither the Seller nor any of its representatives or Affiliates nor any other Person will have or be subject to any liability to the Buyer, any Affiliate of the Buyer or any other Person resulting from the distribution of any such information to, or use of any such information by, the Buyer, any Affiliate of the Buyer or any of their agents, consultants, accountants, counsel or other representatives. In making its determination to proceed with the transactions contemplated by this Agreement the Buyer and its Affiliates have relied solely on (a) the results of their own independent investigation and (b) the representations and warranties of Seller expressly and

36

specifically set forth in this Agreement.  The Buyer and its Affiliates expressly and specifically disclaim that they are relying upon or have relied upon any representation or warranty of any kind or nature, whether express or implied, not included in this Agreement that may have been made by any Person, and acknowledge and agree that the Seller expressly and specifically disclaims any such other representations and warranties.

                      **Section 11.15. <u>Specific Performance</u>**.  The parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached or the Closing was not consummated, and that money damages would not be an adequate remedy, even if available. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions, or any other appropriate form of specific performance or equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (including the parties' obligations to consummate the Closing) in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. Each of the parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to post any bond or other security in connection with any such order or injunction.

[Signatures on following page]

4850-6291-3457.3

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**<u>SELLER</u>**

MARSHALL BROADCASTING GROUP, INC.

By:_____
     Name:
     Title:

**<u>BUYER</u>**

[INSERT]

By:_____
     Name:
     Title:

**Exhibit 2**

**Schedule of Assumed Contracts**