**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| MARSHALL BROADCASTING GROUP, INC.,[1] | § § § | Case No. 19-36743 (DRJ) |
| Debtor. | § § § | |

**NOTICE OF STALKING HORSE BIDDER**

**PLEASE TAKE NOTICE** that on February 14, 2020, the Court entered its *Order (A) Approving Bidding Procedures and Certain Bid Protections, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof* [Docket No. 157] (the "Bidding Procedures Order"). The Bidding Procedures Order approved, among other things, the bidding procedures attached thereto as Exhibit A (the "Bidding Procedures").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph 13 of the Bidding Procedures Order and Section IX of the Bidding Procedures, the Debtor reserved the right to select one or more bidders to act as a stalking horse for the Debtor's assets.

**PLEASE TAKE FURTHER NOTICE** that pursuant to paragraph 13 of the Bidding Procedures Order and Section IX of the Bidding Procedures, the Debtor hereby designates Allen Media Broadcasting Evansville, Inc. as the stalking horse bidder on the terms set forth in the Asset Purchase Agreement dated February 14, 2020, attached hereto as **Exhibit A**.

---

[1] The last four digits of the Debtor's federal tax identification number are (7805).

Respectfully submitted this 14th day of February, 2020.

**GRAY REED & McGRAW LLP**

By: */s/ Jason S. Brookner*
    Jason S. Brookner
    Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:     jbrookner@grayreed.com

    -and-

    Lydia R. Webb
    Texas Bar No. 24083758
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:     lwebb@grayreed.com

    -and

David B. Golubchik (*pro hac vice*)
Eve H. Karasik (*pro hac vice*)
**LEVENE NEALE BENDER YOO**
    **& BRILL L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: dbg@lnbyb.com
     ehk@lnbyb.com

**COUNSEL TO THE DEBTOR**

**CERTIFICATE OF SERVICE**

    I do hereby certify that on February 14, 2020, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this case.

        */s/ Jason S. Brookner*
        Jason S. Brookner

**Exhibit A**

**Stalking Horse APA**

**ASSET PURCHASE AGREEMENT**

**for**

**the SALE of TELEVISION-RELATED ASSETS**

**KMSS-TV, SHREVEPORT, LOUISIANA**
**KPEJ-TV, ODESSA, TEXAS**
**KLJB, DAVENPORT, IOWA**

**by and among**

**MARSHALL BROADCASTING GROUP, INC**

**and**

**ALLEN MEDIA BROADCASTING EVANSVILLE, INC.**

**Dated as of February 14, 2020**

# TABLE OF CONTENTS

**Page**

**Article I DEFINITIONS** ................................................................................................ 1
    Section 1.1.    Definitions ................................................................................ 1

**Article II PURCHASE AND SALE OF PURCHASED ASSETS** ............................... 9
    Section 2.1.    Purchase and Sale of Purchased Assets ................................... 9
    Section 2.2.    Excluded Assets ..................................................................... 10
    Section 2.3.    Assumption of Liabilities ...................................................... 11
    Section 2.4.    Excluding or Adding Assumed Contracts ............................. 13
    Section 2.5.    Closing Date ........................................................................... 13
    Section 2.6.    Purchase Price ........................................................................ 14
    Section 2.7.    Prorations and Adjustments ................................................... 14
    Section 2.8.    Closing Date Deliveries ......................................................... 16
    Section 2.9.    Further Assurances ................................................................. 17
    Section 2.10.    Allocation of Purchase Price ................................................. 18

**Article III REPRESENTATIONS AND WARRANTIES OF THE SELLER** ...................... 18
    Section 3.1.    Organization ........................................................................... 18
    Section 3.2.    Authority of the Seller ........................................................... 18
    Section 3.3.    All Assets ............................................................................... 19
    Section 3.4.    Governmental Permits; FCC Matters ..................................... 19
    Section 3.5.    Real Property Leases .............................................................. 20
    Section 3.6.    Title to Purchased Assets ....................................................... 21
    Section 3.7.    Contracts ................................................................................ 21
    Section 3.8.    No Violation, Litigation or Regulatory Action ..................... 21
    Section 3.9.    Insurance ................................................................................ 22
    Section 3.10.    Employees .............................................................................. 22
    Section 3.11.    Environmental Protection ...................................................... 23
    Section 3.12.    Seller's Broker ....................................................................... 24
    Section 3.13.    Intellectual Property .............................................................. 24
    Section 3.14.    Taxes ...................................................................................... 24
    Section 3.15.    OFAC ..................................................................................... 25

**Article IV REPRESENTATIONS AND WARRANTIES OF THE BUYER** ...................... 25
    Section 4.1.    Organization ........................................................................... 25
    Section 4.2.    Authority of the Buyer ........................................................... 25
    Section 4.3.    Litigation ............................................................................... 26
    Section 4.4.    No Finder ............................................................................... 26
    Section 4.5.    Qualifications as FCC Licensee ............................................ 27
    Section 4.6.    Financial Capacity; Solvency ................................................ 27

**Article V ACTION PRIOR TO THE CLOSING DATE** ........................................ 27
    Section 5.1.    Access to the Business ........................................................... 27
    Section 5.2.    Notification of Certain Matters ............................................. 28
    Section 5.3.    FCC Consent; Other Consents and Approvals ...................... 28
    Section 5.4.    Operation of the Stations and the Business Prior to the Closing Date ................... 30

Section 5.5.      Public Announcement ............................................................. 31
Section 5.6.      Employees ............................................................................... 31

**Article VI ADDITIONAL AGREEMENTS** ..............................................................**32**

Section 6.1.      Control of Operations Prior to Closing Date........................... 32
Section 6.2.      Bulk Transfer Laws ................................................................ 32
Section 6.3.      Use of Names ......................................................................... 32

**Article VII CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER** ..........**32**

Section 7.1.      No Breach of Covenants and Warranties ................................. 33
Section 7.2.      No Restraint ........................................................................... 33
Section 7.3.      Certain Governmental Approvals ........................................... 33
Section 7.4.      Closing Deliveries .................................................................. 33
Section 7          33

**Article VIII CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER** ..........**33**

Section 8.1.      No Breach of Covenants and Warranties ................................. 33
Section 8.2.      No Restraint ........................................................................... 33
Section 8.3.      Certain Governmental Approvals ........................................... 34
Section 8.4.      Closing Deliveries .................................................................. 34
Section 8.5.      No Material Adverse Effect ..................................................... 34
Section 8.6.      Contract Consents .................................................................. 34
Section 8.7.      Approval of Schedules and Exhibits. ...................................... 34

**Article IX [RESERVED]** .......................................................................................**34**

**Article X TERMINATION** ....................................................................................**34**

Section 10.1.     Termination ............................................................................ 34
Section 10.2.     Withdrawal of Certain Filings ................................................ 37

**Article XI GENERAL PROVISIONS** ......................................................................**37**

Section 11.1.     Survival of Obligations ........................................................... 37
Section 11.2.     Confidential Nature of Information ......................................... 37
Section 11.3.     Governing Law ....................................................................... 38
Section 11.4.     Exclusive Jurisdiction; Court Proceedings.............................. 38
Section 11.5.     Notices ................................................................................... 38
Section 11.6.     Successors and Assigns; Third Party Beneficiaries ................. 40
Section 11.7.     Access to Records after Closing ............................................. 40
Section 11.8.     Entire Agreement; Amendments ............................................. 41
Section 11.9.     Interpretation ......................................................................... 41
Section 11.10.    Waivers .................................................................................. 41
Section 11.11.    Expenses ................................................................................ 41
Section 11.12.    Partial Invalidity.................................................................... 41
Section 11.13.    Execution in Counterparts ...................................................... 42
Section 11.14.    Disclaimer of Warranties ....................................................... 42
Section 11.15.    Specific Performance / Liquidated Damages ........................... 42

iii

**<u>EXHIBITS</u>**

Exhibit A – Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit B – Form of Assignment of Seller FCC Authorizations

**<u>SCHEDULES</u>**

Schedule 1.1 – Business
Schedule 1.1 – Retained Names and Marks
Schedule 2.1(b) – Tangible Personal Property
Schedule 2.1(g) – Assumed Contracts
Schedule 2.2(g) – Excluded Assets
Schedule 3.4(a) – Governmental Permits, including the Seller FCC Authorizations
Schedule 3.5(a) – Real Property Leases
Schedule 3.7 – Contracts other than the Real Property Leases
Schedule 3.9 – Insurance Claims
Schedule 3.10(a) – Employee Benefit Plans
Schedule 3.11 – Environmental Exceptions
Schedule 3.13(a) – Intellectual Property
Schedule 3.13(d) – Intellectual Property Agreements

DOCS_SF:102776.8 68700/048

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT**, dated as of February 14, 2020 (this "Agreement"), by and among Marshall Broadcasting Group, Inc., a Texas corporation ("Seller") and Allen Media Broadcasting Evansville, Inc., a Delaware corporation (or its designee) (the "Buyer"). Buyer and Seller are each referred to herein individually as a "Party," and collectively as the "Parties."

## RECITALS:

A.    The Seller owns and operates television broadcast stations KMSS-TV, Shreveport, Louisiana, KPEJ-TV, Odessa, Texas and KLJB, Davenport, Iowa (the "Stations"), pursuant to certain authorizations issued by the U.S. Federal Communications Commission (the "FCC").

B.    On December 3, 2019 (the "Petition Date"), Seller filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing voluntary proceedings (the "Bankruptcy Case") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

C.    Buyer desires to purchase the Purchased Assets and assume the Assumed Liabilities, and the Seller desires to sell to the Buyer the Purchased Assets and transfer the Assumed Liabilities, on the terms and subject to the conditions contained in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Parties do hereby agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.1.    Definitions**.  As used in this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

"**Acquisition Proposal**" means a proposal (other than by the Buyer or its Affiliates) relating to any merger, consolidation, business combination, sale or other disposition of all or substantially all of the Purchased Assets pursuant to one (1) or more transactions (and for the avoidance of doubt excluding sales in the ordinary course of Business), the sale of a majority of the outstanding shares of capital stock or equity interests of the Seller (including by way of a tender offer, foreclosure, plan of reorganization or liquidation, or chapter 7 liquidation), or a similar transaction or business combination involving one (1) or more Persons and the Seller.

"**Affiliate**" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person.  As used in this definition, the term "control" (including the terms "controlling," "controlled by" and "under

common control with") shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning specified in the introductory paragraph hereof.

"**Ancillary Agreements**" means any certificate, agreement, document or other instrument to be executed and delivered in connection with the transactions contemplated by this Agreement.

"**Assignment of the Seller FCC Authorizations**" has the meaning specified in Section 2.8.

"**Assumed Liabilities**" has the meaning specified in Section 2.3(a).

"**Avoidance Actions**" means any causes of action arising under Chapter 5 of the Bankruptcy Code, including any and all preference or other avoidance claims and actions of the Seller, including all such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code.

"**Bankruptcy Case**" has the meaning specified in the Recitals hereof.

"**Bankruptcy Code**" has the meaning specified in the Recitals hereof.

"**Bankruptcy Court**" has the meaning specified in the Recitals hereof.

"**Bid Deadline**" means the deadline set in the Bid Procedures Order for Persons to submit bids for the purchase of any of the Purchased Assets.

"**Bid Procedures Order**" means the Bankruptcy Court's *Order (A) Approving Bidding Procedures and Certain Bid Protections, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof* [Docket No. 157], entered on February 14, 2020.

"**Bill of Sale and Assignment and Assumption Agreement**" has the meaning specified in Section 2.8(a).

"**Breakup Fee**" has the meaning specified in Section 10.1(f).

"**Business**" means the business of the Stations and any other business or assets of Seller, except the Excluded Assets and any assets specifically described on Schedule 1.1(Business) attached hereto.

"**Business Day**" means any day on which the principal offices of the Securities and Exchange Commission are open to accept filings and on which banks in the City of New York are not required or authorized to close.

"**Buyer**" has the meaning specified in the introductory paragraph hereof.

2

"**Buyer Ancillary Agreements**" has the meaning specified in Section 4.2(a).

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., and any regulations promulgated thereunder.

"**Closing**" has the meaning specified in Section 2.5.

"**Closing Date**" has the meaning specified in Section 2.5.

"**Closing Date Adjustments**" has the meaning specified in Section 2.7(a).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Communications Act**" means the Communications Act of 1934, as amended, and the rules and regulations of the FCC promulgated under the foregoing, in each case, as in effect from time to time.

"**Contract**" means any binding agreement, license, contract, commitment, or other binding arrangement or understanding, and with respect to any Contract to which Seller is a party, such contract which Seller is permitted under the Bankruptcy Code to assume and assign.

"**Cure Amount**" has the meaning specified in Section 2.7(a).

"**Cure Amount Cap**" has the meaning specified in Section 2.3(a)(ii).

"**Customer Records**" means all customer data and information derived from customer files, brand loyalty programs, and promotional events.

"**Cutoff Time**" means 11:59 P.M. (central time) on the date immediately prior to the Closing Date.

"**Employee Benefit Plans**" has the meaning specified at Section 3.10(a).

"**Encumbrance**" means any lien, claim, charge, security interest, mortgage, pledge, easement, conditional sale or other title retention agreement, defect in title, covenant or other restrictions of any kind, other than any license of, option to license, or covenant not to assert claims of infringement or misappropriation with respect to, Intellectual Property.

"**Environmental Law**" means all Requirements of Laws relating to or addressing the prevention of pollution, the environment, human health, occupational health or safety, including but not limited to CERCLA, OSHA, RCRA, the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300(f) et seq.; the Clean Air Act, as amended, 42 U.S.C. §§ 7401 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; and any state equivalents thereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"**ERISA Affiliate**" has the meaning specified at Section 3.10(b).

"**Escrow Agent**" means Wells Fargo Bank, National Association, a national banking association organized under the laws of the United States.

"**Escrow Agreement**" means that certain Escrow Agreement, dated as of the date hereof, by and among the Seller, the Buyer and the Escrow Agent.

"**Escrow Deposit**" has the meaning specified in Section 2.7(b).

"**Excluded Assets**" has the meaning specified in Section 2.2.

"**Excluded Liabilities**" has the meaning specified in Section 2.3(b).

"**Expense Reimbursement**" has the meaning specified in Section 10.1(g).

"**FCC**" has the meaning specified in the Recitals hereof.

"**FCC Applications**" has the meaning specified in Section 5.3(a).

"**FCC Consent**" means action by the FCC (including action by staff acting on delegated authority) granting its consent to the FCC Applications.

"**Final Order**" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"**Governmental Body**" means any foreign, federal, state, local or other governmental authority, or judicial or regulatory body.

"**Governmental Consents**" means (i) the FCC Consent; (ii) the Sale Order; and (iii) all authorizations, consents, Orders and approvals of all Governmental Bodies, including any State Attorney General, that are or may become necessary for the execution, delivery and consummation of the transactions contemplated hereby.

"**Governmental Permits**" has the meaning specified in Section 3.4(a).

"**Hazardous Materials**" means any waste, pollutant, hazardous substance, toxic substance, hazardous waste, special waste, regulated or defined as "hazardous," "toxic" or words of similar import pursuant to any Environmental Law, including asbestos, asbestos containing material, petroleum or petroleum-derived substance or waste, or any constituent of any such substance or waste.

"**Hired Employee**" has the meaning specified in Section 5.6.

"**Indebtedness**" with respect to any Person means any obligation of such Person for borrowed money, and in any event shall include (a) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, (b) the face amount of all letters of credit issued for the

account of such Person, (c) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Encumbrances, (d) capitalized lease obligations, (e) all guarantees and similar obligations of such Person, (f) all accrued interest, fees and charges in respect of any indebtedness and (g) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness.

"**Independent Accountant**" has the meaning specified in Section 2.7(b).

"**Intellectual Property**" means, except for the Retained Names and Marks, to the extent relating to or used in connection with the Business, whether owned or licensed, whether related to use in the United States or another country, (i) any and all patents (including design patents) and patent applications (including docketed patent disclosures awaiting filing, reissues, divisions, continuations, continuations-in-part and extensions), patent disclosures awaiting filing determination, inventions and improvements thereto, (ii) trademarks, service marks, certification marks, trade names, brand names, trade dress, logos, business and product names, slogans, and registrations and applications for registration thereof, (iii) copyrights (including software) and registrations thereof, (iv) inventions, processes, designs, formulae, trade secrets, know-how, industrial models, confidential and technical information, manufacturing, engineering and technical drawings, product specifications, domain names, discoveries and confidential business information, (v) computer software, web site and domain names/URLs, web addresses, web pages, websites and related content, accounts with Twitter, Facebook and other social media companies and the content found thereon and related thereto, (vi) copies and tangible embodiments thereof (in whatever form or medium, including electronic media), and (vii) intellectual property rights similar to any of the foregoing.

"**Intellectual Property Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property that is used in or necessary for the conduct of the Business as currently conducted to which Seller is a party, beneficiary or otherwise bound.

"**Knowledge of the Seller**" means, as to a particular matter, the actual knowledge, after reasonable inquiry of the manager of the Stations, of Pluria Marshall and the other executive level employees of Seller.

"**Laws**" means any and all domestic (federal, state or local) or foreign or provincial laws, statutes, ordinances, rules, published regulations, judgments, orders, injunctions, awards, or agency policies, procedures, requirements or decrees promulgated by any Governmental Body.

"**Liability**" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes and any "claim" as that term is defined in the Bankruptcy Code.

5

"**Loss**" means any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, damages, expenses, deficiencies or other charges.

"**Market**" means, with respect to the Stations, the "Designated Market Area," as determined by The Nielsen Company, of the Stations.

"**Material Adverse Effect**" means a material adverse effect on (i) the ability of the Seller to perform its obligations under this Agreement, or (ii) the Stations or the Business, taken as a whole; provided, however, that for purposes of determining whether there has been or is reasonably likely to be a "Material Adverse Effect" for purposes of clause (ii), the results and consequences of the following events, occurrences, facts, conditions, changes, developments or effects shall not be taken into account: (a) any changes that generally affect the industries in which the Seller operates or the Markets of the Stations, (b) the taking of any action expressly required by, or the failure to take any action expressly prohibited by, this Agreement, or the taking of any action at the written request or the prior written consent of the Buyer, or (d) any changes in the economy or capital, financial or securities markets generally, including changes in interest or exchange rates.

"**Nexstar Claims**" means the claims and causes of action that were or could have been asserted against Nexstar Media Group. Inc. and/or affiliated entities in any forum including but not limited to *Marshall Broadcasting Group, Inc. v Nexstar Broadcasting, Inc.*, Civ. A. No. 651943/2019 (N.Y. Sup. Ct.).

"**OFAC**" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**Order**" means any order, judgment, injunction, awards, stipulations, decree or writ handed down, adopted or imposed by, including any consent decree, settlement agreement or similar written agreement with, any Governmental Body.

"**OSHA**" means the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq., and any regulations promulgated thereunder.

"**Party**" or "**Parties**" has the meaning specified in the introductory paragraph hereof.

"**Payment Date**" has the meaning specified in Section 2.7(b).

"**Permitted Encumbrance**" means (a) liens for Taxes, assessments or other governmental charges which are not yet due and payable or Taxes being contested in good faith by appropriate proceedings, (b) terms and conditions of any leases assumed by Buyer, (c) zoning laws and ordinances and similar Laws that are not materially violated by any existing improvement or that do not prohibit the use of the Real Property as currently used in the operation of the Business; (d) any right reserved to any Governmental Body to regulate the affected property; (e) in the case of any leased asset, (i) the rights of any lessor under the applicable lease agreement or any Encumbrance granted by any lessor or any Encumbrance that the applicable lease is subject to, (ii) any statutory lien for amounts that are not yet due and payable or are being contested in good faith, (iii) any subleases listed in any Schedule hereto and

6

(iv) the rights of the grantor of any easement or any Encumbrance granted by such grantor on such easement property; (f) inchoate materialmens', mechanics', workmen's, repairmen's or other like Encumbrances arising in the ordinary course of business for amounts that are not yet due and payable or that are being contested in good faith by appropriate proceedings; and (g) Encumbrances that will be released prior to or as of the Closing Date, including all mortgages and security interests securing indebtedness of Seller.

"**Person**" means any person, employee, individual, corporation, limited liability company, partnership, trust, or any other non-governmental entity or any governmental or regulatory authority or body.

"**Petition Date**" has the meaning specified in the Recitals hereof.

"**Proceeding**" means any action, claim, charge, demand, action, litigation, arbitration, liability, damage, suit in equity or at law, administrative, regulatory or quasi-judicial proceeding.

"**Purchase Price**" has the meaning specified in Section 2.6.

"**Purchased Assets**" has the meaning specified in Section 2.1.

"**PVB**" has the meaning specified in Section 3.12.

"**RCRA**" means the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., and any regulations promulgated thereunder.

"**Real Property**" has the meaning specified in Section 3.5(a).

"**Real Property Leases**" has the meaning specified in Section 3.5(a).

"**Receivables Cap**" has the meaning specified in Section 2.6(c).

"**Release**" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"**Requirements of Law**" means any foreign, federal, state or local law, rule or regulation, Governmental Permit or other binding determination of any Governmental Body.

"**Retained Names and Marks**" means all (a) Trademarks containing or incorporating the term "Marshall," (b) other Trademarks owned by Seller which are listed on Schedule 1.1(Retained Names and Marks) attached hereto, (c) variations or acronyms of any of the foregoing, and (d) Trademarks confusingly similar to or dilutive of any of the foregoing.

"**Sale Order**" means the order of the Bankruptcy Court expressly authorizing delivery of the Stations and the Purchased Assets to the Buyer pursuant to Sections 105, 363, and 365 of the Bankruptcy Code free and clear of all liens, claims, and encumbrances, other than

Permitted Encumbrances and the Assumed Liabilities.  The Sale Order shall be in a form acceptable to Buyer in its sole discretion.

"**Seller**" has the meaning specified in the introductory paragraph hereof.

"**Seller Cash**" has the meaning specified in Section 2.1(c).

"**Seller FCC Authorizations**" means those Governmental Permits issued to Seller by the FCC with respect to the Stations that are material to the Stations' operations.

"**Seller Receivables**" has the meaning specified in Section 2.1(d).

"**Solvent**" when used with respect to any Person or group of Persons on a combined basis, means that, as of any date of determination, (A) the amount of the "fair saleable value" of the assets of such Person (or group of Persons on a combined basis) will, as of such date, exceed (1) the value of all "liabilities of such Person (or group of Persons on a combined basis), including contingent and other liabilities," as of such date, as such quoted terms are generally determined in accordance with applicable Laws governing determinations of the insolvency of debtors, and (2) the amount that will be required to pay the probable liabilities of such Person (or group of Persons on a combined basis) on its existing debts (including contingent liabilities) as such debts become absolute and matured, (B) such Person (or group of Persons on a combined basis) will not have, as of such date, an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged following such date and (C) such Person (or group of Persons on a combined basis) will be able to pay its liabilities, including contingent and other liabilities, as they mature.

"**Stations**" has the meaning specified in the Recitals hereof.

"**Target Value**" has the meaning specified in Section 2.6(c).

"**Tangible Personal Property**" has the meaning specified in Section 2.1(b).

"**Tax**" means any federal, state, local or foreign net income, alternative or add-on minimum, gross income, gross receipts, property, sales, use, transfer, gains, license, employment, payroll, capital stock, environmental, franchise, social security, stamp, registration and value-added taxes, withholding or minimum tax, or other tax, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Body.

"**Tax Return**" means any return, declaration, report, claim for refund or other document relating to Taxes, including any schedule or attachment thereto, and amendment thereof.

"**Termination Date**" has the meaning specified in Section 10.1(a)(v).

"**Title IV Plans**" has the meaning specified at Section 3.10(b).

"**Transfer Taxes**" has the meaning specified at Section 2.7(c).

8

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, and any similar Law.

## ARTICLE II

## PURCHASE AND SALE OF PURCHASED ASSETS

**Section 2.1.**   **Purchase and Sale of Purchased Assets**.  Upon the terms and subject to the conditions of this Agreement and pursuant to Section 363 of the Bankruptcy Code, at the Closing, the Seller shall sell, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase, acquire and take assignment and delivery of, from the Seller pursuant to this Agreement, for the consideration specified herein, free and clear of all Encumbrances (except for Permitted Encumbrances and Assumed Liabilities), all of the right, title and interest of the Seller as of the Closing, whether tangible or intangible, real or personal and wherever located and by whomever possessed, whether or not listed below but including for the avoidance of doubt, all of the following properties, assets and rights used in or related to the Business (excepting only the Excluded Assets) (all of the assets to be sold, assigned, transferred and delivered pursuant to this Section 2.1 shall be referred to collectively herein as the "Purchased Assets"):

(a)   (x) The Seller FCC Authorizations, including the call signs KMSS-TV, KPEJ-TV and KLJB, (y) all other assignable Governmental Permits related to the Stations and the Business, and (z) any applications therefor and renewals or modifications thereof between the date hereof and Closing, and the rights to all data and records of the Seller held by any permitting, licensing and certifying agencies relating to the Purchased Assets;

(b)   All machinery, equipment auxiliary and translator facilities, transmitting towers, transmitters, broadcast equipment, antennae, supplies, computers, mobile phones, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, spare parts, miscellaneous supplies, and other tangible personal property, including without limitation the personal property set forth on Schedule 2.1(b), except for any retirements or dispositions thereof made in the ordinary course between the date hereof and Closing in accordance with Section 5.4 ("Tangible Personal Property");

(c)   Any cash or cash equivalents (including any marketable securities or certificates of deposit) of the Seller (other than the Purchase Price), including any funds held in any bank or depository account of the Seller ("Seller Cash);

(d)   Subject to Seller's right to participate in the proceeds of collection thereof in accordance with the provisions of Sections 2.6(c) and 2.7 below, all accounts receivable of the Seller, including all reimbursements arising from the FCC repacking process ("Seller Receivables");

(e)   All Intellectual Property of the Seller, along with all income, royalties, damages and payments due or payable to the Seller as of the Closing Date or thereafter, including damages and payments for past, present or future infringements or misappropriations

9

thereof or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof or other conflicts therewith, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including all copies and tangible embodiments of any such Intellectual Property in the Seller's possession or control;

(f)     All of Seller's rights existing under those equipment, personal property and intangible property leases, non-residential real property leases, rental agreements, licenses (including Intellectual Property Agreements), executory contracts, agreements and similar arrangements set forth on <u>Schedule 2.1(g)</u> (the "<u>Assumed Contracts</u>"), including all security deposits thereunder, all contractual rights of the Seller to indemnification, exculpation, advancement or reimbursement of expenses, and all rights to proceeds under insurance policies relating thereto;

(g)     Other than the Nexstar Claims, all claims or causes of action of the Seller, including Avoidance Actions, against third parties that arise out of the Purchased Assets or Assumed Liabilities;

(h)     All refunds, credits and rebates of Taxes due to the Seller;

(i)     All books and records of the Seller that relate to the Business, including Customer Records and all files, logs, programming information and studies, technical information and engineering data, news and advertising studies or consulting reports and sales correspondence relating to the Business, excluding records exclusively relating to the Excluded Assets; and

(j)     all goodwill as a going concern and all other intangible property of the Seller relating to the Business.

**Section 2.2.   Excluded Assets**.  Notwithstanding the foregoing, the Purchased Assets shall not include the following (herein referred to as the "<u>Excluded Assets</u>"):

(a)     The Purchase Price;

(b)     All bank and other depository accounts of the Seller, excluding any funds held in such accounts other than the Purchase Price;

(c)     All Tangible Personal Property of the Seller sold, transferred, retired or otherwise disposed of in the ordinary course between the date of this Agreement and Closing in accordance with <u>Section 5.4</u>;

(d)     The Nexstar Claims;

(e)     All Contracts of the Seller other than the Assumed Contracts (the "<u>Excluded Contracts</u>");

10

(f)     All records prepared in connection with or relating to the sale or transfer of the Stations, including bids received from others and analyses relating to the Stations and the Purchased Assets;

(g)     The items designated in Schedule 2.2(g) as "Excluded Assets," if any;

(h)     The Retained Names and Marks;

(i)     All records and documents relating to Excluded Assets or to liabilities other than Assumed Liabilities;

(j)     All capital stock or other equity securities of Seller or subsidiaries of Seller or its Affiliates and all other equity interests in any entity that are owned beneficially or of record by Seller or its Affiliates; and

(k)     Any rights of or payment due to the Seller, under or pursuant to this Agreement or the other agreements with the Buyer contemplated hereby.

### Section 2.3.    Assumption of Liabilities.

(a)     Upon the terms and subject to the conditions of this Agreement, as of the Closing, the Buyer shall assume and shall thereafter be obligated for, and shall agree to pay, perform and discharge in accordance with their terms, the following obligations and liabilities of the Seller (except to the extent such obligations and liabilities constitute Excluded Liabilities):

(i)     The liabilities and obligations of the Stations and the Business, including the owning or holding of the Purchased Assets, first arising after the Closing Date; and

(ii)     All Liabilities under the Assumed Contracts first arising after the Closing Date and related to post-Closing period, and any Cure Amounts in an amount not to exceed Three Million Dollars ($3,000,000.00) in the aggregate for all Assumed Contracts (the "Cure Amount Cap").

All of the foregoing to be assumed by the Buyer hereunder are referred to herein as the "Assumed Liabilities."

(b)     The Buyer shall not assume or be obligated for any liabilities or obligations of any and every kind whatsoever, direct or indirect, known or unknown, absolute or contingent, not expressly assumed by the Buyer under Section 2.3(a) and, notwithstanding anything to the contrary in Section 2.3(a), none of the following (herein referred to as "Excluded Liabilities") shall be Assumed Liabilities for purposes of this Agreement:

(i)     Any claims or Liabilities of the Seller relating to the Business arising, or relating to the period, prior to the Closing Date;

(ii)     Any Seller liabilities or obligations under this Agreement or the Ancillary Agreements;

11

(iii)     All claims or Liabilities of the Seller that primarily relate to any of the Excluded Assets, including Contracts that are not Assumed Contracts;

(iv)     All Liabilities for Taxes attributable to the Purchased Assets or the Business for any taxable periods (or the portion thereof) ending on or before the Closing Date, other than 50% of any Transfer Taxes;

(v)     All accounts payable of the Seller, except for Cure Amounts payable by the Buyer pursuant to Section 2.3(a);

(vi)     All intercompany obligations of the Seller and any Affiliates of the Seller;

(vii)     All Liabilities in respect of Indebtedness of the Seller or any predecessor or Affiliate of the Seller;

(viii)     All Liabilities pursuant to the WARN Act that arise either from any action or inaction of the Seller occurring prior to the Closing;

(ix)     All Liabilities of the Seller resulting from the conduct of the Seller occurring prior to the Closing and which (i) constitute a violation of any Law or (ii) relate to any and all Proceedings against the Seller or its predecessors or Affiliates;

(x)     All Liabilities arising out of any Proceeding commenced against the Seller or any predecessor or Affiliate of the Seller after the Closing to the extent arising out of any occurrence or event happening prior to the Closing;

(xi)     All Liabilities under any Assumed Contract which become payable after the Closing but arise out of or relate to (A) any breach, claim, or indemnity that relates to the period occurring prior to the Closing or (B) any adjustments (including adjustments of common area maintenance expenses, taxes, insurance premiums and any other pass through expenses) related to any pre-Closing period whether or not billed;

(xii)     All Liabilities arising out of or relating to any infringement or misappropriation of, or other conflict with, the Intellectual Property of any Person to the extent arising out of or related to the conduct of the Business or any act or omission of the Seller or any predecessor or Affiliate of the Seller prior to the Closing;

(xiii)     All claims and Liabilities relating to or arising under or in connection with any Employee Benefit Plan including, but not limited to, any Liabilities with respect to claims incurred but not received or the provision of healthcare continuation coverage pursuant to Sections 601-607 of ERISA, commonly known as COBRA continuation coverage;

(xiv)    All Liabilities of the Seller to any current, former or prospective shareholder or other equity interest holder of the Seller, including all Liabilities of the Seller related to the right to or issuance of any capital stock or other equity securities;

(xv)    All Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by the Seller in connection with, resulting from or attributable to the transactions contemplated by this Agreement, the Bankruptcy Case or otherwise; and

(xvi)    All Liabilities of the Seller related to workers' compensation claims or work-related injuries or illnesses which occurred prior to the Closing, regardless of whether first asserted before or after the Closing.

**Section 2.4.    Excluding or Adding Assumed Contracts**.  At the Closing, the Seller shall, pursuant to the Sale Order and any transfer and assignment documents reasonably requested by the Buyer, assume and sell and assign to the Buyer (the consideration for which is included in the Purchase Price), all Assumed Contracts which may be assigned by the Seller to the Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code and which shall be set forth on Schedule 2.1(g).  The Buyer shall have the right in its sole discretion to notify the Seller in writing (i) of any Assumed Contract that it does not wish to assume up to the date of the Closing, and (ii) of a Contract that it wishes to add as an Assumed Contract up to two (2) Business Days prior to the date of the Closing.  At the sole discretion and instruction of the Buyer, any such previously considered Assumed Contract that the Buyer no longer wishes to assume shall be automatically deemed removed from Schedule 2.1(g) (Assumed Contracts) and automatically deemed to be an Excluded Contract.  At the sole discretion of the Buyer and up to ten (10) days prior to the effective date of rejection of any previously considered Excluded Contract, the Buyer may notify the Seller of its intent to assume such Contract and such Assumed Contract shall be automatically deemed added to the Schedule related to Assumed Contracts and assumed by the Seller and assigned to the Buyer (such contracts, the "Added Contracts"); *provided, that*, the Buyer will be responsible for paying the Cure Amounts payable in connection with the assignment and assumption of any Added Contracts (up to the Cure Amount Cap), and such amounts payable in connection with the Added Contracts will automatically be deemed Assumed Obligations hereunder.

**Section 2.5.    Closing Date**.  Subject to any prior termination of this Agreement pursuant to Section 10.1 the purchase and sale of the Purchased Assets provided for in Section 2.1 (the "Closing") shall be consummated at 9:00 A.M., Central Time, within five (5) Business Days after the conditions set forth in Articles VII and VIII are satisfied or, if legally permissible, waived (other than those conditions that by their nature are to be satisfied (or validly waived) at the Closing, but subject to such satisfaction or waiver), at the offices of Seller counsel, unless such time, date, or place is changed by mutual agreement of the Seller and the Buyer (the "Closing Date").

**Section 2.6.** **Purchase Price**.

(a)     The purchase price for the Purchased Assets (the "Purchase Price") shall be equal to Fifty-Five Million Dollars ($55,000,000.00), subject to adjustment as provided in Section 2.6(c) below or any other provision of this Agreement.  Buyer shall pay, or cause to be paid, the Purchase Price, net of the Escrow Deposit and the Holdback, at the Closing by wire transfer in immediately available funds to the account or account(s) designated by Seller.

(b)     As of the date hereof, Buyer has deposited, or has caused to be deposited, an amount of cash equal to Five Million Five Hundred Thousand Dollars ($5,500,000.00) with the Escrow Agent to be held as an earnest money deposit ("Escrow Deposit") pursuant to the Escrow Agreement.  At the Closing, the Buyer and the Seller shall deliver joint written instructions (pursuant to the Escrow Agreement) to the Escrow Agent to disburse the Escrow Deposit (including any interest earned thereon prior to Closing), net of the Holdback, to the Seller as a credit towards payment of the Purchase Price due at Closing to the Seller, other than any adjustments thereto as provided in this Agreement, and shall not, by any act or omission, delay or prevent such disbursement.

(c)     The Parties agree to a target value of Eight Million Dollars ($8,000,000.00) for the aggregate of the Seller Receivables and the Seller Cash as of the Cutoff Time (as estimated in the Closing Date Adjustments delivered by Seller in accordance with Section 2.7(b) below) (the "Target Value").  Subject to further adjustment if applicable in accordance with Section 2.7 below, the Purchase Price shall be decreased at Closing by the amount, if any, that the aggregate of the Seller Receivables and the Seller Cash as of the Cutoff Time is less than the Target Value.  Subject to adjustment following the True-Up Period (as defined below), if applicable, pursuant to Section 2.7, in the event that the Target Value is exceeded, there shall be no reduction to the Purchase Price pursuant to the foregoing sentence and, notwithstanding anything to the contrary herein, Seller shall be entitled to the proceeds of any Seller Receivables in excess of the Target Value collected during the True-Up Period up to Two Million Dollars ($2,000,000) (the "Receivables Cap") and Buyer shall be entitled to any proceeds of such Seller Receivables above the Receivables Cap.

(d)     At the Closing, a portion of the Escrow Deposit shall not be released to the Seller and shall be held by the Escrow Agent as a holdback in the amount of Two Million Dollars ($2,000,000.00) (the "Holdback") pending the Closing Date Adjustments pursuant to Section 2.7 of this Agreement

**Section 2.7.** **Prorations and Adjustments**.

(a)     All expenses arising from the Business, including, without limitation, Assumed Liabilities and prepaid expenses, ad valorem and property taxes and assessments, annual regulatory fees payable to the FCC, power and utilities charges, and rents and similar prepaid and deferred items shall be prorated between Seller and Buyer to reflect the principle that Seller shall be responsible for all expenses arising from the Business through the Cutoff Time and Buyer shall be responsible for all expenses arising from the Business after the Cutoff Time; *provided however*, Buyer shall be obligated for all cure amounts required to be paid for the assignment of executory contracts and unexpired leases pursuant to Section 365 of the

14

Bankruptcy Code that Seller assumes and assigns to Buyer (the "Cure Amounts") up to the Cure Amount Cap.  The prorations and adjustments to be made pursuant to this Section 2.7, including any adjustments required for Seller Receivables and Seller Cash pursuant to Section 2.6(c), are referred to as the "Closing Date Adjustments."

(b)     Three (3) Business Days prior to the Closing Date, Seller shall reasonably estimate all Closing Date Adjustments pursuant to this Section 2.7 and shall deliver a statement of its reasonable estimates to Buyer (which statement shall set forth in reasonable detail the basis for those estimates).  At the Closing, the net amount due to Buyer or Seller as a result of the estimated Closing Date Adjustments shall be applied as an adjustment to the Purchase Price, as appropriate.  Within one hundred and eighty (180) days after the Closing (the "**True-Up Period**"), Buyer shall deliver to Seller a statement of any adjustments to Seller's estimate of the Closing Date Adjustments, and no later than the close of business on the thirtieth (30) day after the delivery of such statements (the "Payment Date"), Buyer shall pay to Seller, or Seller shall pay to Buyer, as the case may be, any amount due as a result of the adjustment (or, if there is any good faith dispute, the undisputed amount).  If Buyer has an obligation under this Section 2.7 to pay Seller, then Buyer shall pay any such obligation and further shall concurrently cause the release of the Holdback to Seller by the Escrow Agent.  If Seller has an obligation to pay Buyer under this Section 2.7, then Seller shall cause the Escrow Agent to release the Holdback to Buyer in such amount.  If the Holdback is insufficient to pay Seller's obligations to Buyer under this Section 2.7, then Seller shall pay any amounts due and owing to Buyer out of other Seller funds. Except with respect to items that Seller notifies Buyer that it objects to prior to the close of business on the date that is at least one (1) Business Day prior to the Payment Date, the adjustments set forth in Buyer's statement shall be final and binding on the Parties effective at the close of business on the Payment Date.  If Seller disputes Buyer's determinations or Buyer disputes Seller's determinations, the Parties shall consult with regard to the matter and an appropriate adjustment and payment shall be made as agreed upon by the Parties within thirty (30) days after the Payment Date.  If such thirty (30) day consultation period expires, and the dispute has not been resolved, then the Parties shall select a mutually acceptable independent accounting firm that does not then have a relationship with Seller or Buyer (the "Independent Accountant"), to resolve the disagreement and make a determination with respect thereto as promptly as practicable.  The determination by the Independent Accountant on the matter shall be binding.  If an Independent Accountant is engaged pursuant to this Section 2.7, the fees and expenses of the Independent Accountant shall be borne by Seller and Buyer in inverse proportion as such Parties may prevail on the resolution of the disagreement which proportionate allocation also will be determined by the Independent Accountant and be included in the Independent Accountant's written report, and an appropriate adjustment and payment shall be made within three (3) Business Days of the resolution by the Independent Accountant, which resolution shall be rendered within thirty (30) days after such submission.  Buyer shall have the right to receive and retain for its sole use and account any portion of the Holdback Buyer is not required to pay over to Seller pursuant to this Section 2.7.  Seller shall join in any instruction to Escrow Agent necessary to cause Escrow Agent to disburse to Buyer any such amount to which Buyer is entitled as provided in the immediately preceding sentence.

(c)     During the True-Up Period, Buyer shall use commercially reasonable efforts to collect the Seller Receivables.  During the True-Up Period, until the Receivables Cap is reached, Buyer shall provide a monthly report no later than seven (7) calendar days after the end

of each month that provides detailed information regarding the status of the Buyer's collection of the Seller Receivables during the prior month on both a monthly and aggregate basis. If during the True-Up Period, the Target Value is achieved, then Buyer shall deliver the Holdback to Seller within two (2) business days of achieving the Target Value.  Notwithstanding anything to the contrary in this Agreement, provided that Buyer has satisfied its obligations with respect to adjustment of the Purchase Price pursuant to this Section 2.7, following the True-Up Period, Buyer shall have the right to retain all of the Seller Receivables and all of the proceeds thereof for its own use and account.

(d)     Notwithstanding anything to the contrary herein, any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, registration, use or other Taxes and recording charges, and all conveyance fees and other fees and charges (including any penalties and interest) due and which may be payable by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated in this Agreement (collectively, the "Transfer Taxes") and not exempted under the Sale Order or by Section 1146(c) of the Bankruptcy Code shall be borne equally by the Seller and Buyer,  and timely paid.

### Section 2.8.    Closing Date Deliveries.

(a)     At the Closing, the Seller shall deliver or cause to be delivered to the Buyer (i) a bill of sale and assignment and assumption agreement from the Seller in substantially the form of Exhibit A (the "Bill of Sale and Assignment and Assumption Agreement"), providing for the conveyance of all of the Purchased Assets (other than the Seller FCC Authorizations) and the assumption of all of the Assumed Liabilities, (ii) an assignment of the Seller FCC Authorizations from the Seller, in substantially the form of Exhibit B (the "Assignment of the Seller FCC Authorizations"), assigning to the Buyer the Seller FCC Authorizations, (iii) all of the documents and instruments required to be delivered by the Seller pursuant to Article VIII, (iv) specific assignment and assumption agreements duly executed by the Seller relating to any Assumed Contracts included as Purchased Assets that the Buyer or the Seller have determined to be reasonably necessary to assign such Contracts to the Buyer and for the Buyer to assume the Assumed Liabilities thereunder pursuant to Section 365 of the Bankruptcy Code, (v) such other documents and instruments as the Buyer has determined to be reasonably necessary to consummate the transactions contemplated hereby, (vi) physical possession of all of the Purchased Assets, including Seller's books and records, capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery; provided, however, to the extent books and records of Seller are in the possession of Mission Broadcasting or Nexstar, Seller will use commercially reasonable efforts to deliver physical possession of such books and records to Buyer (which commercially reasonable efforts shall include, without limitation, filing and diligently pursuing at Seller's cost and expense such turnover and other motions, pleadings and proceedings in the Bankruptcy Case as may be necessary or appropriate if either of the foregoing refuse to deliver to Buyer full possession of any of the Purchased Assets in their possession and/or control),   (vii) Intellectual Property assignments, logins, and passwords (as applicable) to the extent necessary or appropriate to assign the Intellectual Property included in the Purchased Assets in a form to be mutually agreed by the Parties in good faith prior to the Closing Date, and as to assignments, each duly executed by Seller and each in recordable form to the extent necessary to assign such Intellectual Property, (viii) a certified copy of the Sale Order entered with the Bankruptcy Court, (ix) certified copies

of the resolutions of each of the board of directors (or similar governing body) of Seller authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby, (x) an executed certification of non-foreign status dated as of the Closing Date and satisfying the requirements of Treasury Regulations §1.1445-2(b)(2)(i) for Seller and confirming that Seller is a "United States person" as defined in Section 7701(a)(30) of the Code, and (xi) a certificate, dated as of the Closing Date, signed by an executive officer of the Seller and certifying as to the satisfaction of the conditions specified in <u>Section 8.1</u>.

(b)      At the Closing, the Buyer shall deliver to the Seller (i) the Purchase Price, inclusive of the Escrow Deposit, net of the Holdback and any adjustments as contemplated by this Agreement; (ii) the Bill of Sale and Assignment and Assumption Agreement, (iii) all of the documents and instruments required to be delivered by the Buyer pursuant to <u>Article VII</u>, (iv) specific assignment and assumption agreements duly executed by the Buyer relating to any agreements included as Purchased Assets that the Buyer or the Seller have determined to be reasonably necessary to assign such agreements to the Buyer and for the Buyer to assume the Assumed Liabilities thereunder pursuant to Section 365 of the Bankruptcy Code, (v) such other documents and instruments as the Seller has determined to be reasonably necessary to consummate the transactions contemplated hereby, and (vi) certificate, dated as of the Closing Date, signed by an executive officer of the Buyer and certifying as to the satisfaction of the conditions specified in this <u>Section 7.1</u>.

(c)      <u>Schedule 2.1(g)</u>, as it may be modified prior to the Closing, sets forth a good faith estimate of all Cure Amounts for each Assumed Contract pursuant to Section 365 of the Bankruptcy Code that Seller assumes and assigns to Buyer.  All Assumed Contracts shall be assumed by Seller and assigned to Buyer pursuant to the Sale Order and this Agreement.  Buyer agrees to promptly satisfy all Cure Amounts (up to the Cure Amount Cap) in respect of each Assumed Contract as and when such Cure Amount become due under the Sale Order.

### Section 2.9.      <u>Further Assurances</u>.

(a)      From time to time following the Closing, the Seller shall execute and deliver, or cause to be executed and delivered, to the Buyer such other instruments of conveyance and transfer as the Buyer may reasonably request or as may be otherwise necessary to effectively convey and transfer to, and vest in, the Buyer and put the Buyer in possession of, any part of the Purchased Assets.  Further, at all times following mutual execution and delivery of this Agreement, the Seller shall cooperate in a commercially reasonable manner in Buyer's efforts, in Buyer's sole discretion, to obtain insurance with respect to the Seller's representations and warranties set forth herein.

(b)      From time to time following the Closing, the Buyer shall execute and deliver, or cause to be executed and delivered, to the Seller such other undertakings and assumptions as the Seller may reasonably request or as may be otherwise necessary to effectively evidence the Buyer's assumption of and obligation to pay, perform and discharge the Assumed Liabilities.

17

Section 2.10.  **Allocation of Purchase Price**.  Following the Closing Date, the Seller shall provide to the Buyer an allocation of the applicable portions of the Purchase Price in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provisions of state, local, or non-U.S. Law, as appropriate).  The Buyer shall provide the Seller with any comments to such allocation within fifteen (15) days after the date of receipt by the Buyer, and the Buyer and the Seller shall negotiate in good faith to finalize such allocation no later than sixty (60) days prior to the earliest due date (taking into account, for these purposes, any applicable extension of a due date) for the filing of a Tax Return to which such allocation is relevant (unless the Buyer does not provide any comments within such fifteen-day period, in which case the Seller's allocation shall be deemed final). If the Parties are unable to mutually agree to such allocation then the Parties shall have no further obligation under this Section 2.10, and each Party shall make its own determination of such allocation for financial and tax reporting purposes, which determination, for the avoidance of doubt, shall not be binding on the other Party.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

As an inducement to the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, the Seller represents and warrants to the Buyer as of the date of this Agreement and as of the Closing Date that the following statements are true and correct:

Section 3.1.  **Organization**.  Seller is organized, validly existing and in good standing under the laws of the State of Texas. Seller has the requisite organizational power and authority to operate the Stations and the Business as now operated by it, to use the Purchased Assets as now used by it and to carry on the Business as now conducted by it.

Section 3.2.  **Authority of the Seller**.

(a)  Seller has the requisite organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements to be executed and delivered by it pursuant hereto, to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and thereof, subject to and after giving effect to the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code.

(b)  Subject to and after giving effect to FCC Consent and the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code, the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller has been duly authorized and approved by all necessary organizational action on the part of the Seller and does not require any further authorization or consent on the part of the Seller. This Agreement is, and each other Ancillary Agreement when executed and delivered by the Seller will be, a legal, valid and binding agreement of the Seller, subject to entry of the Sale Order by the Bankruptcy Court, enforceable in accordance with its respective terms, except in each case as such enforceability

may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)     Subject to receipt of the FCC Consent and entry of the Sale Order, none of the execution, delivery and performance by the Seller of this Agreement or the Ancillary Agreements, the consummation by the Seller of the transactions contemplated hereby or thereby or compliance by the Seller with or fulfillment by the Seller of the terms, conditions and provisions hereof or thereof will:

(i)     conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon any of the Purchased Assets under, (A) the certificate of incorporation, bylaws or other organizational documents of the Seller, (B) any Contract, (C) any Governmental Permit, (D) any judgment, order, award or decree to which such Person is a party or any of the Purchased Assets is subject or by which such Person is bound, or (E) any material indenture, note, mortgage, lease, guaranty or material agreement to which the Seller is a party, except, in the case of each of the foregoing clauses (B), (C), (D) or (E), as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect; or

(ii)     require the approval, consent, authorization or act of, or the making by Seller of any declaration, filing or registration with, any third Person or any foreign, federal, state or local court or Governmental Body, except, in any case, as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

**Section 3.3.    All Assets**.  Except for the Excluded Assets and to the extent certain assets and properties are provided by Mission Broadcasting and/or Nexstar and not owned in whole or in part by Seller, the Purchased Assets constitute all the assets and properties whether tangible or intangible, whether personal, real or mixed, wherever located, that are used by the Seller in the operation of the Stations and the Business and necessary to continue operating the Business as it has been operated by Seller in the ordinary course prior to the date hereof.  All Tangible Personal Property: (a) is in good working condition in all material respects, and (b) is not materially damaged in any significant way (subject to normal wear and tear).  Seller has no subsidiaries that hold any material assets or any assets relating to the Purchased Assets.

**Section 3.4.    Governmental Permits; FCC Matters**.

(a)     As of the date of this Agreement, the Seller holds or possesses all registrations, licenses, permits, approvals and regulatory authorizations from a Governmental Body that are reasonably necessary to entitle it to own or lease, operate and use the assets of the Stations and to carry on and conduct the Business substantially as conducted immediately prior

to the date of this Agreement (herein collectively called "<u>Governmental Permits</u>"), except for such Governmental Permits as to which the failure to so own, hold or possess would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect. <u>Schedule 3.4(a)</u> sets forth a list of each of Governmental Permits, including the Seller FCC Authorizations, held by the Seller as of the date of this Agreement. The Seller FCC Authorizations constitute all material registrations, licenses, franchises, and permits issued by the FCC to the Seller in respect of the Stations and held by the Seller as of the date of this Agreement.

(b)     Seller has fulfilled and performed its obligations under each of the Governmental Permits except for noncompliance that, individually or in the aggregate, has not had and would not be reasonably likely to have a Material Adverse Effect. Each of the Governmental Permits is valid, subsisting and in full force and effect and has not been revoked, suspended, canceled, rescinded or terminated, other than those that the revocation, suspension, cancellation, rescission or termination of which, individually and in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

(c)     The Stations are being operated in accordance with the Seller FCC Authorizations and in compliance in all material respects with the Communications Act and all other Laws applicable to the Stations, except for such noncompliance that, individually or in the aggregate, has not had and would not be reasonably likely to have a Material Adverse Effect. There is not (i) pending, or, to the Knowledge of the Seller, threatened, any material action or Proceeding, other than actions or Proceedings affecting broadcast television stations generally, by or before the FCC to revoke, suspend, cancel, rescind, terminate, materially adversely modify or refuse to renew in the ordinary course any Seller FCC Authorization (other than, in the case of modifications, proceedings to amend the FCC rules of general applicability), or (ii) issued or outstanding, by or before the FCC, any (A) order to show cause, (B) notice of violation, (C) notice of apparent liability or (D) order of forfeiture, in each case, against the Stations or Seller with respect to the Stations that has resulted or would reasonably be expected to result in any action described in the foregoing clause (i) with respect to such Seller FCC Authorizations. The Seller FCC Authorizations have been issued by the FCC for full terms customarily issued by the FCC for each of the Stations, and the Seller FCC Authorizations are not subject to any condition except for those conditions appearing on the face of the Seller FCC Authorizations and conditions applicable to broadcast licenses generally. Seller has (i) paid or caused to be paid all FCC regulatory fees due and payable by it in respect of the Stations, and (ii) timely filed all material registrations and reports required to have been filed by it with the FCC relating to the Seller FCC Authorizations except where the failure to do so would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.  This <u>Section 3.4</u> does not relate to Governmental Permits for environmental, health and safety matters which are the subject solely of <u>Section 3.11</u>.

Section 3.5.     <u>Real Property Leases</u>.

(a)     <u>Schedule 3.5(a)</u> sets forth a list of each material lease or similar contract or agreement under which Seller is a lessee of, or occupies, for use in the Business, any real property owned by any third Person (each such lease, contract or agreement, whether or not material, a "<u>Real Property Lease</u>," and the property leased under the Real Property Leases is

20

referred to herein as the "Real Property") that is in effect as of the date of this Agreement. Except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, Seller has a valid leasehold interest in, sub leasehold interest in, or other occupancy right with respect to, the leased or occupied premises under the Real Property Leases in effect as of the date hereof.

(b)     Except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, to the Knowledge of the Seller, no property leased by Seller under any Real Property Lease is subject to any pending or threatened suit for condemnation or other taking by any public authority.  Except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, Seller's use and occupancy of the Real Property complies with all regulations, codes, ordinances and statutes of all applicable Governmental Bodies.

Section 3.6.   **Title to Purchased Assets**.  Except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, Seller has good and valid title or a valid right to use each of the Purchased Assets free and clear of all Encumbrances, except for Permitted Encumbrances.

Section 3.7.   **Contracts**.  Schedule 3.7 sets forth a list of all of the Seller's Contracts other than the Real Property Leases.  Except as set forth in Schedule 3.7 or any other Schedule hereto, as of the date of this Agreement, Seller is not party to or bound by any contract relating to the Business.  Except as set forth in Schedule 3.7 or in any other Schedule hereto or as, individually or in the aggregate, has not had and would not be reasonably likely to have a Material Adverse Effect, each of Contracts listed in Schedule 3.7 constitutes a valid and binding obligation of the Seller and, to the Knowledge of the Seller, the other parties thereto and is in full force and effect (in each case, subject to bankruptcy, insolvency, reorganization or other similar laws relating to or affecting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)).  Except as, individually or in the aggregate, has not had and would not be reasonably likely to have a Material Adverse Effect, (i) the Seller is not in breach of, or default under, any of the Contracts and, to the Knowledge of the Seller, no other party to any Contract is in breach of, or default under, any of the Contracts, and (ii) to the Knowledge of the Seller, no event has occurred which would result in a breach of, or default under, any of the Contracts (in each case, with or without notice or lapse of time or both).  True and correct copies of each of the Contracts, together with all amendments thereto, have heretofore been made available to the Buyer by the Seller.  The Cure Amounts set forth on Schedule 2.1(g) are true and correct and the Seller does not owe any other amounts under such Assumed Contracts as of the Closing Date.

Section 3.8.   **No Violation, Litigation or Regulatory Action**.

(a)     Seller is in compliance with all Laws and Orders which are applicable to the Purchased Assets, the Stations or the Business, except where the failure to comply would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect; and

(b)     Since January 1, 2016 and through the date of this Agreement, Seller has not has received any written notice of violation of any applicable Laws, except for such violations that, individually or in the aggregate, have not had and would not be reasonably likely to have a Material Adverse Effect; and

(c)     As of the date of this Agreement, except for the approval of the Bankruptcy Court and the FCC, there are no Proceedings by or before any court or any Governmental Body which are pending or, to the Knowledge of the Seller, threatened against Seller in respect of the Purchased Assets, any of the Stations or the Business which would, individually or in the aggregate, be reasonably be likely to have a Material Adverse Effect.

Section 3.9.    **Insurance**.  Seller maintains, in respect of the Purchased Assets, the Stations and the Business, policies of fire and extended coverage and casualty, liability and other forms of insurance in such amounts and against such risks and losses as are in the judgment of the Seller prudent for the Business. Except as set forth in Schedule 3.9 with respect to the Business, there are no outstanding claims under any insurance policy or default with respect to provisions in any such policy which claim or default, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect.

Section 3.10.    **Employees**.  Seller has provided to Buyer a complete and accurate list of the following information for each current employee of Seller: current base salary or rate of pay; bonus, commission and other incentive compensation (if any) paid or payable for calendar year 2018; hire date, position and location of employment; immigration status, VISA type, and any VISA expiration; and accrued and unused vacation and other paid time off.

(a)     Except as set forth on Schedule 3.10(a), there are no "employee benefit plans," as defined in Section 3(3) of ERISA, or other material employee benefit arrangements, including bonus plans, consulting or other compensation agreements, incentive, equity or equity-based compensation, or deferred compensation arrangements, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical insurance, life insurance, or scholarship programs currently maintained by Seller or to which Seller contributed or is obligated to contribute thereunder for current or former employees or to which Seller has any material Liability (contingent or otherwise) ("Employee Benefit Plans").

(b)     There are no "employee pension plans," as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code, maintained by Seller and any trade or business (whether or not incorporated) which are or have been under common control in the past six years, or which are or have been treated as a single employer with Seller under Section 414(b), (c), (m) or (o) of the Code ("ERISA Affiliate") or to which Seller, or any ERISA Affiliate thereof, contributed or has been obligated in the past six years to contribute thereunder in the last six years or to which Seller has any material Liability (contingent or otherwise) ("Title IV Plans").

(c)     Each Employee Benefit Plan has been established, administered and funded in accordance with its terms, and in compliance in all material respects with the applicable provisions of ERISA, the Code and other applicable Laws. None of the Purchased Assets are subject to a Lien under Section 412 of the Code or Title IV of ERISA.

(d)      Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due, or increase the amount of any compensation or benefits due, to any current or former employee of Seller; (ii) result in the acceleration of the time of payment or vesting of any such compensation or benefits; or (iii) result in the payment of any amount that would, individually or in combination with any other such payment, be an "excess parachute payment" within the meaning of Section 280G of the Code.

(a)      Seller is not a party to or otherwise bound by any collective bargaining agreement or other labor union contract applicable to employees of Seller and, to Seller's Knowledge, there are not any activities or proceedings of any labor union to organize any such employees.  Additionally, (i) there is no unfair labor practice charge or complaint pending before any applicable Governmental Body relating to Seller or any employee or other service provider thereof; (ii) there is no labor strike, material slowdown or material work stoppage or lockout pending or, to Seller's Knowledge, threatened against or affecting Seller, and Seller has not experienced during the past three years any strike, material slowdown or material work stoppage, lockout or other collective labor action by or with respect to its employees; and (iii) there is no representation claim or petition pending before any applicable Governmental Body.  Seller is, and during the past three years has been, in compliance in all material respects with all applicable Laws relating to employment of labor, including all applicable Laws relating to wages, hours, overtime, collective bargaining, employment discrimination, civil rights, safety and health, workers' compensation, pay equity, classification of employees and independent contractors, and the collection and payment of withholding and/or social security taxes.  Seller is not delinquent in payment to any of its current or former employees or other service providers for any wages, fees, salaries, commissions, bonuses, or other direct compensation for service performed by them. Seller has not effectuated a "plant closing" or "mass layoff" (as defined under the WARN Act or any similar applicable state or local law) or taken any other action that would trigger notice or Liability under the WARN Act or any similar applicable state or local law.  Seller is, and during the past three years has been, in compliance with the WARN Act and any similar applicable state or local law.

**Section 3.11.  Environmental Protection**.  Except as set forth in Schedule 3.11:

(a)      As of the date of this Agreement, the Business is in compliance with all Environmental Laws, except where the failure to comply would not be reasonably likely to have a Material Adverse Effect;

(b)      Seller has, in respect of the Business, obtained all Governmental Permits required under Environmental Law necessary for its operation, except for such Governmental Permits as to which the failure to so own, hold or possess would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect. Seller is in compliance with all terms and conditions of such Governmental Permits except where failure to comply would not be reasonably likely to have a Material Adverse Effect; and

(c)      As of the date of this Agreement, Seller, with respect to the Business, is not the subject of any pending or, to the Knowledge of the Seller, threatened action, claim,

23

complaint, investigation or notice of noncompliance or potential responsibility or other Proceedings relating to a Release or any Hazardous Materials or alleging any failure of the Business to comply with, or liability of the Business under, any Environmental Law, except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

(d)     Seller is not subject to any material judgment, Order or decree of any court or governmental body that is outstanding and was issued pursuant to Environmental Laws.

**Section 3.12.   Seller's Broker**.  Seller has engaged PVB Advisors, LLC ("PVB") to serve as its broker in connection with the transactions contemplated hereby.  PVB shall be compensated by Seller from the sale proceeds pursuant to the *Agreed Order Granting Application to Employ PVB Advisors, LLC Effective as of the Petition Date* [Docket No. 122]. There is no other agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, any of Seller in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement.

**Section 3.13.   Intellectual Property**.

(a)     Schedule 3.13(a) sets forth a list of all Intellectual Property that is registered or issued under the authority of the United States Patent and Trademark Office or the United States Copyright Office and/or any other Governmental Body, and all applications for such registration and issuance of Intellectual Property, in each case that is owned by Seller.

(b)     To the knowledge of Seller, (i) no third party is currently infringing, misappropriating, or otherwise violating any of the Intellectual Property and (ii) there are no claims that the Intellectual Property is infringing, misappropriating, or otherwise violating any Intellectual Property rights of a third party.

(c)     All of the trademark and copyright registrations that constitute Intellectual Property are, subsisting, and to the knowledge of the Seller, valid and enforceable.

(d)     Schedule 3.13(d) sets forth all material Intellectual Property Agreements to which Seller is a party or by which Seller is bound and that are primarily used in or primarily related to the Business or the Purchased Assets.  Each Intellectual Property Agreement is in full force and effect, and no party is in breach of or default under such Intellectual Property Agreement (other than as a result of the Seller's bankruptcy).

**Section 3.14.   Taxes**.

(a)     Seller has filed or caused to be filed all income Tax Returns and other material Tax Returns that it was required to file (taking into account any valid extension of time to file), and all such filed Tax Returns were correct and complete in all respects. All material Taxes owed by Seller and all Taxes with respect to the Acquired Assets have been paid.

(b)     No written claim has been made or threatened by a Governmental Body in a jurisdiction where Seller does not file Tax Returns with respect to the Purchased Assets such that Seller or the Business is or may be subject to taxation by that jurisdiction.

24

(c)     There is no audit, dispute, claim or controversy concerning any Tax liability or Tax Return of Seller which relates to the Purchased Assets that is ongoing or that has been threatened in writing; and

(d)     Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency which relates to the Purchased Assets.

Section 3.15.  **OFAC**.  Seller is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, or nation pursuant to any law that is enforced or administered by OFAC, and is not engaging in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of, any such person, group, entity or nation; (b) Seller is not engaging in this transaction, directly or indirectly, in violation of any laws relating to drug trafficking, money laundering or predicate crimes to money laundering; (c) none of the funds of Seller have been or will be derived from any unlawful activity with the result that the investment of direct or indirect equity owners in such Seller is prohibited by law or that the transaction or this Agreement is or will be in violation of law; and (d) Seller has and will continue to implement procedures, and has consistently and will continue to consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times prior to the Closing.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

As an inducement to the Seller to enter into this Agreement and to consummate the transactions contemplated hereby, the Buyer represents and warrants to the Seller as of the date of this Agreement and as of the Closing Date that the following statements are true and correct:

Section 4.1.   **Organization**. The Buyer is organized, validly existing and in good standing under the laws of the state of its organization. The Buyer has the requisite organizational power and authority to own, lease and operate the properties and assets used in connection with its business as currently being conducted or to be acquired pursuant hereto.

Section 4.2.   **Authority of the Buyer**.

(a)     The Buyer has the requisite organizational power and authority to execute and deliver this Agreement and all of the other agreements and instruments to be executed and delivered by the Buyer pursuant hereto (collectively, the "Buyer Ancillary Agreements"), to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and thereof.

25

(b)     The execution, delivery and performance of this Agreement and the Buyer Ancillary Agreements by the Buyer have been duly authorized and approved by all necessary organizational action on the part of the Buyer and its Affiliates and do not require any further authorization or consent on the part of the Buyer or any of its Affiliates. This Agreement is, and each other Buyer Ancillary Agreement when executed and delivered by the Buyer or any of its Affiliates and the other parties thereto will be, a legal, valid and binding agreement of the Buyer or such Affiliates party thereto enforceable in accordance with its respective terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)     Except for the FCC Consent, none of the execution, delivery and performance by the Buyer of this Agreement, or by the Buyer or any of its Affiliates, as applicable, of the Buyer Ancillary Agreements to which it is a party, the consummation by the Buyer or its Affiliates, as applicable, of the transactions contemplated hereby or thereby or compliance by the Buyer or any of its Affiliates, as applicable, with or fulfillment by the Buyer or its Affiliates, as applicable, of the terms, conditions and provisions hereof or thereof will:

(i)     conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Encumbrance upon any assets of the Buyer under, (A) the certificate of incorporation, bylaws or other organizational documents of the Buyer, or (B) any material indenture, note, mortgage, lease, guaranty or material agreement, or any judgment, order, award or decree, to which the Buyer or any of its Affiliates is a party; or

(ii)    require the approval, consent, authorization or act of, or the making by the Buyer or any of its Affiliates of any declaration, filing or registration with, any third Person or any foreign, federal, state or local court or Governmental Body.

**Section 4.3.     <u>Litigation</u>**.  None of the Buyer or any of its Affiliates is a party to any action, suit or proceeding pending or, to the knowledge of the Buyer, threatened which, if adversely determined, would reasonably be expected to restrict the ability of the Buyer to consummate promptly the transactions contemplated by this Agreement. There is no order to which the Buyer or any of its Affiliates is subject which would reasonably be expected to restrict the ability of the Buyer to consummate promptly the transactions contemplated by this Agreement.

**Section 4.4.     <u>No Finder</u>**.  None of the Buyer or any of its Affiliates, or any party acting on any of their behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

Section 4.5.   **Qualifications as FCC Licensee**.   The Buyer is legally, financially and otherwise qualified to be the licensee of, and to acquire, own, operate and control, the Stations under the Communications Act, including the provisions relating to media ownership and attribution, foreign ownership and control, and character qualifications.  There are no facts or circumstances that would, under the Communications Act or any other applicable Laws, (i) disqualify the Buyer as the assignee of the Seller FCC Authorizations with respect to the Stations or as the owner and operator of the Stations, (ii) delay the FCC's processing of the FCC Applications, or (iii) cause the FCC to impose a material condition or conditions on its granting of the FCC Consent.   No waiver of or exemption from, whether temporary or permanent, any provision of the Communications Act, or any divestiture or other disposition by the Buyer or any of their respective Affiliates of any asset or property, is necessary for the FCC Consent to be obtained under the Communications Act.

Section 4.6.   **Financial Capacity; Solvency**.  The Buyer has, as of the date of this Agreement, and will have as of the Closing Date, on hand (or access through committed credit facilities to) adequate funds to perform all of its obligations under this Agreement (including, but not limited to, payment of the Purchase Price and all fees and expenses required to be paid by Buyer in connection with the transactions contemplated by this Agreement), and there is no restriction or condition on the use of such funds for such purposes or fact or circumstance that, individually or in the aggregate with all other facts and circumstances, could reasonably be expected to prevent or delay the availability of such funds at the Closing.  The Buyer is Solvent as of the date of this Agreement and will, immediately after giving effect to all of the transactions contemplated by this Agreement, including payment of the Purchase Price and all other amounts required to be paid, borrowed or refinanced in connection with the consummation of the transactions contemplated by this Agreement and all related fees and expenses, be Solvent at and after the Closing Date.

## ARTICLE V

## ACTION PRIOR TO THE CLOSING DATE

The respective Parties hereto covenant and agree to take the following actions between the date hereof and the Closing Date:

Section 5.1.   **Access to the Business**.  Upon the written request of the Buyer, the Seller shall use reasonable efforts to afford to the officers and authorized representatives of the Buyer (including independent public accountants, attorneys and consultants; provided that Seller shall be given a reasonable opportunity to participate in any meetings or other discussions with such independent public accountants) reasonable access during normal business hours, and upon reasonable prior notice, to the properties and business and financial records of the Business to the extent reasonably necessary for Buyer's transition planning and shall furnish to the Buyer or its authorized representatives such additional information concerning the Business as shall be reasonably requested to the extent reasonably necessary for Buyer's transition planning; *provided, however*, that the Seller shall not be required to violate any obligation of confidentiality or other obligation under applicable Law to which the Seller is subject in discharging its obligations pursuant to this <u>Section 5.1</u>. The Buyer agrees that any such access shall be conducted in such a manner as not to interfere unreasonably with the operations of the

27

Business or the Seller. Notwithstanding the foregoing, Seller shall not be required to (i) take any action which would constitute a waiver of attorney-client or other privilege or would compromise the confidential information of the Seller not related to the Business, (ii) supply the Buyer with any information which, in the reasonable judgment of the Seller, the Seller is under a contractual or legal obligation not to supply, or (iii) execute or deliver any certificate, document, instrument or agreement that is effective prior to the Closing or agree to any change or modification of any existing certificate, document, instrument or agreement that is effective prior to the Closing.

### Section 5.2.    Notification of Certain Matters.

(a)     The Buyer, on the one hand, and the Seller, on the other hand, shall promptly notify the other upon becoming aware of any material breach of any representation or warranty contained in this Agreement including, in the case of the Buyer, upon any of its officers, employees or authorized representatives becoming aware of such a breach as a result of the access to the Business permitted by Section 5.1.

(b)     Each Party shall promptly notify the other of any action, suit or proceeding that shall be instituted or threatened against such Party to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement. The Seller shall promptly notify the Buyer, and the Buyer shall promptly notify the Seller, of any lawsuit, claim, proceeding or investigation that may be threatened, brought, asserted or commenced against the other which would be an exception to Section 4.3 if such lawsuit, claim, proceeding or investigation had arisen prior to the date hereof.

### Section 5.3.    FCC Consent; Other Consents and Approvals.

(a)     As promptly as practicable after the date hereof, but in any event no later than five (5) Business Days after entry of the Sale Order, the Seller, the Buyer any of their Affiliates, as applicable, shall file with the FCC the necessary applications requesting its consent to the Assignment of the Seller FCC Authorizations to the Buyer, as contemplated by this Agreement (the "FCC Applications"). The Seller and the Buyer shall, or shall cause their respective Affiliates to, cooperate in the preparation of such applications and will diligently take, or cooperate in the taking of, all necessary, desirable and proper steps, provide any additional information required by the FCC and shall use commercially reasonable efforts to obtain promptly the FCC Consent.  The Seller, on the one hand, and the Buyer, on the other hand, shall equally bear the cost of FCC filing fees relating to the FCC Applications.  The Buyer and the Seller shall oppose any petitions to deny or other objections filed with respect to the FCC Applications to the extent such petition or objection relates to any such Party.  Neither Seller nor Buyer shall, and each shall cause its Affiliates not to, take any intentional action that would, or intentionally fail to take such action the failure of which to take would, reasonably be expected to have the effect of materially delaying the receipt of the FCC Consent.  The Parties agree that they will cooperate to amend the FCC Applications as may be necessary or required to obtain the timely grant of the FCC Consent.  As may reasonably be necessary to facilitate the grant of the FCC Consent, in the event that in order to obtain the FCC Consent in an expeditious manner, it is necessary for the Buyer or any of its Affiliates to enter into a customary assignment, assumption, tolling, or other similar arrangement with the FCC to resolve any complaints with the FCC

28

relating to the Stations, the Buyer shall enter, or cause its Affiliates, as applicable, to enter, into such a customary assignment, assumption, tolling or other arrangement with the FCC.

(b)     Subject to the terms and conditions herein, the Seller and the Buyer shall, use their respective commercially reasonable efforts to consummate and make effective the transactions contemplated hereby and to cause the conditions set forth in Article VII and Article VIII to be satisfied as promptly as reasonably practicable after the date hereof, including (i) in the case of the Buyer, the obtaining of all necessary consents, approvals, waivers and authorizations of, actions or nonactions by, and making all required filings and submissions with, any Governmental Body, including the Bankruptcy Court, or any third party required in connection with the transactions contemplated by this Agreement, (ii) cooperating with each other in (A) determining which filings are required to be made prior to the Closing with, and which consents, approvals, permits, notices or authorizations are required to be obtained prior to Closing from, Governmental Bodies or third parties in connection with the execution and delivery of this Agreement and related agreements, and consummation of the transactions contemplated hereby and thereby and (B) timely making all necessary filings and timely seeking all consents, approvals, permits, notices or authorizations, (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions performed or consummated by such party in accordance with the terms of this Agreement, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Body vacated or reversed and (iv) taking, or causing to be taken, all other actions and doing, or causing to be done, and cooperating with each other in order to do, all other things necessary or appropriate to consummate the transactions contemplated hereby as soon as practicable.  The Buyer agrees not to, and shall cause its Affiliates not to, take any action that would reasonably be expected to materially delay, materially impede or prevent receipt of the Governmental Consents.

(c)     The Seller and the Buyer shall, and shall cause their respective Affiliates to, use commercially reasonable efforts to obtain all consents and amendments from the parties to the Assumed Contracts which are required by the terms thereof or this Agreement for the consummation of the transactions contemplated by this Agreement; *provided, however*, that neither the Seller, the Buyer nor any of their Affiliates shall have any obligation to offer or pay any consideration in order to obtain any such consents or amendments, including, with respect to the Seller and its Affiliates, any obligation to amend, modify or otherwise alter the terms of any contract or agreement with any such party that is not included in the Purchased Assets; and provided, further, that the Parties acknowledge and agree that to the extent that the requirement for counterparty consent to assignment of an Assumed Contract(s) is expressly obviated pursuant to the Sale Order (and only to such consent), obtaining such third party consents shall not be a condition to Closing.

(d)     Buyer and Seller understand and agree that Seller has a case pending as debtor in possession in the Bankruptcy Court.  The terms of this Agreement, the submission of the FCC Applications and the consummation of the transaction contemplated herein all are subject to the review and approval by the Bankruptcy Court, and that such approval shall be a mutual Closing Condition in accordance with Articles VII and VIII hereto. In regard to Bankruptcy Court approval of this Agreement, the Parties agree that (i) the Sale Order shall expressly authorize delivery of the Stations and the Purchased Assets pursuant to Sections 105,

363 and 365 of the Bankruptcy Code free and clear of liens, claims, and encumbrances, other than the Permitted Encumbrances and Assumed Liabilities, in a manner and form satisfactory to Buyer; and (ii) except to the extent filings must be made on an emergency basis in the reasonable judgment of Seller, Seller shall provide Buyer a draft of any motions, orders or other pleadings that Seller proposes to file with the Bankruptcy Court seeking approval of this Agreement, no later than two (2) Business Days prior to the filing thereof with the Bankruptcy Court.

(e)     Seller shall use commercially reasonable efforts to obtain entry of the Sale Order . In the event an appeal is taken or a stay pending appeal is requested with respect to the Sale Order, Seller shall defend such appeal or seek to dismiss it to the fullest extent possible. Seller shall use commercially reasonable efforts to satisfy all conditions to Closing and to proceed to Closing as quickly as possible.

**Section 5.4.     Operation of the Stations and the Business Prior to the Closing Date**.

(a)     Subject to the restrictions set forth in the Bankruptcy Code or Orders of the Bankruptcy Court, prior to the Closing Date, except as approved by the Buyer, the Seller shall use its commercially reasonable efforts to operate the Stations and carry on the Business in all material respects in the ordinary course of the Business, honor and fulfill Seller's obligations under the Assumed Contracts, and to the extent consistent therewith keep and maintain the Purchased Assets in good operating condition and repair (wear and tear in ordinary usage excepted).  Seller shall promptly notify Buyer of any Material Adverse Effect occurring prior to the Closing Date.

(b)     Notwithstanding Section 5.4(a) and subject to Section 6.1 regarding control of the Stations, except (x) as expressly contemplated by this Agreement, (y) as required by applicable Laws or by any Governmental Body of competent jurisdiction, or (z) with the prior written consent of the Buyer (which consent shall not be unreasonably withheld, delayed or conditioned), prior to the Closing Date, the Seller shall not in respect of the Stations and the Business:

(i)     sell, lease (as lessor), transfer or otherwise dispose of or mortgage or pledge, or impose or suffer to be imposed any Encumbrance on, any of the material assets or properties relating to the Purchased Assets, other than the sale, lease (as lessor), transfer or other disposal of property in the ordinary course of the Business or pursuant to existing contracts or commitments, and other than Permitted Encumbrances;

(ii)     fail to use all commercially reasonable efforts to maintain in full force and effect in accordance with their respective terms and conditions, any of the Purchased Assets, including any Seller FCC Authorizations, or to not take or fail to take any action that could reasonably be expected to cause the FCC or any other Governmental Body to institute proceedings for the suspension, revocation or adverse modification of any of the material Seller FCC Authorizations in any material respect;

30

       (iii)     modify, amend, terminate or waive any rights under any Assumed Contract, except in the ordinary course of the Business;

       (iv)     fail to pay any Tax included in the Assumed Obligations on or before the date when it becomes due and payable;

       (v)     (A) sell, transfer or otherwise dispose of, encumber, or take or fail to take any action that would reasonably be expected to result in, any loss, lapse, abandonment, expiration, invalidity or unenforceability of, any material Intellectual Property, or (B) enter into any agreement with any other Person that limits or restricts the ability of Seller to conduct activities relating to the Business or use or dispose of any Purchased Assets;

       (vi)     grant or announce any stock option, equity or incentive awards or the increase in the salaries, bonuses or other compensation payable by Seller to any of the employees, directors or other service providers of the Business; or

       (vii)     agree or commit to do any of the foregoing.

**Section 5.5.**   **Public Announcement**.  Neither the Seller, Buyer nor any of their Affiliates shall, without the approval of the other, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such party shall be so obligated by Laws or by the rules, regulations or policies of any national securities exchange or association.

**Section 5.6.**   **Employees**.  Prior to and contingent upon the Closing, Buyer (or an Affiliate of Buyer),in its sole discretion, may make offers of employment commencing on the Closing Date, on an at-will basis (except to the extent otherwise expressly agreed in a writing signed by Buyer and such employee) and on such other terms and conditions as Buyer may determine, in its sole discretion, to each of the employees of Seller designated by Buyer who shall be employed by Buyer or an Affiliate of Buyer in connection with the Business.  Seller shall terminate the employment of each Seller employee who receives an offer of employment from Buyer effective as of the Closing Date.  Each such employee accepting an offer of employment with the Buyer and commencing employment with the Buyer on the Closing Date shall be considered a "Hired Employee."

       (a)     The Hired Employees shall be eligible to participate in the employee benefit plans and policies, if any, offered by Buyer from time to time.  Buyer shall not be responsible for any compensation or other benefits due from Seller to any Hired Employees on or prior to the Closing Date.

       (b)     Buyer shall not be responsible for any severance Liabilities with respect to any employees of Seller whose employment is terminated on or prior to the Closing Date.

       (c)     Buyer shall not be responsible for any WARN Act Liabilities with respect to any employees of Seller whose employment is terminated on or prior to the Closing Date.

(d)     Nothing expressed or implied in this Agreement is intended to confer upon any Person or his or her legal representatives any rights or remedies, including any rights of employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement.  Nothing contained in this section or elsewhere in this Agreement shall be construed to modify any employee benefit plan of Buyer or Seller (or any Person acting as a professional employer organization or employee leasing company) or prevent the termination of employment of any employee or any change in the employee benefits available to any employee.

## ARTICLE VI

## ADDITIONAL AGREEMENTS

**Section 6.1.    Control of Operations Prior to Closing Date**.  Notwithstanding anything contained herein to the contrary, the sale of the Purchased Assets contemplated hereby shall not be consummated prior to the grant by the FCC of the FCC Consent. The Seller and the Buyer acknowledge and agree that at all times commencing on the date hereof and ending on the Closing Date, (x) nothing in this Agreement, including Section 5.4, shall be construed to give the Buyer any right to control, direct or otherwise supervise, or attempt to control, direct or otherwise supervise, any of the management or operations of any of the Stations or the Business and (y) the Seller shall have complete control and supervision of the programming, operations, policies and all other matters relating to the Stations and the Business.

**Section 6.2.    Bulk Transfer Laws**.  The Buyer hereby waives compliance by the Seller with the provisions of any so-called bulk sales or bulk transfer law of any jurisdiction in connection with the sale of the Purchased Assets to the Buyer hereunder.

**Section 6.3.    Use of Names**.  The Seller is not conveying ownership rights or granting the Buyer a license to use any of the Retained Names and Marks and, after the Closing, the Buyer shall not and shall not permit any of its Affiliates to use in any manner the Retained Names and Marks or any word or mark that is similar in sound or appearance thereto.  In the event the Buyer violates any of its obligations under this Section 6.3, the Seller may proceed against the Buyer in law or in equity for such damages or other relief as a court may deem appropriate.  The Seller acknowledges that a violation of this Section 6.3 may cause the Seller irreparable harm, which may not be adequately compensated for by money damages.  The Buyer therefore agrees that in the event of any actual or threatened violation of this Section 6.3, any of such parties shall be entitled, in addition to other remedies that they may have, to a temporary restraining order and to preliminary and final injunctive relief against the Buyer or any such Affiliate of the Buyer to prevent any violations of this Section 6.3, without the necessity of posting a bond.

## ARTICLE VII

## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER

The obligations of the Seller under this Agreement to consummate the sale of the Purchased Assets contemplated hereby shall be subject to the satisfaction, fulfillment or, where legally possible, waiver, on or prior to the Closing Date, of the following conditions:

**Section 7.1.** **No Breach of Covenants and Warranties**.  (a) The Buyer shall have performed and complied in all material respects with its covenants and agreements contained herein required to be performed or complied with by it as of or prior to the Closing; and (b) each of the representations and warranties of the Buyer contained in this Agreement shall be true and correct on the  Closing Date as though made on the Closing Date (except to the extent that they expressly speak as of a specific date or time other than the Closing Date, in which case they need only have been true and correct as of such specified date or time).

**Section 7.2.** **No Restraint**.  There shall not be in effect any Order (whether temporary, preliminary or permanent) issued by any U.S. federal or state court of competent jurisdiction preventing the consummation of the sale of the Purchased Assets contemplated hereby.

**Section 7.3.** **Certain Governmental Approvals**.  The FCC Consent shall have been granted and shall be effective, and the Bankruptcy Court shall have approved the Sale Order.

**Section 7.4.** **Closing Deliveries**. The Buyer shall have made, or stands ready at the Closing to make, the deliveries contemplated by Section 2.8 to the Seller

**Section 7**.5 **Approval of Schedules and Exhibits**.   The Seller and Buyer shall have mutually approved the Schedules and Exhibits to this Agreement in writing by no later than March 13, 2020 (the "Schedule/Exhibit Date").  By no later than March 6, 2020, Seller shall have prepared and delivered to Buyer (for Buyer's review and approval) initial drafts of all Schedules and Exhibits hereto.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER

The obligations of the Buyer under this Agreement to consummate the sale of the Purchased Assets contemplated hereby shall be subject to the satisfaction, fulfillment or, where legally possible, waiver on or prior to the Closing Date, of the following conditions:

**Section 8.1.** **No Breach of Covenants and Warranties**.  (a) The Seller shall have performed and complied with in all material respects its covenants and agreements contained herein required to be performed or complied with by it as of or prior to the Closing, including delivery of the Purchased Assets to the Buyer at the Closing; and (b) each of the representations and warranties of the Seller contained in this Agreement shall be true and correct on the Closing Date as though made on the Closing Date (except to the extent that they expressly speak as of a specific date or time other than the Closing Date, in which case they need only have been true and correct as of such specified date or time).

**Section 8.2.** **No Restraint**.  There shall not be in effect any Order (whether temporary, preliminary or permanent) issued by any U.S. federal or state court of competent jurisdiction preventing the consummation of the sale of the Purchased Assets contemplated hereby.

**Section 8.3.     Certain Governmental Approvals**.  All Governmental Consents, including the FCC Consent, shall have been granted and shall be effective and the Bankruptcy Court shall have approved the Sale Order, which shall be a Final Order.  The Sale Order shall be in form and substance satisfactory to Buyer in its sole discretion.  At a minimum, the Sale Order shall (a) provide that the Purchased Assets are being sold to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code except for the Assumed Liabilities and Permitted Encumbrances, (b) authorize the assumption and assignment of the Assumed Contracts to Buyer pursuant to Section 365 of the Bankruptcy Code, and (c) find that Buyer is a good faith purchaser entitled to the protection of Section 363(m) of the Bankruptcy Code.

**Section 8.4.     Closing Deliveries**.  The Seller shall have made, or stand ready at the Closing to make, the deliveries contemplated by Section 2.8 to the Buyer.

**Section 8.5.     No Material Adverse Effect**.  There shall not have occurred any circumstance or event that would have a Material Adverse Effect on the Business or the Purchased Assets.

**Section 8.6.     Contract Consents**.  The Seller shall have obtained any necessary third party consents in order to assumed and assign the Assumed Contracts, including any Intellectual Property Agreements, to the Buyer to extent that such consents are necessary notwithstanding the provisions of Section 365 of the Bankruptcy Code.

**Section 8.7.     Approval of Schedules and Exhibits.**   The Buyer and Seller shall have mutually approved in writing the Schedules and Exhibits to this Agreement by no later than the Schedules/Exhibit Date.

**ARTICLE IX**

**[RESERVED]**

**ARTICLE X**

**TERMINATION**

**Section 10.1.  Termination**.

(a)     Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing:

(i)     by the mutual written consent of the Seller and the Buyer;

(ii)     by the Seller, if a material breach or failure to perform any of the covenants or agreements of the Buyer contained in this Agreement shall have occurred, or there shall be any material inaccuracy of any of the representations or warranties of the Buyer contained in this Agreement, and such material breach,

34

failure to perform or inaccuracy either individually or in the aggregate would, if occurring or continuing on the Closing Date, give rise to the failure of a condition set forth in Section 7.1, and such material breach, failure to perform or inaccuracy if curable, is not cured by, on or before the earlier of (i) the Termination Date or (ii) thirty (30) days following receipt of written notice by Buyer, or which by its nature or timing cannot be cured prior to the Termination Date; *provided, however*, that the Seller shall not have the right to terminate this Agreement pursuant to this Section 10.1(a)(ii) if the Seller is then in material breach of any of its covenants or agreements contained in this Agreement or any of the representations or warranties of the Seller contained in this Agreement shall be materially inaccurate, and, in any such case would give rise to the failure of a condition set forth in Section 8.1;

(iii)     by the Buyer, if a material breach or failure to perform any of the covenants or agreements of the Seller contained in this Agreement shall have occurred, or there shall be any material inaccuracy of any of the representations or warranties of the Seller contained in this Agreement, and such material breach, failure to perform or inaccuracy either individually or in the aggregate would, if occurring or continuing on the Closing Date, give rise to the failure of a condition set forth in Section 8.1, and such material breach, failure to perform or inaccuracy if curable, is not cured by, on or before the earlier of (i) the Termination Date or (ii) thirty (30) days following receipt of written notice by Buyer, or which by its nature or timing cannot be cured prior to the Termination Date; *provided, however*, that the Buyer shall not have the right to terminate this Agreement pursuant to this Section 10.1(a)(iii) if the Buyer is then in material breach of any of its covenants or agreements contained in this Agreement or any of the representations or warranties of the Buyer contained in this Agreement shall be materially inaccurate, and, in any such case would give rise to the failure of a condition set forth in Section 7.1;

(iv)     by the Seller or the Buyer, if any U.S. federal or state court of competent jurisdiction shall have issued a Final Order permanently enjoining or otherwise prohibiting the consummation of the sale of the Purchased Assets contemplated hereby;

(v)     by the Seller or the Buyer if the Closing shall not have been consummated on or before the date which is six (6) months following the date on which the Sale Order becomes a Final Order (the "Termination Date"). Notwithstanding the foregoing, the right to terminate this Agreement under this Section 10.1(a)(v) shall not be available to any Party if the failure of the Closing to occur by such date shall be due to the failure of such Party to perform or observe the covenants and agreements of such Party set forth in this Agreement.

(vi)     by the Buyer if the Bankruptcy Court has not entered the Sale Order by March 30, 2020.

(vii)    by the Buyer if (i) the Bankruptcy Case is dismissed or converted into a case under Chapter 7 of the Bankruptcy Code or (ii) an examiner or trustee is appointed in the Bankruptcy Case.

(viii)    by the Seller or the Buyer if (i) the Seller agrees to consummate (or provides written notice to the Buyer of its intent to consummate) one or more Acquisition Proposals with one or more Persons other than the Buyer or (ii) the Bankruptcy Court approves an Acquisition Proposal other than with the Buyer.

(ix)    by Seller or the Buyer if the Buyer is not selected as the successful bidder at the conclusion of the auction for the Purchased Assets, if any.

(b)    The Party desiring to terminate this Agreement pursuant to Section 10.1(a) (other than pursuant to Section 10.1(a)(i)) shall give written notice of such termination to the other Party.

(c)    Subject to clause (d) below, in the event that this Agreement shall be terminated pursuant to Section 10.1(a), all further obligations of the Parties under this Agreement (other than Section 5.5, this Article X and Article XI, and, for the avoidance of doubt, any confidentiality agreement, which, in each case, shall remain in full force and effect) shall be terminated without further liability of any Party; provided that nothing herein shall relieve any Party from liability for any breach of this Agreement.

(d)    If this Agreement is terminated by the Seller pursuant to Section 10.1(a)(ii), then the Seller shall be entitled to the Escrow Deposit. Following any such termination, the Seller and Buyer shall immediately deliver joint written instructions (pursuant to the Escrow Agreement) to the Escrow Agent directing such disbursements.  Forfeiture of the foregoing portion of the Escrow Deposit by the Buyer to the Seller shall constitute liquidated damages and the sole and exclusive remedy of the Seller for any termination of this Agreement on account of any breach by the Buyer.  The Parties acknowledge and agree that if this Agreement is terminated as contemplated by Section 10.1(a)(ii), the actual damages incurred by Seller will be difficult, if not impossible, to ascertain and accordingly, the Parties have provided for the liquidated damages provided above. This provision shall not be construed as a penalty, but as a bona fide attempt to establish an agreed upon measure of damages which Seller will suffer as a result of such termination of this Agreement.

(e)    If this Agreement is terminated either (i) by the Buyer pursuant to Section 10.1(a)(iii), Section 10.1(a)(vi), or Section 10.1(a)(vii), or (ii) by either the Seller or the Buyer pursuant to Section 10.1(a)(iv), Section 10.1(a)(v), Section 10.1(a)(viii), or Section 10.1(a)(ix), then the Seller and the Buyer shall deliver joint written instructions (pursuant to the Escrow Agreement) to the Escrow Agent directing the disbursement of the Escrow Deposit (with all interest earned thereon) to the Buyer.

(f)    If this Agreement is terminated by either the Seller or the Buyer pursuant to Section 10.1(a)(viii) or Section 10.1(a)(ix), then in addition to a refund of the Escrow Deposit, the Seller shall pay to the Buyer, within three (3) Business Days of such termination, a breakup

36

fee in the amount of One Million Six Hundred Fifty Dollars ($1,650,000.00) (*i.e.*, 3% of the Purchase Price) (the "Breakup Fee").

(g)     If this Agreement is terminated by either the Seller or the Buyer pursuant to Section 10.1(a)(viii) or Section 10.1(a)(ix), , in addition to Seller's obligations under Section 10.1(e) and Section 10.1(f), the Seller shall pay to the Buyer, within three (3) Business Days of such termination, an amount equal to the reasonable and documented costs and out-of-pocket expenses incurred by the Buyer in connection with the negotiation, documentation and implementation of this Agreement and the transactions contemplated herein in the amount of up to Three Hundred Seventy-Five Thousand Dollars ($375,000) (the "Expense Reimbursement").

(h)     If this Agreement is terminated by the Buyer pursuant to Section 10.1(a)(iii), then in addition to a refund of the Escrow Deposit, the Seller shall pay to the Buyer, within three (3) Business Days of such termination, the amount of Two Million Dollars ($2,000,000).  Payment of such amount to Buyer shall constitute liquidated damages and the sole and exclusive remedy of Buyer for any termination of this Agreement on account of  Seller's breach of this Agreement.  The Parties acknowledge and agree that if this Agreement is terminated as contemplated by Section 10.1(a)(iii), the actual damages incurred by Buyer will be difficult, if not impossible, to ascertain and accordingly, the Parties have provided for the liquidated damages provided above. This provision shall not be construed as a penalty, but as a bona fide attempt to establish an agreed upon measure of damages which Buyer will suffer as a result of such termination of this Agreement.

(i)     The Seller's obligation to pay the Breakup Fee and Expense Reimbursement pursuant to this Section 10.1 shall survive termination of this Agreement and shall constitute an allowed administrative expense of Seller under Section503(b) of the Bankruptcy Code.

Section 10.2.  **Withdrawal of Certain Filings**.  In the event of termination under the provisions of this Article X, all filings, applications and other submissions relating to the transactions contemplated by this Agreement as to which termination has occurred shall, to the extent practicable, be withdrawn from the Governmental Body or other Person to which made.

## ARTICLE XI

## GENERAL PROVISIONS

Section 11.1.  **Survival of Obligations**.  None of the covenants, agreements or obligations shall survive the consummation of the Closing, except to the extent such covenants, agreements and obligations contemplate performance after the Closing, in which case each such covenant, agreement and obligation shall survive until performed.   No claim may be brought under this Agreement unless written notice describing in reasonable detail the facts giving rise to the claim is given on or prior to the last day of the applicable survival period.

Section 11.2.  **Confidential Nature of Information**.  Each Party agrees that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other Party during the course of the negotiations leading to the

consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, each Party will return to the other Party all copies of nonpublic documents and materials which have been furnished in connection therewith. Without limiting the right of either Party to pursue all other legal and equitable rights available to it for violation of this Section 11.2 by the other Party, it is agreed that other remedies cannot fully compensate the aggrieved Party for such a violation of this Section 11.2 and that the aggrieved Party shall be entitled to injunctive relief to prevent a violation or continuing violation hereof.

Section 11.3.   **Governing Law**.   This Agreement and all claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed and construed in accordance with the internal Laws of the State of California. The Bankruptcy Court shall have exclusive jurisdiction over the interpretation and enforcement of this Agreement.  In the event the Bankruptcy Court declines to exercise jurisdiction over any dispute arising under, relating to or connected with this Agreement, the Parties shall submit to jurisdiction in the federal and state courts sitting in Los Angeles, California.

Section 11.4.   **Exclusive Jurisdiction; Court Proceedings**.   The Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 11.5 shall be deemed effective service of process on such Party. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER IN CONTRACT OR TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM INVOLVING ANY FINANCING SOURCE AND THEIR RESPECTIVE NONPARTY AFFILIATES)

Section 11.5.   **Notices**.   All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (a) on the date of delivery if delivered personally or if sent via facsimile (with confirmation and same day dispatch by express courier utilizing next-day service), (b) on the earlier of confirmed receipt or the third (3rd) Business Day following the date of mailing if mailed by registered or certified mail (return receipt requested), (c) on the first (1st) Business Day following the date of dispatch if delivered

utilizing next-day service by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice) or (d) on the date such notice is transmitted by e-mail to the e-mail addresses previously provided to the other Parties:

If to the Seller:

Marshall Broadcasting Group, Inc.
Attn: Pluria Marshall Jr.
3731 Wilshire Boulevard
Suite 840
Los Angeles, CA 90010
Email: pluria@MBGroup.tv

with a copy to:

Levene Neale Bender Yoo & Brill L.L.P.
10250 Constellation Boulevard
Suite 1700
Los Angeles, CA 90067
Attn:  David B. Golubchik
          Eve H. Karasik
Email: dbg@lnbyb.com
          ehk@lnbyb.com

-and-

Gray Reed & McGraw LLP
1300 Post Oak Blvd.
Suite 2000
Houston, TX 77056
Attn.:  Jason S. Brookner
          Lydia R. Webb
Email: jbrookner@grayreed.com
          lwebb@grayreed.com

If to the Buyer, to:

Allen Media Broadcasting Evansville, Inc.
Attn:  General Counsel
1925 Century Park East, 10th Floor
Los Angeles, CA 90067

with a copy to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:  Richard M. Pachulski
   Richard Gruber
   Maxim B. Litvak
Email:  rpachulski@pszjlaw.com
   rgruber@pszjlaw.com
   mlitvak@pszjlaw.com

**Section 11.6.**  **Successors and Assigns; Third Party Beneficiaries**.

(a)  This Agreement and all of its terms shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including any successor by a merger or conversion referenced below. Except as provided in this Section 11.6(a), this Agreement shall not be assigned by any Party hereto. Any Party (including, for this purpose, Seller) may assign or transfer any of its rights and obligations under this Agreement to any of its Affiliates with consent of the other Party, provided that no such assignment or transfer materially delays the grant of the FCC Consent and, provided further, that no such assignment or transfer shall operate to relieve a Party of any of its liabilities or obligations hereunder.

(b)  Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the Parties and successors and assigns permitted by this Section 11.6 any right, remedy or claim under or by reason of this Agreement.

**Section 11.7.**  **Access to Records after Closing**.

(a)  For a period of two (2) year after the Closing Date, the Seller and its representatives shall have reasonable access to all of the books and records of the Business transferred to the Buyer hereunder to the extent that such access may reasonably be required by the Seller in connection with matters relating to or affected by the operations of the Business prior to the Closing Date.  Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours.  The Seller shall be solely responsible for any costs or expenses incurred by it pursuant to this Section 11.7(a).  If the Buyer shall desire to dispose of any of such books and records prior to the expiration of such two (2) year period, it shall, prior to such disposition, give the Seller a reasonable opportunity, at the Seller's expense, to segregate and remove such books and records as the other Party may select.

(b)  For a period of two (2) year after the Closing Date, the Buyer and its representatives shall have reasonable access to all of the books and records relating to the Business, if any, which the Seller may retain after the Closing Date.  Such access shall be afforded by the Seller upon receipt of reasonable advance notice and during normal business hours.  The Buyer shall be solely responsible for any costs and expenses incurred by it pursuant to this Section 11.7(b).  If the Seller shall desire to dispose of any of such books and records prior to the expiration of such two (2) year period, such party shall, prior to such disposition, give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such books and records as the other Party may select.

**Section 11.8.  Entire Agreement; Amendments**.  This Agreement, the Exhibits and Schedules referred to herein and the other documents delivered pursuant hereto contain the entire understanding of the Parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or intents between or among any of the Parties hereto. The Parties hereto, by mutual agreement in writing, may amend, modify and supplement this Agreement.

**Section 11.9.  Interpretation**.  Article titles and headings to Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. The Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. For purposes of this Agreement, (i) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation," (ii) the word "or" is not exclusive and (iii) the words "herein", "hereof", "hereby", "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein (a) to Articles, Sections, Exhibits and Schedules mean the Articles and Sections of, and the Exhibits and Schedules attached to, this Agreement and (b) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and by this Agreement. This Agreement, the Buyer Ancillary Agreements and the Ancillary Agreements shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted. References to a "Party hereto" or the "Parties hereto" or similar phrases shall refer to the Seller and the Buyer.

**Section 11.10. Waivers**.  Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party or Parties entitled to the benefit thereof. The failure of any Party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

**Section 11.11. Expenses**.  Except as otherwise expressly provided herein, each of Seller and the Buyer will pay all of its own respective costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

**Section 11.12. Partial Invalidity**.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

Section 11.13. <u>**Execution in Counterparts**</u>.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the Parties and delivered to each of the Seller and the Buyer.

Section 11.14. <u>**Disclaimer of Warranties**</u>.  Seller makes no representations or warranties with respect to any projections, forecasts or forward-looking information provided to the Buyer. There is no assurance that any projected or forecasted results will be achieved. EXCEPT AS TO THOSE MATTERS EXPRESSLY COVERED BY THE REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT, THE SELLER IS SELLING THE BUSINESS AND THE PURCHASED ASSETS ON AN "AS IS, WHERE IS" BASIS AND SELLER DISCLAIMS ALL OTHER WARRANTIES, REPRESENTATIONS AND GUARANTIES WHETHER EXPRESS OR IMPLIED. THE SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND NO IMPLIED WARRANTIES WHATSOEVER.  The Buyer acknowledges that neither the Seller nor any of its representatives or Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any memoranda, charts, summaries or schedules heretofore made available by the Buyer or its representatives or Affiliates or any other information which is not included in this Agreement or the Schedules hereto, and neither the Seller nor any of its representatives or Affiliates nor any other Person will have or be subject to any liability to the Buyer, any Affiliate of the Buyer or any other Person resulting from the distribution of any such information to, or use of any such information by, the Buyer, any Affiliate of the Buyer or any of their agents, consultants, accountants, counsel or other representatives. In making its determination to proceed with the transactions contemplated by this Agreement the Buyer and its Affiliates have relied solely on (a) the results of their own independent investigation and (b) the representations and warranties of Seller expressly and specifically set forth in this Agreement. The Buyer and its Affiliates expressly and specifically disclaim that they are relying upon or have relied upon any representation or warranty of any kind or nature, whether express or implied, not included in this Agreement that may have been made by any Person, and acknowledge and agree that the Seller expressly and specifically disclaims any such other representations and warranties.

Section 11.15. <u>**Specific Performance / Liquidated Damages**</u>.  The Seller agrees that irreparable damage would occur in the event that any provision of this Agreement was not performed by the Seller in accordance with its specific terms or was otherwise breached or the Closing was not consummated, and that money damages would not be an adequate remedy for Buyer, even if available.  It is accordingly agreed that the Buyer shall be entitled to an injunction or injunctions, or any other appropriate form of specific performance or equitable relief, to prevent breaches of this Agreement by the Seller and to enforce specifically the terms and provisions hereof (including the Seller's obligation to consummate the Closing) in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. The Seller agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the Buyer has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity.  To the extent that the Buyer seeks an injunction or injunctions to prevent breaches of

this Agreement and to enforce specifically the terms and provisions of this Agreement, the Buyer shall not be required to post any bond or other security in connection with any such order or injunction.  For the avoidance of doubt except as provided in Section 6.3 of this Agreement,, the Seller shall not be entitled to specific performance and its sole and exclusive remedy for the Buyer's breach shall be limited to the Escrow Deposit, which shall constitute liquidated damages for any breach by the Buyer.

[Signatures on following page]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the day and year first above written.

<u>**SELLER**</u>

MARSHALL BROADCASTING GROUP, INC.

By:_____
Name:  Pluria Marshall, Jr.
Title:   President & CEO

<u>**BUYER**</u>

ALLEN MEDIA BROADCASTING
EVANSVILLE, INC.

By:_____
Name: _____
Title: _____

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the day and year first above written.

<u>**SELLER**</u>

MARSHALL BROADCASTING GROUP, INC.

By:_____
        Name:
        Title:

<u>**BUYER**</u>

ALLEN MEDIA BROADCASTING EVANSVILLE, INC.

By:_____
        Name: Jeffrey W. Mayes
        Title: Co-Secretary / SVP, Assistant General Counsel