**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| MARSHALL BROADCASTING | § | |
| GROUP, INC.,[1] | § | Case No. 19-36743 (DRJ) |
| | § | |
| Debtor. | § | |
| ------------------------------------------------- | § | |
| | § | |
| MARSHALL BROADCASTING | § | |
| GROUP, INC., | § | Adversary No. _____ |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| NEXSTAR BROADCASTING, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

## COMPLAINT

Marshall Broadcasting Group, Inc.*,* the above-captioned debtor and debtor in possession
(the "Debtor," "MBG," or "Plaintiff"), for its Complaint against Nexstar Broadcasting, Inc.
("Nexstar" or "Defendant"), alleges as follows:

### I.

### NATURE OF THE ACTION AND INTRODUCTION

1.      MBG is a small minority-owned company that owns and operates three television

stations (the "Stations") that it acquired from Nexstar, a subsidiary of the largest operator of

television stations in the United States.  Nexstar never desired to sell the Stations to MBG or to

anyone else.  As a condition to Nexstar's $500 million acquisition of numerous other stations,

---

[1] The last four digits of the Debtor's federal tax identification number are (7805).

however, the Federal Communications Commission (the "FCC") required Nexstar to divest itself of the Stations.  Originally, Nexstar attempted to spin off the Stations to its longtime business partner, Mission Broadcasting, Inc. ("Mission") through a collaborative arrangement known in the industry as a "sidecar" arrangement, in which Nexstar would effectively continue to operate the Stations for its own benefit.  Because the proposed sale to Mission would have left Nexstar with impermissible control over the Stations, the FCC refused to approve the sale.

2.      Nexstar next turned to MBG, seeking to leverage MBG's minority ownership as a means to obtain FCC approval.  Nexstar never intended to permanently divest itself of the Stations, nor to cede control of their operation.  Instead, Nexstar hoped to reacquire the Stations that it parked with MBG if the FCC subsequently modified its ownership rules.  To facilitate its anticipated reacquisition, Nexstar undertook to undermine and hobble MBG from the outset. Nexstar disregarded MBG's contractually assured independence and systematically dominated and controlled MBG's operations and finances—continually interfering with MBG's day-to-day operations and diverting and wrongfully withholding tens of millions of dollars in funds that belong to MBG and that constitute property of the Debtor's estate.

3.      MBG files this action to recover its property being wrongfully withheld by Nexstar, to avoid and recover fraudulent transfers that Nexstar required MBG to make, and to recover damages for the substantial harm inflicted by Nexstar.

## II.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the Southern District of Texas has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This adversary proceeding presents a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(A), (B), (E), (H), and (O).  To the extent it may be determined that this adversary proceeding involves any non-core claims, the Debtor nonetheless consents to this Court's entry of a final order and judgment.

6.      Venue is proper pursuant to 28 U.S.C. § 1409.

## III.
## THE PARTIES

7.      MBG is a corporation organized under the laws of Texas.  MBG is a minority-owned business that owns three television stations:  KPEJ-TV in Odessa, Texas ("KPEJ"); KMSS-TV in Shreveport, Louisiana ("KMSS"); and KLJB in Davenport, Iowa ("KLJB").  MBG's chapter 11 case is pending before this Court.

8.      Nexstar is a corporation organized under the laws of Delaware.  Its principal place of business is located at 545 E. John Carpenter Freeway, Suite 700, Irving, Texas 75062. Nexstar may be served through its registered agent for service of process in the State of Texas, Corporation Service Company dba CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.  Nexstar may also be served pursuant to Rule 7004(a)(3) of the Federal Rules of Bankruptcy Procedure via first class U.S. Mail, postage prepaid, to the attention of its general counsel at its principal place of business.

## IV.
## FACTS

### A.  History of Inadequate Minority Ownership of Media Outlets in the United States.

9.      The American broadcast industry has historically suffered from a dearth of minority owners.  To combat this racial inequality, in 1978, the FCC adopted its "Statement of Policy on Minority Ownership of Broadcast Facilities," announcing its intention to encourage and facilitate

3

minority ownership in the broadcast media.  Since 1978, the FCC has continued to adopt policies and enact programs to promote minority ownership.  Despite these efforts, the FCC's objectives have proved elusive.  According to an FCC "snapshot report," as of April 15, 2014, only 0.7 percent of major television broadcast stations were controlled by black or African-American owners; 0.9 percent by American Indian or Alaska Native owners; 0.4 percent by Asian-American owners; 0.1 percent by Native Hawaiian or Pacific Islander owners; and 2.9 percent by Hispanic or Latino owners.  As the FCC has recognized, the anemic rate of minority ownership in the broadcast industry can largely be attributed to "the lack of financing available to capitalize minority broadcast ventures."  Commission Policy Regarding the Advancement of Minority Ownership in Broadcasting, 50 FR 1239-01 at 1241 (1985).

**B.  Nexstar Attempts to Expand its Television Business.**

10.     Against this backdrop, in 2013, Nexstar sought to expand its ownership of television stations across the United States through a $500 million acquisition of stations from Communications Corporation of America ("CCA"), White Knight Broadcasting ("White Knight"), and Grant Broadcasting ("Grant").  To secure FCC approval of its acquisitions, though, Nexstar was required to divest itself of the three Stations now owned by MBG.

11.     Nexstar's first instinct, however, was not to convey the Stations to MBG or another minority-owned acquirer but instead to retain effective control over the Stations by selling them to its longtime business partner, Mission, through a sidecar arrangement.

12.     Under the transaction as originally proposed, Mission was to acquire KPEJ and KMSS for $27 million and KLJB for $15.3 million.  In addition, Nexstar and Mission would enter

into a Shared Services Agreement ("SSA")[2] and a Joint Sales Agreement ("JSA")[3] for each Station that collectively would have allowed Nexstar to manage most, if not all, of the Stations' day-to-day operations as well as sell 100% of the commercial advertising time for the Stations. The practical reality of this "divestiture" was that, after closing, Nexstar would continue to control the Stations as if they continued to be owned and operated by Nexstar.

C. **The FCC Rejects Nexstar's Sham Sale to Mission.**

13.      Nexstar's proposed transaction with Mission, however, ran afoul of the FCC's concerns regarding the aggregation of ownership interests in a single market. Under the FCC's "attribution rule," if a party owned one station in a market and entered into a JSA allowing that party to sell more than 15% of a second station's advertising time, the party would be treated as owning both stations. The attribution rule addressed the FCC's growing concern that certain "divestitures" were really sham transactions intended to circumvent the FCC's ownership limitations by allowing the selling party to retain effective control of the station following the transaction. Because Nexstar's proposed JSAs with Mission provided Nexstar with impermissible control over the Stations, Nexstar was unable to obtain FCC approval of its $500 million acquisition of stations from CCA, White Knight, and Grant. Nexstar was thus forced to abandon its sham sale to Mission and find an alternative means to circumvent the FCC's ownership limitations.

---

[2] SSAs are agreements that allow one television broadcaster to provide station-related services, including back-office services, to one or more other television broadcasters.

[3] JSAs are agreements with a television broadcaster that authorize a broker to sell some or all of the advertising time for the television broadcaster in return for a fee or percentage of the revenues paid to the television broadcaster.

**D.  Nexstar Pursues a Sale to MBG.**

14.     Undeterred by the FCC's rebuke of its proposed sham sale to Mission, Nexstar sought to find another purchaser on terms that were originally substantially similar to the ones proposed in the failed Mission sale.  Rather than make significant changes to the structure or economic terms of the proposed sale, Nexstar determined that the key to FCC approval was identifying a minority-owned entity to purchase the Stations—thus attempting to appeal to the FCC's stated interest in increasing minority ownership in the broadcast industry.

15.     MBG's owner, Pluria Marshall, Jr., is a longtime media executive and civic activist who has extensive experience in print, radio, and television station operations.  Over the course of his decades-long career, Mr. Marshall has worked steadfastly to increase his ownership in various media outlets, particularly in television stations.  He has often faced significant hurdles in obtaining the financing necessary to consummate such acquisitions.  In the late 1980s and early 1990s, Mr. Marshall sought to acquire several television stations but was unable to obtain financing.  Over this period, he made contact with no fewer than eight institutional lenders that commonly provide broadcast financing without success.  In 2008, with nearly three decades of media experience, Mr. Marshall sought to acquire one or more television stations from Media General Corporation.  Institutional lenders and private equity firms were unwilling to finance these acquisitions, citing Mr. Marshall's lack of sufficient independent assets.

16.     In or about March 2014, Richard "Dick" Wiley (a former FCC chairman) contacted Mr. Marshall to inquire about a potential transaction with Nexstar.  Mr. Marshall had known Mr. Wiley for more than three decades and trusted and respected him.  At Mr. Wiley's suggestion, Mr. Marshall met with Nexstar's CEO, Perry Sook, to discuss the potential acquisition of the Stations.  To enable itself to leverage Mr. Marshall's minority status, Nexstar offered to assist him in

overcoming the financing obstacles that had stalled his previous efforts. Over the next few months, Nexstar's senior leadership met with Mr. Marshall to discuss the proposed transaction and ultimately agreed to sell the Stations to him. Nexstar's commitment to assist Mr. Marshall in obtaining financing to purchase and operate the Stations and to guarantee the debt obligations was an indispensable component of the anticipated transaction.

17.     In addition to offering financial support, Nexstar offered to provide the technical knowhow and financial resources to produce new, minority-oriented programming. Nexstar promised Mr. Marshall, and later the FCC, that it would provide financial and technical assistance in the production of 40 hours per week of new, locally-produced news, sports, and public-affairs programming, including the production of a minority-oriented public-affairs program that Nexstar would syndicate.

18.     In or about May 2014, Mr. Marshall formed MBG for the express purpose of acquiring the Stations from Nexstar, and the parties undertook to document the proposed transaction. Recognizing that Mr. Marshall could not acquire the Stations without Nexstar's commitment to guarantee the acquisition financing, Nexstar immediately began to take advantage of the extreme disparity in negotiating leverage.

19.     Nexstar drafted the agreements to facilitate the transaction with MBG. In effect, MBG would be substituted into the agreements originally drafted for the Mission sale, and MBG would assume Mission's asset purchase agreement and related obligations. Like Mission, MBG agreed to pay $27 million for KMSS and KPEJ and $15.3 million for KLJB. After MBG executed the assignment agreement, however, Nexstar insisted on an amendment to the purchase agreement that increased the purchase price for KMSS and KPEJ by $16.3 million, from $27 million to $43.3 million. According to Nexstar, the materially increased price allegedly reflected Nexstar's

7

anticipated conveyance to MGB of additional assets not originally slated to be sold to Mission. This statement was false.

20.     When Nexstar filed the proposed Mission asset purchase agreement for KMSS and KPEJ with the FCC, it omitted several of the schedules identifying the assets to be conveyed. MBG was therefore unable to compare the assets Nexstar intended to transfer to Mission with the assets Nexstar transferred to MBG. Because MBG believed Nexstar was operating in good faith, MBG believed Nexstar's explanation for the increased purchase price and relied upon that representation when agreeing to the new purchase price. Nexstar, however, failed to transfer additional assets valued at $16.3 in exchange for the enhanced purchase price.

21.     Nexstar also required MBG to enter into JSAs and SSAs that were identical to those in the FCC-rejected Mission transaction. Under the SSAs, Nexstar was to provide certain back-office services at the Stations for a combined $185,000 per month. The JSAs contemplated that Nexstar would sell 100% of the advertising time for the Stations in return for a commission on those sales. The proposed JSAs and SSAs were filed with the FCC for approval. Nexstar hoped that MGB's minority-owned status would influence the FCC to waive the attribution rule that doomed the original Mission transaction and would otherwise have limited Nexstar to selling 15% of the Stations' advertising time.

22.     Nexstar and MBG met with FCC representatives on several occasions to lobby for approval of the contemplated transaction. Nexstar urged the FCC to approve the sale, arguing that the transaction would advance the FCC's policy of increasing the number of minority-owned television stations.

23.     MBG contacted influential public interest groups, including The National Association of Black Owned Broadcasters ("NABOB") and The Multicultural Media, Telecom,

and Internet Council ("MMTC"), to solicit their support for the Nexstar-MBG transaction.  Mr. Marshall met on several occasions with members of the Congressional Black Caucus, which issued a letter of support for the transaction.

24.     The FCC, however, ultimately rejected the proposal, concluding that the contemplated JSAs would render the Stations insufficiently independent.

**E.   Nexstar Modifies the Sale Terms to Obtain FCC Approval while Retaining Control.**

25.     In response to the FCC's rejection of the new MBG sale, Nexstar modified the terms to nominally address the FCC's objections.  Nexstar amended the JSAs by reducing the amount of commercial-advertising time Nexstar could sell to 15% of the total time sold by the Stations.  Additionally, Nexstar assured the FCC that MBG would operate independently of Nexstar, representing that "MBG will acquire the Stations' programming independently without the involvement of Nexstar."  Based upon Nexstar's representations and the parties' modification to the JSAs, the FCC approved the sale of the Stations to MBG.

26.     After FCC approval and on the eve of sale closing, Nexstar required an amendment to the SSAs to vastly increase the fees payable to Nexstar.  Rather than paying a static $185,000 per month for the initial eight-year term, as originally proposed and disclosed to the FCC, MBG was required to pay $535,500 per month, with annual increases of 2.5%.  Over the life of the initial eight-year term of the SSAs, this last-minute amendment would result in tens of millions of dollars in additional fees, for which MBG would receive no additional benefits.  This massive fee increase was not intended to, and did not, reflect the value of services MBG would receive from Nexstar under the SSAs; indeed, Nexstar was not required to provide any meaningful additional services under the amended SSAs.  The mushrooming fees were wholly untethered to the economic value of Nexstar's anticipated services.  Rather, the enhanced SSA fees were simply a money grab by

9

Nexstar to recapture the advertising revenue that would be lost as a result of the FCC's required amendments to the JSAs (which effectively decreased Nexstar's JSA fees by 85%). Nexstar did not submit the drastically modified SSA fees to the FCC for approval.

27.     Nexstar controlled and dictated the terms of the transaction with MBG, including the last-minute modifications to the SSAs. MBG had no ability to negotiate the economic terms of the agreements but instead was presented with a take-it-or-leave-it option. MBG lacked arms-length bargaining power and instead was forced to accept Nexstar's terms.

## F.   Nexstar Misappropriates Revenue Streams from Two Stations.

28.     Nexstar engaged in additional last-minute maneuvering to divert material revenue streams that Nexstar represented would be acquired by MBG in the sale transaction. Prior to the MBG sale, KMSS had a longstanding shared services agreement and related agreement for advertising sales with KSHV-TV in Shreveport, which was licensed to White Knight. During the due diligence process related to the MBG transaction, Nexstar presented the related revenue from those agreements as a valuable part of KMSS's business. At closing of the MBG sale, however, Nexstar amended the agreement with White Knight to substitute itself, rather than MBG, as the new SSA partner, thus depriving MBG of this revenue stream.

29.     Similarly, KLJB had previously been co-owned with KGCW (in Burlington, Iowa), which had entered into a management agreement with KLJB's then-licensee. The management agreement and related agreements resulted in material revenues for KLJB, and Nexstar touted this revenue stream when marketing KLJB to MGB.  Prior to MBG's purchase of KLJB, however, Nexstar purchased KGCW and diverted the associated revenues previously paid to KLJB to itself.

30.     In 2014, prior to the MBG sale and Nexstar's misappropriation of these revenue streams, KMSS and KLJB earned approximately $2.5 million from the agreements. The absence

of these material revenues critically impaired MBG's ability to fund its operations from the outset and significantly reduced MBG's value.

**G.  Nexstar's Exercises Control Over the Stations and Interferes with Their Operation.**

31.     Despite Nexstar's assurances to the FCC that MBG would be independent, Nexstar exercised control over the Stations from the outset and continually interfered with MBG's operations.   Through its seizure of key operational and financial choke points, Nexstar misappropriated day-to-day control of the Stations, which it exercised at its discretion.  As part of its master plan, Nexstar structured the sale transaction to hobble MBG financially from the start by retaining the Stations' existing capital accounts and converting advertising revenues from the Stations that were intended for MBG  to its own benefit.  As a result, MBG had no ability to meet its immediate operational obligations with respect to the Stations and was forced to draws on its line of credit.  MBG has remained Nexstar's financial ward and operational captive from day one.

32.     Nexstar's efforts to subvert MBG's operations have been expansive and continuous.  Nexstar falsely communicated to the market (including potential advertisers) that it continued to own the Stations, and Nexstar personnel represented themselves as speaking for MBG and as having authority over the operation of the Stations.  As a result, Nexstar sowed confusion in the market, stifled the Stations' ability to compete, appropriated MBG's potential clients for the benefit of its own stations, and otherwise prevented clients from advertising on MBG's Stations. Additionally, Nexstar has interfered with MBG's programming and sales, reduced or eliminated critical on-air promotions, refused to pay MBG sales staff advertising sales commissions, and refused to include MBG in critical discussions affecting operations, sales, and financing.

33.     Nexstar's control over, and interference with, MBG's operations is demonstrated quite clearly through the actions of a Nexstar executive in Odessa—the location of KPEJ.  As with

all of MBG's Stations, Nexstar also owns a station in the same market, KMID.  For a lengthy period of time after the sale to MBG closed, Nexstar's local station manager misrepresented himself to business associates and the public as KPEJ's general manager, failing to correct clients when they mistakenly approached him regarding KPEJ business.  He also interfered with KPEJ's sales and operations by enacting programming changes he had no authority to implement and without consulting KPEJ's actual station manager.  He undertook numerous personnel decisions on behalf of KPEJ for which he lacked authority—going so far as to hire an anchor for the KPEJ local news with no involvement from KPEJ's station manager, instead presenting the significant personnel move as a *fait accompli*.

34.     Nexstar's misdeeds in MBG's other markets demonstrated a similar pattern of improper operational control and interference.  Nexstar personnel have repeatedly interfered with MBG's operation of its Shreveport station, KMSS.   The sales manager at Nexstar's competing station in the market, KTAL, repeatedly disparaged KMSS's managers and MBG's executives to KMSS's account executives.  He also discouraged a potential job applicant from applying for a position at KMSS by advising the applicant that she would be "miserable" working for MBG. Additionally, Nexstar failed to address ongoing issues with KMSS's local news program, including missed commercials, blackouts, reporters on KMSS news using microphones with the wrong station flag, and reporters overtly promoting KTAL.  Despite Nexstar's obligations to address these matters, Nexstar failed to do so, instead using these operational failings as a means to undermine MBG.  As a result of Nexstar's underhanded actions and failure to abide by its contractual obligations, KMSS's perception in the market has deteriorated, going from the perceived dominant station to the "smaller sister" station to Nexstar's KTAL.

4841-4626-9875.6

35.     Nexstar has similarly interfered with MBG's operation of its Davenport, Iowa

station, KLJB.  The general manager of one Nexstar station in the market, WHBF, persisted in

telling clients that he was the general manager of both stations and continued to interact with KLJB

clients, rather than referring them to KLJB's station manager.  Nexstar's manager also repeatedly

sent e-mails to all sales personnel, including KLJB account executives who did not report to him,

with operational directives.  This practice diminished the authority of KLJB managers and gave

the false impression that Nexstar managers had decision-making authority for KLJB.

36.     In addition to its proactive efforts to undermine MBG's Stations, Nexstar also failed

to honor its obligations to MBG and its representations to the FCC.  Nexstar promised Mr. Marshall

and the FCC that it would provide technical and financial assistance to facilitate MBG's production

of minority-oriented programming.  The programming was to include up to 40 hours per week of

new, locally produced news, sports, and public-affairs programming, including a minority-oriented

public-affairs program that Nexstar would syndicate.  Nexstar has withheld its promised

assistance, blocking the creation of the diverse programming touted by Nexstar in its proposal to

the FCC.  In fact, even though MBG independently produced the minority-oriented public-affairs

program, Nexstar failed to syndicate it.

37.     Additionally, Nexstar has refused to meet its obligation under the SSAs to

"maintain and repair (as needed) the transmission facilities" of the Stations.  Since mid-2019,

MBG has expended approximately $1 million to replace transmission equipment that third-party

engineers determined was at risk of failure.  Nexstar was contractually obligated to make these

repairs but failed to do so.

38.     Nexstar personnel have controlled the traffic functions of the Stations and also

control (i) how MBG's programming looks on-air, (ii) whether commercial spots are inserted

properly, (iii) whether proper ownership credit is designated, and (iv) whether the right program episode is aired at the right time.  Although Nexstar agreed to *assist* MBG in starting local news programming, Nexstar actually *took control* of the programming by selecting the personnel and programs and determining how widely the programming would be distributed and whether it would be syndicated.

## H.  Nexstar Exercises Pervasive Financial Control Over MBG.

39.    In addition to its expansive operational control and interference, Nexstar has also dominated and controlled MBG from a financial perspective.  Since the sale of the Stations, Nexstar has had virtually unfettered control over MBG's funds.  Until late 2019, Nexstar collected 100% of MBG's revenue, including customer payments and fees that rightfully belong to MBG.

40.    MBG, through the Stations, transmits a digital broadcast television signal over-the-air to certain multichannel video programming distributors ("MVPDs"), like cable companies, in exchange for a fee (the "Retransmission Fee").  Certain MVPDs have paid, and continue to pay, their Retransmission Fees and certain other fees directly to Nexstar rather than to MBG.  The Retransmission Fees and other payments received by Nexstar are property of MBG, not Nexstar. MBG has made repeated requests to Nexstar to turn over MBG's property, but Nexstar has refused. As of the December 3, 2019 (the "Petition Date"), Nexstar was withholding in excess of $15.5 million in Retransmission Fees, accounts receivable collections, expense reimbursements, and other amounts belonging to MBG.  By December 31, 2019, Nexstar was wrongfully withholding in excess of $16.5 million in funds belonging to MBG.

41.    Nexstar has also retained fees under the JSAs that it did not earn and that rightfully belong to MBG.  Although the JSAs provide Nexstar with the right to sell up to 15% of the Stations' advertising, Nexstar has actually never sold *any* advertising for the Stations; instead,

14

MBG's sales personnel have sold 100% of the advertising. From December 2014 through June 2015, MBG agreed to pay Nexstar approximately $295,000 to not sell any advertising, due to MBG's realization that Nexstar was interfering with MBG's operations and MBG's concern that Nexstar's efforts to sell advertising would facilitate Nexstar's further interference. For several periods after June 2015, Nexstar similarly did not sell any advertising for the Stations, but it nevertheless charged MBG under the JSAs as if it had sold 15% of the Stations' advertising. From December 2014 through December 2019, Nexstar has charged MBG approximately $2,250,000 in JSA fees, while providing no benefit to MBG in exchange for those payments.

42.     Through its wrongful retention of MBG's funds and its imposition of unjustified SSA fees and JSA fees, Nexstar has attempted to starve MBG financially. Prior to its bankruptcy filing, MBG had to request that Nexstar advance funds (rightfully belonging to MBG) in order to allow MBG to pay its outstanding obligations. MBG was entirely dependent on Nexstar for access to MBG's own funds.

43.     As part of its efforts to cripple MBG, Nexstar also denied MBG access to records detailing Nexstar's actual receipt of funds on MBG's behalf. Nexstar historically provided MBG with a monthly summary of funds collected on MGB's behalf. Due to its repeated requests for underlying documentation from Nexstar, which have been denied, MBG has been unable to independently verify whether, in fact, the summary information provided by Nexstar is accurate. Nexstar may have retained a significantly greater amount of MBG's funds than MBG is aware.

**I.   Nexstar Attempted to Force MBG to Default on Its Loan Obligations.**

44.     Nexstar has also attempted to use the loan guarantee it promised MBG as a means of forcing MBG into default of its credit obligations. To finance its acquisition of the Stations, MBG entered into that certain December 2014 Credit Agreement (the "December 2014 Credit

Agreement") with Bank of America ("BoA") and other lenders (collectively with BoA, the "Lenders"). In connection with the December 2014 Credit Agreement, Nexstar entered into an agreement (the "December 2014 Guarantee Agreement") guaranteeing MBG's obligations and agreeing that the guarantee would last for five years and would apply to any extension of the credit facility such that the Lenders did not need to provide notice of any extension to Nexstar or otherwise seek additional assurances.

45.     The December 2014 Guarantee Agreement was entered into for the benefit of MBG, stating that Nexstar's guarantee was a "condition precedent" for the Lenders to extend credit to MBG. The FCC acknowledged the guarantee's critical role when it noted that the Nexstar-MBG transaction was remarkable in part because it enabled Mr. Marshall to overcome the "inability to obtain financing" through Nexstar's commitment to guarantee MBG's financing. The guarantee was intended to provide MBG with a five-year runway to take over and operate the Stations. Without the guarantee, MBG would have been unable to obtain the necessary funding to acquire the Stations—and Nexstar would have been unable to complete its $500 million acquisition.

46.     The December 2014 Credit Agreement was refinanced in January 2017 (the "January 2017 Credit Agreement"), and Nexstar reaffirmed its guarantee of MBG's obligations (the "January 2017 Guarantee Agreement," and collectively with the December 2014 Guarantee Agreement, the "Guarantee Agreements"). The January 2017 Guarantee Agreement continued to require Nexstar to guarantee any extension of MBG's credit facility.

47.     MBG refinanced its credit facility again in July 2017 (the "July 2017 Credit Agreement"). Although the July 2017 Credit Agreement permitted extension of the credit facility's maturity date through December 31, 2019, the maturity date remained June 28, 2018.

48.     Because Nexstar's interference with MBG's operations had damaged MBG and the Stations so significantly, MBG realized in early 2018 that it likely would not be able to pay off the credit facility by the June 2018 maturity date.  In May 2018, MBG therefore requested that the Lenders extend the maturity date to December 1, 2019, consistent with Nexstar's original agreement to guarantee MBG's debt for five years from December 2014.  Certain Lenders indicated that they would agree to extend the facilities, but only if Nexstar expressly reaffirmed its guarantee.

49.     Contrary to its commitments to MBG (and its representations to the FCC), Nexstar initially refused to reaffirm its guarantee and encouraged the Lenders to abdicate their contractual rights and obligations.  In June 2018, MBG notified BoA, the administrative agent and collateral agent for the July 2017 Credit Agreement, that Nexstar was in violation of its commitment in the January 2017 Guarantee Agreement to guarantee extensions of the credit facilities.  MBG requested that BoA exercise its rights under the January 2017 Guarantee Agreement to obtain from Nexstar assurances necessary to "confirm . . . the rights granted to the Secured Parties" under the agreement.  Nexstar, however, implored BoA not to request the assurances that Nexstar knew it was bound to provide, nor to grant MBG's request for an extension of the maturity date.  Nexstar's actions were in violation of the July 2017 Credit Agreement and the Guarantee Agreements.

50.     Nexstar's refusal to reaffirm its guarantee was another step in furtherance of its plan to reacquire the Stations.  Tellingly, on May 30, 2018, Nexstar stated that if MBG were unable to repay its maturing obligations, Nexstar would "actively participate in any foreclosure sale over the equity interests" in, or assets of, MBG.  Nexstar was prepared to reclaim the Stations and was unabashedly using its leverage (as a large client of BoA) to facilitate its plan.

17

51.     Nexstar abandoned its efforts to manufacture MBG's default under the credit facilities only after MBG threatened litigation (and after MBG had incurred considerable expense). Once Nexstar reaffirmed its guarantee obligations, the Lenders quickly agreed to extend the maturity date.

**J.   Nexstar Intentionally Frustrated MBG's Pre-bankruptcy Sale Efforts.**

52.     Nexstar's interference with MBG's business continued well beyond its efforts in mid-2018 to manufacture a default of MBG's credit facility.  Recognizing that the Nexstar relationship was financially and operationally untenable, MBG attempted to sell the Stations in 2019.  MBG received significant buyer interest, and it ultimately agreed to sell the Stations for $67 million, with MBG retaining its cash and accounts receivable.  The proposed sale would have resulted in MBG's receipt of approximately $72 million in cash plus approximately $5 million in accounts receivable—amounts sufficient to repay MBG's bank debt and all amounts owing to Nexstar, while leaving $17 million in net proceeds for MBG.

53.     The sale agreement required, however, that Nexstar agree to terminate the existing JSAs and SSAs—the financial albatrosses that crippled MBG.  The potential buyer recognized that the JSAs and SSAs significantly impaired the Stations' value and thus would only agree to acquire the Stations free and clear of those uneconomic burdens.  Nexstar had previously advised MBG that the JSAs and SSAs would be terminated upon the payment in full of MBG's debt and/or the sale of its assets to a third party.  However, when MBG requested that Nexstar agree to terminate the JSAs and SSAs upon completion of the proposed sale of the Stations—which would have resulted in full payment of all amounts due to Nexstar and repayment of MBG's bank debt—Nexstar simply said "no."  Nexstar's refusal scuttled the proposed sale, as the proposed buyer declined to move forward with the transaction.

54.     Upon information and belief, Nexstar used the threat of retribution against potential purchasers to foil MBG's efforts to sell the Stations to other parties.

**K.  MBG Seeks Bankruptcy Protection as a Consequence of Nexstar's Actions.**

55.     As a result of Nexstar's unceasing efforts to operationally and financially cripple the Stations, MBG was unable to satisfy its obligations under the July 2017 Credit Agreement upon their maturity on November 29, 2019.  Nexstar's actions rendered it impossible for MBG to satisfy its debt, refinance those obligations, or sell the Stations.

56.     Upon maturity, upon information and belief, Nexstar transferred its Guarantee Agreement to Mission, along with the necessary funds to pay off MBG's debt to the Lenders. Mission paid the debt, subrogated under the Guarantee Agreement, and effectively became MBG's secured lender.

57.     MBG filed its Chapter 11 case on December 3, 2019, to seek protection from Nexstar's onslaught and to facilitate an orderly, value-maximizing sale of the Stations without Nexstar's interference.

**L.  The Sale Transaction Rendered MBG Insolvent and Undercapitalized.**

58.     The Nexstar-MBG transaction rendered MBG insolvent and left it with unreasonably small capital to operate its business—a financial status that remained constant from December 2014 through the Petition Date.  Nexstar ensured that MBG remained in a financially debilitated state through the imposition of exorbitant fees under the JSAs and SSAs that were exponentially higher than the value received by MBG in return.  Nexstar exercised such control and domination of MBG that it collected virtually all of MBG's revenue prior to the bankruptcy case—releasing MBG's funds only as Nexstar saw fit.  MBG was unable to utilize its own funds

to operate its business, but instead was continually strangled by Nexstar's refusal to turn over MBG's funds.

59.     MBG's insolvency was assured when Nexstar increased the sales price for KMSS and KPEJ by $16.3 million and failed to convey to MBG additional assets or value in exchange for this increase in price.  MBG borrowed the funds necessary to pay for this increase in price, thus resulting in $16.3 million in additional liabilities for which MBG received no corresponding assets or value.  Nexstar's diversion of KMSS's and KLJB's revenue streams further diminished the value of MBG's acquired assets and resulted in no corresponding decrease in the purchase price. MBG was thus required to borrow funds to finance a purchase price that failed to reflect the acquired asset value—creating a further divergence between MBG's assets and its liabilities from the outset.

60.     MBG's insolvency and lack of adequate capitalization is also demonstrated by the Lenders' refusal to enter into the December 2014 Credit Agreement or any subsequent amendments absent Nexstar's guarantees.  The Lenders' actions make clear their belief that neither MBG's acquired assets nor MBG's ability to generate operating profits from the Stations would be sufficient to repay MBG's loan obligations.  The Lenders (and Nexstar) knew that MBG would be unable to satisfy the bank debt on its own.

61.     Nexstar's efforts to force a default under the January 2017 Credit Agreement made clear MBG's insolvency and undercapitalization.  In May 2018, MBG indicated that it would not be able to satisfy its obligations to the Lenders on the June 28, 2018 maturity date and requested an extension of the credit facilities.  Nexstar knew that, absent its reaffirmation of its guarantee, MBG would default on its obligations to the Lenders, as demonstrated by Nexstar's expressed intention to participate in the anticipated foreclosure of MBG's assets upon maturity of the debt.

MBG's insolvency was again confirmed in December 2019 when MBG defaulted on its obligations under the July 2017 Credit Agreement.

## M. **Nexstar is an Insider of MBG.**

62.     The Nexstar-MBG transaction was not negotiated at arms' length; rather, Nexstar exercised absolute control over the transaction terms.   MBG's lack of negotiating power is unequivocally demonstrated by Nexstar's ability to demand and obtain a three-fold increase in SSA fees in exchange for which Nexstar provided no additional services or value.   Nexstar exercised pervasive dominion and control over MBG throughout the parties' relationship, including by: (i) collecting MBG's Retransmission Fees, all accounts receivable, and other amounts owed to MBG by MBG's customers and clients; (ii) dictating the timing and amount of funds that Nexstar released for MBG's use; (iii) refusing to turn over to MBG funds that rightfully belong to MBG; (iv) falsely representing to third parties that Nexstar continued to own the Stations post-closing of the MBG sale; (v) falsely representing to third parties, post-closing of the MBG sale, that Nexstar's local managers also served as managers for the Stations; (vi) stealing MBG's clients; (vii) refusing to include MBG in critical discussions affecting MBG's operations, sales, and financing; (viii) sending e-mails to MBG's sales staff with directives that Nexstar was not permitted to give; (ix) moving MBG executives and staff to small, makeshift offices, thus impeding MBG's ability to operate its Stations effectively; (x) purporting to make personnel decisions on behalf of the Stations; (xi) attempting to force MBG to default on its credit obligations; and (xii) converting revenue streams that had been promised to MBG.   Nexstar's relationship with MBG was sufficiently close that it permitted Nexstar to wield influence over MBG and to gain advantage over MBG by, among other things, coercing MBG into transactions that benefitted Nexstar at MBG's expense.

63.     As a consequence of the foregoing, Nexstar was an insider of MBG at all times relevant to the claims asserted in this Complaint.

**V.**

**CLAIMS FOR RELIEF**

**A.  Count I:  Turn Over of Estate Property**

64.     MBG repeats and realleges the allegations in the paragraphs set forth above as though fully set forth here.

65.     Prior to the Petition Date, Nexstar collected funds belonging to MBG but refused to turn over those funds to MBG despite repeated requests.  MBG, through the Stations, transmits a digital broadcast television signal over-the-air to certain MVPDs.  In exchange for the right to broadcast MBG's programming, the MVPDs pay Retransmission Fees to MBG.  Prior to the Petition Date, certain MVPDs tendered their Retransmission Fees directly to Nexstar rather than to MBG.

66.     Prior to the Petition Date, Nexstar also collected accounts receivable, expense reimbursements, and other payments on MBG's behalf.   MBG has demanded that Nexstar turn over these funds to MBG, but Nexstar has refused.

67.     The     Retransmission     Fees,     accounts     receivable     collections,     expense reimbursements, and other funds collected by Nexstar on MBG's behalf (collectively, the "Wrongfully Retained Funds") are property of MBG's estate under 11 U.S.C. § 541(a).  As of the Petition Date, Nexstar held in excess of $15.5 million in Wrongfully Retained Funds on MBG's behalf.  As of December 31, 2019, the Wrongfully Retained Funds exceeded $16.5 million.  Due to Nexstar's continual efforts to conceal information relating to amounts that Nexstar has collected

on MBG's behalf, MBG lacks visibility into, and clarity regarding, the entirety of MBG's property that Nexstar has improperly retained. Those amounts could materially exceed $16.5 million.

68.     The Wrongfully Retained Funds were paid to Nexstar to hold for MBG's sole benefit, and Nexstar has no ownership interest in the funds. Nexstar would be unjustly enriched if it were permitted to retain the funds. Nexstar holds the funds in constructive trust for MBG.

69.     MBG is entitled, pursuant to 11 U.S.C. § 542, to turn over of the Wrongfully Retained Funds held by Nexstar on MBG's behalf.

70.     Nexstar is not entitled to set off the Wrongfully Retained Funds.

## B. Count II: Constructive Fraudulent Transfer

71.     MBG repeats and realleges the allegations in the paragraphs set forth above as though fully set forth here.

72.     Prior to Nexstar's sale of the Stations to MBG, Nexstar had agreed to sell KMSS and KPEJ to its longtime business partner Mission for $27 million. After the FCC refused to approve the sale to Mission, Nexstar revised the transaction documents to assign the Mission asset purchase agreement to MBG, and MBG replaced Mission as purchaser of KMSS and KPEJ at the previously agreed purchase price of $27 million. After MBG executed the assignment agreement, Nexstar insisted on an amendment that increased the purchase price from $27 million to $43.3 million, an increase of $16.3 million (the "Purchase Price Overpayment"). The sale closed on January 1, 2015, and MBG paid Nexstar the purchase price on that date.

73.     Nexstar contended that the Purchase Price Overpayment was intended to account for additional assets not slated to be sold to Mission. Nexstar, however, did not ultimately transfer additional assets valued at $16.3 million to MBG, and MBG received no value (much less reasonably equivalent value) in exchange for the Purchase Price Overpayment.

23

74.     Nexstar also required MBG to enter into SSAs that were supposed to be identical to those in the proposed Mission transaction.  Under the SSAs, Nexstar originally proposed to provide certain back-office services for the Stations at a combined $185,000 per month.  When the FCC failed to approve Nexstar's proposal to allow it to sell 100% of the Stations' advertising, Nexstar increased the monthly SSA fees (the "SSA Fees") to $535,500 in the aggregate (with an annual increase during the life of the SSAs), while providing no additional value to MBG in exchange for the increase in monthly fees.  The parties entered into the SSA for KLJB on December 1, 2014, and the SSAs for KMSS and KPEJ on January 1, 2015.

75.     From January 2015 through December 2, 2015, MBG incurred $5,890,500 in monthly SSA Fees (the "Pre-December 3, 2015 SSA Fees"), of which MBG paid Nexstar $3,169,726.63.  From December 3, 2015 through the Petition Date, MBG incurred $26,534,049.55 in monthly SSA Fees (the "Four-Year SSA Fees"), of which MBG paid Nexstar $2,246,811.62.[4] It is unclear to MBG, but Nexstar may have attempted to improperly offset the Four-Year SSA Fees against funds that Nexstar holds on MBG's behalf.  MBG failed to receive reasonably equivalent value for any of the monthly SSA Fees.

76.     Under the JSAs, Nexstar was permitted to sell up to 15% of the Stations' advertising time in exchange for a fee (the "JSA Fees").  Nexstar, however, never sold any of the Stations' advertising time.  For the period from December 2014 through June 2015, MBG agreed to pay Nexstar a fee not to sell any advertising time.  For all periods following June 2015, Nexstar failed to sell any advertising time but nevertheless charged MBG fees under the JSAs based on the false assumption that Nexstar had placed 15% of MBG's advertising revenue.  From June 2015 through

---

[4] MBG's assertions regarding the SSA Fees that it has incurred and paid are based on information and belief, as MBG lacks access to records necessary to confirm these amounts.  Those records are in the possession of Nexstar or Mission.

4841-4626-9875.6

December 2, 2015, Nexstar charged MBG $312,446.52 in JSA fees (the "Pre-December 3, 2015 JSA Fees").  From December 3, 2015 through the Petition Date, MBG paid Nexstar $1,236,821.95 in JSA fees and Nexstar charged MBG an additional $1,637,368.27 in JSA fees (collectively, all JSA fees paid or incurred since December 3, 2015, the "Four-Year JSA Fees").[5]  It is unclear to MBG, but Nexstar may have attempted to improperly offset the JSA Fees against funds that Nexstar holds on MGB's behalf.  MBG received no value (much less reasonably equivalent value) in exchange for any of the JSA Fees.

77.     At the time that MBG (i) paid the Purchase Price Overpayment, (ii) entered into the SSAs, (iii) paid or incurred the monthly SSA Fees, and (iv) paid or incurred the JSA Fees ((i) – (iv) collectively, the "Avoidable Transfers and Obligations"),  MBG was engaged, or was about to engage, in a business or transaction for which MBG's remaining assets were unreasonably small in relation to the business or transaction, or intended to incur debts beyond MBG's ability to pay as they came due.   MBG was also insolvent at the time that each of the Avoidable Transfers and Obligations was made or incurred, or MBG became insolvent as a result of the Avoidable Transfers and Obligations.

78.     At the time of each Avoidable Transfer and Obligation, Nexstar was an insider of MBG as a result of its domination and control over MBG's operations and its finances.  Additionally, Nexstar knew or had reasonable cause to believe that MBG was insolvent at the time of each Avoidable Transfer and Obligation.

79.     MBG may avoid each of the Avoidable Transfers and Obligations (including the SSAs) pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 544(b) and Texas Business and Commerce Code

---

[5] MBG's assertions regarding the JSA Fees that it has incurred and paid are based on information and belief, as MBG lacks access to records necessary to confirm these amounts.  Those records are in the possession of Nexstar or Mission.

§§ 24.005(a)(2) and 24.006 (or other applicable law).  MBG may recover from Nexstar the value of each avoided transfer pursuant to 11 U.S.C. § 550 because Nexstar was the initial transferee of each transfer or the entity for whose benefit the transfers were made.

80.     Prior to the time the Avoidable Transfers and Obligations were made or incurred, there were creditors in existence holding claims against MBG, including, but not limited to, the Internal Revenue Service (the "IRS"), MidAmerican Energy, American Tower, and BDO USA, LLP.  As of the Petition Date, there were creditors holding claims against MBG, including the IRS, MidAmerican Energy, American Tower, and BDO USA, LLP.  MBG lacks access to records that would identify additional creditors at various points in time because that information is in the sole possession of Mission or Nexstar.  Upon information and belief, there exist additional creditors of MBG that held claims at the time of, or arising within a reasonable time after, each of the Avoidable Transfers and Obligations.

## C.  **Count III:  Actual Fraudulent Transfer**

81.     MBG repeats and realleges the allegations in the paragraphs set forth above as though fully set forth here.

82.     Nexstar controlled and dominated MBG's operations and its finances, including exercising control over MBG's funds and control over the Avoidable Transfers and Obligations. Nexstar was an insider of MBG at all relevant times.  Due to its control over MBG, Nexstar's intent with respect to each of the Avoidable Transfers and Obligations is imputed to MBG. Accordingly, each of the Avoidable Transfers and Obligations was made with the actual intent to hinder, delay, or defraud MBG's creditors.

83.     This intent is evidenced by the following facts:  (i) Nexstar concealed the last-minute increase in the monthly SSA fees from the FCC, the public, and MBG's creditors; (ii) the

Avoidable Transfers and Obligations were made to Nexstar, which was an insider of MGB; (iii) MBG failed to receive reasonably equivalent value for the Avoidable Transfers and Obligations; (iv) MBG was insolvent at the time of, or shortly after, each of the Avoidable Transfers and Obligations; (v) the SSAs were entered into and the Purchase Price Overpayment was made shortly after MBG incurred a substantial debt; (vi) Nexstar exercised dominion and control over MBG's finances, including the collection of MBG's Retransmission Fees, all accounts receivable, and other amounts owed by MBG's customers and clients; (vii) Nexstar dictated the timing and amount of funds that it released for MBG's use; (viii) Nexstar continually interfered with MBG's business operations, stole MBG's clients, converted revenue streams that had been promised to MBG, attempted to force MBG to default on its credit facilities, falsely communicated to the marketplace that it owned MBG's Stations, and refused to turn over funds belonging to MBG.

84.     Nexstar has exhibited the intent, from the outset, to wrest ownership of the Stations from MBG.  That intent was manifested with respect to each of the Avoidable Transfers and Obligations, which were designed and functioned to strip MBG of the resources necessary to operate its business.   Nexstar's actions demonstrated Nexstar's lack of good faith with respect to each of the Avoidable Transfers and Obligations.

85.     MBG may avoid each of the Avoidable Transfers and Obligations (including the SSAs) pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 544(b) and Texas Business and Commerce Code §§ 24.005(a)(1) (or other applicable law).  MBG may recover from Nexstar the value of each avoided transfer pursuant to 11 U.S.C. § 550 because Nexstar was the initial transferee of each transfer or the entity for whose benefit the transfers were made.

86.     As noted above, there existed creditors that could have avoided the Avoidable Transfers and Obligations.

87.     MBG's creditors had not discovered and could not have reasonably discovered the existence or the fraudulent nature of the Avoidable Transfers and Obligations occurring more than four years prior to the Petition Date.  There was no public announcement of the last-minute SSA amendments that exponentially increased the SSA Fees in exchange for no additional value, nor was there any public disclosure that MBG failed to receive assets valued at $16.3 million in exchange for the Purchase Price Overpayment.  Similarly, there was no public disclosure that Nexstar was providing no value in exchange for the JSA Fees and was not, in fact, selling the Stations' advertising.  MBG's creditors did not have access to the company's books and records or other information that would have disclosed the existence or fraudulent nature of the transfers and obligations.

**D.  Count IV:  Breach of Contract (SSAs)**

88.     MBG repeats and realleges the allegations in the paragraphs set forth above as though fully set forth here.

89.     In addition to failing to provide reasonably equivalent value in exchange for MBG's entry into the SSAs, Nexstar has breached its contractual obligations to MBG.  Nexstar's actions since MBG's purchase of the Stations have been designed to drive MBG out of business and allow Nexstar to reacquire the Stations.  That behavior contravenes Nexstar's obligations to MBG under the SSAs.  The SSAs provide that "MBG shall maintain full control, supervision and direction of" the Stations, including the Stations' "management, programming, finances, editorial policies, personnel, facilities and compliance with the FCC Rules and Regulations."  Nexstar consistently breached its obligations under the SSAs, including by (i) interfering with MBG's independent operation of its Stations, (ii) refusing to devote sufficient resources to promote MBG's content on air; (iii) communicating to the marketplace that Nexstar owns or controls the Stations; (iv)

diverting MBG's clients from MBG to Nexstar; (v) failing to maintain an adequate broadcast signal for MBG programming; (vi) failing to maintain and repair the Stations' transmission equipment; (vii) exerting and maintaining control over MBG's programming and sales matters; and (viii) exerting undue control over MBG's finances.

90.     Except where otherwise excused by Nexstar's conduct, MBG has performed its obligations under the SSAs.

91.     The SSAs are continuous in nature, and Nexstar and MBG intended the SSAs to be continuous in nature.

92.     As a direct and proximate result of Nexstar's breach of the SSAs, MBG has suffered and continues to suffer injuries and damages.

**E.   Breach of Contract (Guarantee Agreements)**

93.     MBG repeats and realleges the allegations in the paragraphs set forth above as though fully set forth here.

94.     The Guarantee Agreements executed between Nexstar and BoA are valid and enforceable contracts supported by mutual consideration.

95.     The Guarantee Agreements were intended to benefit MBG, and MBG is a third-party beneficiary of the Guarantee Agreements.

96.     The Guarantee Agreements are continuous in nature, and Nexstar and BoA intended the Guarantee Agreements to be continuous in nature.

97.     Nexstar breached its contractual obligations to MBG.  The Guarantee Agreements require that Nexstar's guarantee would continue under any extension of the maturity of MBG's credit facility "without any notice to or further assent from [Nexstar]."  Nexstar nevertheless refused to confirm its continued guarantee in May and June 2018, in breach of its obligations under

the Guarantee Agreements.  Nexstar implicitly conceded that the purpose of its refusal to reaffirm

its guarantee was to force MBG into bankruptcy or foreclosure and acquire the Stations, stating

that it would "actively participate in any foreclosure sale over the equity interests in Marshall or

the assets of Marshall."

98.     As a direct and proximate result of Nexstar's breach of the Guarantee Agreements,

MBG has suffered and continues to suffer injuries and damages.

## F.  Count VI: Breach of the Implied Covenant of Good Faith and Fair Dealing (SSAs)

99.     MBG repeats and realleges the allegations in the paragraphs set forth above as

though fully set forth here.

100.    The SSAs executed between Nexstar and MBG are valid and enforceable contracts

supported by mutual consideration.  As alleged above, Nexstar breached the SSAs.  Alternatively,

Nexstar breached the covenant of good faith and fair dealing implied in the SSAs.

101.    Implied in the SSAs between MBG and Nexstar is a mutual covenant by which

each contracting party agrees to act in good faith in the performance of its respective contractual

duties.

102.    Except where otherwise excused by Nexstar's conduct, MBG has performed its

obligations under the SSAs.

103.    The SSAs are continuous in nature, and Nexstar and MBG intended the SSAs to be

continuous in nature.

104.    By the conduct complained of in this Complaint, Nexstar has subverted MBG's

right to receive the benefits of the SSAs and has, in fact, frustrated the purpose of the contracts.

105.    As a direct and proximate result of Nexstar's breach of the implied covenant of

good faith and fair dealing, MBG has suffered and continues to suffer injuries and damages.

G. **Count VII: Breach of the Implied Covenant of Good Faith and Fair Dealing (Guarantee Agreements)**

106.    MBG repeats and realleges the allegations in the paragraphs set forth above as though fully set forth here.

107.    The Guarantee Agreements executed between Nexstar and BoA are valid and enforceable contracts supported by mutual consideration.  As alleged above, Nexstar breached the Guarantee Agreements.  Alternatively, Nexstar breached the covenant of good faith and fair dealing implied in the Guarantee Agreements.

108.    The Guarantee Agreements were intended to benefit MBG, and MBG is a third-party beneficiary of the Guarantee Agreements executed between Nexstar and BoA.

109.    Implied in the Guarantee Agreements is a mutual covenant by which each contracting party agrees to act in good faith in the performance of its respective contractual duties.

110.    The Guarantee agreements are continuous in nature, and Nexstar and BoA intended the Guarantee Agreements to be continuous in nature.

111.    By the conduct complained of in this Complaint, Nexstar has subverted MBG's right to receive the benefits of the Guarantee Agreements and has, in fact, frustrated the purpose of the contracts.

112.    As a direct and proximate result of Nexstar's breach of the implied covenant of good faith and fair dealing, MBG has suffered and continues to suffer injuries and damages.

H. **Count VIII: Conversion**

113.    MBG repeats and realleges the allegations in the paragraphs set forth above as though fully set forth here.

114.    As noted above, Nexstar is wrongfully withholding more than $16.5 million in Wrongfully Retained Funds that rightfully belong to MBG.  Nexstar collected the Wrongfully

Retained Funds on MBG's behalf and has no entitlement to retain them.  Nexstar is exercising dominion over the Wrongfully Retained Funds in derogation of MBG's rights.  MBG has demanded that Nexstar turn over the Wrongfully Retained Funds, but Nexstar has refused.

115.    As a result of Nexstar's wrongful retention of the Wrongfully Retained Funds, MBG has been damaged.  By reason of the egregious nature of Nexstar's unlawful conduct, MBG is further entitled to an award of punitive damages in an amount to be fixed at trial.

## I.   Count IX:  Fraudulent Misrepresentation

116.    MBG repeats and realleges the allegations in the paragraphs set forth above as though fully set forth here.

117.    MBG agreed to assume Mission's rights and obligations under the asset purchase agreements to acquire KMSS and KPEJ for $27 million.  Nexstar subsequently increased the purchase price for those stations to $43.3 million, a $16.3 million increase.  Nexstar represented to MBG that Nexstar intended to transfer additional assets to MBG that it had not agreed to transfer to Mission.  This representation was false.  Nexstar did not transfer to MBG additional assets valued at $16.3 million in exchange for the increased purchase price.

118.    Nexstar knew that the increased purchase price was not based upon or tied to the transfer of additional assets.  Indeed, Nexstar knew that additional assets valued at $16.3 million were not being, or would not be, transferred to MBG.  Nexstar intended for MBG to rely on its misrepresentation.

119.    The complete list of assets Nexstar intended to transfer to Mission is not publicly available, and MBG was therefore unable to compare the assets Nexstar intended to transfer to Mission with the assets Nexstar transferred to MBG.  Because MBG believed Nexstar was

operating in good faith, MBG actually and justifiably relied upon Nexstar's misrepresentation and agreed to the increased purchase price for KMSS and KPEJ.

120.    As a result of its reliance on Nexstar's misrepresentations, MBG has suffered damages and injuries through its overpayment for the stations.

## VI.

## PRAYER

WHEREFORE the Plaintiff respectfully request that the Court enter judgment in favor of Plaintiff (i) requiring Defendant to turn over all estate property that Defendant has received; (ii) avoiding all Avoidable Transfers and Obligations and permitting recovery from Defendant; (iii) equitably subordinating Nexstar's claims against the estate; (iv) awarding Plaintiff monetary damages in an amount to be determined at trial, including pre- and post-judgment interest; (v) awarding punitive damages sufficient to punish Defendant for the acts complained of and to deter future conduct; (vi) granting all appropriate injunctive relief; (vii) awarding Plaintiff attorneys' fees and costs incurred in bringing this action; (viii) disallowing Defendant's claims against the Debtor pending the outcome of this action; and (ix) granting such other and further relief as may be just and proper.

**GRAY REED & McGRAW LLP**

By: _/s/ Jason S. Brookner_
    Jason S. Brookner
     Texas Bar No. 24033684
     Paul D. Moak
     Texas Bar No. 00794316
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone:  (713) 986-7000
Facsimile:  (713) 986-7100
Email:      jbrookner@grayreed.com
Email:      pmoak@grayreed.com

     -and-

    Lydia R. Webb
     Texas Bar No. 24083758
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:     lwebb@grayreed.com

      -and

David B. Golubchik (admitted *pro hac vice*)
Eve H. Karasik (admitted *pro hac vice*)
**LEVENE NEALE BENDER YOO**
     **& BRILL L.L.P.**
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: dbg@lnbyb.com
      ehk@lnbyb.com

**COUNSEL TO THE DEBTOR**

34