

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
04/04/2020

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| MARSHALL BROADCASTING GROUP, INC.,[1] | § § | Case No. 19-36743 (DRJ) |
| Debtor. | § § § | |

AMENDED **ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE**
**DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS**
**[Relates to Docket No. 113, 157]**

Upon the motion [Docket No. 113] (the "Motion"),[2] filed by Marshall Broadcasting Group,

Inc., the above-captioned debtor and debtor in possession (the "Debtor"), for entry of an order (this

"Order") pursuant to 11 U.S.C. §§ 363 and 365 and Rules 2002, 6004, and 6006 of the Federal

Rules of Bankruptcy Procedure approving (a) the proposed sale under the terms of the Asset

Purchase Agreement by and between the Debtor and Mission Broadcasting, Inc. (the "Buyer"), a

true and correct copy of which is attached hereto as **Exhibit 1**, (and together with all schedules

attached thereto and all other documents contemplated thereby including the TSA (as defined

below), collectively, the "APA) of substantially all of the Debtor's assets free and clear of all liens,

claims, encumbrances and interests (other than the Assumed Liabilities set forth in the APA), and

(b) the assumption and assignment of executory contracts and unexpired leases of the Debtor as

may be requested by the Buyer and the proposed cure amounts with respect thereto (the "Cure

Amount"), all as more fully set forth in the Motion; and the Court being satisfied that the relief

requested in the Motion is necessary and in the best interests of the Debtor and its estate and

---

[1] The last four digits of Debtor's federal tax identification number are (7805).

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the APA.

creditors; and it appearing that sufficient notice of the Motion has been given, and that no other or further notice is required; and this Court having reviewed the Motion and having considered the evidence and arguments presented at hearing on March 30, 2020 (the "Sale Hearing"); and this Court having considered (i) the *Declaration of Philip de Roziere in Support of Sale* [Docket No. 205] (the "de Roziere Declaration"); (ii) the *Declaration of Drew McManigle in Support of Sale* [Docket No. 206] (the "McManigle Declaration"); (iii) the *Declaration of Dennis Thatcher in Support of Sale* [Docket No. 207] (the "Thatcher Declaration"); and (iv) the *Declaration of Pluria Marshall, Jr. in Support of Sale* [Docket No. 208] (the "Marshall Declaration"); and this Court having determined that the legal and factual bases set forth in the Motion, the de Roziere Declaration, the McManigle Declaration, the Thatcher Declaration, the Marshall Declaration and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, the Court hereby finds as follows:[3]

## I. Jurisdiction and Statutory Predicates.

A. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

B. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

C. The statutory predicates for the relief ordered herein are sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014 and Paragraph 28 of the Procedures for Complex Chapter 11 Cases in the Southern District of Texas.

D. The relief requested in the Motion is in the best interests of the Debtor, its estate, creditors, and other parties in interest.

---

[3] The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

**II. Notice**.

E.      Proper, timely, adequate, and sufficient notice of (a) the Motion, (b) the Bid Deadline of March 17, 2020 (the "<u>Bid Deadline</u>") pursuant to the Bid Procedures Order (as defined below) (c) the sale of the Purchased Assets (as defined below) to Buyer (as defined below) pursuant to (i) the bidding procedures authorized by the Court in the Bid Procedures Order (the "<u>Bidding Procedures</u>") and (ii) the APA and the transactions contemplated in connection therewith (the "<u>Sale</u>"), (d) the assumption and assignment to the Buyer of certain executory contracts and unexpired leases as described and identified more fully in the APA (the "<u>Assumed Contracts</u>"), (e) the Cure Amounts, (f) the Sale Hearing, and (g) all deadlines related thereto, has been provided by the Debtor in its (i) *Notice of Bid Deadline, Auction and Sale Hearing* [Docket No. 160] (the "<u>Sale Notice</u>"), the Cure Notice (as defined below) and the Notice of Successful Bidder (as defined below), as relevant, in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, 9008, and 9014, and in compliance with the *Order (A) Approving Bidding Procedures and Certain Bid Protections, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof* [Docket No. 157] (the "<u>Bid Procedures Order</u>"), to each party entitled thereto.  A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities.

F.      The Debtor further filed with the Court and served upon the non-Debtor counterparties to the Assumed Contracts a *Notice of Executory Contracts and Unexpired Leases Subject to Possible Assumption and Assignment and Proposed Cure Amounts*, identifying, among other things, the Cure Amounts [Docket No. 175] (as amended by Docket Nos. 176 and 177, collectively, the "<u>Cure Notice</u>"), in accordance with the Bid Procedures Order.  The service of the

Cure Notice was sufficient under the circumstances and in full compliance with the Bid Procedures Order, and no further notice need be provided in respect of the Debtor's assumption and assignment to the Buyer of the Assumed Contracts, the Cure Amounts, or the Sale.  All non-Debtor counterparties to the Assumed Contracts have had an adequate opportunity to object to the assumption and assignment of the Assumed Contracts and the Cure Amounts in accordance with the Cure Notice. Objections to cure amounts were filed by American Towers LLC [Docket No. 196] (the "American Towers Objection"), Nexstar Broadcasting, Inc., ("Nexstar") [Docket No. 201] (the "Nexstar Objection") and Warner Bros. Domestic Television Distribution [Docket No. 202] (the "WB Objection").  A reservation of rights was filed by Fox Broadcasting Company and Fox News Network (collectively, "Fox") [Docket No. 200] (the "Fox Reservation").

G.      The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Sale (and the transactions contemplated in connection therewith), the assumption and assignment to the Buyer of the Assumed Contracts, the Cure Amounts, the Sale Hearing, and all deadlines related thereto is or shall be required.

**III. Seller's Authorization**.

H.      The assets being sold to Buyer (the "Purchased Assets" as defined in the APA), as more fully described in the APA between the Debtor and Buyer whereby the Debtor has agreed to sell the Purchased Assets to Buyer, constitute property of the Debtor's bankruptcy estate and title thereto is vested in the Debtor's estate, within the meaning of section 541 of the Bankruptcy Code.

I.      The Debtor (i) has full corporate power and authority to execute the APA, and the Sale by the Debtor to the Buyer has been duly and validly authorized by all necessary corporate action, including approval from the Board of Directors, the Independent Director (as defined

below) and the Debtor's sole shareholder, (ii) has all of the corporate power and authority necessary to consummate the Sale and all transactions contemplated by the APA, (iii) has taken all corporate action necessary to authorize and approve the APA and the consummation by the Debtor of the Sale and all transactions contemplated thereby, and (iv) requires no consents or approvals that have not been obtained, other than the Court's entry of this Order and those expressly provided for in the APA to consummate such transactions, including but not limited to, approval by the Federal Communications Commission ("FCC").

**IV. Highest and Best Offer.**

J.       The Sale is duly authorized pursuant to sections 363(b)(1) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 6004(f).  As demonstrated by (i) the testimony and other evidence adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor has marketed the Purchased Assets and conducted all aspects of the sale process at arms' length, in good faith, and in compliance with the Bidding Procedures and Bid Procedures Order.  The marketing process undertaken by the Debtor and its professionals, agents, and other representatives with respect to the Purchased Assets has been adequate and appropriate and reasonably calculated to maximize value for the benefit of all stakeholders.  The Bidding Procedures were duly noticed and were substantively and procedurally fair to all parties.  The APA constitutes the highest and best offer for the Purchased Assets.

**V. AMBE Bid; No Auction**.

K.       On February 14, 2020, the Debtor filed a *Notice of Stalking Horse Bidder* [Docket No. 158], pursuant to which it designated Allen Media Broadcasting Evansville, Inc. ("AMBE") as the stalking horse bidder on the terms set forth in the Asset Purchase Agreement submitted by AMBE dated February 14, 2020.  The Buyer timely submitted its bid, and no bids other than the

Buyer's bid and AMBE's bid were received by the Bid Deadline of March 17, 2020.  Based on AMBE's noncompliance with certain provisions of the Bidding Procedures, the Debtor determined not to proceed with AMBE as the Stalking Horse Bidder and accordingly, on March 21, 2020, filed its *Notice of Cancellation of Auction* [Docket No. 194] cancelling the Auction in accordance with the Bidding Procedures.

## VI. Successful Bid.

L.      The Debtor, including the independent director, Drew McManigle (the "Independent Director"), who was appointed and vested with certain decision-making authority related to the sale process pursuant to the *Final Order (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Certain Protections to Prepetition Lender, and (III) Modifying the Automatic Stay* [Docket No. 107] (the "Final Cash Collateral Order"), determined in a valid and sound exercise of its business judgment that the transactions contemplated by the APA were the highest or otherwise best bid and, therefore, Buyer's bid was designated as the successful bid (the "Successful Bid").   On March 27, 2020, the Debtor filed its *Notice of Successful Bidder* [Docket No. 198] (the "Notice of Successful Bidder"), identifying the Buyer as the Successful Bidder for the Purchased Assets in accordance with the Bid Procedures Order.  As established by the record of the Sale Hearing, the Bid Procedures Order has been complied with in all material respects by the Debtor and the Buyer.  The Bidding Procedures afforded a full, fair, and reasonable opportunity for any entity or person to make a higher or otherwise better offer to purchase the Purchased Assets.

## VII. Credit Bid

M.      As set forth more fully in the Final Cash Collateral Order, and subject to the terms thereof, the MBG Secured Obligations (as defined in the Final Cash Collateral order) are legal,

valid, binding obligations of the Debtor and provide MBG with a secured, allowed claim against

the Debtor that is allowed and not subject to offset, challenge, counterclaim or offset of any kind

in the amount of $49,013,808.90.  Pursuant to applicable law, including section 363(k) of the

Bankruptcy Code and in accordance with the Final Cash Collateral Order, the Buyer is authorized

to credit bid the full amount of the MBG Obligations plus Adequate Protection Obligations.

Pursuant to the APA, the Buyer has submitted a credit bid of $ 49,013,808.90 of the Obligations

(the "Credit Bid").  The Credit Bid is a valid and proper consideration pursuant to sections 363(b)

and 363(k) of the Bankruptcy Code and the Final Cash Collateral Order.

**VIII. Best Interests of the Estate**.

        N.        Approval of the APA and consummation of the Sale are in the best interests of the

Debtor, its creditors, its estate, and other parties in interest.

        O.        The Debtor has demonstrated both (i) good, sufficient, and sound business purposes

and justifications and (ii) compelling circumstances for this Court to approve the APA and

consummation of the Sale pursuant to section 363(b) of the Bankruptcy Code prior to and outside

of a plan of reorganization because of the Debtor's current financial position.

**IX. Good Faith Purchaser**.

        P.        The APA was negotiated, proposed, and entered into by the Debtor and the Buyer

without collusion, in good faith, and on an arms'-length basis.

        Q.        Neither the Debtor, nor the Buyer, nor any affiliate of the Buyer has engaged in any

conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy

Code.  The Buyer is purchasing the Purchased Assets in good faith and is a good-faith buyer within

the meaning of section 363(m) of the Bankruptcy Code.  The Buyer is not an "insider" of the

Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  The Buyer is therefore entitled to all of the protections afforded thereby.

R.      The consideration provided by the Buyer for the Purchased Assets pursuant to the APA is (a) reasonably equivalent value under the Bankruptcy Code and any Uniform Fraudulent Transfer Act, (b) fair consideration under any Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration, fair salable value, and fair value under any such laws as applicable or any other applicable laws of the United States, any state, territory, or possession thereof, or the District of Columbia.  Neither the Debtor nor the Buyer has entered into the APA or is consummating the Sale with any fraudulent or otherwise improper purpose.

**X. Free and Clear.**

S.      As of the Closing, pursuant and subject to the terms of the APA, the transfer of the Purchased Assets and the Sale will effect a legal, valid, enforceable, and effective transfer of the Purchased Assets and will vest the Buyer with all of the Debtor's right, title, and interest in the Purchased Assets, free and clear of (i) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and encumbrances relating to, accruing, or arising at any time prior to the Closing Date (collectively, the "Liens") and (ii) all debts arising under, relating to, or in connection with any act of the Debtor or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests of any kind or nature, mortgages, easements, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, covenant or other restrictions of any kind, restrictions, defects of title,

attachments rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use or transfer, voting, transfer, receipt of income or other exercise of any attributes of ownership, alter-ego, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity, or otherwise, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtor's or the Buyer's interests in the Purchased Assets, or any similar rights (collectively, as defined in this clause (ii), "Claims"), relating to, accruing or arising at any time prior to the Closing, with the exception of any Permitted Encumbrances and Cure Amounts.

T.      The Buyer would not have entered into the APA and would not have consummated the Sale, thus adversely affecting the Debtor, its estate, and its creditors, if both (i) the Sale and (ii) the assumption and assignment of the Assumed Contracts to the Buyer were not free and clear of all Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever, with the exception of Permitted Encumbrances, Cure Amounts and Assumed Liabilities.

U.      The Buyer and its affiliates and their respective predecessors, successors, assigns, past, present and future members, partners, principals, directors, officers, shareholders, supervisor, managers, employees, agents, representatives and advisors (collectively, the "Buyer Entities") (1) are not successors (and shall not be deemed successors) to the Debtor or its estate by reason of any

theory of law or equity, and (2) shall not assume or in any way be responsible for any liability or obligation of the Debtor and/or its estate, except as otherwise expressly provided in the APA. [4]

## XI. Section 363(f) is Satisfied.

V.      The Debtor may sell the Purchased Assets free and clear of all Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. All parties in interest, including, without limitation, any holders of Liens, Claims, Encumbrances, and other interests and any other non-Debtor counterparties to the Assumed Contracts, that did not object, or who withdrew their objection, to the Sale, the Motion, the assumption and assignment of the applicable Assumed Contract or the associated Cure Amount have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code.

## XII. Assumption and Assignment of the Assumed Contracts

W.      The Debtor has demonstrated that the assumption and assignment of the Assumed Contracts to the Buyer in connection with the consummation of the Sale is an exercise of the Debtor's sound business judgment and is in the best interests of the Debtor, its estate and creditors, and other parties in interest.  The Assumed Contracts being assigned to the Buyer are an integral part of the APA and the Sale and, accordingly, the assumption and assignment of the Assumed Contracts is reasonable and enhances the value of the Debtor's estate.  Any non-Debtor counterparty to an Assumed Contract that has not actually filed with the Court an objection to such

---

[4]      For the avoidance of doubt, Nexstar Broadcasting Inc. and Nexstar Media Group, and each of their respective affiliates, predecessors, successors, assigns, past, present and future members, partners, principals, directors, officers, shareholders, supervisor, managers, employees, and agents (collectively, the "Nexstar Entities"), are not "Buyer Entities" and shall not be entitled to any of the protections herein afforded to the Buyer Entities.

assumption and assignment in accordance with the terms of the Bid Procedures Order and Cure Notice is deemed to have consented to such assumption and assignment.

X.      The Debtor and the Buyer, as applicable under the APA, have, including by way of entering into the APA, and agreeing to the provisions relating to the Assumed Contracts therein, (i) cured, or provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Buyer has, based upon the record of these proceedings, provided adequate assurance of its future performance of and under the Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  No default exists in the Debtor's performance under the Assumed Contracts as of the Closing Date other than the failure to pay Cure Amounts or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code. The Buyer's promise under the APA to perform the obligations under the Assumed Contracts after the Closing shall constitute sufficient adequate assurance of future performance under the Assumed Contracts being assigned to the Buyer within the meanings of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.  The Cure Amounts are hereby found to be the sole amounts necessary to cure any and all defaults under the Assumed Contracts under section 365(b) of the Bankruptcy Code.

Y.      The Buyer is hereby substituted for all purposes as a party to all Assumed Contracts in the place of the Debtor.  Buyer shall have any and all rights and benefits of the Debtor under all such Assumed Contracts without interruption or termination of any kind, and all terms applicable

to the Debtor shall apply to the Buyer as if such Assumed Contracts were amended to replace the Debtor with the Buyer..

**XIII. Immediate Effect of Order /Waiver of Stay**

Z.      Time is of the essence in consummating the Sale.  The consummation of the Sale as soon as practicable is necessary both to preserve and maximize the value of the Debtor's assets for the benefit of the Debtor, its estate, its creditors, interest holders and all other parties in interest in the chapter 11 case, and to provide the means for the Debtor to maximize creditor and interest holder recoveries.  The Court expressly finds that there is no just reason for delay in the implementation of this Order, waives any stay including as contemplated by Bankruptcy Rules 6004 and 6006, directs that this Order be effective immediately upon its entry, and expressly directs entry of this Order as set forth herein.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      **Relief Granted; Objections Overruled.**  The Motion (as it pertains to approval of the matters set forth herein) is **GRANTED** as set forth herein and the Sale contemplated thereby and by the APA is approved as set forth in this Order.  Except for those objections to any cure amount, adequate assurance, or both referenced in paragraphs 30 and 31 in this Order, all of which are expressly reserved for future determination, any objections that have not been previously resolved or withdrawn are overruled on the merits.

2.      **Approval of APA**.  The APA, and all other ancillary documents, including all of the terms and conditions thereof, is hereby approved.

3.      **Authorization.**  Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to execute and deliver, perform under, consummate, implement, comply with and close fully the APA subject to the receipt of approval by the FCC, together with all

additional instruments and documents that may be reasonably necessary or desirable to implement

the APA and the Sale, consummate the Sale pursuant to and in accordance with the terms and

conditions of the APA including, but not limited to, receipt of the approval by the FCC, and to take

all further actions as may be reasonably requested by the Buyer for the purpose of assigning,

transferring, granting, conveying and conferring to the Buyer or reducing to possession, the

Purchased Assets, or as may be reasonably necessary or appropriate to the performance of the

obligations as contemplated by the APA.

4.     **<u>Binding Effect.</u>**  This Order and the APA shall be binding in all respects upon the

Debtor and its estate, successors, and assigns, all creditors of and equity holders in the Debtor, and

any and all other parties in interest, including, without limitation, any and all holders of Liens,

Claims, encumbrances, and other interests (including holders of any rights or claims based on any

putative successor or transferee liability) of any kind or nature whatsoever in the Purchased Assets,

all non-Debtor parties to the Assumed Contracts, and any trustee or successor trustee appointed in

these chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code.  The APA

and the Sale are not subject to rejection or avoidance (whether through any avoidance or recovery,

claim, action, or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar

state or federal Law or any other cause of action) by the Debtor, any chapter 7 or chapter 11 trustee

of the Debtor's bankruptcy estates or any other person or entity.  The APA, this Order, and the

Debtor's obligations therein and herein shall not be altered, impaired, amended, rejected,

discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in these

bankruptcy cases, any order confirming any chapter 11 plan, or any subsequent order of this Court

without the prior written consent of the Buyer.  Nothing contained in any chapter 11 plan confirmed

in these chapter 11 cases or the confirmation order confirming any such chapter 11 plan shall

conflict with or derogate from the provisions of the APA or this Order. This Order and the APA shall inure to the benefit of the Debtor, its estate, its creditors, the Buyer, and their respective successors and assigns.

5.    **Good Faith Purchaser.** The Buyer is a good faith purchaser of the Purchased Assets and is hereby granted and is entitled to all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code. Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified or vacated by a subsequent order of the Bankruptcy Court or any other court, such reversal, modification or vacatur shall not affect the validity and enforceability of any sale, transfer or assignment under the APA or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing Date) and, notwithstanding any reversal, modification or vacatur, any sale, transfer or assignment, shall be governed in all respects by the original provisions of this Order or the APA, as the case may be.

6.    **Section 363(n) of the Bankruptcy Code**. The sale approved by this Order is not subject to avoidance or any recovery of damages pursuant to section 363(n) of the Bankruptcy Code.

7.    **Modifications.**    The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in a writing signed by both parties in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate.

8.    **Valid Transfer.**  Except as expressly permitted or otherwise specifically provided for in the APA or this Order, including, but not limited to, the FCC approval, pursuant to sections

105(a), 363(b), 363(f), 365(b), 365(f) of the Bankruptcy Code or any other applicable section of the Bankruptcy Code, upon the Closing, the Purchased Assets shall be transferred to the Buyer, and such transfer shall constitute a legal, valid, binding and effective transfer of the Purchased Assets free and clear of all Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever pursuant to section 363(f) of the Bankruptcy Code.  Upon the Closing, the Buyer shall take title to and possession of the Purchased Assets subject only to the Assumed Liabilities and Permitted Encumbrances.

9.     **<u>Free and Clear.</u>** Except as expressly permitted or otherwise specifically provided by the APA or this Order, all persons and entities (as defined in section 101(15) of the Bankruptcy Code), including, but not limited to, all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to executory contracts and unexpired leases, creditors holding Liens or claims of any kind or nature whatsoever against or in the Debtor or any of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) arising under or out of, in connection with, or in any way relating to, the Debtor, the Purchased Assets, the operation of the Debtor's business prior to the Closing, or the transfer of the Purchased Assets to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting any Liens or Claims of any kind or nature whatsoever, against the Buyer and its successors, designees, assigns, or property, or the Purchased Assets conveyed in accordance with the APA.  On the Closing Date, each of the Debtor's creditors is authorized to execute such documents and take all other actions as may be deemed by the Buyer to be necessary or desirable to release Liens or Claims on the Purchased Assets, if any, as provided for herein, as such Liens or Claims may have been recorded or may otherwise exist.  This Order (a) shall be effective as a determination that, upon the Closing, all Liens, Claims, Encumbrances,

and other interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, foreign, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Purchased Assets.

10.     **No Responsibility.**  For the avoidance of doubt, unless set forth in the APA, the Buyer shall not be responsible for any Liens, Claims, Encumbrances, interests and Excluded Liabilities (other than Assumed Liabilities), including in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust and security interests; (iii) any intercompany loans and receivables between the Debtor and its owners,(iv) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as

amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtor or any of its predecessors; (vi) liabilities arising under any Environmental Laws with respect to any assets owned or operated by the Debtor at any time prior to the Closing Date; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (ix) any Excluded Liabilities.

11. **Operation of the Business Prior to Closing.** Until the Closing, the Debtor shall operate the business (including the Purchased Assets) in accordance with section 11 of the Final Cash Collateral Order and Section 5.4 of the APA.

12. **Possession.** All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Buyer or its assignee as of the Closing Date.

13. **Release of Liens.** If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Liens in the Purchased Assets conveyed pursuant to the APA and this Order has not delivered to the Debtor, prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens which the person or entity has with respect to the Purchased Assets or otherwise, then (a) the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets, and (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise

recorded, shall constitute conclusive evidence of the release of all Liens in the Purchased Assets of any kind or nature whatsoever.  Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Liens, interests and the Excluded Liabilities shall be self-executing, and neither the Debtor nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

14.     **Wind Down Amount.**    The APA provides for a "Wind Down Amount," which shall be used to pay certain accrued and unpaid allowed expenses of the Debtor after closing of the Sale solely as set forth in the APA and solely in accordance with the budget attached hereto as **Exhibit 2** (the "Wind Down Budget").  At Closing, the Debtor shall provide an estimate of all accrued and unpaid fees, disbursements, costs, and expenses (the "Professional Fees") incurred by professionals or professional firms retained by the Debtor or its estate pursuant to sections 327, 328 or 363 of the Bankruptcy Code which Professional Fees were incurred (regardless of when invoiced or applied for) prior to the Closing and are expressly provided for in the Approved Budget (as defined in the Final Cash Collateral Order (the "Pre-Closing Fee Estimate").  An amount equal to the Pre-Closing Fee Estimate shall be added to the "Wind Down Amount" set forth in the APA and included in the Wind Down Budget, and such amounts shall only be paid to such professionals in accordance with the Approved Budget and upon allowance by the Court.  Any amounts in the Wind Down Budget budgeted for Professional Fees for the period after Closing shall only be distributed to such professionals upon further order of the Court upon motion.  Any residual amount remaining after payment of the allowed items contained within the Wind Down Budget shall be promptly delivered to the Buyer without further order of the Court.  Notwithstanding anything to the contrary in this Order or APA, at Closing, the Buyer shall have the right (in its sole

discretion) to assume (upon written notice to the Debtor) any item in the Wind Down Budget, which will reduce the Wind Down Amount on a dollar for dollar basis. For the avoidance of doubt, unless expressly assumed by the Buyer in its sole discretion, the Buyer shall have no responsibility for the payment or reimbursement of any amounts set forth in the Wind Down Budget, and nothing in this Order or otherwise shall be construed to obligate the Buyer to guarantee that the Debtor has sufficient cash on hand at Closing to fund the Wind Down Amount.

15.     **Authorization of Assumption and Assignment.** The Debtor is hereby authorized to and shall, in accordance with sections 105(a) and 365 of the Bankruptcy Code, and upon payment of the applicable Cure Amounts (if any) by the Buyer, (a) assume the Assumed Contracts, (b) assign the Assumed Contracts to the Buyer, effective upon and subject to the occurrence of the Closing, free and clear of all Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever, which Assumed Contracts by operation of this Order, shall be deemed assumed and assigned effective as of the Closing, and (c) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Buyer. The Buyer's assumption on the terms set forth in the APA of the Assumed Contracts, is hereby approved, and all requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption and assignment of the Assumed Contracts by the Debtor to the Buyer have been satisfied.

16.     **Anti-Assignment Provisions Unenforceable.** Upon assignment to the Buyer, (i) the Assumed Contracts shall remain in full force and effect for the benefit of the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that (a) prohibits, restricts, limits, or conditions such assignment or transfer, or (b) allows

the non-Debtor party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract.  Each non-Debtor party to an Assumed Contract is hereby forever barred, estopped, and permanently enjoined from asserting any objection to the assumption and assignment of such non-Debtor party's Assumed Contract including, without limitation, that its consent is necessary for such assumption and assignment; provided further that any provision in any Assumed Contract that prohibits or conditions the assignment of such Assumed Contract on the consent of the non-Debtor counterparty thereto shall be unenforceable and of no force and effect.

17.     **Substitution of Buyer.**  Upon assignment to the Buyer, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title, and interest of the Debtor in each Assumed Contract free and clear of Liens, Claims, encumbrances, and other interests of any kind or nature whatsoever.  The Buyer is hereby substituted for all purposes solely related to the Purchased Assets as a party to all Assumed Contracts in the place of the Debtor, and the Buyer shall have any and all rights and benefits of the Debtor related to the Purchased Assets under all such Assumed Contracts without interruption or termination of any kind, and all terms applicable to the Debtor solely related to the Purchased Assets shall apply to the Buyer as if such Assumed Contracts were amended to replace the Debtor with the Buyer.

18.     **Cure.**  All defaults or other obligations of the Debtor under the Assumed Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) as to which no objections were interposed and remain pending as of the date of this Order are deemed satisfied

by the payment of the proposed amount necessary, if any, to cure all monetary defaults, if any, under such Assumed Contract in those amounts set forth in the Cure Notice, which was served in compliance with the Bid Procedures Order, and which were satisfied, or shall be satisfied as soon as practicable, as provided in the APA.  For all Assumed Contracts for which a Cure Notice was served, the Buyer is authorized and directed to pay all Cure Amounts required to be paid by such parties in accordance with the APA upon the later of (a) the Closing or (b) for any Assumed Contract for which an objection has been filed to the assumption and assignment of such agreement or the Cure Amounts relating thereto and such objection remains pending as of the date of this Order, within ten (10) business days of the resolution of such objection by settlement or order of this Court.  Any non-Debtor counterparty to an Assumed Contract that has not filed an objection on or before the deadline as set forth in the relevant Cure Notice shall thereafter be barred from objecting or asserting monetary or non-monetary defaults with respect to any such Assumed Contract other than the applicable amount set forth in the Cure Notice, and such Assumed Contract shall be deemed assumed by the Debtor and assigned to the Buyer on the Closing Date.

19.    **Addition or Removal of Contracts.**  The Buyer is authorized, in its sole discretion, to add or remove any contracts from Schedule 2.1(j) to the APA, the list of those Contracts and Real Property Leases that Buyer elects to have assumed and assigned to Buyer, in accordance with the APA.  Notwithstanding anything in this Order or the APA, none of the 33 contracts listed under the heading Contracts with Fox Broadcasting Company, LLC shall be removed from schedule 2.1(j) without the consent of Fox Broadcasting Company, LLC and Fox News Network, L.L.C.

20.    **No Claims Against Buyer.**  Upon the Closing and payment of any Cure Amount, each non-Debtor party to an Assumed Contract shall be forever barred, estopped, and permanently enjoined from asserting against the Buyer or any of its affiliates, or the property of any of them,

any default, breach, claims of pecuniary losses arising from the Assumed Contract and existing as of the Closing or by reason of Closing, action, liability, or other cause of action existing as of the date of the Sale Hearing whether asserted or not, or, against the Buyer or any of its affiliates, any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtor.

21.     **Adequate Assurance.** The Buyer has provided adequate assurance of its future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(l)(C) and 365(f)(2)(B) of the Bankruptcy Code (including to the extent, if any, modified by section 365(b)(3) of the Bankruptcy Code). All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtor's assumption and assignment to the Buyer of the Assumed Contracts have been satisfied.

22.     **Administrative Expense.** Any amounts that become payable by the Debtor to the Buyer pursuant to the APA and any related agreements executed in connection therewith shall be paid in accordance therewith;  provided that in the event any amounts are not promptly paid to the Buyer, such amounts shall (a) be entitled to administrative expense claim status under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code; (b) not be subordinate to any other administrative expense claim against the Debtor, (c) not be altered, amended, discharged or affected by any chapter 11 plan proposed or confirmed in these chapter 11 cases without the prior written consent of the Buyer, (d) be paid by the Debtor in the time and manner provided for in the APA without further order of this Court, and (e) not be subject to any bar date in these chapter 11 cases or any requirement to file any request for allowance of administrative claim or proof of claim.  For the avoidance of doubt, post-petition amounts incurred by the Debtor and owed to Fox in the ordinary course of business under the Fox Contracts shall be entitled to administrative expense priority and paid in accordance with the Cash Collateral Budget and Wind Down Budget (as applicable).  In the event the News Edge fees for KMSS-TV (Shreveport, LA) of $3,560/month

incurred post-petition but prior to Closing are not paid consistent with past practice, such amount shall be added to the Cash Collateral Budget or Wind Down Budget (as applicable), and paid by the Debtor.

23. **Buyer's Assignment of Rights.** At any time prior to the Closing, Buyer may assign the APA or its rights thereunder to one or more of its affiliates or designees, which shall be entitled to assume and accede to the APA and to purchase and acquire any or some of the Purchased Assets in lieu of Buyer, and such affiliate(s) or designee(s) shall be deemed to be Buyer for all purposes under this Order. Notwithstanding anything in this Order or the APA, any assignment of the Fox Contracts to any party other than Mission shall require the consent of Fox Broadcasting Company, LLC and Fox News Network, L.L.C., which shall not be unreasonably withheld.

24. **No Successor Liability.** None of the Buyer Entities are or shall be deemed, as a result of the consummation of the Sale contemplated herein, to: (a) be legal successors to the Debtor or its estate by reason of any theory of law or equity, (b) be an affiliate of the Debtor, (c) have, *de facto* or otherwise, merged with or into the Debtor, or (d) be an alter ego or a mere continuation or substantial continuation or successor of the Debtor in any respect. Except as expressly permitted or otherwise specifically provided for in the APA or this Order, neither the Buyer nor any of its affiliates shall (i) assume or in any way be responsible for any liability or obligation of any of the Debtor and/or its estate or (ii) have any liability or responsibility for any liability or other obligation of the Debtor's arising under or related to the Purchased Assets or otherwise. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the APA, the Buyer and its affiliates shall not be liable for any claims against the Debtor or its predecessors or affiliates, and the Buyer and its affiliates shall have no successor or vicarious liabilities of any kind or character including but not limited to any theory of warranty,

product liability, environmental, successor or transferee liability, labor law, *de facto* merger, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtor's business prior to the Closing.

25.    **Release of Buyer.**  Except with respect to the obligations under the Transaction Documents (as defined below), upon Closing, the Seller and all of its past, present and future shareholders, partners, members, board of directors and/or supervisors, managers, officers, employees, agents, representatives and advisors (collectively, the "Seller Entities") shall irrevocably and unconditionally release, remise, and forever discharge the Buyer Entities (in any capacity) from any and all suits, legal or administrative proceedings, Claims, demands, damages, losses, costs, liabilities, interest or causes of action whatsoever at law or in equity, known or unknown, which Seller Entities might now or subsequently may have, based on, relating to or arising out of or in connection with the Debtor, the Debtor's chapter 11 case, and sale process including claims for "lender liability" under any theory and any and all claims and causes of action arising under the Bankruptcy Code or applicable law.  For the avoidance of doubt, the release set forth in this paragraph is not being given by, to, or for the benefit of the Nexstar Entities.

26.    **Release of Seller.**  Except with respect to the obligations under the Transaction Documents (as defined below), upon Closing, the Buyer shall irrevocably and unconditionally release, remise, and forever discharge the Seller Entities (in any capacity) from any and all suits, legal or administrative proceedings, Claims, demands, losses, costs, liabilities, interest or causes of action whatsoever at law or in equity, known or unknown, which Seller Entities might

now or subsequently may have, based on, relating to or arising out of the Debtor, the Debtor's chapter 11 case, or the sale process. For the avoidance of doubt, the release set forth in this paragraph is not being given by, to, or for the benefit of the Nexstar Entities.

27. **Prohibition**. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of the APA and this Order.

28. **No Interference.** Following the Closing, no holder of a Lien in the Purchased Assets shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to such Lien, or any actions that the Debtor may take in this chapter 11 case or any successor case.

29. **Jurisdiction.** This Court retains jurisdiction to enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Purchased Assets or performance of other obligations owed to the Buyer under the APA, Sale Order, TSA, or any exhibit or ancilliary agreements in connection with the Sale (collectively, the "Transaction Documents"); (b) resolve any disputes arising under or related to the Transaction Documents, except as otherwise provided therein; (c) interpret, implement, and enforce the provisions of the Transaction Documents; (d) protect the Buyer and its affiliates against (i) any Liens in the Debtor or the Purchased Assets of any kind or nature whatsoever and (ii) any creditors or other parties in interest regarding the turnover of the Purchased Assets that may be in their possession; and (e) enforce the provisions of the Transaction Documents.

30.     **American Towers Objection.**  Notwithstanding anything to the contrary herein, all rights of American Towers LLC and the Debtor are reserved and preserved with respect to the American Towers Objection, and all issues related thereto will be resolved either by stipulation of the parties or Order of the Court at a later date.  A hearing on the American Towers Objection, to the extent not resolved beforehand, is scheduled for April 20, 2020 at 2:00 p.m.

31.     **WB Objection.**  Notwithstanding anything to the contrary herein, all rights of Warner Bros. Domestic Television Distribution and the Debtor are reserved and preserved with respect to the WB Objection, and all issues related thereto will be resolved either by stipulation of the parties or Order of the Court at a later date.  None of the WBDTD Licenses (as that term is defined in the WB Objection) nor any rights and obligations of the Debtor arising under or in connection with the WBDTD Licenses will be assumed or assigned by the Debtor until such issues are so resolved.  A hearing on the WB Objection, to the extent not resolved beforehand, is scheduled for April 20, 2020 at 2:00 p.m.

32.     **Fox Reservation.**  Any revised Cure Notice shall include identification and notice to both Fox Broadcasting Company, LLC and Fox News Network, L.L.C.  In exchange for the provisions and consideration granted to Fox herein, Fox agrees that the Fox Reservation has been resolved.

33.     **Nexstar Objection.**  Because the Debtor's agreements with Nexstar are not being assumed and assigned under the APA, the Nexstar Objection is overruled as moot.  Nothing in the Nexstar Objection or this Order shall in any way determine or affect any rights, claims or causes of action possessed by the Debtor or Nexstar, and all such rights, claims and causes of are reserved and preserved in all respects.

34.     **FCC.**  Notwithstanding any other provision of this Order or any other Order of this Court, no sale, transfer or assignment of any rights and interests of the Debtor in any federal license or authorization issued by the FCC shall take place prior to the issuance of FCC regulatory approval for such sale, transfer or assignment pursuant to the Communications Act of 1934, as amended, and the rules and regulations promulgated thereunder.  The FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on such sales, transfers and assignments and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

35.     **No Bulk Sales.**  The so-called "bulk sale" laws or any similar law of any applicable state or other jurisdiction are waived or inapplicable to the Sale.  Except for PVB Advisors LLC, no brokers were involved in consummating the Sale.  The Buyer is not, and will not become, obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the Sale based upon any arrangement made by, or on behalf of, the Debtor.

36.     **Employee Issues.**  Except as otherwise expressly provided in the APA, the Buyer shall have no Liability to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees of the Debtor. Except as otherwise expressly provided in the APA shall have no Liability with respect to any collective bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan to which the Debtor is a party and relating to the Purchased Assets (including, without limitation, arising from or related to the rejection or other termination of any such

agreement), and Buyer shall in no way be deemed a party to or assignee of any such agreement, and no employee of Buyer shall be deemed in any way covered by or a party to any such agreement, and except as otherwise expressly provided in the APA, all parties to any such agreement are hereby enjoined from asserting against Buyer any and all Claims arising from or relating to such agreement.

37.    **TSA**.  As a condition to the Buyer's execution of the APA, Pluria Marshall, Jr. has agreed to execute the Transaction Support Agreement (the "<u>TSA</u>"), attached hereto as **<u>Exhibit 3</u>**, pursuant to which, among other things, Mr. Marshall has agreed to support (and not directly or indirectly oppose or otherwise interfere with) the Sale to the Buyer.

38.    **<u>Nexstar Administrative Expense Claim.</u>**    Notwithstanding anything to the contrary in the APA or in this Order, on the Closing Date, Buyer shall satisfy (whether by cash or, at Buyer's election, assumption) the post-petition administrative expense claims (if any) that have not been otherwise satisfied as of the Closing Date and are otherwise due and owing by the Debtor to Nexstar under those certain Shared Services Agreements between Nexstar and the Debtor — one for each of the three stations owned by the Debtor; <u>provided however</u>, Buyer's obligation under this paragraph is capped at the lesser of $4.2 million or $600,000 per month from the Petition Date through the Closing Date.

39.    **<u>Failure to Specify Provision.</u>**  The failure to specifically include any particular provision of the APA or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and other related documents be authorized and approved in their entirety.

40.    **<u>Headings</u>**. The headings in this Order are for convenience of reference only and shall not be deemed to modify or limit the provisions of this Order or the APA.

41.     **Conflict.**  To the extent of any conflict between the APA and this Order, the terms and provisions of this Order shall govern.

42.     **Non-Severable.**   The provisions of this Order are non-severable and mutually dependent.

43.     **No Stay of Order.**  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any entity obtaining a stay pending appeal, the Debtor and the Buyer are free to close the Sale under the APA in accordance with its terms at any time.


     **Signed:  April 03, 2020.**

                                             _____
                                             **DAVID R. JONES**
                                             **UNITED STATES BANKRUPTCY JUDGE**

## Exhibit 1

**APA**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**for**

**the SALE of TELEVISION-RELATED ASSETS**

**KMSS-TV, SHREVEPORT, LOUISIANA**
**KPEJ-TV, ODESSA, TEXAS**
**KLJB, DAVENPORT, IOWA**

**by and between**

**MARSHALL BROADCASTING GROUP, INC.**

**and**

**MISSION BROADCASTING, INC.**

**Dated as of March 30, 2020**

114030734v12

Table of Contents

Page

**ARTICLE I DEFINITIONS** ..............................................................................1
    Section 1.1.    Definitions ....................................................................1
**ARTICLE II PURCHASE AND SALE OF PURCHASED ASSETS**.......................10
    Section 2.1.    Purchase and Sale of Purchased Assets ............................10
    Section 2.2.    Excluded Assets ..............................................................11
    Section 2.3.    Assumption of Liabilities.................................................12
    Section 2.4.    Closing Date ...................................................................13
    Section 2.5.    Purchase Price.................................................................14
    Section 2.6.    [INTENTIONALLY OMITTED]......................................14
    Section 2.7.    Closing Date Deliveries ..................................................14
    Section 2.8.    Further Assurances .........................................................15
    Section 2.9.    Allocation of Purchase Price.............................................15
**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER** .................16
    Section 3.1.    Organization; Capitalization ............................................16
    Section 3.2.    Authority of the Seller; Consents and Approvals; No Violations ...............16
    Section 3.3.    All Assets........................................................................17
    Section 3.4.    Governmental Permits; FCC Matters ...............................17
    Section 3.5.    Real Property Leases .......................................................19
    Section 3.6.    Title to Tangible Personal Property ..................................19
    Section 3.7.    Contracts ........................................................................19
    Section 3.8.    No Violation, Litigation or Regulatory Cause of Action.............................20
    Section 3.9.    Insurance ........................................................................20
    Section 3.10.    Employees......................................................................21
    Section 3.11.    Environmental Protection ................................................22
    Section 3.12.    Seller's Broker ................................................................23
    Section 3.13.    Affiliate Transactions .....................................................23
    Section 3.14.    MVPD Matters................................................................23
    Section 3.15.    No Material Changes .......................................................23
    Section 3.16.    Intellectual Property........................................................24
    Section 3.17.    Tax Matters.....................................................................24
**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE BUYER** ...................25
    Section 4.1.    Organization....................................................................25
    Section 4.2.    Authority of the Buyer.....................................................25
    Section 4.3.    Litigation........................................................................26
    Section 4.4.    No Finder ........................................................................26
    Section 4.5.    Qualifications as FCC Licensee........................................26
    Section 4.6.    Financial Capacity; Solvency ...........................................26
    Section 4.7.    Affiliation.......................................................................27
**ARTICLE V ACTION PRIOR TO THE CLOSING DATE**......................................27
    Section 5.1.    Access to the Business.....................................................27
    Section 5.2.    Notification of Certain Matters.........................................27

114030734v12

Section 5.3.      FCC Consent; Other Consents and Approvals ...................................28
Section 5.4.      Operations of the Stations Prior to the Closing Date.....................29
Section 5.5.      Public Announcement.......................................................................31
Section 5.6.      Employees.........................................................................................31
Section 5.7.      Assignment/Assumption of Contracts ............................................32
Section 5.8.      Mutual Covenants ............................................................................33
Section 5.9.      Tax Cooperation. .............................................................................33

**ARTICLE VI ADDITIONAL AGREEMENTS ...........................................................34**
Section 6.1.      Control of Operations Prior to Closing Date ..................................34
Section 6.2.      Bulk Transfer Laws .........................................................................34
Section 6.3.      Use of Names....................................................................................34
Section 6.4.      No Successor Liability. ....................................................................34
Section 6.5.      Transfer Taxes. ................................................................................34
Section 6.6.      Schedules and Exhibits. ...................................................................35

**ARTICLE VII CONDITIONS PRECEDENT TO OBLIGATIONS OF THE
          SELLER.............................................................................................35**
Section 7.1.      No Breach of Covenants and Warranties.........................................35
Section 7.2.      No Restraint .....................................................................................35
Section 7.3.      Certain Governmental Approvals .....................................................36
Section 7.4.      Closing Deliveries............................................................................36

**ARTICLE VIII CONDITIONS PRECEDENT TO OBLIGATIONS OF THE
          BUYER...............................................................................................36**
Section 8.1.      No Breach of Covenants and Warranties.........................................36
Section 8.2.      No Restraint .....................................................................................36
Section 8.3.      Certain Governmental Approvals .....................................................36
Section 8.4.      Closing Deliveries............................................................................37
Section 8.5.      Assumed Contracts ..........................................................................37
Section 8.6.      Other Consents.................................................................................37

**ARTICLE IX [INTENTIONALLY OMITTED].......................................................37**

**ARTICLE X TERMINATION....................................................................................37**
Section 10.1.     Termination......................................................................................37

**ARTICLE XI GENERAL PROVISIONS ...................................................................39**
Section 11.1.     Survival of Obligations ....................................................................39
Section 11.2.     Confidential Nature of Information .................................................39
Section 11.3.     Governing Law ................................................................................39
Section 11.4.     Exclusive Jurisdiction; Court Proceedings .....................................40
Section 11.5.     Notices.............................................................................................40
Section 11.6.     Successors and Assigns; Third Party Beneficiaries.......................41
Section 11.7.     Access to Records after Closing ......................................................42
Section 11.8.     Entire Agreement; Amendments ....................................................42
Section 11.9.     Interpretation...................................................................................43
Section 11.10.    Waivers............................................................................................43
Section 11.11.    Expenses..........................................................................................43
Section 11.12.    Partial Invalidity ..............................................................................43

Section 11.13.   Execution in Counterparts ...........................................................................44
Section 11.14.   Disclaimer of Warranties ..............................................................................44
Section 11.15.   Specific Performance .....................................................................................44
Section 11.16.   Time of Essence ..............................................................................................45
Section 11.17.   No Recourse .....................................................................................................45

114030734v12

**EXHIBITS**

Exhibit A   -   Form of Bill of Sale and Assignment and Assumption Agreement
Exhibit B   -   Form of Assignment of Seller FCC Authorizations

**SCHEDULES**

1.1(a)   -   Permitted Encumbrances

2.1(b)   -   Tangible Personal Property

2.1(j)   -   Assumed Contracts

2.1(l)   -   Taxes

2.1(n)   -   Other Purchased Assets

2.2(e)   -   Excluded Assets

3.2   -   Consents and Approvals

3.4(a)(i)   -   Governmental Permits

3.4(c)   -   FCC Authorizations

3.5(a)   -   Real Property Leases

3.5(b)   -   Real Property Leases

3.7(a)   -   Contracts

3.8   -   No Violation

3.9   -   Insurance

3.10(a)   -   Employees

3.10(f)   -   Consultants

3.11   -   Environmental Protection

3.13   -   Affiliate Transactions

3.14   -   MVPD

3.16(i)   -   Intellectual Property

3.16(ii)   -   Software

3.16(iii)     -     Intellectual Property Agreements

4.2           -     Buyer Consent

5.4(b)        -     Operation of the Stations Prior to the Closing Date

5.7(a)        -     Potential Assumed Contracts and Cure Amounts

8.6           -     Other Consents

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT**, dated as of March 30, 2020 (this "Agreement"), by and between Marshall Broadcasting Group, Inc., a Texas corporation (the "Seller") and Mission Broadcasting, Inc., a Delaware corporation (the "Buyer"). Buyer and Seller are each referred to herein individually as a "Party," and collectively as the "Parties."

## RECITALS:

A.      The Seller owns and operates television broadcast stations KMSS-TV, Shreveport, Louisiana ("KMSS-TV"), KPEJ-TV, Odessa, Texas ("KPEJ-TV") and KLJB, Davenport, Iowa ("KLJB") (collectively, the "Stations"), pursuant to certain authorizations issued by the Federal Communications Commission (the "FCC").

B.      On December 3, 2019 (the "Petition Date"), Seller filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing voluntary proceedings (the "Bankruptcy Case") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").

C.      In connection with the Bankruptcy Case, the Bankruptcy Court has authorized the Buyer (or its designee or assignee) to credit bid on a dollar-for-dollar basis up to the full amount of the outstanding Obligations in any sale of all or substantially all of Seller's assets pursuant to Section 363 of the Bankruptcy Code.

D.      Buyer desires to purchase the Purchased Assets and assume the Assumed Liabilities, and the Seller desires to sell to the Buyer the Purchased Assets and transfer the Assumed Liabilities, through and as part of the Bankruptcy Case on the terms and subject to the conditions contained in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Parties do hereby agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.1.      Definitions**.  As used in this Agreement, the following terms have the meanings specified or referred to in this Section 1.1:

"**Adequate Protection Obligations**" means, as of any date of determination, the Seller's obligations under the Cash Collateral Order to provide adequate protection including the Adequate Protection Liens and Adequate Protection Collateral (in each case as defined in the Cash Collateral Order).

"**Affiliate**" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person.  As used in this definition, the term "control" (including the terms "controlling," "controlled by" and "under

114030734v12

common control with") shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Agreement**" has the meaning specified in the introductory paragraph hereof.

"**Ancillary Agreements**" means any certificate, agreement, document or other instrument to be executed and delivered in connection with the transactions contemplated by this Agreement, including the Bill of Sale and Assignment and Assumption Agreement, and the Assignment of the Seller FCC Authorizations.

"**Assignment of the Seller FCC Authorizations**" has the meaning specified in Section 2.7.

"**Assumed Contracts**" has the meaning specified in Section 2.1(j).

 "**Assumed Liabilities**" has the meaning specified in Section 2.3(a).

"**Auction**" has the meaning specified in the Bid Procedures Order.

 "**Bankruptcy Court**" has the meaning specified in the recitals.

"**Bid Procedures Order**" means the Bankruptcy Court's *Bid Procedures Order (A) Approving Bidding Procedures and Certain Bid Protections, (B) Scheduling Bid Deadline, Auction Date, and Sale Hearing and Approving Form and Manner of Notice Thereof; and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof* [Docket No. 157].

 "**Bill of Sale and Assignment and Assumption Agreement**" has the meaning specified in Section 2.7(a).

"**Business**" means the business and operation of the Stations.

"**Business Day**" means any day on which the principal offices of the Securities and Exchange Commission are open to accept filings and on which banks in the City of New York are not required or authorized to close.

"**Buyer**" has the meaning specified in the introductory paragraph hereof.

 "**Cash Collateral Order**" means the *Final Order (i) Authorizing the Debtor to Use Cash Collateral, (ii) Granting Certain Protections to Prepetition Lender, and (iii) Modifying the Automatic Stay* Docket No. 107, entered by the Bankruptcy Court on 1/21/20 (as amended, modified or supplemented from time to time in accordance with the terms thereof).

"**Cause of Action**" means any action, claim, cause of action, controversy, demand, right, action, Encumbrance, indemnity, interest, guaranty, suit, obligation, Liability, damage, credit, judgment, account, defense, offset, power, privilege, license, franchise, lawsuit, investigation, arbitration, formal inquiry, audit, citation, summons, subpoena, notice of violation, proceeding or litigation, whether civil, criminal, administrative, regulatory, of any kind or

character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising, in Contract or in tort, in Law or in equity. For the avoidance of doubt, "Cause of Action" includes, without limitation: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of Contract or for breach of duties imposed by Law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of Contract, breach of fiduciary duty, violation of state or federal Law or breach of any duty imposed by Law or in equity, including securities laws, negligence, and gross negligence; (c) any claim or defense including fraud, mistake and duress, and any other defenses set forth in section 558 of the Bankruptcy Code; and (d) any "claim" (as defined in section 101(5) of the Bankruptcy Code) pursuant to section 362 or chapter 5 of the Bankruptcy Code, any claim or defense including fraud, mistake and duress, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign Law fraudulent transfer or similar claim.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., and any regulations promulgated thereunder.

"**Channel 30 CP**" has the meaning specified in Section 3.4(d).

"**Closing**" has the meaning specified in Section 2.4.

"**Closing Date**" has the meaning specified in Section 2.4.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Communications Act**" means the Communications Act of 1934, and the rules and regulations of the FCC promulgated under the foregoing, in each case, as in effect from time to time.

"**Contract**" has the meaning specified in Section 3.2(d)(i).

"**Contractor**" has the meaning specified in Section 3.10(g).

"**Credit Bid**" has the meaning specified in Section 2.5(a).

"**Cure Amounts**" has the meaning specified in Section 5.7(a).

"**Deposit Amount**" has the meaning specified in Section 2.5(b).

"**Designated Buyer**" has the meaning specified in Section 11.6(a).

"**Effect**" has the meaning specified in the definition of "Material Adverse Effect".

"**Encumbrance**" means any lien, claim, charge, security interest, interest, mortgage, pledge, easement, conditional sale or other title retention agreement, defect in title, option, attachment, right of first refusal, restriction on transfer, covenant or other restrictions of any kind.

"**Environmental Law**" means all Laws relating to or addressing or concerning the prevention of pollution, protection of the environment, human health, occupational health or safety, including CERCLA, OSHA, RCRA, the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300(f) et seq.; the Clean Air Act, as amended, 42 U.S.C. §§ 7401 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; and any state equivalents thereof.

"**ERISA**" has the meaning specified in Section 3.10(a).

"**Excluded Assets**" has the meaning specified in Section 2.2.

"**Excluded Contracts**" has the meaning specified in Section 2.2(a).

"**Excluded Liabilities**" has the meaning specified in Section 2.3(b).

"**FCC**" has the meaning specified in the preamble.

"**FCC Applications**" has the meaning specified in Section 5.3(a).

"**FCC Consent**" means action by the FCC (including action by staff acting on delegated authority) granting its consent to the FCC Applications.

"**Governmental Body**" means any foreign, federal, state, local or other governmental authority, or judicial or regulatory or taxing authority, body, agency, department, bureau or commission, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"**Governmental Permits**" has the meaning specified in Section 3.4(a).

"**Hazardous Materials**" means any waste, pollutant, hazardous substance, toxic substance, hazardous waste, special waste, regulated or defined as "hazardous," "toxic" or words of similar import pursuant to any Environmental Law, including asbestos, asbestos containing material, petroleum or petroleum-derived substance or waste, radioactive materials and substances, urea formaldehyde and polychlorinated biphenyls or any constituent of any such substance or waste.

"**Hired Employee**" has the meaning specified in Section 5.6.

"**Inactive Employee**" has the meaning specified in Section 5.6.

"**Independent Director**" means the independent director or collateral preservation director, as applicable, under the Cash Collateral Order.

"**Insurance Policies**" has the meaning specified in Section 3.9.

"**Intellectual Property**" means all call letters, Trademarks, designs, patents, inventions, trade secrets, know-how, processes, methods, techniques, websites, web content,

accounts with Twitter, Facebook and other social media companies and the content found thereon and related thereto, databases, software or applications (including user-applications, source code, executable code, systems, tools, data, firmware and related documentation), copyrights and other works of authorship, programs and programming material, jingles, slogans, logos, content, all applications, registrations and renewals relating to any of the foregoing, any other intellectual property rights or proprietary rights in or arising from any of the foregoing, and in all tangible embodiments of the foregoing, including all licenses, sublicenses and other rights granted and obtained with respect thereto, and rights thereunder, including rights to collect royalties, products and proceeds, rights to sue and bring other claims and seek remedies against past, present and future infringements or misappropriations thereof or other conflicts therewith, rights to recover damages or lost profits in connection therewith, and other rights to recover damages (including attorneys' fees and expenses) or lost profits in connection therewith, and otherwise to seek protection or enforcement of interests therein under the legal requirements of all jurisdictions, owned, used or held by the Seller and used in the Business.

"**Intellectual Property Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property that is used in or necessary for the conduct of the Business as currently conducted to which Seller is a party, beneficiary or otherwise bound.

"**KLJB**" has the meaning specified in the recitals.

"**KMSS- TV**" has the meaning specified in the recitals.

"**Knowledge of the Seller**" means, as to a particular matter, the actual knowledge, after due and reasonable inquiry, of the following persons: Pluria Marshall and the manager of the Stations.

"**KPEJ- TV**" has the meaning specified in the recitals.

"**Laws**" means any and all domestic (federal, state or local) or foreign or provincial laws (including common law), statutes, ordinances, rules, published regulations, judgments, Orders, or agency policies, procedures or requirements promulgated by any Governmental Body.

"**Liability**" means any debt, liability, claim (as defined in the Bankruptcy Code), obligation or commitment of any nature whatsoever (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether determined or determinable, and whether due or to become due, or otherwise), including any liability for any and all Taxes.

"**Loss**" means any and all losses, damages, liabilities, fines, penalties, payments, Taxes, costs or expenses (including reasonable attorneys' and accountants' fees) and any out-of-pocket expenses incurred in connection with investigating, monitoring, defending against or settling any of the foregoing or any claims relating to or potentially giving rise to any of such items.

"**Market**" means, with respect to the Stations, the "Designated Market Area," as determined by The Nielsen Company, of the Stations.

"**Material Adverse Effect**" means any events, occurrences, facts, conditions, changes, developments or effects (each, an "**Effect**") that, individually or in the aggregate, is or would reasonably be expected to result in (i) a material adverse effect on, or cause a material delay in, the ability of the Seller to perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement, or (ii) a material adverse effect on the Business or the Purchased Assets; provided, however, that for purposes of determining whether there has been or is reasonably likely to be a "Material Adverse Effect" for purposes of clause (ii), the results and consequences of the following Effects shall not be taken into account: (a) any changes that generally affect the industries in which the Seller operates or the Markets of the Stations, (b) the taking of any action expressly required by, or the failure to take any action expressly prohibited by, this Agreement, or the taking of any action at the written request or the prior written consent of the Buyer, and (c) any changes in the economy or capital, financial or securities markets generally, including changes in interest or exchange rates; provided, however, that the Effect referred to in clauses (a) or (c) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or would be reasonably likely to occur to the extent that such Effect materially and disproportionately has a greater adverse effect on the Business or the Purchased Assets as compared to the adverse effect that such Effect has generally on other similarly situated Persons operating in the broadcast television industry.

"**MBG Loan Documents**" that certain Credit Agreement, by and among the Seller, the lenders from time to time party thereto and Bank of America, N.A., as administrative agent and collateral agent, dated as of January 17, 2017 (as amended, restated, supplemented and/or otherwise modified in writing from time to time, including pursuant to Amendment No.1 to Credit Agreement, dated as of July 19, 2017 and Amendment No. 2 to Credit Agreement, dated as of June 28, 2018, the "**MBG Credit Agreement**"), together with all security agreements, pledge agreements, mortgages and the other Loan Documents (as defined in the MBG Credit Agreement) related to the MBG Secured Obligations.

"**MBG Secured Obligations**" means, as of any date of determination, the total amount outstanding under the MBG Credit Agreement, including accrued and unpaid prepetition interest, fees, costs and expenses (collectively with all other debts, liabilities, fees, costs, expenses, penalties, premiums, indemnities and other charges owing under or in connection with the MBG Loan Documents and Obligations (as defined in the MBG Credit Agreement)).

"**MVPD**" means (i) any multi-channel video programming distributor, including, without limitation, cable systems, satellite master antenna television systems, open video systems, multipoint distribution service systems, multichannel multipoint distribution service systems, telephone companies and direct broadcast satellite systems and (ii) OTT Providers.

"**Nexstar Claims**" means (A) the claims and causes of action asserted, or may be asserted by the Seller against Nexstar Media Group. Inc. and/or Affiliated entities or persons in any forum including, but not limited to, the claims and causes of action asserted in the action captioned *Marshall Broadcasting Group, Inc. v Nexstar Broadcasting, Inc.*, Index No.

651943/2019 (N.Y. Sup. Ct.), (B)(i) any and all assets, proceeds and recoveries in respect of the claims and causes of actions in (A) above and (ii) any and all amounts claimed by Seller to be owing from Nexstar in any form, including, but not limited to retransmission fees collected by Nexstar, cash or cash equivalents, reimbursements, accounts receivable or deposits, and proceeds thereof.

"**Non-Party Affiliate**" has the meaning specified in Section 11.17.

"**Obligations**" means collectively the MBG Secured Obligations and/or the Adequate Protection Obligations.

"**Order**" means any order, judgment, injunction, awards, verdict, stipulations, decree or writ handed down, adopted or imposed by, including any consent decree, settlement agreement or similar written agreement with, any Governmental Body.

"**OSHA**" means the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq., and any regulations promulgated thereunder.

"**OTT Provider**" means any internet-based and/or non-facilities-based  linear multichannel video programming platform to which Seller, either directly or indirectly, has granted its consent to the simultaneous retransmission of all or any portion of a Station's over-the-air linear program stream(s) by means of the internet or other data delivery network  utilizing technology for geo-filtering, including, 'over-the-top' internet-based distributors of programming and other direct-to-consumer platforms (e.g., CBS All-Access).

"**Permitted Encumbrance**" means (a) liens for Taxes, assessments or other governmental charges which are not yet due and payable or Taxes being contested in good faith by appropriate proceedings, in each case, only to the extent such liens are, as of the Petition Date, senior in priority (as a matter of Law) to the liens securing the MBG Secured Obligations and not otherwise avoidable under the Bankruptcy Code; and (b) any Encumbrances of any Governmental Body with respect to the affected property only to the extent such Encumbrances are, as of the Petition Date, senior in priority (as a matter of Law) to the Encumbrances securing the MBG Secured Obligations and not otherwise avoidable under the Bankruptcy Code, in each of the foregoing cases, solely to the extent set forth on Schedule 1.1(a) and otherwise limited by the amounts set forth on Schedule 1.1(a).

"**Person**" means any person, employee, individual, corporation, limited liability company, partnership, trust, or any other non-governmental entity or any Governmental Body.

"**Potential Assumed Contract**" has the meaning specified in Section 5.7(a).

"**Purchase Price**" has the meaning specified in Section 2.5.

"**Purchased Assets**" has the meaning specified in Section 2.1.

"**RCRA**" means the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., and any regulations promulgated thereunder.

"**Real Property**" has the meaning specified in Section 3.5(a).

"**Real Property Leases**" has the meaning specified in Section 3.5(a).

"**Release**" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

"**Representatives**" means with respect to either Party, such Party's Affiliates and its and their respective directors, officers, employees, attorneys, accountants, representatives, financial advisors, lenders, consultants and/or other agents.

"**Retained Names and Marks**" means all (a) Trademarks containing or incorporating the term "Marshall," and (b) Trademarks confusingly similar to any of the foregoing.

"**Sale Hearing**" means that hearing held by the Bankruptcy Court to consider the approval of this Agreement and the entry of the Sale Order.

"**Sale Order**" means an order (in form and substance acceptable to Buyer in its sole discretion), entered by the Bankruptcy Court pursuant to Sections 105, 363, and 365 of the Bankruptcy Code expressly (a) authorizing and approving (i) the transfer of the Purchased Assets to the Buyer free and clear of all liens, claims, Liabilities, Encumbrances and other interests of any kind or nature whatsoever pursuant to Section 363(f) of the Bankruptcy Code except for the Assumed Liabilities and Permitted Encumbrances, (ii) the assumption and assignment of the Assumed Contracts and the related Cure Amounts to Buyer and the assumption by Buyer of the Assumed Liabilities, in each case, on the terms and subject to the conditions set forth in this Agreement, and (iii) the mutual releases between and among the Buyer and the Seller, and (b) finding that the Buyer is a good faith purchaser entitled to the protection of Section 363(m) of the Bankruptcy Code.

"**Seller**" has the meaning specified in the introductory paragraph hereof.

"**Seller FCC Authorizations**" means those registrations, consents, certificates, qualifications, franchises, licenses, permits, approvals, special temporary authorizations and other authorizations issued to the Seller by the FCC with respect to the Stations, including any applications therefor and renewals or modifications thereof.

"**Shared Services Agreements**" means collectively (a) the Shared Services Agreement, dated as of December 1, 2014, by and between the Seller and Nexstar Broadcasting, Inc. (re: KLJB), (b) the Shared Services Agreement, dated as of January 1, 2015, by and between the Seller and Nexstar Broadcasting, Inc. (re: KMSS), and (c) the Shared Services Agreement, dated as of January 1, 2015, by and between the Seller and Nexstar Broadcasting, Inc. (re: KPEG)

"**Solvent**" when used with respect to any Person or group of Persons on a combined basis, means that, as of any date of determination, (A) the amount of the "fair saleable value" of the assets of such Person (or group of Persons on a combined basis) will, as of such date, exceed (1) the value of all "liabilities of such Person (or group of Persons on a combined basis), including

8

contingent and other liabilities," as of such date, as such quoted terms are generally determined in accordance with applicable Laws governing determinations of the insolvency of debtors, and (2) the amount that will be required to pay the probable liabilities of such Person (or group of Persons on a combined basis) on its existing debts (including contingent liabilities) as such debts become absolute and matured, and (B) such Person (or group of Persons on a combined basis) will be able to pay its liabilities, including contingent and other liabilities, as they mature.

"**Stations**" has the meaning specified in the first recital hereof.

"**Station Employees**" means collectively the employees located at KMSS-TV, KPEJ-TV and KLJB, and for clarity will exclude any employee not physically located at such Stations.

"**Tangible Personal Property**" has the meaning specified in Section 2.1(b).

"**Tax**" means, whether disputed or not, (a) any U.S. federal, state, local or non-U.S. income, profits, license, severance, occupation, windfall profits, capital gains, capital stock, transfer, registration, social security (or similar), production, franchise, gross receipts, payroll, sales, employment, use, property (real or personal), excise, customs, value added, estimated, stamp, alternative or add-on minimum, withholding (including backup withholding), lease, service, service use, recording, documentary, intangibles, conveyancing, gains, unemployment, disability, net worth, escheat, abandoned property, environmental, premium, real property gains, tax impost or other compulsory payment to a Governmental Body, including any interest and penalties imposed with respect to such amounts and any additions to such amounts and (b) any Liability for the payment of any amounts of the type described in clause (a) above relating to any other Person as a result of being party to any agreement, (including, but not limited to, tax sharing or allocation arrangement, any agreement to indemnify such other Person or deemed agreement created by operation of Law), being a successor or transferee of such other Person, or being (or ceasing to be) a member of the same affiliated, consolidated, combined, unitary or other group with such other Person.

"**Tax Return**" means any return, declaration, report, claim for refund or information return or statement (including schedules or any related or supporting information) required to be filed with any Governmental Body relating to Taxes, including any amendment thereof.

"**Termination Date**" has the meaning specified in Section 10.1(a)(v).

"**Trademarks**" means trademarks, service marks, Internet domain names, trade dress, trade names, and corporate names, all applications and registrations for the foregoing, and all goodwill connected with the use thereof and symbolized thereby.

"**Transfer Date**" has the meaning specified in Section 5.6.

"**Transfer Taxes**" has the meaning specified in Section 6.5.

"**Wind Down Amount**" means an estimated amount, not to exceed $931,334, determined prior to the Sale Hearing in good faith by Seller and acceptable to Buyer, necessary

following the Closing to fund (i) accrued unpaid and allowed administrative expense claims subject to the Final Cash Collateral Order and Approved Budget (as defined in the Cash Collateral Order) (including reasonable documented fees and expenses of the Seller's professionals accrued and unpaid as of the Closing Date in accordance with the Final Cash Collateral Order and Approved Budget), and (ii) an orderly liquidation, dismissal or conversion of the Bankruptcy Case and the dissolution of the Seller to be used in accordance with a budget (to be finalized prior the Sale Hearing and attached as an exhibit to the Sale Order) determined with the reasonable consent of the Buyer; provided, that to the extent there is any residual amount remaining after the payment of the items set forth in (i) – (ii), such amounts shall be promptly delivered to the Buyer.

## ARTICLE II

## PURCHASE AND SALE OF PURCHASED ASSETS

Section 2.1.    **Purchase and Sale of Purchased Assets**.  On the terms and subject to the conditions of this Agreement, at the Closing, the Seller shall sell, transfer, assign, convey and deliver to the Buyer, and the Buyer shall purchase from the Seller, free and clear of all Encumbrances (except for Permitted Encumbrances and Assumed Liabilities), all of Seller's right, title and interest in, to and under substantially all of the assets, properties, rights and business of the Seller as of the Closing (excepting only the Excluded Assets), and including the following (herein collectively referred to as the "Purchased Assets"):

(a)    (x) The Seller FCC Authorizations, including those listed on Schedule 3.4(a) and the call signs KMSS-TV, KPEJ-TV and KLJB, and (y) all other assignable Governmental Permits, and including, in each case, any applications therefor and renewals or modifications thereof between the date hereof and Closing;

(b)    All machinery, equipment, auxiliary and translator facilities, transmitting towers, transmitters, broadcast equipment, antennae, cables, supplies, vehicles, furniture, fixtures, appliances, servers, traffic systems, graphic systems, audio boards, switchers, radar systems, microwaves, transponders, relays, backup generators, computers, computer hardware and peripherals, information technology infrastructure, telephone systems, office equipment, cameras, production and news operation equipment, inventory, leasehold improvements, spare parts and other tangible personal property of every kind and description, including the personal property set forth on Schedule 2.1(b) (except for any retirements or dispositions of such scheduled personal property made between the date hereof and Closing in accordance with Section 5.4 or any tangible property located at the Seller's corporate offices in Los Angeles and Houston that are not used in or relevant to the operation of the Stations) ("Tangible Personal Property"), together with all rights against the manufacturers and/or suppliers of any of the foregoing;

(c)    Other than the Nexstar Claims, the Causes of Action of the Seller or its estate that could be asserted by the Seller or its estate, relating to or arising out of the Purchased Assets or the Assumed Liabilities, including rights against counterparties to the Assumed Contracts, the manufacturers and/or suppliers of Tangible Personal Property or other third parties that are or were vendors, services providers or employees of the Business;

(d)     All books and records in any form or media to the extent related to the Business, including (i) all files, documents, records, books of account, logs, programming information and studies, technical information and engineering files, data, drawings, blueprints, schematics, news and advertising studies or consulting reports, marketing and demographic data, customer lists, credit and sales reports, personnel files, and sales correspondence to the extent relating to the Business, but excluding records to the extent relating to Excluded Assets, and (ii) the public and political files of the Stations and those papers, logs, files and other records of Seller maintained in connection with or for compliance by the Stations with all applicable rules, regulations and policies of the FCC;

(e)     All cash or cash equivalents (including any marketable securities or certificates of deposit) of the Seller as of the Closing other than the Wind Down Amount;

(f)     All accounts receivable (whether billed or unbilled), rebates, notes, chattel paper, and negotiable instruments of Seller for the period before the Closing;

(g)     All reimbursements arising from the FCC repacking process for the period prior to the Closing;

(h)     All rights with respect to all deposits (including customer deposits and security deposits), prepayments, advances, pre-paid expenses or premiums, vendor rebates, reimbursements, refunds, credits, and other refunds of every kind and nature to the extent related to the Business (which, for the avoidance of doubt, does not include (i) retainers and advances held by the Seller's legal counsel for the Bankruptcy Case, or (ii) the assets set forth in clause (B) of the definition of Nexstar Claims ;

(i)     All Insurance Policies to the extent transferable, together with all rights to insurance proceeds, reserves, rights, benefits or claims of Seller under the Insurance Policies maintained by Seller in connection with or for the benefit of the Purchased Assets or the Business;

(j)     The Contracts and Real Property Leases listed on Schedule 2.1(j) as such schedule may be modified pursuant to Section 5.7 (the "Assumed Contracts");

(k)     All Intellectual Property other than the Retained Names and Marks;

(l)     Refunds, credits and rebates of Taxes or prepayment of Taxes arising for periods prior to the Closing, including, but not limited to, as set forth on Schedule 2.1(l);

(m)     All amounts payable to the Seller, if any, from the United States Copyright Office or such arbitration panels as may be appointed by the United States Copyright Office to the extent related to the Business; and

(n)     All other assets set forth on Schedule 2.1(n).

**Section 2.2.     Excluded Assets**.  Notwithstanding the foregoing, the Purchased Assets shall not include the following (herein referred to as the "Excluded Assets"):

(a)      All Contracts of Seller other than (i) the Assumed Contracts and (ii) any Contract that is a Purchased Asset (collectively, the "Excluded Contracts");

(b)      The Nexstar Claims;

(c)      All records and documents prepared or acquired in connection with or relating to the sale or transfer of the Stations in connection with the Bankruptcy Case, including bids received from others and analyses relating to the Stations and the Purchased Assets;

(d)      All rights, Causes of Action, and claims of Seller, whether mature, contingent or otherwise, against third parties to the extent solely relating to any Excluded Asset or Excluded Liability;

(e)      The items designated in Schedule 2.2(e) as "Excluded Assets";

(f)      The Retained Names and Marks;

(g)      All records and documents solely to the extent relating to Excluded Assets or Excluded Liabilities (including, for the avoidance of doubt, those solely to the extent relating to the Nexstar Claims);

(h)      All shares of capital stock or other equity securities issued by Seller;

(i)      All bank and depository accounts of the Seller, including funds in such accounts in an amount not to exceed the Wind Down Amount; and

(j)      Any rights of or payment due to the Seller or its Affiliates, under or pursuant to this Agreement or the other Ancillary Agreements with the Buyer or any of its Affiliates contemplated hereby.

**Section 2.3.      Assumption of Liabilities**.

(a)      On the terms and subject to the conditions of this Agreement, as of the Closing, the Buyer shall assume and shall thereafter be obligated for, and shall agree to pay, perform and discharge in accordance with their terms, the following obligations and liabilities of the Seller, whether direct or indirect, known or unknown (except to the extent such obligations and liabilities constitute Excluded Liabilities):

(i)      the liabilities and obligations arising with, or relating to, the operation of the Stations, including the owning or holding of the Purchased Assets, by Buyer, in each case, to the extent first arising after the Closing; and

(ii)      any Cure Amounts that Buyer is required to pay pursuant to Section 5.7(g).

All of the foregoing to be assumed by the Buyer hereunder are referred to herein as the "Assumed Liabilities."

(b)      The Buyer shall not assume or be obligated for any liabilities or obligations of any and every kind whatsoever, direct or indirect, known or unknown, absolute or contingent, not expressly assumed by the Buyer under Section 2.3(a) and, notwithstanding anything to the contrary in Section 2.3(a) or any Ancillary Agreements, none of the following (herein referred to as "Excluded Liabilities") shall be "Assumed Liabilities" for purposes of this Agreement:

(i)      any intercompany payables of the Business owing to any of the Affiliates of the Seller;

(ii)     any Seller liabilities or obligations under this Agreement or the Ancillary Agreements;

(iii)    any liabilities and obligations arising with, or relating to, the operation of the Stations prior to the Closing, including the owning or holding of the Purchased Assets and the Excluded Assets;

(iv)     any Liabilities of the Seller or any of its Affiliates (including ERISA Affiliates) arising under or with respect to (A) any Title IV Plan and (B) any Employee Benefit Plan, in each case, which Liability arises at, prior to, or following the Closing;

(v)      any Liabilities of the Seller or any of its Affiliates (including ERISA Affiliates) with respect to (A) any current or former employee or independent contractor of the Seller or any of its Affiliates who does not become a Hired Employee, arising out of or relating to any act, omission or event occurring, or circumstance, condition or state of facts existing on, prior to, or following the Closing and (B) any Hired Employee solely arising out of or relating to any act, omission or event occurring, or circumstance, condition or state of facts existing on or prior to the Transfer Date; and

(vi)     any Taxes.

Section 2.4.     Closing Date.  Subject to any prior termination of this Agreement pursuant to Section 10.1, the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Section 2.1 and Section 2.3(a) (the "Closing") shall be consummated at 9:00 A.M., Central Time, on the first day of a calendar month (or, if such day is not a Business Day, the first Business Day thereafter) immediately following the month in which the conditions set forth in Articles VII and VIII are satisfied or, if legally permissible, waived (other than those conditions that by their nature are to be satisfied (or validly waived) at the Closing, but subject to such satisfaction or waiver), by the exchange of original documents and signatures, or remotely by the electronic exchange of documents and signatures in PDF format, unless such time or date is changed by mutual agreement of the Seller and the Buyer (the "Closing Date"); provided, that unless the Buyer elects otherwise, the Closing Date shall in no event occur less than three (3) Business Days after such conditions are satisfied.

13

**Section 2.5.**     **Purchase Price; Purchase Price Deposit**.

(a)     The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be:

(i)     A credit bid of a portion of the Obligations pursuant to Section 363(k) of the Bankruptcy Code in an amount equal to $ 49,013,808.90 to be credited on a dollar-for-dollar basis (the "Credit Bid"), it being understood that the portion of the Obligations that are not included in the Credit Bid shall remain outstanding; and

(ii)     the assumption of the Assumed Liabilities.

(b)     A portion of the MBG Secured Obligations equal to $4,901,380.89 (the "Deposit Amount") will be forfeited and waived by the Buyer if this Agreement is terminated by the Seller pursuant to Section 10.1(a)(ii), and such Deposit Amount will be deemed compensation and consideration for entering into this Agreement and will be deemed liquidated damages and, notwithstanding anything to the contrary set forth herein, such Deposit Amount will be the sole and exclusive remedy of the Seller in the event that this Agreement is terminated by the Seller pursuant to Section 10.1(a)(ii). If this Agreement is terminated for any reason other than by the Seller pursuant to Section 10.1(a)(ii), the Deposit Amount will be returned to the Buyer and reinstated as a portion of the MBG Secured Obligations.

**Section 2.6.**     **[INTENTIONALLY OMITTED]**

**Section 2.7.**     **Closing Date Deliveries**.

(a)     At the Closing, the Seller shall deliver or cause to be delivered to the Buyer:

(i)     cash by wire transfer of immediately available funds an aggregate sum equal to the cash or cash equivalents purchased pursuant to Section 2.1(e);

(ii)     a bill of sale and assignment and assumption agreement from the Seller in substantially the form of Exhibit A (the "Bill of Sale and Assignment and Assumption Agreement"), providing for the conveyance of all of the Purchased Assets (other than the Seller FCC Authorizations) and the assumption of all of the Assumed Liabilities;

(iii)     an assignment of the Seller FCC Authorizations from the Seller, in substantially the form of Exhibit B (the "Assignment of the Seller FCC Authorizations"), assigning to the Buyer the Seller FCC Authorizations;

(iv)     all of the documents, certificates and instruments required to be delivered by the Seller pursuant to Article VIII;

(v)     specific assignment and assumption agreements duly executed by the Seller relating to any agreements included as Purchased

Assets that the Buyer or the Seller have determined to be reasonably necessary to assign such agreements to the Buyer and for the Buyer to assume the Assumed Liabilities thereunder pursuant to Section 365 of the Bankruptcy Code;

(vi)    all books and records purchased pursuant to Section 2.1(d) or copies thereof where applicable; and

(vii)    such other documents and instruments as the Buyer has determined to be reasonably necessary to consummate the transactions contemplated hereby.

(b)    At the Closing, the Buyer shall deliver to the Seller (i) the Bill of Sale and Assignment and Assumption Agreement, (ii) all of the documents, certificates and instruments required to be delivered by the Buyer pursuant to Article VII, (iii) specific assignment and assumption agreements duly executed by the Buyer relating to any agreements included as Purchased Assets that the Buyer or the Seller have determined to be reasonably necessary to assign such agreements to the Buyer and for the Buyer to assume the Assumed Liabilities thereunder pursuant to Section 365 of the Bankruptcy Code, and (iv) such other documents and instruments as the Seller has determined to be reasonably necessary to consummate the transactions contemplated hereby.

Section 2.8.    **Further Assurances**.

(a)    From time to time following the Closing, the Seller shall execute and deliver, or cause to be executed and delivered, to the Buyer such other instruments of conveyance and transfer, and take such other actions, as the Buyer may reasonably request or as may be otherwise necessary to carry out the provisions hereof and to effectively convey and transfer to, and vest in, the Buyer and put the Buyer in possession of, any part of the Purchased Assets.

(b)    From time to time following the Closing, the Buyer shall execute and deliver, or cause to be executed and delivered, to the Seller such other undertakings and assumptions, and take such other actions, as the Seller may reasonably request or as may be otherwise necessary to carry out the provisions hereof and to effectively evidence the Buyer's assumption of and obligation to pay, perform and discharge the Assumed Liabilities.

Section 2.9.    **Allocation of Purchase Price**.

(a)    Following the Closing Date, the Buyer shall provide to the Seller an allocation of the applicable portions of the Purchase Price in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provisions of state, local, or non-U.S. Law, as appropriate).  The Seller shall provide the Buyer with any comments to such allocation within fifteen (15) days after the date of receipt by the Seller, and the Buyer and the Seller shall negotiate in good faith to finalize such allocation no later than sixty (60) days prior to the due date, as extended  for the filing of a Tax Return to which such allocation is relevant (unless the Seller does not provide any comments within such fifteen-day period, in which case the Buyer's allocation shall be deemed final). If the parties are unable to mutually agree to such allocation then the parties shall have no further obligation under this Section 2.9, and each party

15

shall make its own determination of such allocation for financial and tax reporting purposes, which determination, for the avoidance of doubt, shall not be binding on the other party.

(b)     Buyer shall be entitled to deduct and withhold from the Purchase Price otherwise payable pursuant to this Agreement to the Seller such amounts as Buyer is required to deduct and withhold under applicable legal requirements. To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Seller.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

As an inducement to the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, the Seller represents and warrants to the Buyer as follows as of the date hereof and as of the Closing Date:

**Section 3.1.     Organization; Capitalization**.

(a)     Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas. Seller has the requisite organizational power and authority to own, lease and operate its properties and assets (including, the Stations and the Purchased Assets) and to carry on the Business as currently being conducted by it, subject to any applicable provisions of the Bankruptcy Code.

(b)     The Seller does not hold any securities, ownership interests or other equity interests in any Person.

**Section 3.2.     Authority of the Seller; Consents and Approvals; No Violations**.

(a)     Seller has the requisite organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements to be executed and delivered by it pursuant hereto, to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and thereof, subject to and after giving effect to the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code.

(b)     Seller is a debtor in possession and authorized to operate its business and manage its affairs in accordance with applicable sections of the Bankruptcy Code, and Marshall Broadcasting Group, Inc., as Debtor-In-Possession is the FCC licensee.

(c)     Subject to and after giving effect to FCC Consent and the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code, the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller has been duly authorized and approved by all necessary organizational action on the part of the Seller and do not require any further authorization or consent on the part of the Seller. This Agreement is, and each other Ancillary Agreement when executed and delivered by the Seller will be, a legal, valid and

binding agreement of the Seller, subject to entry of the Sale Order by the Bankruptcy Court, enforceable in accordance with its respective terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(d)     Subject to receipt of the FCC Consent, entry of the Sale Order, and as set forth in <u>Schedule 3.2</u>, none of the execution, delivery and performance by the Seller of this Agreement or the Ancillary Agreements, the consummation by the Seller of the transactions contemplated hereby or thereby or compliance by the Seller with or fulfillment by the Seller of the terms, conditions and provisions hereof or thereof will:

(i)     conflict with, result in a breach or violation of the terms, conditions or provisions of, or constitute a default or an event of default (with or without notice or lapse of time, or both) or an event creating rights of acceleration, termination, cancellation, right of first refusal, revocation, acceleration or a loss of rights or benefits under, or result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon any of the Purchased Assets under, (A) the certificate of incorporation, bylaws or other organizational documents of the Seller, (B) any Governmental Permit, (C) any Order to which such Person is a party or any of the Purchased Assets is subject or by which such Person is bound,  or any applicable Law, or (D) any indenture, note, mortgage, lease, sublease, guaranty, license, contract, legal binding agreement, arrangement or understanding or warranty (each a "<u>Contract</u>") to which the Seller is a party or by which any of its properties or assets may be bound, except, in the case of each of the foregoing clauses (B), (C) or (D), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; or

(ii)     require the approval, consent, authorization or act of, or the making by Seller of any declaration, filing or registration with, any third Person or any foreign, federal, state or local court or Governmental Body, except, in any case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 3.3.     <u>All Assets</u>**.  Except for the Excluded Assets, the Purchased Assets constitute all the assets, properties and rights of every type and description, whether tangible or intangible, whether personal, real or mixed, wherever located, that are used by, owned, leased or licensed by the Seller in the operation of the Stations and the Business in the manner in which the Business is presently conducted. Subject to Bankruptcy Court and FCC approvals, the Seller has the power and right to sell, assign and transfer to the Buyer, and upon consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, the Buyer will acquire the Purchased Assets, free and clear of all Encumbrances. The Permitted Encumbrances are the only Encumbrances encumbering the Purchased Assets.

**Section 3.4.     <u>Governmental Permits; FCC Matters</u>**.

114030734v12

(a)     The Seller holds or possesses all registrations, consents, certificates, qualifications, franchises, licenses, permits, approvals, special temporary authorizations, and other authorizations issued by or from a Governmental Body, including all Seller FCC Authorizations (collectively, the "Governmental Permits") that are reasonably necessary for the Seller to own or lease, operate and use the assets of the Stations and to carry on and conduct the Business substantially as conducted immediately prior to the date of this Agreement, all of which are set forth on Schedule 3.4(a)(i). Schedule 3.4(a)(i) sets forth the holder and expiration date of each Governmental Permit.

(b)     Seller has fulfilled and performed its obligations in all material respects under each of the Governmental Permits. Each of the Governmental Permits is valid, subsisting and in full force and effect and has not been revoked, suspended, canceled, adversely modified, rescinded or terminated and has not expired, and no Cause of Action is pending or to the Knowledge of Seller, threatened by or before any Governmental Body to revoke, suspend, cancel, adversely modify, rescind or terminate such Governmental Permit. Seller is not in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a material default or violation) of any term, condition or provision of any such Governmental Permit.

(c)     The Stations are being operated in all material respects in accordance with the Seller FCC Authorizations and are in compliance in all material respects with the Communications Act and all other Laws applicable to the Stations and the conduct of the Business. Except as disclosed in Schedule 3.4(c), there is not (i) pending, or, to the Knowledge of the Seller, threatened, any Causes of Action, by or before the FCC to revoke, suspend, cancel, rescind, terminate, adversely modify or refuse to renew in the ordinary course any Seller FCC Authorization (other than, in the case of modifications, proceedings to amend the FCC rules of general applicability to broadcast television stations), or (ii) issued or outstanding, or pending by or before the FCC, any complaint, investigation, order to show cause, cease and desist order, notice of violation, notice of apparent liability, or order of forfeiture, in each case, against the Stations or Seller with respect to the Stations. The Seller FCC Authorizations have been issued by the FCC for full terms customarily issued by the FCC to a broadcast television station in the states in which each Station's respective community of license is located, and the Seller FCC Authorizations are not subject to any condition except for those conditions appearing on the face of the Seller FCC Authorizations and conditions applicable to broadcast licenses generally. Seller has (A) paid or caused to be paid all FCC regulatory fees due and payable by it in respect of the Stations, and (B) timely filed all material registrations and reports required to have been filed by it with the FCC, the Federal Aviation Administration and the Copyright Office relating to the Seller FCC Authorizations.  This Section 3.4 does not relate to Governmental Permits for environmental, health and safety matters which are the subject solely of Section 3.11.

(d)     Station KPEJ-TV presently broadcasts on channel 23 and has not been assigned a new channel as part of the FCC's broadcast incentive auction repack process.  Station KMSS-TV presently broadcasts on channel 34 and has not been assigned a new channel as part of the FCC's broadcast incentive auction repack process.   Station KLJB has been assigned to Phase 7 to transition from its pre-auction channel 49 to its post-auction channel 30. Station KLJB has complied with FCC rules and published decisions and policies governing the repacking of television broadcast stations, including but not limited to Section 73.3700 of the FCC rules, 47

18

C.F.R. §73.3700. Station KLJB has timely (i) ceased broadcasts on its pre-auction channel (channel 49); (ii) completed the construction of its post-auction facility on channel 30 as specified by FCC LMS File No. 0000034774 ("Channel 30 CP"); (iii) filed a license to cover the Channel 30 CP; (iv) provided notifications to multichannel video programming distributors and viewers in accordance with the requirements set forth in Sections 73.3700(c)-(d) of the FCC rules, 47 C.F.R §73.3700(c)-(d); and (v) filed all required transition progress reports, including the pre-auction termination report, the ten-week report, and the construction completion report. If the repack construction is complete before the Closing, Station KLJB will timely file with the FCC its Schedule 399 and submit correct and accurate invoices for reimbursement by the FCC for all of the actual costs of services and equipment required to implement and construct the repack facilities designated in the Channel 30 CP incurred and expended by Station KLJB in connection with the transition to channel 30.

**Section 3.5.** **Real Property Leases**.

(a)    Schedule 3.5(a) sets forth a list of each lease, sublease, license or similar Contract, together with all amendments, supplements or extensions with respect thereto, under which Seller is a lessee or sublessee of, or occupies, for use in the Business, any real property owned by any third Person (each such lease, sublease, license or similar Contract, a "Real Property Lease," and the property leased under the Real Property Leases is referred to herein as the "Real Property"). The Seller has made available to the Buyer true and complete copies of each Real Property Lease. The Seller has a valid leasehold interest in, sub leasehold interest in, or other occupancy right with respect to, the leased or occupied premises under the Real Property Leases.

(b)    Except as set forth in Schedule 3.5(b), the Seller and, to the Knowledge of Seller, each of the other parties thereto has performed in all material respects all obligations required to be performed by it under each Real Property Lease and to the Knowledge of Seller, no parties thereto have threatened to terminate any Real Property Lease. Seller has not received any written notice of any pending or threatened suit for condemnation or other taking by any public authority with respect to the Real Property Leases. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Seller's use and occupancy of the Real Property complies with all regulations, codes, ordinances and statutes of all applicable Governmental Bodies and all applicable Laws.

**Section 3.6.** **Title to Tangible Personal Property**.  Seller has good and valid title or a valid right to use all of the Tangible Personal Property included in the Purchased Assets free and clear of all Encumbrances, except for Permitted Encumbrances (and, as of the date hereof, Encumbrances arising out of the MBG Secured Obligations).

**Section 3.7.** **Contracts**.  The Potential Assumed Contracts constitute all of the Contracts relating to the Purchased Assets, Assumed Liabilities and/or the Business. Except as set forth in Schedule 3.7(a), each Assumed Contract constitutes a valid and binding obligation of the Seller and, to the Knowledge of the Seller, the other parties thereto and is in full force and effect (in each case, subject to bankruptcy, insolvency, reorganization or other similar Laws relating to or affecting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at Law)). Except for claims asserted by Nexstar against the Seller with

respect to the three Shared Services Agreements with Nexstar Broadcasting, Inc. set forth on Schedule 5.7(a) in the case entitled *Marshall Broadcasting Group, Inc. v. Nexstar Broadcasting, Inc.* (No. 651943/2019) pending in New York State Supreme Court and any related litigation, (i) the Seller is not in, and has not received notice of any, breach of, or default under, any of the Assumed Contracts and, to the Knowledge of the Seller, no other party to any Assumed Contract is in, or has received notice of being in, breach of, or default under, any of the Assumed Contracts, and (ii) to the Knowledge of the Seller, no event or circumstance has occurred which would or would reasonably be expected to result in a breach of, or default under, any of the Assumed Contracts (in each case, with or without notice or lapse of time or both). Copies of each of the Assumed Contracts, together with all amendments thereto, have been made available to the Buyer by the Seller prior to the date of the Sale Hearing. No party to any such Assumed Contract has provided written notice to any other party thereto of its intent to cancel or terminate such Assumed Contract, and the Seller has not waived or failed to enforce any right or benefit under any such Assumed Contract in a manner that would reasonably be expected to materially affect the Seller's rights under any such Assumed Contract following the Closing. For the purposes of this Section 3.7, Assumed Contracts consists of  (A) as of the date of this Agreement, those Contracts set forth on Schedule 2.1(j), and (B) as of the Closing, those Contracts set forth on Schedule 2.1(j) as such schedule may have been modified or amended pursuant to Section 5.7. Notwithstanding that the Assumed Contracts are defined to include Real Property Leases, for purposes of this Section 3.7, the term shall be deemed to exclude Real Property Leases, which are the subject solely of Section 3.5.

**Section 3.8.    No Violation, Litigation or Regulatory Cause of Action**.  Except as set forth in Schedule 3.8:

(a)    Seller is in compliance in all material respects with all Laws and Orders which are applicable to the Purchased Assets, the Stations or the Business;

(b)    Since January 1, 2016, neither Seller, nor to the Knowledge of Seller, any of its Representatives, have received any written notice of violation from a Governmental Body or third party alleging that Seller or the Business is not in compliance with any applicable Laws, Orders or Permits, except for such violations that, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect; and

(c)    Except for the approval of the Bankruptcy Court and claims asserted against the Seller in the case entitled *Marshall Broadcasting Group, Inc. v. Nexstar Broadcasting, Inc.* (No. 651943/2019) pending in New York State Supreme Court and any related litigation, there are no Causes of Action or Orders which are pending or, to the Knowledge of the Seller, threatened, against Seller in respect of the Purchased Assets, any of the Stations or the Business, or that challenges the validity or enforceability of this Agreement or any Ancillary Agreement or seeks to enjoin or prohibit the consummation of the transactions contemplated hereby or thereby.

**Section 3.9.    Insurance**.  Seller maintains, in respect of the Purchased Assets, the Stations and the Business, policies of fire and extended coverage and casualty, liability and other forms of insurance in such amounts and against such risks and losses as are in the reasonable judgment of the Seller prudent for the Business (collectively, the "Insurance Policies"). All of the Insurance Policies are in full force and effect and are enforceable against the issuer, and all

20

premiums with respect thereto have been paid, except where such failure would not, individually or in the aggregate, reasonably be expected to be material to the rights otherwise available under such Insurance Policies. Except as set forth in <u>Schedule 3.9</u> with respect to the Business, there are no outstanding claims under any Insurance Policy or default with respect to provisions in any such Insurance Policy which claim or default, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 3.10. **Employees**. Seller has provided to Buyer a complete and accurate list of the following information for each current employee of Seller: current base salary or rate of pay; bonus, commission and other incentive compensation (if any) paid or payable for calendar year 2019 and the two (2)-month period ending February 29, 2020; hire date, position and location of employment; and accrued and unused vacation and other paid time off.

(a)     Except as set forth on <u>Schedule 3.10(a)</u>, there are no: (i) "employee benefit plans," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), or other material employee benefit arrangements, including bonus plans, consulting or other compensation agreements, incentive, equity or equity-based compensation, or deferred compensation arrangements, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical insurance, life insurance, or scholarship programs currently maintained by Seller or to which Seller contributed or is obligated to contribute thereunder for current or former employees or to which Seller has any material Liability (contingent or otherwise) ("<u>Employee Benefit Plans</u>").

(b)     There are no "employee pension plans," as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code, maintained by Seller and any trade or business (whether or not incorporated) which are or have been under common control in the past six years, or which are or have been treated as a single employer with Seller under Section 414(b), (c), (m) or (o) of the Code ("<u>ERISA Affiliate</u>") or to which Seller, or any ERISA Affiliate thereof, contributed or has been obligated in the past six years to contribute thereunder in the last six years or to which Seller has any material Liability (contingent or otherwise) ("<u>Title IV Plans</u>").

(c)     Each Employee Benefit Plan has been established, administered and funded in accordance with its terms, and in compliance in all material respects with the applicable provisions of ERISA, the Code and other applicable Laws. None of the Purchased Assets are subject to a Lien under Section 412 of the Code or Title IV of ERISA.

(d)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due, or increase the amount of any compensation or benefits due, to any current or former employee of Seller; (ii) result in the acceleration of the time of payment or vesting of any such compensation or benefits; or (iii) result in the payment of any amount that would, individually or in combination with any other such payment, be an "excess parachute payment" within the meaning of Section 280G of the Code.

(e)     Seller is not a party to or otherwise bound by any collective bargaining agreement or other labor union Contract applicable to employees of Seller and, to Seller's Knowledge, there are not any activities or proceedings of any labor union to organize any such

21

employees. Additionally, (i) there is no unfair labor practice charge or complaint pending before any applicable Governmental Body relating to Seller or any employee or other service provider thereof; (ii) there is no labor strike, material slowdown or material work stoppage or lockout pending or, to Seller's Knowledge, threatened against or affecting Seller, and since January 1, 2016, Seller has not experienced any strike, material slowdown or material work stoppage, lockout or other collective labor action by or with respect to its employees; and (iii) there is no representation claim or petition pending before any applicable Governmental Body. Seller is, and since January 1, 2016 has been, in compliance in all material respects with all applicable Laws relating to employment of labor, including all applicable Laws relating to wages, hours, overtime, collective bargaining, employment discrimination, civil rights, safety and health, workers' compensation, pay equity, classification of employees and independent contractors, and the collection and payment of withholding and/or social security taxes. Seller is not delinquent in payment to any of its current or former employees or other service providers for any wages, fees, salaries, commissions, bonuses, or other direct compensation for service performed by them. Seller has not effectuated a "plant closing" or "mass layoff" (as defined under the WARN Act) or taken any other action that would trigger notice or Liability under the WARN Act. Seller is, and since January 1, 2016 has been, in compliance with the WARN Act.

(f)        Schedule 3.10(f) lists as of the date hereof, the names of all independent contractors ("Consultants") who are engaged by Seller to provide personal services to the Business, including the terms of compensation payable to each Consultant.

Section 3.11.    **Environmental Protection**. Except as set forth in Schedule 3.11:

(a)        The Business is being conducted in compliance in all material respects with all Environmental Laws;

(b)        Seller has, in respect of the Business, obtained all Governmental Permits required under Environmental Law necessary for its operation, except for such Governmental Permits as to which the failure to own, hold or possess would not, individually or in the aggregate, be or reasonably be expected to be material to the operation of the Business or the Purchased Assets. Seller is in compliance in all material respects with all terms and conditions of such Governmental Permits;

(c)        Seller, with respect to the Business, is not the subject of any pending or, to the Knowledge of the Seller, threatened Cause of Action or notice of noncompliance or potential responsibility alleging any failure of the Business to comply with, or Liability of the Business under, any Environmental Law, except as would not, individually or in the aggregate, reasonably be expected to be material to the operation of the Business or the Purchased Assets;

(d)        Seller has received no written notice, report or other information regarding any material violation of Environmental Laws relating to the Business or the Purchased Assets;

(e)        To the Knowledge of the Seller, there has been no release of Hazardous Materials on, at, under or from any of the Real Property, in quantities or circumstances that would reasonably be expected to result in material Liability to Seller arising under or pursuant to any Environmental Law;

114030734v12

(f)     Seller has made available to the Buyer true and complete copies of all environmental audits, reports or assessments relating to the past or current operations or facilities of the Business, in each case, which are in Seller's possession, custody or control; and

(g)     The representations and warranties contained in this Section 3.11 are the sole and exclusive representations and warranties relating to Environmental Law or Hazardous Materials.

Section 3.12.   **Seller's Broker**.  Except for PVB Advisors, LLC ("PVB"), no broker, finder, investment banker or other Person is entitled to any broker's, finder's or investment banker's fee or commission or other similar compensation or payments in connection with the transactions contemplated by this Agreement or by any of the Ancillary Agreements based upon arrangements made by and on behalf of the Seller. PVB shall be compensated from the sale proceeds, if applicable, in accordance with and pursuant to the *Agreed Order Granting Application to Employ PVB Advisors, LLC Effective as of the Petition Date* [Docket No. 122], and shall have no recourse against the Buyer.

Section 3.13.   **Affiliate Transactions**.  Except as disclosed on Schedule 3.13, (a) no current or former corporate or limited liability company officer, director, shareholder or Affiliate of the Seller and no entity in which the Seller owns a controlling interest, and (b) to the Knowledge of the Seller, no individual in such officer's, director's, shareholder's or Affiliate's immediate family, in each case, (i) is a party to any Contract (other than for employment) with the Seller, (ii) has any interest in any material tangible or intangible assets used or held for use in the Business, or (iii) owns, directly or indirectly, any financial interest in, or is a director, officer or employee of any Person that is a lessor, service provider or vendor of the Seller or the Business.

Section 3.14.   **MVPD Matters**.  Each Station's signal is carried on all of the MVPDs with over 1,000 subscribers serving the Market. The Seller has made valid retransmission consent elections with respect to those MVPDs in the Market to which elections are applicable for each Station for the 2018-2020 election cycle.  Schedule 3.14 lists all of the MVPDs on which each Station is carried pursuant to such election.  All retransmission consent agreements which are being assumed by the Buyer are listed on Schedule 2.1(j).  No Station has any Liability to any Person arising under or in respect of its performance of its cable or satellite carriage agreements, including, without limitation, copyright royalties (other than contractual Liabilities specifically referenced in such agreements arising in the ordinary course of business that are not yet due or payable and Liabilities for the Cure Amounts set forth on Schedule 5.7(a)).  Since January 1, 2019, the Seller has not received (i) any written notice from any MVPD of such MVPD's intention to delete any Station from carriage or to change such Station's channel positions and (ii) any written notice that such Station may not be entitled to carriage on any MVPD either because such Station fails to meet the requisite signal strength for such status or such Station would be considered a distant signal under the cable compulsory copyright license, 17 U.S.C. §111.

Section 3.15.   **No Material Changes**.  Since January 1, 2019, there has not been any: (a) material amendment or termination of any material Assumed Contract or Governmental Permit to which Seller is a party, except pursuant to the natural expiration of its terms; (b) increase in compensation or other benefits payable or to become payable by Seller to any of its employees with an annual compensation of $100,000 or more, except in connection with increases in compensation

23

or benefits in the ordinary course of business; (c) notice from any sponsor or customer as to that sponsor's or customer's intention not to conduct business with the Stations, the result of which loss or losses of business, individually or in the aggregate, has had, or would reasonably be expected to have, a Material Adverse Effect; (d) period of four (4) consecutive days or more during which a Station was off the air for any reason or a period of fifteen (15) days or more during which such Station operated with less than 80% of its authorized power; (e) sale, assignment, lease, license, abandonment or other transfer or disposition of any of the Purchased Assets except in the ordinary course of business; (f) other event or condition of any character that has or would reasonably be expected to have a Material Adverse Effect; or (g) agreement by Seller to do any of the foregoing.

Section 3.16.   **Intellectual Property.**

(a)     Schedule 3.16(i) sets forth, for the Intellectual Property that is owned by Seller and used in the operation of the Business, a list of all: (i) patents (including applications therefor); (ii) Trademark registrations (including applications therefor); (iii) copyright registrations (including applications therefor); and (iv) domain name registrations. Schedule 3.16(ii) sets forth, for Intellectual Property that is owned by Seller or licensed to it, a list of any software that is used in the operation of the Business (other than off-the-shelf software with a replacement value or aggregate annual license and maintenance fees of less than $25,000). The registrations set forth in Schedule 3.16(i) are valid and subsisting.

(b)     The operation of the Business does not infringe, misappropriate or otherwise conflict with any third party's Intellectual Property, and in the past three (3) years Seller has not received any notice or claim that the operation of the Business infringes, misappropriates or otherwise conflicts with the Intellectual Property of any other Person or challenging the ownership, use, validity or enforceability of any material Intellectual Property, and, to Knowledge of Seller, there is no reasonable basis for any of the foregoing.  To the Knowledge of Seller, no Person is infringing upon, misappropriating or otherwise conflicting with the rights of Seller in or to any Intellectual Property.

(c)     There are no royalty agreements between Seller and any third party relating to Intellectual Property.

(d)     Schedule 3.16(iii) sets forth all material Intellectual Property Agreements to which Seller is a party or by which Seller is bound and that are primarily used in or primarily related to the Business or the Purchased Assets.  Each Intellectual Property Agreement is in full force and effect, and no party is in breach of or default under such Intellectual Property Agreement (other than as a result of the Seller's bankruptcy).

Section 3.17.   **Tax Matters.** The Seller has timely filed all Tax Returns in respect of the Business and Purchased Assets required to be filed with the appropriate Governmental Body (taking into account any extension of time to file granted to the Seller). All such Tax Returns are true, complete and correct in all material respects and were prepared in compliance with all applicable laws. All Taxes relating to the Business and the Purchased Assets that are due and payable, whether or not shown to be payable on such Tax Returns, have been or will be timely paid before or at the Closing, except as otherwise required or permitted under the Bankruptcy Code. No examination of any such Tax Return of the Seller is currently in progress by any Governmental

24

Body and the Seller has not received notice of any contemplated examination of any such Tax Return.  The Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and all IRS Forms W-2 and Forms 1099 (or any other applicable form) required with respect thereto have been properly and timely distributed.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

As an inducement to the Seller to enter into this Agreement and to consummate the transactions contemplated hereby, the Buyer represents and warrants to the Seller as follows as of the date hereof and as of the Closing Date:

**Section 4.1.**     **Organization**. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the state of its organization. The Buyer has the requisite organizational power and authority to own, lease and operate the properties and assets used in connection with its business as currently being conducted.

**Section 4.2.**     **Authority of the Buyer**.

(a)     The Buyer has the requisite organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements to be executed and delivered by it pursuant hereto, to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and thereof.

(b)     Subject to and after giving effect to the FCC Consent and the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code, the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Buyer have been duly authorized and approved by all necessary organizational action on the part of the Buyer and do not require any further authorization or consent on the part of the Buyer. This Agreement is, and each Ancillary Agreement when executed and delivered by the Buyer will be, a legal, valid and binding agreement of the Buyer enforceable in accordance with its respective terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at Law).

(c)     Except for the FCC Consent and as set forth in Schedule 4.2, none of the execution, delivery and performance by the Buyer of this Agreement or the Ancillary Agreements, the consummation by the Buyer of the transactions contemplated hereby or thereby or compliance by the Buyer with or fulfillment by the Buyer of the terms, conditions and provisions hereof or thereof will:

(i)     conflict with, result in a breach or violation of the terms, conditions or provisions of, or constitute a default or an event of default (with or without notice or lapse of time, or both) or an event creating rights of

114030734v12

acceleration, termination, cancellation, right of first refusal, revocation, acceleration or a loss of rights or benefits under, or result in the creation or imposition of any Encumbrance (other than Permitted Encumbrances) upon any assets of the Buyer under, (A) the certificate of incorporation, bylaws or other organizational documents of the Buyer, or (B) any Contract or Order to which the Buyer or by which any of its properties or assets may be bound, except as would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by this Agreement; or

(ii)      require the approval, consent, authorization or act of, or the making by the Buyer or any of its Affiliates of any declaration, filing or registration with, any third Person or any foreign, federal, state or local court or Governmental Body, except as would not reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by this Agreement.

Section 4.3.     **Litigation**.  There are no Causes of Action or Orders which are pending or, to the knowledge of the Buyer, threatened, against Buyer which, if adversely determined, would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated by this Agreement.

Section 4.4.     **No Finder**.  No broker, finder, investment banker or other Person is entitled to any broker's, finder's or investment banker's fee or commission or other similar compensation or payments in connection with the transactions contemplated by this Agreement or by any of the Ancillary Agreements based upon arrangements made by and on behalf of the Buyer.

Section 4.5.     **Qualifications as FCC Licensee**.  The Buyer is legally, financially and otherwise qualified to be the licensee of, and to acquire, own, operate and control, the Stations under the Communications Act, including the provisions relating to media ownership and attribution, foreign ownership and control, and character qualifications. To the knowledge of the Buyer, there are no facts or circumstances that would, under the Communications Act, (i) disqualify the Buyer as the assignee of the Seller FCC Authorizations with respect to the Stations or as the owner and operator of the Stations, (ii) materially delay the FCC's processing of the FCC Applications, or (iii) result in the FCC's refusal to grant the FCC Consent.  To the knowledge of Buyer, no waiver of or exemption from any provision of the Communications Act with respect to the Buyer is necessary for the FCC Consent to be obtained under the Communications Act.

Section 4.6.     **Financial Capacity; Solvency.** Buyer is solvent as of the date of this Agreement.  Further, the Buyer will have as of the Closing Date, on hand (or access through committed credit facilities to) adequate funds to perform all of its obligations under this Agreement (including, having rights with respect to the MBG Secured Obligations required in order to convert the Credit Bid Amount as the Purchase Price and payment of all fees and expenses required to be paid by Buyer in connection with the transactions contemplated by this Agreement).  Assuming the (i) accuracy of the representations and warranties of the Seller set forth in this Agreement and the Ancillary Agreements (without giving effect to any "materiality," "Seller Material Adverse Effect," "Knowledge" or "knowledge" qualifiers included herein and therein) and (ii) performance by the Seller of its obligations under this Agreement and the Ancillary Agreements, immediately after

26

giving effect to the transactions contemplated hereby and thereby, including the Buyer's payment of the Purchase Price and all other amounts required to be paid, borrowed or refinanced in connection with the consummation of the transactions contemplated by this Agreement and all related fees and expenses, the Buyer shall be Solvent, at and after the Closing Date.

Section 4.8.    **Affiliation.**  Buyer is not an Affiliate, agent or representative of either (a) Nexstar Media Group, Inc., or Affiliates of Nexstar Media Group, Inc., or (b) Nexstar Broadcasting, Inc., or Affiliates of Nexstar Broadcasting, Inc., and vice versa.

## ARTICLE V

## ACTION PRIOR TO THE CLOSING DATE

The respective parties hereto covenant and agree to take the following actions between the date hereof and the Closing Date:

Section 5.1.    <u>Access to the Business</u>.  Upon the written request of the Buyer, the Seller shall, and shall cause its Representatives to, reasonably cooperate to, provide to the Buyer and its Representatives (including independent public accountants, attorneys and consultants) reasonable access during normal business hours, and upon reasonable prior notice, to the properties, premises, personnel, and business, financial and operating records related to the Business and the Purchased Assets to the extent reasonably necessary for the Buyer's transition planning, and shall furnish to the Buyer or its Representatives such additional information and data concerning the Business as shall be reasonably requested to the extent reasonably necessary for Buyer's transition planning; provided that reasonable out-of-pocket costs incurred by the Seller associated with the foregoing shall be reimbursed by Buyer. The Buyer agrees that any such access shall be conducted in such a manner as not to interfere unreasonably with the operations of the Business or the Seller. Notwithstanding the foregoing, Seller shall not be required to (i) take any action which would constitute a waiver of attorney-client or other legal privilege (provided that the Seller shall use its reasonable best efforts to allow for such access or redacted disclosure to the maximum extent that does not result in a loss of any such attorney-client or other legal privilege) or would compromise the confidential information of the Seller wholly unrelated to the Business; (ii) supply the Buyer with any information to the extent the Seller is under a contractual obligation with an unaffiliated third party entered into prior to the Petition Date; (iii) execute or deliver any certificate, document, instrument or agreement that is effective prior to the Closing or agree to any change or modification of any existing certificate, document, instrument or agreement that is effective prior to the Closing; (iv) permit the Buyer or any of its Affiliates to conduct any sampling of soil, sediment, groundwater, surface water or building material; or (v) would violate any applicable Law to which the Seller is subject (provided that the Seller shall use its reasonable best efforts to make appropriate substitute arrangements or redactions to permit reasonable disclosure not in violation of any applicable Law).

Section 5.2.    <u>Notification of Certain Matters</u>.

(a)    The Buyer, on the one hand, and the Seller, on the other hand, shall promptly notify the other upon becoming aware of (i) any Effect that comes to the knowledge of the Buyer or the Knowledge of the Seller, as applicable, that (A) would reasonably be expected to (1) cause a breach of any representation or warranty contained in this Agreement, (2) render the

27

satisfaction of the conditions to Closing in <u>Section 8.1</u> or <u>Section 7.1</u>, as applicable, reasonably unlikely to be fulfilled, or (3) prevent, prohibit or materially delay the Closing, or (B) if occurring or arising or in existence before or on the date of this Agreement would have caused a representation or warranty of the Buyer or the Seller, as applicable, to be inaccurate or deficient, and (ii) any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the transactions contemplated by this Agreement. The delivery of any notice pursuant to this <u>Section 5.2(a)</u> shall not have any effect on either party's right to terminate the Agreement pursuant to <u>Section 10.1(a)(ii)</u> or <u>Section 10.1(a)(iii)</u>, as applicable.

(b)     Each party shall promptly notify the other of any Cause of Action that shall be instituted or threatened against such party to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement.

<b>Section 5.3.     <u>FCC Consent; Other Consents and Approvals</u></b>.

(a)     As promptly as practicable after the date hereof, but in any event no later than five (5) Business Days after entry of the Sale Order, the Seller, the Buyer and their respective Affiliates, as applicable, shall file with the FCC the necessary applications requesting its consent to the Assignment of the Seller FCC Authorizations to the Buyer, as contemplated by this Agreement (the "<u>FCC Applications</u>"). The Seller and the Buyer shall, or shall cause their respective Affiliates to, cooperate in the preparation of such applications and will diligently take, or cooperate in the taking of, all necessary, desirable and proper steps, provide any additional information requested or required by the FCC and shall use reasonable best efforts to obtain promptly the FCC Consent. The Seller, on the one hand, and the Buyer, on the other hand, shall bear the cost of FCC filing fees relating to the FCC Applications equally.  The Buyer and the Seller shall oppose any petitions to deny or other objections filed with respect to the FCC Applications to the extent such petition or objection relates to any such party; provided, however, that neither party shall have any obligation to participate in any evidentiary hearing designated by the FCC on any FCC Application filed with the FCC. Neither Seller nor Buyer shall, and each shall cause its Affiliates not to, take any action that would, or fail to take such action the failure of which to take would, reasonably be expected to have the effect of materially delaying the receipt of the FCC Consent.  The parties agree that they will cooperate to amend the FCC Applications as may be necessary or required to obtain the timely grant of the FCC Consent.  As may reasonably be necessary to facilitate the grant of the FCC Consent, in the event that in order to obtain the FCC Consent in an expeditious manner, it is necessary for the Buyer or any of its Affiliates to enter into a customary assignment, assumption, tolling, or other similar arrangement with the FCC to resolve any complaints with the FCC relating to the Stations, the Buyer shall enter, or cause its Affiliates, as applicable, to enter, into such a customary assignment, assumption, tolling or other arrangement with the FCC.

(b)     Subject to the terms and conditions herein, the Seller and the Buyer shall, use their respective reasonable best efforts to consummate and make effective the transactions contemplated hereby and to cause the conditions set forth in <u>Article VII</u> and <u>Article VIII</u> to be satisfied as promptly as reasonably practicable after the date hereof, including  cooperating with each other in (i) (A) determining which filings are required to be made prior to the Closing with, and which consents, approvals, permits, notices or authorizations are required to be obtained prior

28

to Closing from, Governmental Bodies or third parties in connection with the execution and delivery of this Agreement and related agreements, and consummation of the transactions contemplated hereby and thereby and (B) timely making all necessary filings and timely seeking all consents, approvals, permits, notices or authorizations, including to obtain entry of the Sale Order, and (ii) taking, or causing to be taken, all other actions and doing, or causing to be done, and cooperating with each other in order to do, all other things necessary or appropriate to consummate the transactions contemplated hereby as soon as practicable.   In the event any legal proceedings, whether judicial or administrative, by any Governmental Body or other Person is commenced challenging this Agreement or the consummation of the transactions to be performed or consummated in accordance with the terms of this Agreement, the Seller and the Buyer shall (A) cooperate and use commercially reasonable efforts to defend against such proceeding, (B) in the event an injunction or other Order is issued in any such proceeding, use commercially reasonable efforts to have such injunction or other Order lifted, and (C) cooperate reasonably regarding any other impediment to the consummation of the transactions contemplated hereby.

(c)     [Intentionally omitted]

(d)     Buyer and Seller understand and agree that Seller has a case pending as debtor in possession in the Bankruptcy Court.  The terms of this Agreement, the submission of the FCC Application and the consummation of the transaction contemplated herein all are subject to the review and approval by the Bankruptcy Court, and that such approval shall be a mutual closing condition in accordance with <u>Articles VII</u> and <u>VIII</u> hereto. In regard to Bankruptcy Court approval of this Agreement, the Parties agree that Seller shall not file any motions, orders or other pleadings with the Bankruptcy Court seeking approval of this Agreement without the prior written consent of the Buyer.

**Section 5.4.     <u>Operations of the Stations Prior to the Closing Date</u>**.

(a)     Subject to the restrictions set forth in the Bankruptcy Code or Orders of the Bankruptcy Court, prior to the Closing Date, except as approved by the Buyer (which approval shall not be unreasonably withheld, delayed or conditioned), the Seller shall use its reasonable best efforts  to (i) operate and carry on the Business in the ordinary course of business, (ii) maintain the Purchased Assets in good operating condition and repair (wear and tear in ordinary usage expected), (iii) maintain and preserve the organization and management of the Business and the existing relationships with Persons having material business relationships with the Seller as related to the Business, (iv) maintain in full force and effect in accordance with their respective terms and conditions, any of the Seller FCC Authorizations or the Seller's other Governmental Permits, or (v) defend and protect the Purchased Assets from infringement or deterioration; provided however, the Parties acknowledge that any inability to perform the covenants provided in this <u>Section 5.4(a)</u> to the extent due to the direct impact of the Covid-19 virus shall not be deemed to be a violation of this <u>Section 5.4(a)</u>.

(b)     Notwithstanding <u>Section 5.4(a)</u> and subject to <u>Section 6.1</u> regarding control of the Stations, except (w) as expressly contemplated by this Agreement, (x) as set forth in <u>Schedule 5.4(b)</u>, (y) as required by applicable Laws or by any Governmental Body of competent jurisdiction, or (z) with the prior written consent of the Buyer (which consent shall not be

unreasonably withheld, delayed or conditioned), the Seller shall not in respect of the Stations, the Business or the Purchased Assets:

(i)       sell, lease (as lessor), transfer or otherwise dispose of or mortgage or pledge, or impose or suffer to be imposed any Encumbrance on, any of the Purchased Assets;

(ii)      take any action that could reasonably be expected to cause the FCC or any other Governmental Body to institute any Cause of Action for the suspension, revocation or adverse modification of any of the Seller FCC Authorizations or the Seller's other Governmental Permits in any material respect;

(iii)     amend, modify, terminate, reject, waive any rights under, release or assign any rights or claims under, create any Encumbrance with respect to, any Potential Assumed Contract, or otherwise take any action not required by the terms of such Potential Assumed Contracts that would result in any increase in any payments to be made under such Potential Assumed Contracts, or fail to exercise any renewal right with respect to any Potential Assumed Contract that by its terms would otherwise expire;

(iv)     enter into any Contract, including any Real Property Lease unless approved by the Bankruptcy Court;

(v)      (A) hire, terminate or transfer any employee of the Seller, excluding any termination for "cause" as reasonably determined by the Seller, or (B) increase the compensation for any employee of the Seller other than a salary increase for any employee of the Seller with an annual compensation of less than $100,000 in the ordinary course of business and not exceeding 2% of such employee's compensation;

(vi)     (A) make change or rescind any material Tax election, or (B) make, change or rescind a material Tax reporting practice or policy, file an amended Tax Return, enter into any closing agreement, settle any material Tax claim or assessment, surrender any right to claim a material refund of Taxes or take any other similar action relating to the filing of any Tax Return or the payment of any Tax that is material in nature;

(vii)    propose, commit or take any action, as the case may be, that is inconsistent with the terms of the Cash Collateral Order, including, without limitation, using Cash Collateral (as defined in the Cash Collateral Order) in a manner that deviates from the Approved Budget (as defined in the Cash Collateral Order); provided, that in the event the Cash Collateral Order is not in effect at any time between the date of this Agreement and the Closing Date, the Seller shall operate the Business in accordance with a budget mutually approved by the Seller and Buyer and shall not take any action that would have required the approval of the Independent Director under the governance

30

agreement set forth in Section 11 of the Cash Collateral Order unless the Buyer and the Seller mutually agree otherwise; or

(viii)    agree or commit to do any of the foregoing.

Section 5.5.    **Public Announcement**.  Neither the Seller, Buyer nor any of their Affiliates shall, without the approval of the other, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and solely to the extent that any such party shall be required by applicable Law or an Order of the Bankruptcy Court. If any such announcement or other disclosure is required by applicable Law or an Order of the Bankruptcy Court, the disclosing party required to make such announcement or disclosure shall give the other party prior notice of, and a reasonable opportunity to comment on, the proposed announcement or disclosure.

Section 5.6.    **Employees**.  Prior to and contingent upon the Closing, Buyer (or an Affiliate of Buyer) shall make offers of employment commencing on the Closing Date. Buyer shall offer employment in accordance with the provisions of this <u>Section 5.6</u> to each of the Station Employees (provided such Station Employee is employed as an active employee as of such date) (such Station Employees who accept employment with Buyer, the "<u>Hired Employees</u>", and the date that such Hired Employee commences employment with Buyer, the "<u>Transfer Date</u>"), on terms and conditions that are substantially similar in the aggregate to those offered by Seller on the date of this Agreement. Buyer's offer of employment to each Station Employee who is not actively employed as of Closing Date (the "<u>Inactive Employees</u>") shall be made promptly when such Inactive Employee is eligible to return to active service pursuant to Law (the date that such Inactive Employee commences employment with the Buyer and thereby becomes a Hired Employee, if any, shall be such employee's Transfer Date).

(a)    Each Hired Employee shall be employed by Buyer on an at will basis and nothing shall prohibit Buyer from terminating the employment of any such Hired Employees at any time after the effective date of their employment with Buyer or changing any of the terms and conditions of employment related to such Hired Employees at any time, except for such changes that are inconsistent with Buyer's obligations as set forth in this <u>Section 5.6</u>, provided that Buyer shall pay severance to each Hired Employee who is terminated by Buyer in accordance with Buyer's severance policies for similarly situated employees with service credit granted to each Hired Employee for each such employee's full tenure with the applicable Station.

(b)    Buyer shall permit Hired Employees (and their spouses and dependents) to participate in its "employee welfare benefit plans" (including without limitation health insurance plans) and "employee pension benefit plans" (as defined in Section 3(1) and 3(2) of ERISA, respectively) in which similarly situated employees of Buyer are generally eligible to participate, with coverage effective immediately on the applicable effective date of their employment with Buyer (and without exclusion from coverage on account of any pre-existing condition under a group health plan except to the extent such persons were subject to such pre-existing condition limitations under Seller's group health plan).  Buyer shall ensure that Hired Employees' service with Seller (and any predecessors of Seller) is deemed as service with Buyer for purposes of eligibility, waiting periods, vesting periods and benefit accrual based on length of service, and

calculation of vacation and severance benefits, if applicable, and that Hired Employees receive credit for deductible expenses incurred prior to the employment by Buyer.

(c)     From and after the applicable effective date of their employment with Buyer, Buyer shall permit each Hired Employee who participates in Seller's 401(k) plan to elect to make direct rollovers of their account balances into Buyer's 401(k) plan, including any employee loan balances, subject to compliance with applicable law and subject to the reasonable requirements of Buyer's 401(k) plan.

(d)     Each Hired Employee will be credited (i) under Buyer's sick leave policy with the amount of sick leave accrued by such Hired Employee but unused as of the Transfer Date; and (ii) under Buyer's vacation leave policy with the amount of vacation time accrued by such Hired Employee but unused as of the Transfer Date. For avoidance of doubt, no Hired Employee will receive any sick or vacation leave credit in excess of the amount set forth in Buyer's policies for similarly situated employees.

(e)     Buyer shall not be responsible for any compensation or other benefits due from Seller to any Hired Employees on or prior to the Transfer Date. Buyer shall not be responsible for any Liabilities, whenever arising, with respect to any employees of Seller who do not become Hired Employees.

(f)     The parties expressly acknowledge and agree that nothing contained in this Section 5.6 or any other provision of this Agreement, shall (i) be construed to establish, amend, or modify any benefit or compensation plan, program, agreement, Contract, policy or arrangement of Seller or Buyer, (ii) limit the ability of Buyer or any of its Affiliates to amend, modify or terminate any benefit or compensation plan, program, agreement, Contract, policy or arrangement at any time assumed, established, sponsored or maintained by any of them, (iii) create any third-party beneficiary rights or obligations in any Person (including any Station Employee or Hired Employee) other than the parties to this Agreement or create a Contract between Buyer, Seller, or any of their respective Affiliates on the one hand and any employee of Seller on the other hand, and no employee of Seller may rely on this Agreement as the basis for any breach of Contract claim against Buyer or Seller, (iv) be deemed or construed to require Buyer or any of its Affiliates to continue to employ any particular employee of Seller for any period after the applicable Closing Date, or (v) be deemed or construed to limit Buyer's or any of its Affiliates' right to terminate the employment of any Hired Employee during any period on or after the applicable effective date of their employment with Buyer or confer on any Person any right to employment or continued employment or to a particular term or condition of employment with Buyer or any of its Affiliates.

### Section 5.7.     Assignment/Assumption of Contracts.

(a)     Schedule 5.7(a) sets forth all Contracts and unexpired Real Property Leases of Seller that are capable of assumption and assignment or purchase pursuant to Section 365 of the Bankruptcy Code (the "Potential Assumed Contracts"), as well as the Seller's good faith estimate of all amounts required in order to cure any defaults that may exist under and to assign each such Potential Assumed Contract pursuant to Section 365 of the Bankruptcy Code (the "Cure Amounts").

(b)     At any time prior to the Sale Hearing, Seller shall have the right to correct or update Schedule 5.7(a) by giving written notice to Buyer.

(c)     At any time prior to the Sale Hearing, Buyer shall have the right in its sole and absolute discretion to amend Schedule 2.1(j) by giving written notice to Seller, whereupon any additional Contract or unexpired Real Property Lease listed thereon shall become an Assumed Contract, and any removed Contract or unexpired Real Property Lease shall no longer be an Assumed Contract and shall become an Excluded Contract.

(d)     At the Sale Hearing (notice of which shall be properly and timely served by Seller on all counterparties to Potential Assumed Contracts), Seller shall seek authority to assume and assign, or sell and transfer, as applicable, to Buyer those Potential Assumed Contracts that are Assumed Contracts.

(e)     At any time after the Sale Hearing and prior to the Closing, Buyer and Seller together may agree to remove any Assumed Contract from Schedule 2.1(j), in which case Seller shall notify the counterparty of such removal via U.S. first-class mail by no later than two (2) Business Days from such determination.

(f)     Notwithstanding anything to the contrary set forth herein, if at any time the Bankruptcy Court determines that the Cure Amount for any Assumed Contract exceeds the estimated amount therefor set forth on Schedule 5.7(a), Buyer can elect (in its sole discretion) by written notice to Seller to remove such Contract or unexpired lease from Schedule 2.1(j), at which point it shall be deemed an Excluded Contract (and not an Assumed Contract) and Buyer shall have no obligation with respect thereto.  Buyer shall not be liable for any costs or Liabilities in respect of any Excluded Contracts and any Liabilities arising under, relating to, or in connection with such Excluded Contract shall be deemed Excluded Liabilities for all purposes under this Agreement.

(g)     On the Closing Date, Seller shall assign or transfer to Buyer the Assumed Contracts and Buyer shall promptly satisfy all Cure Amounts in respect of each such Assumed Contract.

Section 5.8.     **Mutual Covenants**. From and after the date of this Agreement until the Closing, each party shall continue performing their respective obligations under each of the Shared Services Agreements in the ordinary course of business.

Section 5.9.     **Tax Cooperation**.  Prior to the Closing, the Seller agrees to furnish or cause to be furnished, upon request, as promptly as practicable, information and assistance relating to the Business and the Purchased Assets, including access to books and records (including any Tax records), as is reasonably necessary in connection with (a) the preparation or filing of any Tax Return by Buyer, (b) the making of any Tax election by Buyer, (c) Buyer's claim for any Tax Refund, (d) the determination of Liability for Taxes, and (e) any audit, examination or other proceeding in respect of Taxes related to the Purchased Assets. Seller and its Affiliates shall (i) abide by all record retention agreements entered into with any Governmental Body, and (ii) give Buyer thirty (30) days' written notice prior to transferring, destroying or discarding any Tax records and, if Buyer so requests, shall allow Buyer to take possession of such Tax records.

# ARTICLE VI

# ADDITIONAL AGREEMENTS

**Section 6.1.    Control of Operations Prior to Closing Date**.  Notwithstanding anything contained herein to the contrary, the sale of the Purchased Assets contemplated hereby shall not be consummated prior to the grant by the FCC of the FCC Consent. The Seller and the Buyer acknowledge and agree that at all times commencing on the date hereof and ending on the Closing Date, (x) nothing in this Agreement shall be construed to give the Buyer any right to control, direct or otherwise supervise, or attempt to control, direct or otherwise supervise, any of the management or operations of any of the Stations and (y) the Seller shall have complete control and supervision of the programming, operations, policies and all other matters relating to the Stations until the consummation of the Closing. Notwithstanding the foregoing, nothing in this Agreement shall be construed or deemed to derogate or limit the rights of the Buyer under Section 5.4.

**Section 6.2.    Bulk Transfer Laws**.  The Parties hereby waive (a) compliance with the provisions of any so-called bulk sales or bulk transfer law of any jurisdiction in connection with the sale of any or all of the Purchased Assets to the Buyer hereunder and (b) all claims related to the non-compliance therewith.

**Section 6.3.    Use of Names**.  Seller is not conveying ownership rights or granting the Buyer a license to use any of the Retained Names and Marks and, after the Closing, the Buyer shall not and shall not permit any of its Affiliates to use the Retained Names and Marks. Prior to the Closing, the Seller shall, at the Seller's own expense, remove any Retained Names or Marks appearing on the Tangible Purchased Assets.

**Section 6.4.    No Successor Liability.**  The parties intend that, to the fullest extent permitted by Law (including under Section 363 of the Bankruptcy Code), upon the Closing, the Buyer shall not be deemed to: (i) be the successor of the Seller, (ii) have, de facto, or otherwise, merged with or into the Seller, (iii) be a mere continuation or substantial continuation of the Seller or the enterprise(s) of the Seller or (iv) be liable for any acts or omissions of the Seller in the conduct of the Business or arising under or related to the Purchased Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that the Buyer shall not be liable for any Liability or Encumbrance (other than Assumed Liabilities) against the Seller or any of the Seller's predecessors or Affiliates, and the Buyer shall have no successor or vicarious Liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any Liabilities of the Seller arising prior to the Closing Date. The parties agree that the provisions substantially in the form of this Section 6.4  shall be reflected in the Sale Order.

**Section 6.5.    Transfer Taxes.**  Notwithstanding Section 2.3(b)(vi), any transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the transactions contemplated herein shall, to the extent not avoided by the Bankruptcy Code (collectively, "**Transfer Taxes**") shall be paid fifty percent (50%) by the Seller and fifty percent (50%) by the

Buyer. Each Tax Return with respect to such Transfer Taxes will be prepared and filed by the party that customarily has primary responsibility for filing such Tax Return pursuant to applicable Law. Such non-filing party will advance to the filing party its portion of any such Taxes or other fees reflected on such Tax Return at least (1) day prior to the due date (giving effect to any extensions) for payment thereof. The parties will each timely sign and deliver (or cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate (and will each otherwise cooperate) to establish any available exemption (or otherwise reduce) any such Taxes or fees. The parties shall cooperate in good faith to minimize, to the fullest extent possible under applicable Law, the amount of any such Transfer Taxes.

Section 6.6.    **Schedules and Exhibits**.  The Seller shall, and in no event later than March 23, 2020, prepare and deliver to the Buyer, initial drafts of the Schedules and Exhibits to this Agreement, in each case, for the Buyer's review and approval. The Seller and the Buyer shall cooperate in good faith to negotiate and finalize the Schedules and Exhibits to this Agreement, and the parties shall mutually approve such Schedules and Exhibits in writing by no later than March 27, 2020.


# ARTICLE VII

## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER

The obligations of the Seller under this Agreement to consummate the sale of the Purchased Assets contemplated hereby shall be subject to the satisfaction, fulfillment or, where legally possible, waiver, on or prior to the Closing Date, of the following conditions:

Section 7.1.    **No Breach of Covenants and Warranties**.  (a) The Buyer shall have performed and complied in all material respects with its covenants and agreements contained herein required to be performed or complied with by it as of or prior to the Closing; and (b) each of the representations and warranties of the Buyer contained in this Agreement shall be true and correct on the  Closing Date as though made on the Closing Date (except to the extent that they expressly speak as of a specific date or time other than the Closing Date, in which case they need only have been true and correct as of such specified date or time), except where the failure of such representations and warranties to be true and correct (without giving effect to any qualifiers or exceptions relating to "materiality" set forth in such representations and warranties), individually or in the aggregate, would not reasonably be expected to have a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement. In addition, the Buyer shall have delivered to the Seller a certificate, dated as of the Closing Date, signed by an executive officer of the Buyer and certifying as to the satisfaction of the conditions specified in this Section 7.1.

Section 7.2.    **No Restraint**.  There shall not be in effect any Order (whether temporary, preliminary or permanent) issued by any U.S. federal or state court of competent jurisdiction preventing the consummation of the sale of the Purchased Assets contemplated hereby or the other transactions contemplated by this Agreement or any Ancillary Agreement.

**Section 7.3.** <u>**Certain Governmental Approvals**</u>. The FCC Consent shall have been granted and shall be effective. The Bankruptcy Court shall have entered the Sale Order, no Order staying, reversing, modifying or amending the Sale Order shall be in effect and the Sale Order shall not be subject to any appeal.

**Section 7.4.** <u>**Closing Deliveries**</u>. The Buyer shall have made, or stands ready at the Closing to make, the deliveries contemplated by <u>Section 2.7</u> to the Seller.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER

The obligations of the Buyer under this Agreement to consummate the sale of the Purchased Assets contemplated hereby shall be subject to the satisfaction, fulfillment or, where legally possible, waiver on or prior to the Closing Date, of the following conditions:

**Section 8.1.** <u>**No Breach of Covenants and Warranties**</u>. (a) The Seller shall have performed and complied with in all material respects its covenants and agreements contained herein required to be performed or complied with by it as of or prior to the Closing; and (b) (i) each of the representations and warranties of the Seller contained in <u>Sections 3.1</u>, <u>3.2</u>, <u>3.6</u> and <u>3.12</u> shall be true and correct in all respects on the Closing Date as though made on the Closing Date (except to the extent that they expressly speak as of a specific date or time other than the Closing Date, in which case they need only have been true and correct as of such specified date or time), and (ii) each of the other representations and warranties of the Seller contained in this Agreement shall be true and correct on the Closing Date as though made on the Closing Date (except to the extent that they expressly speak as of a specific date or time other than the Closing Date, in which case they need only have been true and correct as of such specified date or time), except where the failure of such representations and warranties to be true and correct (without giving effect to any qualifiers or exceptions relating to "materiality" or "Material Adverse Effect" set forth in such representations and warranties), would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Seller Material Adverse Effect shall have occurred since the date of this Agreement. In addition, the Seller shall have delivered to the Buyer a certificate, dated as of the Closing Date, signed by an executive officer of the Seller and certifying as to the satisfaction of the conditions specified in this <u>Section 8.1</u>.

**Section 8.2.** <u>**No Restraint**</u>. There shall not be in effect any Order (whether temporary, preliminary or permanent) issued by any U.S. federal or state court of competent jurisdiction preventing the consummation of the sale of the Purchased Assets contemplated hereby or the other transactions contemplated by this Agreement or any Ancillary Agreement.

**Section 8.3.** <u>**Certain Governmental Approvals**</u>. The FCC Consent shall have been granted and shall be effective. The Bankruptcy Court shall have entered the Sale Order, no Order staying, reversing, modifying or amending the Sale Order shall be in effect and the Sale Order shall not be subject to any challenge that challenges Buyer's good faith under Section 363(m) of the Bankruptcy Code.

Section 8.4.    **Closing Deliveries**.  The Seller shall have made, or stand ready at the Closing to make, the deliveries contemplated by Section 2.7 to the Buyer.

Section 8.5.    **Assumed Contracts**.  Subject to Section 5.7, all Assumed Contracts will, contemporaneously with the Closing, have been assigned to and assumed by Buyer, and all Cure Amounts with respect thereto have been satisfied by the Buyer.

Section 8.6.    **Other Consents**.  All approvals, consents and waivers that are listed in Schedule 8.6 (to the extent such approvals, consents and waivers are not otherwise rendered unenforceable by applicable Law, court order or legal proceedings) shall have been received in a form reasonably acceptable to Buyer.

# ARTICLE IX

# [INTENTIONALLY OMITTED]

# ARTICLE X

# TERMINATION

**Section 10.1.    Termination**.

(a)    Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing:

(i)    by the mutual written consent of the Seller and the Buyer;

(ii)    by the Seller, if a failure to perform any of the covenants or agreements of the Buyer contained in this Agreement shall have occurred, or there shall be any inaccuracy or breach of any of the representations or warranties of the Buyer contained in this Agreement, and such failure to perform or inaccuracy or breach either individually or in the aggregate would, if occurring or continuing on the Closing Date, reasonably be expected to give rise to the failure of a condition set forth in Section 7.1, and such failure to perform or inaccuracy or breach if curable, is not cured by, on or before the earlier of (i) the Termination Date or (ii) thirty (30) days following receipt of written notice by Buyer, or which by its nature or timing cannot be cured prior to the Termination Date; provided, however, that the Seller shall not have the right to terminate this Agreement pursuant to this Section 10.1(a)(ii) if the Seller is then in material breach of any of its covenants or agreements contained in this Agreement or any of the representations or warranties of the Seller contained in this Agreement;

(iii)    by the Buyer, if a failure to perform any of the covenants or agreements of the Seller contained in this Agreement shall have occurred, or there shall be any inaccuracy or breach of any of the representations or warranties of the Seller contained in this Agreement, and such failure to perform or inaccuracy or breach either individually or in the aggregate would,

if occurring or continuing on the Closing Date, reasonably be expected to give rise to the failure of a condition set forth in Section 8.1, and such failure to perform or inaccuracy or breach if curable, is not cured by, on or before the earlier of (i) the Termination Date or (ii) thirty (30) days following receipt of written notice by the Seller, or which by its nature or timing cannot be cured prior to the Termination Date; provided, however, that the Buyer shall not have the right to terminate this Agreement pursuant to this Section 10.1(a)(iii) if the Buyer is then in material breach of any of its covenants or agreements contained in this Agreement or any of the representations or warranties of the Buyer contained in this Agreement;

(iv)     by the Seller or the Buyer, if there is in effect a final and nonappealable Order of a Governmental Body of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(v)     by the Buyer if the Closing shall not have been consummated on or before twelve (12) months after the date this Agreement was executed by the Parties (or such later date as has been mutually agreed in writing by the Seller and the Buyer) (the "Termination Date").  Notwithstanding the foregoing, the right to terminate this Agreement under this Section 10.1(a)(v) shall not be available to any party if the failure of the Closing to occur by such date shall be due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by such party;

(vi)     by the Seller or the Buyer, upon a final and non-appealable denial of the FCC Consent;

(vii)     by the Buyer if (i) the Bankruptcy Case is dismissed or converted into a case under Chapter 7 of the Bankruptcy Code or (ii) an examiner or trustee is appointed in the Bankruptcy Case; and

(viii)     subject to the terms of the Cash Collateral Order, by the Buyer upon occurrence of the Termination Date (as defined in the Cash Collateral Order).

(b)     The party desiring to terminate this Agreement pursuant to Section 10.1(a) (other than pursuant to Section 10.1(a)(i)) shall give written notice of such termination to the other party or parties, as applicable, and this Agreement shall terminate as described in Section 10.1(c).

(c)     In the event that this Agreement shall be terminated pursuant to Section 10.1(a), all further obligations of the parties under this Agreement (other than Section 5.5, this Article X and Article XI, which, in each case, shall remain in full force and effect) shall be terminated without further Liability of any party; provided that nothing herein shall relieve any party from Liability for any breach of this Agreement prior to termination thereof or in the case of fraud; provided, further that nothing in this Section 10.1(c) will be deemed to interfere with the

Seller's right to retain, and the Buyer's waiver of, the Deposit Amount under <u>Section 2.5(b)</u> hereof, which shall be deemed liquidated damages.

**ARTICLE XI**

**GENERAL PROVISIONS**

**Section 11.1.   <u>Survival of Obligations</u>**.  None of the covenants, agreements or obligations of the parties contained herein or in any Ancillary Agreement shall survive the Closing, except to the extent such covenants, agreements or obligations contemplate performance after the Closing, in which case each such covenant, agreement and obligation shall survive the Closing for the period contemplated by its terms (or if no such survival period is contemplated, until the expiration of the applicable statute of limitations).

**Section 11.2.   <u>Confidential Nature of Information</u>**.  Each party acknowledges and agrees that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other party or parties during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, each party will return to the other party or parties all copies of nonpublic documents and materials which have been furnished in connection therewith. The Seller acknowledges and agrees that from and after the Closing, all non-public information relating to the Business and the Purchased Assets shall be valuable and proprietary to the Buyer and its Affiliates. The Seller agrees that, from and after the Closing, the Seller shall not, and shall cause its Affiliates not to, disclose to any Person any information relating to the Buyer and its Affiliates (including, after the Closing, the Business and the Purchased Assets), except as required by Law or as otherwise becomes available in the public domain other than through any action by the Seller or its Affiliates in violation of its obligations under this <u>Section 11.2</u>. Without limiting the right of either party to pursue all other legal and equitable rights available to it for violation of this <u>Section 11.2</u> by the other party, it is agreed that other remedies cannot fully compensate the aggrieved party for such a violation of this <u>Section 11.2</u> and that the aggrieved party shall be entitled to injunctive relief to prevent a violation or continuing violation hereof.

**Section 11.3.   <u>Governing Law</u>**. This Agreement and all Causes of Action that may be based upon, arise out of or relate to this Agreement or the Ancillary Agreements, or the negotiation, execution or performance of this Agreement or the Ancillary Agreements (including any Cause of Action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed and construed in accordance with the internal Laws of the State of Delaware, except to the extent that the Laws of such state are superseded by the Bankruptcy Code.  The Bankruptcy Court shall have exclusive personal and subject matter jurisdiction over the interpretation and enforcement of this Agreement or the Ancillary Agreements, and the transactions contemplated hereby and thereby.  In the event the Bankruptcy Court declines to exercise jurisdiction over any dispute arising under, relating to or connected with this Agreement or the Ancillary Agreements or the transactions contemplated hereby or thereby, the parties shall submit to jurisdiction in the Court

39

of Chancery of the State of Delaware or, if (and only if) such court finds it lacks subject matter jurisdiction, the federal court of the United States of America sitting in Delaware.

   **Section 11.4. <u>Exclusive Jurisdiction; Court Proceedings</u>**. The parties hereto agree that any Cause of Action seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Ancillary Agreements, or the transactions contemplated hereby and thereby shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the exclusive jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Cause of Action and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Cause of Action in any such court or that any such Cause of Action brought in any such court has been brought in an inconvenient forum. Process in any such Cause of Action may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in <u>Section 11.5</u> shall be deemed effective service of process on such party. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION   (WHETHER IN CONTRACT OR TORT OR OTHERWISE) ARISING, DIRECTLY OR INDIRECTLY, OUT OF OR RELATED TO THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR THE ANCILLARY AGREEMENTS OR ANY OF THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE , WHETHER NOW EXISTING OR HEREAFTER ARISING (INCLUDING ANY ACTION INVOLVING ANY FINANCING SOURCE AND THEIR RESPECTIVE NONPARTY AFFILIATES).

   **Section 11.5. <u>Notices</u>**. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (a) on the date of delivery if delivered personally, (b) on the earlier of confirmed receipt or the third (3rd) Business Day following the date of mailing if mailed by registered or certified mail (return receipt requested), (c) on the first (1st) Business Day following the date of dispatch if delivered utilizing next-day service by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice) or (d) on the date such notice is transmitted by e-mail to the e-mail addresses previously provided to the other parties:

   If to the Seller:

     Marshall Broadcasting Group, Inc.
     Attn: Pluria Marshall Jr.
     3731 Wilshire Boulevard
     Suite 840
     Los Angeles, CA 90010
     Email: <u>pluria@MBGroup.tv</u>

   with a copy to:

Levene Neale Bender Yoo & Brill L.L.P.
10250 Constellation Boulevard
Suite 1700
Los Angeles, CA 90067
Attn:  David B. Golubchik
       Eve H. Karasik
Email: dbg@lnbyb.com
       ehk@lnbyb.com

-and-

Gray Reed & McGraw LLP
1300 Post Oak Blvd.
Suite 2000
Houston, TX 77056
Attn.:  Jason S. Brookner
        Lydia R. Webb
Email: jbrookner@grayreed.com
       lwebb@grayreed.com

If to the Buyer, to:

Mission Broadcasting, Inc.
901 Indiana Avenue, Suite 375
Wichita Falls, TX 76301-6719
Attn: Dennis Thatcher
Email: missionbroadcasting@gmail.com

with a copy to:

Proskauer Rose LLP
11 Times Square
New York, NY 10036
Attn: David M. Hillman
Email: dhillman@proskauer.com

**Section 11.6.    Successors and Assigns; Third Party Beneficiaries**.

(a)    This Agreement and all of its terms shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, including any trustee appointed in the Seller's Bankruptcy Case (either under Chapter 11 or if convert to a case under Chapter 7). Except as provided in this Section 11.6(a), this Agreement shall not be assigned by any party hereto without the prior written consent of the other party and any attempted assignment without the required consents will be void; provided, however, that the Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 11.6, one or more Affiliates (so long as such assignment or transfer does not materially delay the grant of the FCC Consent and, provided further, that no such assignment or transfer shall operate to relieve a party of any of its Liabilities hereunder) to (i) purchase the Purchased Assets and/or (ii)

114030734v12

assume the Assumed Liabilities, on and after the date hereof (any such Affiliate of the Buyer that shall be properly designated by the Buyer in accordance with this clause, a "Designated Buyer"). The designation shall be made by the Buyer by way of a written notice to be delivered to the Seller no later than the fifth (5th) day prior to the Closing Date, which written notice shall contain appropriate information about the Designated Buyer and shall indicate which Purchased Assets and Assumed Liabilities that the Buyer intends such Designated Buyer(s) to purchase and/or assume, as applicable, hereunder. Upon any such permitted assignment, the references in this Agreement to the Seller or the Buyer will also apply to any such assignee unless the context otherwise requires.

(b)       Except pursuant to Section 11.17, nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 11.6 any right, remedy or claim under or by reason of this Agreement.

Section 11.7.   **Access to Records after Closing**.

(a)       For a period of six (6) years after the Closing Date, the Buyer shall use reasonable best efforts to make available and provide reasonable access to the Seller and its Representatives to the books and records of the Business (or copies or extracts thereof) transferred to the Buyer hereunder with respect to periods or portions of periods ending on or before the Closing Date solely to the extent that such access may reasonably be required by the Seller in connection with matters relating to or affected by the operations of the Business prior to the Closing Date, or solely in connection with the Seller's Bankruptcy Case, including any adversary proceedings filed or to be filed in the Seller's Bankruptcy Case; provided that such access shall not unreasonably disturb the operation of the Buyer's business. Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours. The Seller shall be solely responsible for any costs or expenses incurred by it pursuant to this Section 11.7(a). If the Buyer desires to dispose of any of such books and records prior to the expiration of such six (6) year period, it shall, prior to such disposition, give the Seller a reasonable opportunity, at the Seller's expense, to segregate and remove such books and records as the Seller may select.

(b)       For a period of six (6) years after the Closing Date, the Seller shall use reasonable best efforts to make available and provide reasonable access to Buyer and its Representatives to the books and records relating to the Business  (or copies or extracts thereof) which the Seller may retain after the Closing Date. Such access shall be afforded by the Seller upon receipt of reasonable advance notice and during normal business hours; provided that such access shall not unreasonably disturb the operation of the Seller's business. The Buyer shall be solely responsible for any costs and expenses incurred by it pursuant to this Section 11.7(b). If the Seller desires to dispose of any of such books and records prior to the expiration of such six (6) year period, such party shall, prior to such disposition, give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such books and records as the Buyer may select.

Section 11.8.   **Entire Agreement; Amendments**.  This Agreement, the Exhibits and Schedules referred to herein and the other documents delivered pursuant hereto contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements or understandings between or among any of the parties

42

hereto. The parties hereto, by mutual agreement in writing, may amend, modify and supplement this Agreement.

Section 11.9.  **Interpretation**.  Article titles and headings to Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. The Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. For purposes of this Agreement, (i) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation," (ii) the word "or" is not exclusive,  (iii) the words "herein", "hereof", "hereby", "hereto" and "hereunder" refer to this Agreement as a whole, (iv) the phrase "in the ordinary course of business" shall be deemed to be followed by "consistent with past practice", subject to operations under the Bankruptcy Code, and (v) wherever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. Unless the context otherwise requires, references herein (a) to Articles, Sections, Exhibits and Schedules mean the Articles and Sections of, and the Exhibits and Schedules attached to, this Agreement and (b) to any Law defined or referred to herein or any agreement or instrument that is referred to herein means such agreement, instrument or Law as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of Laws) by succession of comparable successor Laws and references to all attachments thereto and instruments incorporated therein. This Agreement and the Ancillary Agreements shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. References to a "party hereto" or the "parties hereto" or similar phrases shall refer to the Seller and the Buyer.

Section 11.10.  **Waivers**.  Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof. The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

Section 11.11.  **Expenses**.  Except as otherwise expressly provided herein or in any Ancillary Agreement, each of the Seller and the Buyer will pay all of its own respective costs and expenses incident to its negotiation and preparation of this Agreement and the Ancillary Agreements and to its performance and compliance with all agreements and conditions contained herein and therein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

Section 11.12.  **Partial Invalidity**.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable Law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

43

Section 11.13.  **Execution in Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the parties and delivered to each of the Seller and the Buyer.

Section 11.14.  **Disclaimer of Warranties**.  Except as otherwise expressly set forth in this Agreement or any Ancillary Agreement, Seller makes no representations or warranties with respect to any projections, forecasts or forward-looking information provided to the Buyer and there is no assurance that any projected or forecasted results will be achieved. EXCEPT AS TO THOSE MATTERS EXPRESSLY COVERED BY THE REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT AND THE ANCILLARY AGREEMENTS DELIVERED BY THE SELLER PURSUANT TO SECTION 8.4, THE SELLER IS SELLING THE BUSINESS AND THE PURCHASED ASSETS ON AN "AS IS, WHERE IS" BASIS AND SELLER DISCLAIMS ALL OTHER WARRANTIES, REPRESENTATIONS AND GUARANTIES WHETHER EXPRESS OR IMPLIED. THE SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND NO IMPLIED WARRANTIES WHATSOEVER. Each party acknowledges that neither the other party nor any of its Representatives or Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any memoranda, charts, summaries or schedules heretofore made available by the other party or its representatives or Affiliates or any other information which is not included in this Agreement, the Ancillary Agreements, or the Schedules and Exhibits hereto or thereto, and neither party nor any of its Representatives or Affiliates nor any other Person will have or be subject to any liability to the other party, any Affiliate of the party or any other Person resulting from the distribution of any such information to, or use of any such information by, the other party, any Affiliate of the other party or any of their agents, consultants, accountants, counsel or other Representatives, except in the case of fraud. In making its determination to proceed with the transactions contemplated by this Agreement each party and its Affiliates have relied solely on (a) the results of their own independent investigation and (b) the representations and warranties of the other party expressly and specifically set forth in this Agreement and the Ancillary Agreements.  Each party and its Affiliates acknowledge and agree that the other party expressly and specifically disclaims any such other representations and warranties that are not expressly set forth in this Agreement and the Ancillary Agreements.

Section 11.15.  **Specific Performance**.  The parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached or the Closing was not consummated, and that money damages would not be an adequate remedy, even if available. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions, or any other appropriate form of specific performance or equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (including the parties' obligations to consummate the Closing) in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at Law or in equity. Each of the parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any party seeking an injunction or injunctions to prevent breaches

44

of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to post any bond or other security in connection with any such order or injunction.

           **Section 11.16.  <u>Time of Essence</u>**.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

           **Section 11.17.  <u>No Recourse</u>**.  All Causes of Action that may be based upon, arise out of or relate in any manner to this Agreement or the Ancillary Agreements, or the negotiation, execution or performance of this Agreement or the Ancillary Agreements, may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto and thereto.  No Person who is not a named party to this Agreement or the Ancillary Agreements, including any past, present or future director, officer, employee, incorporator, member, partner, stockholder, equityholder, controlling person, Affiliate, agent, attorney or other Representative of any named party to this Agreement or the Ancillary Agreements (the "<u>Non-Party Affiliates</u>"), shall have any Liability for any obligations or Liabilities arising under, in connection with or related to this Agreement or the Ancillary Agreements (as the case may be) or for any claim based on, in respect of, or by reason of this Agreement or the Ancillary Agreements (as the case may be) or the negotiation or execution hereof or thereof, and each Party waives and releases all such Liabilities against any such Non-Party Affiliates.  The parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this <u>Section 11.17</u>.

[Signatures on following page]

114030734v12

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**SELLER**

MARSHALL BROADCASTING GROUP, INC.

By:
Name:  PLUMA MARSHALL JR
Title:  PRESIDENT

**BUYER**

MISSION BROADCASTING, INC.

By:
Name: Dennis P. Thatcher
Title:  President

## EXHIBIT A

**Form of Bill of Sale and Assignment and Assumption Agreement**

## BILL OF SALE

THIS BILL OF SALE is made as of the __ day of _____, 2020, by and between Mission Broadcasting, Inc., a Delaware corporation ("Buyer") and Marshall Broadcasting Group, Inc., a Texas corporation ("Seller").

R E C I T A LS:

The Seller owns and operates television broadcast stations KMSS-TV, Shreveport, Louisiana, KPEJ-TV, Odessa, Texas and KLJB, Davenport, Iowa (the "Stations"), pursuant to certain authorizations issued by the U.S. Federal Communications Commission (the "FCC").

On December 3, 2019, Seller filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing voluntary proceedings pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq..

On March 30, 2020, Buyer and Seller entered into that certain Asset Purchase Agreement (the "APA"), pursuant to which, subject to approval of the Bankruptcy Court, Buyer agreed to purchase the Purchased Assets, and the Seller agreed to sell to the Buyer the Purchased Assets, including the Purchased Assets set forth on Schedule 1 hereto, subject to and on the terms and conditions contained in the APA.

Capitalized terms used and not otherwise defined herein have the meanings ascribed in the APA.

NOW, THEREFORE, for good and valuable consideration (as described in the APA), the receipt and sufficiency of which are hereby acknowledged, effective as of the date of this Bill of Sale, Seller does hereby sell, transfer, assign, convey and deliver to the Buyer, and the Buyer hereby purchases from the Seller, free and clear of all Encumbrances (except for Permitted Encumbrances and Assumed Liabilities), all of Seller's right, title and interest in, to and under the Purchased Assets (other than the Seller FCC Authorizations, including those listed on Schedule 3.4(a)(i) and the call signs KMSS-TV, KPEJ-TV and KLJB, which, for the avoidance of are being conveyed and assigned pursuant to that certain Assignment of Seller FCC Authorizations, dated as of the date hereof, between Buyer and Seller).

1.    EXCEPT AS OTHERWISE PROVIDED IN THE APA, THE SELLER IS SELLING THE BUSINESS AND THE PURCHASED ASSETS ON AN "AS IS, WHERE IS" BASIS AND SELLER DISCLAIMS ALL OTHER WARRANTIES, REPRESENTATIONS AND GUARANTIES WHETHER EXPRESS OR IMPLIED, AND THE SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND NO IMPLIED WARRANTIES WHATSOEVER.

2.     This Bill of Sale has been executed and delivered subject and pursuant to the terms and conditions of the APA, and incorporates by reference all of the terms of the APA, including but not limited to the Seller's representations, warranties and covenants, agreements relating to the Purchased Assets, Assumed Liabilities and Excluded Liabilities, and terms with respect to governing law and jurisdiction, as if each term was fully set forth herein. In the event of conflict between the terms of the APA and the terms of this Bill of Sale, the terms of the APA govern and control.

3.     This Bill of Sale may be executed in counterparts, each of which shall be an original, and all of which, together, shall constitute one and the same instrument, and any signature transmitted by facsimile or electronic means shall be deemed an original.

IN WITNESS WHEREOF, Seller and Buyer have each executed and delivered this Bill of Sale as of the day and year first above written.

"Buyer"                          Mission Broadcasting, Inc.

                                 By:_____
                                    Name:
                                    Its:


"Seller"                         Marshall Broadcasting Group, Inc.

                                 By:_____
                                    Name:
                                    Its:

## SCHEDULE "1"

## PURCHASED ASSETS

(a)     all assignable Governmental Permits (other than the Seller FCC Authorizations, including those listed on Schedule 3.4(a)(i) and the call signs KMSS-TV, KPEJ-TV and KLJB, which, for the avoidance of are being conveyed and assigned pursuant to that certain Assignment of Seller FCC Authorizations, dated as of the date hereof, between Buyer and Seller), including any applications therefor and renewals or modifications thereof between the date hereof and Closing;

(b)     All machinery, equipment, auxiliary and translator facilities, transmitting towers, transmitters, broadcast equipment, antennae, cables, supplies, vehicles, furniture, fixtures, appliances, servers, traffic systems, graphic systems, audio boards, switchers, radar systems, microwaves, transponders, relays, backup generators, computers, computer hardware and peripherals, information technology infrastructure, telephone systems, office equipment, cameras, production and news operation equipment, inventory, leasehold improvements, spare parts and other tangible personal property of every kind and description, including the personal property set forth on Schedule 2.1(b) (except for any retirements or dispositions of such scheduled personal property made between the date hereof and Closing in accordance with Section 5.4 or any tangible property located at the Seller's corporate offices in Los Angeles and Houston that are not used in or relevant to the operation of the Stations) ("Tangible Personal Property"), together with all rights against the manufacturers and/or suppliers of any of the foregoing;

(c)     Other than the Nexstar Claims, the Causes of Action of the Seller or its estate or that could be asserted by the Seller or its estate, relating to or arising out of the Purchased Assets or the Assumed Liabilities, including rights against counterparties to the Assumed Contracts, the manufacturers and/or suppliers of Tangible Personal Property or other third parties that are or were vendors, services providers or employees of the Business;

(d)     All books and records in any form or media to the extent related to the Business, including (i) all files, documents, records, books of account, logs, programming information and studies, technical information and engineering files, data, drawings, blueprints, schematics, news and advertising studies or consulting reports, marketing and demographic data, customer lists, credit and sales reports, personnel files, and sales correspondence to the extent relating to the Business, but excluding records to the extent relating to Excluded Assets, and (ii) the public and political files of the Stations and those papers, logs, files and other records of Seller maintained in connection with or for compliance by the Stations with all applicable rules, regulations and policies of the FCC;

(e)     All cash or cash equivalents (including any marketable securities or certificates of deposit) of the Seller as of the Closing other than the Wind Down Amount;

(f)     All accounts receivable (whether billed or unbilled), rebates, notes, chattel paper, and negotiable instruments of Seller for the period before the Closing;

(g) All reimbursements arising from the FCC repacking process for the period prior to the Closing;

(h) All rights with respect to all deposits (including customer deposits and security deposits), prepayments, advances, pre-paid expenses or premiums, vendor rebates, reimbursements, refunds, credits, and other refunds of every kind and nature to the extent related to the Business (which, for the avoidance of doubt, does not include (i) retainers and advances held by the Seller's legal counsel for the Bankruptcy Case, or (ii) the assets set forth in clause (B) of the definition of Nexstar Claims;

(i) All Insurance Policies to the extent transferable, together with all rights to insurance proceeds, reserves, rights, benefits or claims of Seller under the Insurance Policies maintained by Seller in connection with or for the benefit of the Purchased Assets or the Business;

(j) The Contracts and Real Property Leases listed on Schedule 2.1(j) as such schedule may be modified pursuant to Section 5.7 (the "Assumed Contracts");

(k) All Intellectual Property other than the Retained Names and Marks;

(l) Refunds, credits and rebates of Taxes or prepayment of Taxes arising for periods prior to the Closing, including, but not limited to, as set forth on Schedule 2.1(l);

(m) All amounts payable to the Seller, if any, from the United States Copyright Office or such arbitration panels as may be appointed by the United States Copyright Office to the extent related to the Business; and

(n) All other assets set forth on Schedule 2.1(n).

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT is made as of the __ day of _____, 2020, by and between Mission Broadcasting, Inc., a Delaware corporation ("Assignee") and Marshall Broadcasting Group, Inc., a Texas corporation ("Assignor").

## R E C I T A LS:

The Assignor owns and operates television broadcast stations KMSS-TV, Shreveport, Louisiana, KPEJ-TV, Odessa, Texas and KLJB, Davenport, Iowa (the "Stations"), pursuant to certain authorizations issued by the U.S. Federal Communications Commission (the "FCC").

On December 3, 2019, Assignor filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing voluntary proceedings pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq..

On March 30, 2020, Assignor and Assignee entered into that certain Asset Purchase Agreement (the "APA"), pursuant to which, subject to approval of the Bankruptcy Court, Assignee agreed to purchase the Purchased Assets, and the Assignor agreed to sell to the Assignee the Purchased Assets, subject to and on the terms and conditions contained in the APA.

WHEREAS, in partial consideration therefor, the APA requires the Assignee to assume the Assumed Liabilities, subject to and on the terms and conditions contained in the APA.

Capitalized terms used and not otherwise defined herein have the meanings ascribed in the APA.

NOW, THEREFORE, for good and valuable consideration (as described in the APA), the receipt and sufficiency of which are hereby acknowledged, the Assignor and the Assignee hereby agree as follows:

1.      The Assignor does hereby sell, transfer, assign, convey and deliver to the Assignee, and the Assignee hereby purchases from the Assignor, free and clear of all Encumbrances (except for Permitted Encumbrances and Assumed Liabilities), all of Assignor's right, title and interest in, to and under the Purchased Assets, including the Assumed Contracts (the "Assignment").

2.      The Assignee hereby accepts the Assignment and assumes and agrees to pay, perform and discharge the Assumed Liabilities (which, for the avoidance of doubt, consists solely of liabilities and obligations arising with, or relating to, the operation of the Stations, including the owning or holding of the Purchased Assets, by the Assignee, in each case, to the extent first arising after the date hereof).  The Assignee assumes no liabilities or obligations other than the Assumed Liabilities, and the parties hereto agree that all such liabilities and obligations of the Assignor other than the Assumed Liabilities are not assumed by the Assignee and shall remain the sole responsibility of the Assignor.

3.      This Assignment and Assumption Agreement has been executed and delivered subject and pursuant to the terms and conditions of the APA, and incorporates by reference all of the terms of the APA, including but not limited to the Assignor's representations, warranties and covenants, agreements relating to the Purchased Assets, Assumed Liabilities and Excluded Liabilities, and terms with respect to governing law and jurisdiction, as if each term was fully set forth herein. In the event of conflict between the terms of the APA and the terms of this Assignment and Assumption Agreement, the terms of the APA govern and control.

4.      This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be an original, and all of which, together, shall constitute one and the same instrument, and any signature transmitted by facsimile or electronic means shall be deemed an original.

IN  WITNESS  WHEREOF,  Seller  and  Buyer  have  each  executed  and  delivered  this Assignment and Assumption Agreement as of the day and year first above written.

"Assignee"                              Mission Broadcasting, Inc.

                                        By:_____
                                            Name:
                                            Its:


" Assignor"                             Marshall Broadcasting Group, Inc.

                                        By:_____
                                            Name:
                                            Its:

114030734v12

## EXHIBIT B

### Form of Assignment of Seller FCC Authorizations

THIS ASSIGNMENT OF SELLER FCC AUTHORIZATIONS (this "Assignment") is made as of _____, 2020 by and among Marshall Broadcasting Group, Inc., as Debtor-in-Possession, a Texas corporation ("Assignor"), and Mission Broadcasting, Inc., a Delaware corporation ("Assignee").

**WHEREAS**, this Assignment is made pursuant to that certain Asset Purchase Agreement dated as of March 30, 2020, (the "Purchase Agreement"), by and between Marshall Broadcasting Group, Inc., as Seller, and Assignee, as Buyer, with respect to, among other things, the purchase and sale of the following television stations (collectively, the "Stations") and the Seller FCC Authorizations relating thereto:

KMSS-TV, Shreveport, Louisiana (FCC Facility ID No. 12525),
KPEJ-TV, Odessa, Texas (FCC Facility ID No. 12524), and
KLJB, Davenport, Iowa (FCC Facility ID No. 54011)

**WHEREAS**, capitalized terms used but not defined in this Assignment shall have the meanings ascribed to such terms in the Purchase Agreement;

**WHEREAS,** on December 3, 2019, Seller filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing voluntary proceedings (the "Bankruptcy Case") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq.;

**WHEREAS,** in connection with the Bankruptcy Case, the Seller FCC Authorizations were assigned from Seller to Assignor on January 13, 2020 (see FCC File No. BALCDT-20191216AAI, et. seq.);

**WHEREAS,** the Bankruptcy Court has issued and entered the Sale Order in the Bankruptcy Case on [_____], 2020; and

**WHEREAS,** the FCC has granted its consent to the assignment of the Seller FCC Authorizations from Assignor to Assignee.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confirmed, and pursuant to the Purchase Agreement, Assignor and Assignee agree as follows:

1.      Assignor hereby sells, conveys, assigns, transfers and delivers to Assignee, and Assignee hereby purchases and accepts, all right, title and interest of Assignor in, to and under all of the Seller FCC Authorizations issued to and/or held by Assignor with respect to the Stations and their auxiliaries, including without limitation, all rights in and to the call letters of the Stations and in the public inspection files maintained under the rules of the FCC for the Stations, and all

applications therefor, together with any renewals, extensions or modifications thereof and additions thereto, free of all Encumbrances other than the Permitted Encumbrance described in subpart (b) of the definition of "Permitted Encumbrances" in the Purchase Agreement.

2.      This Assignment may be executed in separate counterparts, each of which shall be deemed to be an original and all of which together constitute one and the same agreement.  Delivery of an executed counterpart of a signature page of this Assignment by .pdf attachment to an e-mail, facsimile or other electronic transmission shall be effective as delivery of a manually executed original counterpart of this Assignment.

3.      This Assignment has been executed and delivered subject and pursuant to the terms and conditions of the Purchase Agreement, and incorporates by reference all of the terms of the Purchase Agreement, including but not limited to the representations, warranties, covenants, and agreements relating to the Seller FCC Authorizations, as if each term was fully set forth herein. In the event of conflict between the terms of the Purchase Agreement and the terms of this Assignment, the terms of the Purchase Agreement govern and control.

4.      Assignor and Assignee hereby agree, from and after the date hereof, without further consideration, upon the request of either party or its respective successors and assigns, to execute such other documents and to take or cause to be taken such other actions as such requesting party or its successors may reasonably require in order to obtain the full benefit of this Assignment and the parties' obligations hereunder.

*[remainder of page intentionally left blank - signature page follows]*

[SIGNATURE PAGE TO ASSIGNMENT OF SELLER FCC AUTHORIZATIONS]

**IN WITNESS WHEREOF,** the parties hereto have caused this Assignment of Seller FCC Authorizations to be duly executed as of the day and year first written above.

**ASSIGNOR:**

**MARSHALL BROADCASTING GROUP, INC., AS DEBTOR-IN-POSSESSION**

By:_____
       Print Name:
       Title:

**ASSIGNEE:**

**MISSION BROADCASTING, INC.**

By:_____
       Print Name:
       Title:

**SCHEDULE 1.1(a)**
**Permitted Encumbrances**

None.

## SCHEDULE 2.1(b)
## Tangible Personal Property

**Market TV** **Quad Cities-Station KLJB**

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| COMP | COMP000000003 | COLOR LASER PRINTER (SPIN-OFF) | COMP036 | Value model | Closed | 11/30/2017 | 12/01/2014 |
| COMP | COMP000000004 | PERSONAL COMPUTER (SPIN-OFF) | COMP036 | Value model | Closed | 11/30/2017 | 12/01/2014 |
| COMP | COMP000000005 | NOTEBOOK COMPUTER (SPIN-OFF) | COMP036 | Value model | Closed | 11/30/2017 | 12/01/2014 |
| COMP | COMP000000006 | UHF COMBINER (SPIN-OFF) | COMP036 | Value model | Closed | 11/30/2017 | 12/01/2014 |
| **COMP Total** | | | | | | | |

**Fixed asset group** FFX

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| FFX | FFX000000001 | Furniture Corp Apt Trade | FFX060 | Value model | Open | 12/31/2019 | 11/30/2015 |
| FFX | FFX000000002 | WOOD CONFERENCE TABLE (SPIN-OF | FFX084 | Value model | Open | 12/31/2019 | 12/01/2014 |
| **FFX Total** | | | | | | | |

**Fixed asset group** LHI

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|

| LHI | LHI000000002 | SECURITY SYSTEM (SPIN-OFF) | LHI012 | Value model | Open | 03/31/2016 | 12/01/2014 |
| LHI | LHI000000003 | ALUMINUM ENTRY CONSTRUCTION (S | LHI012 | Value model | Open | 03/31/2016 | 12/01/2014 |
| LHI | LHI000000004 | MISCELLANEOUS CARPET (SPIN-OFF | LHI012 | Value model | Open | 03/31/2016 | 12/01/2014 |

**LHI Total**

| **Fixed asset group** | MW | | | | | | |

| **Fixed asset group** | **Fixed asset number** | **Name** | **Book** | **Book type** | **Status** | **Last dep run date** | **Placed in service date** |
|---|---|---|---|---|---|---|---|
| MW | MW000000001 | 6' MICROWAVE DISH ANTENNA WITH | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| MW | MW000000002 | 440' OF EW63 ELLIPTICAL WAVEGU | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| MW | MW000000003 | 8' 7 GHZ MICROWAVE DISH ANTEN | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| MW | MW000000004 | 6' METAL EQUIPMENT RACK (SPIN- | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| MW | MW000000005 | 7 GHZ MICROWAVE RECEIVER (SPIN | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| MW | MW000000006 | 7 GHZ MICROWAVE RECEIVER (SPIN | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| MW | MW000000007 | 7 GHZ MICROWAVE TRANSMITTER (S | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| MW | MW000000008 | 6' 7 GHZ MICROWAVE DISH ANTENN | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| MW | MW000000009 | 8' 7 GHZ MICROWAVE DISH ANTENN | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| MW | MW000000010 | 420' OF EW63 ELLIPTICAL WAVEGU | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| MW | MW000000011 | 7 GHZ MICROWAVE TRANSMITTER (S | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| MW | MW000000012 | LINE DEHYDRATOR (SPIN-OFF) | MW060 | Value model | Closed | 11/30/2019 | 12/01/2014 |

**MW Total**

| **Fixed asset group** | STD | | | | | | |

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| STD | STD000000001 | VIDEO RECORDER (SPIN-OFF) | STD060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| STD | STD000000002 | 3.7 METER SATELLITE DISH ANTEN | STD060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| STD | STD000000003 | 3.7 METER SATELLITE DISH ANTEN | STD060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| STD | STD000000004 | CAMCORDER (SPIN-OFF) (Qty 2) | STD060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| STD | STD000000005 | TELEVISION ANALYZER (SPIN-OFF) | STD060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| STD | STD000000006 | 6 KW PORTABLE GENERATOR (SPIN- | STD060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| STD | STD000000007 | 1,500 POUND PALLET JACK (SPIN- | STD060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| STD | STD000000117 | eSports buildout | STD060 | Value model | Open | 12/31/2019 | 12/01/2017 |

**STD Total**

| Fixed asset group | TM |
|---|---|

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| TM | TM000000001 | 35' OF 7 3/16" RIGID TRANSMISS | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000002 | 7 3/16" FLANGED ELBOW (SPIN-OFF | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000003 | 230 KW DIESEL GENERATOR WITH O | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000004 | 944 GALLON DIESEL TANK (SPIN-O | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000005 | 22 KW CHANNEL 49 UHF TELEVISIO | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000006 | 22 KW CHANNEL 49 UHF TELEVISIO | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000007 | ATSC DIGITAL TELEVISION EXCITE | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000008 | 400 A/480 V SAFETY SWITCH (SPI | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000009 | 18 A/480 V TRANSFORMER (SPIN-O | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |

| TM | TM000000010 | 400 A/480 V SAFETY SWITCH (SPI | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
|----|----|----|----|----|----|----|----|
| TM | TM000000011 | 80 A/480 V BREAKER PANEL (SPIN | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000012 | 200 A/480 V AUTOMATIC VOLTAGE | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000013 | MAINTENANCE BYPASS SWITCH (SPI | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000014 | 200 A/600 V SAFETY SWITCH (SPI | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000015 | SURGE SUPPRESSOR (SPIN-OFF) | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000016 | 480 V/600 A BREAKER PANEL (SPI | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000017 | 200 AMP AUTO TRANSFER SWITCH ( | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000018 | 54 A/480 V TRANSFORMER (SPIN-O | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000019 | TRANSMITTER REMOTE CONTROL WIR | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000020 | TRANSMITTER REMOTE CONTROL COM | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000021 | TRANSMITTER REMOTE CONTROL INP | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000022 | TRANSMITTER REMOTE CONTROL WEB | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000023 | TRANSMITTER REMOTE CONTROL (SP | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000024 | 3 KW UNINTERRUPTIBLE POWER SUP | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000025 | 12' OF 4 1/16" RIGID TRANSMISS | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000026 | 4 1/16" FLANGED ELBOW (SPIN-OF | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000027 | 6 1/8" FLANGED ELBOW (SPIN-OFF | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000028 | CUSTOMIZED AIR HANDLING SYSTEM | TM180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TM | TM000000055 | Trans Breaker 15-6200-01 | TM060 | Value model | Open | 12/31/2019 | 12/31/2015 |
| TM | TM000000057 | Transmitter repair | TM180 | Value model | Open | 12/31/2019 | 12/01/2017 |

**TM Total**

**Fixed asset group**   TWR

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| TWR | TWR000000001 | 7 3/16" GAS BARRIER (SPIN-OFF) | TWR180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TWR | TWR000000002 | COMBINER (SPIN-OFF) | TWR180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TWR | TWR000000003 | 1,110' OF 7 3/16" RIGID TRANSM | TWR180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TWR | TWR000000004 | UHF TELEVISION ANTENNA (SPIN-O | TWR180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TWR | TWR000000005 | LINE DEHYDRATOR (SPIN-OFF) (Qt | TWR180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TWR | TWR000000006 | MAGIC T COMBINER (SPIN-OFF) | TWR180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TWR | TWR000000007 | CHANNEL 49 SHARP TUNE FILTER ( | TWR180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TWR | TWR000000008 | 44 KW RF LOAD (SPIN-OFF) | TWR180 | Value model | Open | 12/31/2019 | 12/01/2014 |
| TWR | TWR000000009 | 55' OF 7 3/16" RIGID TRANSMISS | TWR180 | Value model | Open | 12/31/2019 | 12/01/2014 |

**TWR Total**

| Fixed asset group | VEH |
|---|---|

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| VEH | VEH000000001 | 2012 CHEVROLET SILVERADO PICKU | VEH060 | Value model | Closed | 11/30/2019 | 12/01/2014 |
| VEH | VEH000000002 | 2013 FORD EXPLORER SPORT UTILI | VEH060 | Value model | Closed | 11/30/2019 | 12/01/2014 |

**Market TV**   **Shreve LA-Station KMSS**

| Fixed asset group | COMP |
|---|---|

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| COMP | COMP000000001 | Comp purchase M.Thomas | COMP012 | Value model | Closed | 08/31/2016 | 09/30/2015 |

114621366v6

| COMP | COMP000000017 | DELLPOWEREDGE T710SERVER FOR W | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
|------|---------------|--------------------------------|---------|-------------|--------|------------|------------|
| COMP | COMP000000018 | DELLPOWEREDGE R310SERVER | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000019 | LIEBERTGXT2-1500RT1201.5 KVA U | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000020 | CISCO2911ROUTER | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000021 | DIGITAL WATCHDOGVMAXDIGITAL RE | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000022 | ESIIVX X-CLASSTELEPHONE SYSTEM | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000026 | Computer/ docking station | COMP036 | Value model | Closed | 02/28/2019 | 04/01/2016 |
| COMP | COMP000000028 | Computer & Monitor | COMP036 | Value model | Open | 12/31/2019 | 07/01/2017 |
| COMP | COMP000000032 | Laptop - Shreveport Sales dept | COMP012 | Value model | Open | 12/31/2019 | 06/30/2019 |

**COMP Total**

| Fixed asset group | FFX | | | | | | |
|-------------------|-----|--|--|--|--|--|--|

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|-------------------|--------------------|------|------|-----------|--------|-------------------|------------------------|
| FFX | FFX000000003 | 4 STATION CUBICLE UNIT | FFX084 | Value model | Open | 12/31/2019 | 01/01/2015 |
| FFX | FFX000000004 | Office Furniture | FFX060 | Value model | Open | 12/31/2019 | 04/01/2016 |

**FFX Total**

| Fixed asset group | LHI | | | | | | |
|-------------------|-----|--|--|--|--|--|--|

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|-------------------|--------------------|------|------|-----------|--------|-------------------|------------------------|
| LHI | LHI000000001 | LEASEHOLD IMPROVEMENTS | LHI033 | Value model | Closed | 09/30/2017 | 01/01/2015 |

**LHI Total**

| Fixed asset group | MW | | | | | | |
|-------------------|-----|--|--|--|--|--|--|

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|-------------------|--------------------|------|------|-----------|--------|-------------------|------------------------|
| MW | MW000000018 | 6' 7 GHZ MICROWAVE DISH ANTENN | MW060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| MW | MW000000019 | MOSELEYDTV LINK7 GHZ MICROWAVE | MW060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| MW | MW000000020 | 200' OF EW63 ELLIPTICAL WAVEGU | MW060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| MW | MW000000021 | 10' 7 GHZ MICROWAVE DISH ANTEN | MW060 | Value model | Closed | 12/31/2019 | 01/01/2015 |

| MW | MW000000022 | 250' OF EW63 ELLIPTICAL WAVEGU | MW060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| MW | MW000000023 | MOSELEYDTV LINK7 GHZ MICROWAVE | MW060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| MW | MW000000024 | MOSELEYDTV LINK7 GHZ MICROWAVE | MW060 | Value model | Closed | 12/31/2017 | 01/01/2015 |

**MW Total**

| Fixed asset group | STD | | | | | | |

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| STD | STD000000054 | BROADCAST PIXFLINTPRODUCTIONS | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000055 | APPLEFINAL CUT PRO 7.0SOFTWARE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000056 | ADOBECREATIVE SUITE 6.0SOFTWAR | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000057 | APPLEMACPROPERSONAL COMPUTER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000058 | GENTNERDH30TELEPHONE HYBRID | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000059 | AUDIOCOMMS-4002INTERCOM SYSTEM | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000060 | PRESONUSAUDIOLIVE 16.4.216 CHA | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000061 | PANASONICAG-HPX250PP2 CAMCORDE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000063 | PANASONICAG-HPX370PP2 CAMCORDE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000064 | PANASONICAG-HPX170PP2 CAMCORDE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000065 | FUJINONXS17X5.5BRMM38LENS | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000066 | CANONDS126521EOS 7D DSLR CAMER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000067 | DETROIT DIESEL135135 KW DIESEL | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000070 | 4.5 METER C-BAND FIXED SATELLI | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000071 | 3.5 METER C-BAND FIXED SATELLI | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000072 | DIGITAL BROADCASTSYSTEM | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000073 | SERVER FOR LOGO PLAYER (CUSTOM | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000074 | SENCOREIRD3384SATELLITE RECEIV | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000076 | VELA4000-4187-4QUAD ASI MULTIV | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |

| STD | STD000000077 | AJA VIDEOFS1FRAME SYNCHRONIZER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
|-----|--------------|-------------------------------|--------|-------------|--------|------------|------------|
| STD | STD000000078 | FUJITSUIP-9500DEENCODER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000079 | ADTECSOLOIST 2S-SDIMPEG-2 PLAY | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000080 | EVERTZX0401H4 X 1 HD ROUTER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000081 | TFTEAS911EMERGENCY ALERT SYSTE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000084 | MARSHALLV-R82DP-2CDUAL 8 LCD M | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000085 | EVERTZHD9084HDTV CAPTION ENCOD | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000086 | TANDBERGRX1290SATELLITE RECEIV | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000087 | UPCOMUC-IRD+SATELLITE RECEIVER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000088 | RESEARCH CONCEPTSRC2000ANTENNA | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000089 | HARMONICPROVIEW 7000INTEGRATED | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000090 | SCOPUSIRD-2980/CINTEGRATED REC | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000091 | WOHLER TECHNOLOGIESAMP2-DADIGI | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000092 | SENCOREIRD3385SATELLITE RECEIV | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000093 | EVERTZ7700RACK FRAME WITH DUAL | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000094 | EVERTZ7700FCMODULE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000095 | EVERTZ7710ODCDA-HDMODULE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000096 | EVERTZ7735CDM-A4MODULE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000097 | EVERTZ7800IDA8-3G+IGMODULE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000098 | EVERTZ7746FS-EAES4-HDMODULE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000100 | APCSUA3000RM2U3.0 KVA UNINTERR | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000101 | BLACKMAGIC DESIGN32X32COMPACT | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000102 | SUPERMICROSERVER CHASSIS | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000103 | BLACKMAGIC DESIGNSMARTVIEW 18 | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000104 | WOHLER TECHNOLOGIESAMP2-DADIGI | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000105 | RESEARCH CONCEPTSRC2500ANTENNA | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000106 | ESEES-102UMASTER CLOCK | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000107 | KW/21SL255C-SDIM-1202 KW STUDI | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |

| STD | STD000000108 | FLOAT CAMDC SLIDER (6' JIB/SLI | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000109 | CUTLER-HAMMER400 AMP GENERATOR | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000110 | SENCOREIRD3384SATELLITE RECEIV | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000111 | AVCOMPSA-37XPSPECTRUM ANAYZER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000112 | SENCOREDA795DIGITAL AUDIO ANAL | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000118 | Encoder | STD060 | Value model | Open | 12/31/2019 | 03/01/2015 |
| STD | STD000000119 | MC / Technical PC | STD060 | Value model | Open | 12/31/2019 | 03/01/2015 |
| STD | STD000000120 | Microwave 18S_003_001 | STD060 | Value model | Open | 12/31/2019 | 03/01/2015 |
| STD | STD000000122 | Generator | STD060 | Value model | Open | 12/31/2019 | 09/30/2019 |

**STD Total**

| Fixed asset group | TM |
| --- | --- |

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
| --- | --- | --- | --- | --- | --- | --- | --- |
| TM | TM000000045 | ACRODYNEQUANTUM QXD123 KW DIGI | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000047 | BURKARC PLUSTRANSMITTER REMOTE | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000048 | RECTANGULAR WAVEGUIDE SWITCH | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000049 | 25 KW BANDPASS FILTER | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000050 | 20 KW RF LOAD | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000051 | STACOMVR-48QCIY333VOLTAGE REGU | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000052 | ISLATRONBC-3-4400WYESURGE SUPP | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000053 | SQUARE D15240G1TRANSFORMER | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000054 | WR1500 GAS BARRIER | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |

**TM Total**

| Fixed asset group | TWR |
| --- | --- |

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| TWR | TWR000000019 | 1,500' OF WR1500 RECTANGULAR W | TWR180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TWR | TWR000000020 | ANDREWATW27H5-ETP1L-33MCHANNEL | TWR180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TWR | TWR000000021 | PUREGASP4200WLINE DEHYDRATOR | TWR180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TWR | TWR000000022 | 20' OF 8 3/16 RIGID TRANSMISSI | TWR180 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| TWR Total | | | | | | | |

| Fixed asset group | VEH | | | | | | |
|---|---|---|---|---|---|---|---|

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| VEH | VEH000000006 | 2007 FORD FUSION SEDAN | VEH060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| VEH | VEH000000007 | 2013 DODGE DART SEDAN | VEH060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| VEH | VEH000000008 | 2012 FORD ESCAPE SPORT UTILITY | VEH060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| VEH | VEH000000009 | 2011 FORD F150 PICK-UP TRUCK | VEH060 | Value model | Closed | 12/31/2019 | 01/01/2015 |

**Market TV    Midland TX-Station KPEJ**

| Fixed asset group | COMP | | | | | | |
|---|---|---|---|---|---|---|---|

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| COMP | COMP000000009 | HEWLETT-PACKARDELITEDESK 800 G | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000010 | DELLPOWEREDGE 2900DOMAIN SERVE | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000011 | HEWLETT-PACKARDTOUCHMART 9300 | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000012 | HEWLETT-PACKARDPROLIANT DL320E | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000013 | HEWLETT-PACKARDENVY C8U18AV17 | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000014 | HEWLETT-PACKARDZ620PERSONAL CO | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000015 | ANTECPERSONAL COMPUTER | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| COMP | COMP000000016 | NECASPIRE IP1NA-8KSUTELEPHONE | COMP036 | Value model | Closed | 12/31/2017 | 01/01/2015 |

| COMP | COMP000000023 | More Direct Computers 16-6210-9 | COMP036 | Value model | Closed | 12/31/2018 | 01/31/2016 |
| COMP | COMP000000024 | Digital Media laptop 15-3970-5 | COMP036 | Value model | Closed | 11/30/2018 | 12/31/2015 |
| COMP | COMP000000025 | Computer / Docking Stations | COMP036 | Value model | Closed | 01/31/2019 | 02/28/2016 |
| COMP | COMP000000027 | Computer Equip via cr card | COMP036 | Value model | Closed | 04/30/2019 | 05/01/2016 |

**COMP Total**

| Fixed asset group | FFX | | | | | | |
| **Fixed asset group** | **Fixed asset number** | **Name** | **Book** | **Book type** | **Status** | **Last dep run date** | **Placed in service date** |
| FFX | FFX000000005 | 10p News set furniture | FFX060 | Value model | Open | 12/31/2019 | 07/01/2016 |

**FFX Total**

| Fixed asset group | MW | | | | | | |
| **Fixed asset group** | **Fixed asset number** | **Name** | **Book** | **Book type** | **Status** | **Last dep run date** | **Placed in service date** |
| MW | MW000000013 | 245' OF EW63 ELLIPTICAL WAVEGU | MW060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| MW | MW000000014 | MOSELEYDTV-LINK7 GHZ DUPLEX ST | MW060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| MW | MW000000015 | ANDREW10' 7 GHZ MICROWAVE DISH | MW060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| MW | MW000000016 | 270' OF EW63 ELLIPTICAL WAVEGU | MW060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| MW | MW000000017 | MOSELEYDTV-LINK7 GHZ DUPLEX ST | MW060 | Value model | Closed | 12/31/2019 | 01/01/2015 |

**MW Total**

| Fixed asset group | STD | | | | | | |
| **Fixed asset group** | **Fixed asset number** | **Name** | **Book** | **Book type** | **Status** | **Last dep run date** | **Placed in service date** |
| STD | STD000000008 | CANONEOS5 DMARK IIIDSLR CAMERA | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000009 | PANASONICDVCPROHD P2 CAMCORDER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000010 | COMTECH5.0 METER C/KU-BAND MOT | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000011 | COMTECH5.0 METER C-BAND MOTORI | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000012 | COMTECH5.0 METER C-BAND FIXED | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000014 | CATERPILLAR400 AMP 127/220 VOL | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000017 | THERMAL ZONETZAA.360.CA5 TON A | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000019 | ERICCSONRX8200SATELLITE RECEIV | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |

| STD | STD000000020 | COMTECHEC8SATELLITE DISH ANTEN | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
|-----|--------------|-------------------------------|--------|-------------|--------|------------|------------|
| STD | STD000000021 | TANDBERGRX1290SATELLITE RECEIV | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000023 | SUPERIOR SATELLITE ENGINEERSSS | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000024 | MARSHALLV-R25P10 RACKMOUNT 2.5 | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000025 | CYBERPOWEROR2200LCDRTXL2U2.2 K | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000026 | ROSSROSS GEARRACK FRAME WITH D | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000027 | ENSEMBLE DESIGNSBRIGHTEYE BE5T | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000028 | WOHLER TECHNOLOGIESALM53-2424 | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000029 | LOGITEKSUPER-VUVUMETER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000031 | PESABOBCAT16 X 2 SWITCHER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000033 | TANDBERGE5720SATELLITE ENCODER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000034 | TANDBERGE5780SATELLITE ENCODER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000035 | EVERTZ7700RACK FRAME WITH DUAL | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000036 | EVERTZ7735CDM-A4MODULE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000037 | EVERTZ7711UC-AES4-HDMODULE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000038 | EVERTZ7800-IDA8-3G+1GMODULE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000039 | EVERTZ7700FCMODULE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000040 | EVERTZX0401H4 X 1 HD ROUTER | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000041 | WOHLER TECHNOLOGIESAMP1-DAAUDI | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000042 | MARSHALLV-R563P-SDITRIPLE 5 LC | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000044 | HARMONICPROVIEW 8100INTEGRATED | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000045 | DIGITAL ALERT SYSTEMSDASDEC-II | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000047 | SENCOREIRD3384AINTEGRATED RECE | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000051 | ADOBEPRODUCTION PREMIUM CS6SOF | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000052 | WOHLER TECHNOLOGIESAMP2-DAAUDI | STD060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| STD | STD000000116 | Hydrator | STD060 | Value model | Open | 12/31/2019 | 12/01/2018 |

**STD Total**

| **Fixed asset group** | TM | | | | | | |
|-----------------------|----|----|----|----|----|----|----|
| **Fixed asset group** | **Fixed asset number** | **Name** | **Book** | **Book type** | **Status** | **Last dep run date** | **Placed in service date** |

| TM | TM000000029 | CATERPILLARD200P4200 KW DIESEL | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000030 | 250 GALLON DIESEL SUBBASE TANK | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000031 | ZENITHZTG400 AMP GENERATOR TRA | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000032 | SQUARE D400 AMP/600 VAC SAFETY | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000033 | STACOMVR-48QCIY333AUTO VOLTAGE | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000034 | STACOMBM-T500BYPASS SWITCH | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000035 | ISLATROLBC-3-4400WYESURGE SUPP | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000036 | 6 1/8 FLANGED ELBOW | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000037 | ERIENG6080KPEJWAVEGUIDE COMBIN | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000038 | BIRD250 WATT RF LOAD | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000039 | 10 KW WATER-COOLED RF LOAD | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000040 | ACRODYNEQUANTUM QXD110 KW CHAN | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000041 | 30' OF 6 1/8 RIGID TRANSMISSIO | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000042 | LINEARGUI501TELEVISION EXCITER | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000043 | ROHDE & SCHWARZSV7100EAUXILIAR | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000044 | AGILENTE4418BPOWER METER | TM180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TM | TM000000056 | E2V 17S-002-001 | TM060 | Value model | Open | 12/31/2019 | 07/01/2017 |

**TM Total**

| Fixed asset group | TWR | | | | | | |
| **Fixed asset group** | **Fixed asset number** | **Name** | **Book** | **Book type** | **Status** | **Last dep run date** | **Placed in service date** |
| TWR | TWR000000010 | 145' SELF-SUPPORTING TRIANGULA | TWR180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TWR | TWR000000011 | 30' STUB TOWER (1' BASE) | TWR180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TWR | TWR000000012 | ERIATW-25H2-ETC1U-244CHANNEL 2 | TWR180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TWR | TWR000000013 | ANDREW1,200' OF 6 1/8 RIGID TR | TWR180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TWR | TWR000000014 | 6 1/8 GAS BARRIER | TWR180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TWR | TWR000000015 | PUREGASP550WHLINE DEHYDRATOR ( | TWR180 | Value model | Open | 12/31/2019 | 01/01/2015 |
| TWR | TWR000000016 | E2VIMD3000WCIRCUIT ASSEMBLY | TWR180 | Value model | Closed | 12/31/2017 | 01/01/2015 |
| TWR | TWR000000017 | ANDREW20' OF 6 1/8 RIGID TRANS | TWR180 | Value model | Closed | 12/31/2017 | 01/01/2015 |

**TWR Total**

| Fixed asset group | VEH | | | | | | |
|---|---|---|---|---|---|---|---|
| **Fixed asset group** | **Fixed asset number** | **Name** | **Book** | **Book type** | **Status** | **Last dep run date** | **Placed in service date** |
| VEH | VEH000000003 | 2011 BUICK LACROSSE SEDAN | VEH060 | Value model | Closed | 12/31/2019 | 01/01/2015 |
| VEH | VEH000000004 | 2007 MAZDA CX7 SPORT UTILITY V | VEH060 | Value model | Closed | 12/31/2019 | 01/01/2015 |

**SCHEDULE 2.1(j)**
**Assumed Contracts**

Contracts with Nexstar Broadcasting, Inc. and Mission Broadcasting, Inc.

1.  Business Services Agreement dated as of May 1, 2015 by and between Mission Broadcasting, Inc. and Marshall Broadcasting Group, Inc.

Contracts with Fox Broadcasting Company, LLC

1.  2019 NFL Inventory Addendum dated August 9, 2019.

2.  Amended and Restated Station Affiliation Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

3.  Amended and Restated Station Affiliation Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

4.  Amended and Restated Station Affiliation Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

5.  Letter Agreement effective July 1, 2019 which amends and supplements the Amended and Restated Affiliation Agreement as of the same date between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

6.  Letter Agreement effective July 1, 2019 which amends and supplements the Amended and Restated Affiliation Agreement as of the same date between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

7.  Letter Agreement effective July 1, 2019 which amends and supplements the Amended and Restated Affiliation Agreement as of the same date between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

8.  Amended and Restated Equipment Usage Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

9.  Amended and Restated Equipment Usage Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

10. Amended and Restated Equipment Usage Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

11. Network Nonduplication Amendment to the Amended and Restated Station Affiliation Agreement dated July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

12. Network Nonduplication Amendment to the Amended and Restated Station Affiliation Agreement dated July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

13. Network Nonduplication Amendment to the Amended and Restated Station Affiliation Agreement dated July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

14. News Agreement dated September 13, 2002 between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

15. Seventh Amendment to News Agreement dated as of September 5, 2019 by and between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

16. News Agreement dated April 24, 2007 between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

17. Sixth Amendment to News Agreement as of September 5, 2019 by and between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

18. News Agreement dated February 9, 2016 between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

19. Second Amendment to News Agreement as of September 5, 2019 by and between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

20. Fox Representation and Participation Agreement Amendment, effective as of July 1, 2019, and which amends that certain Fox Representation and Participation Agreement dated as of January 17, 2017 between Fox Cable Network Services, LLC and Fox Broadcasting Company, LLC on the one hand, and Nexstar Broadcasting, Inc., Marshall Broadcasting Group, Inc., Mission Broadcasting, Inc., Warwick Communications Inc., and WNAC, LLC on the other hand.

21. Release of Claims Letter dated February 6, 2020.

22. Splicer Modification Side Letter dated November 11, 2019.

23. SuperBowl Dynamic Ad Insertion Letter dated November 7, 2019.

24. Nexstar Binding Term Sheet dated September 15, 2019.

25. Thursday Night Football Term Sheet dated September 19, 2019.

26. DirecTV Distribution Agreement dated January 31, 2018 and extension dated November 15, 2018.

27. DirecTV Side Letter dated January 31, 2018.

28. Fubo Distribution Agreement dated July 31, 2017 and interim extension dated December 10, 2019.

29. Fubo Side Letter dated July 31, 2017.

30. Hulu Distribution Agreement dated July 14, 2017.

31. Hulu Side Letter dated July 14, 2017.

32. YouTube Distribution Agreement dated July 5, 2017 and extension dated August 31, 2019.

33. YouTube Side Letter dated July 5, 2017.

Programming Licensing Agreements

1. Television Station Licensing Agreement dated March 13, 2019 between Debmar-Mercury, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of Family Feud to television station KLJB.

2. License Agreement dated September 13, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Mike and Molly to television station KLJB.

3. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KLJB.

4. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KLJB commencing on September 7, 2020.

5. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KLJB.

6. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KLJB commencing on September 7, 2020.

7. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KLJB.

8. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KLJB commencing on September 7, 2020.

9. License Agreement dated June 12, 2017 between CBS Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Game to television station KLJB.

10. Preseason Television Agreement dated as of June 18, 2019 between The Chicago Bears Football Club, Inc. and Marshall Broadcasting Group, Inc.

11. License Agreement dated August 25, 2015 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Big Bang Theory to television station KLJB.

12. License Agreement dated June 4, 2019 between Entertainment Studios, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Funny You Should Ask to television station KLJB.

13. License Agreement dated June 6, 2018 between NBCUniversal Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Maury to television station KLJB.

14. License Agreement dated July 13, 2016 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of MOM to television station KLJB.

15. License Agreement dated February 19, 2019 between Buena Vista Television and Marshall Broadcasting Group, Inc. pertaining to the licensing of Tamron to television station KLJB.

16. License Agreement dated September 13, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two Broke Girls to television station KLJB.

17. License Agreement dated March 13, 2019 between Debmar-Mercury, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of Wendy Williams to television station KLJB.

18. License Agreement dated March 5, 2013 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Modern Family to television station KLJB.

19. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KMSS.

20. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KMSS commencing on September 7, 2020.

21. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KMSS.

22. License Agreement dated June 18, 2019 between Katz Broadcasting, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of The List to television station KLJB.

23. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KMSS commencing on September 7, 2020.

24. License Agreement dated May 10, 2011 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KMSS.

25. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KMSS.

26. License Agreement dated June 4, 2019 between Entertainment Studios, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Funny You Should Ask to television station KMSS.

27. License Agreement dated January 23, 2012 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Modern Family to television station KMSS.

28. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KMSS.

29.  License Agreement dated July 21, 2017 between CBS Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Game to television station KMSS.

30. License Agreement dated August 25, 2015 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Big Bang Theory to television station KMSS.

31. License Agreement dated November 2, 2016 between Buena Vista Television and Marshall Broadcasting Group, Inc. pertaining to the licensing of Black-ish to television station KMSS.

32. License Agreement dated March 12, 2019 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Divorce Court to television station KMSS.

33. License Agreement dated June 21, 2016 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Last Man Standing to television station KMSS.

34. License Agreement dated June 18, 2019 between Katz Broadcasting, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of The List to television station KMSS.

35. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KPEJ.

36. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KPEJ commencing on September 7, 2020.

37. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KPEJ.

38. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KPEJ commencing on September 7, 2020.

39. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KPEJ.

40. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KPEJ commencing on September 7, 2020.

41. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KPEJ.

42. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KPEJ commencing on September 7, 2020.

43. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KPEJ.

44. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KPEJ commencing on September 7, 2020.

45. License Agreement dated May 10, 2011 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KPEJ.

46. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KPEJ.

47. License Agreement dated August 21, 2019 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Simpsons to television station KPEJ

48. License Agreement dated August 8, 2012 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two Broke Girls to television station KPEJ.

49. License Agreement dated August 25, 2015 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Big Bang Theory to television station KPEJ.

50. License Agreement dated January 23, 2012 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Modern Family to television station KPEJ.

51. License Agreement dated August 17, 2016 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of MOM to television station KPEJ.

52. License Agreement dated February 20, 2019 between Buena Vista Television and Marshall Broadcasting Group, Inc. pertaining to the licensing of Tamron to television station KPEJ.

53. License Agreement dated March 12, 2019 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Divorce Court to television station KPEJ.

54. License Agreement dated June 4, 2019 between Entertainment Studios, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Funny You Should Ask to television station KPEJ.

55. License Agreement dated February 23, 2018 between CBS Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Hot Bench to television station KPEJ.

56. License Agreement dated June 18, 2019 between Katz Broadcasting, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of The List to television station KPEJ.

Retransmission Consent Agreements

1. Retransmission Consent Agreement dated as of December 27, 2017 between Marshall Broadcasting Group, Inc. and RB3, LLC dba Reach Broadband.

2. Retransmission Consent Agreement dated as of December 31, 2017 between Marshall Broadcasting Group, Inc. and Red River Cable.

3. Retransmission Consent Agreement dated as of December 29, 2017 between Marshall Broadcasting Group, Inc. and Muscatine Power & Water.

4. Retransmission Consent Agreement dated as of December 31, 2018 between Marshall Broadcasting Group, Inc. and City of Bellevue.

5. Retransmission Consent Agreement dated as of November 30, 2018 between Marshall Broadcasting Group, Inc. and Wes-Tex Telecommunications, LTD.

6. Retransmission Consent Agreement dated as of December 20, 2018 between Marshall Broadcasting Group, Inc. and Grande Communications Networks, LLC.

7. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and WTC Communications, Inc.

8. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Viola Communications, Inc.

9. Retransmission Consent Agreement dated as of December 17, 2017 between Marshall Broadcasting Group, Inc. and Southwest Arkansas Telephone Cooperative, Inc.

10. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Reynolds Cable, Inc.

11. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Oneida Cablevision, Inc.

12. Retransmission Consent Agreement dated as of December 31, 2017 between Marshall Broadcasting Group, Inc. and Nova Cablevision.

13. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and New Windsor Telephone Co.

14. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and MTC Communications, Inc.

15. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Mid Century Telephone Cooperative.

16. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Mediapolis Telephone Company dba MTC Technologies.

17. Retransmission Consent Agreement dated as of December 21, 2017 between Marshall Broadcasting Group, Inc. and Lost Nation-Elwood Telephone Company.

18. Retransmission Consent Agreement dated as of December 29, 2017 between Marshall Broadcasting Group, Inc. and LaMotte Telephone Company.

19. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and La Harpe Video and Data Services Company.

20. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Grand Mound Cooperative Telephone Association.

21. Retransmission Consent Agreement dated as of December 22, 2017 between Marshall Broadcasting Group, Inc. and F&B Communications, Inc.

22. Retransmission Consent Agreement dated as of October 29, 2018 between Marshall Broadcasting Group, Inc. and ETEX Communications, LLC.

23. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Diverse Communications, Inc.

24. Retransmission Consent Agreement dated as of December 21, 2017 between Marshall Broadcasting Group, Inc. and Central Scott Telephone Company.

25. Retransmission Consent Agreement dated as of December 22, 2017 between Marshall Broadcasting Group, Inc. and Baldwin-Nashville Telephone Company, Inc.

26. Retransmission Consent Agreement dated as of January 1, 2018 between Marshall Broadcasting Group, Inc. and CP-Tel Network Services, Inc.

27. Retransmission Consent Agreement dated as of December 21, 2017 between Marshall Broadcasting Group, Inc. and Bernard Communications.

Other Contracts

1.  Combined and Consolidated Amendment No. 1 to those certain Representation Agreements between, on the one hand, Katz Communications, Inc. and Katz Millennium Sales & Marketing, Inc., and on the other hand, Nexstar Broadcasting, Inc., Marshall Broadcasting Group, Inc. and Mission Broadcasting, Inc., effective February 1, 2017.

2.  Network Affiliation and Representation Agreement dated August 10, 2017 between Liberman Television LLC and Marshall Broadcasting Group, Inc.

3.  Letter Agreement, dated January 23, 2020 between the American Society of Composers, Authors and Publishers ("ASCAP") and Marshall Broadcasting Group, Inc.

4.  License Agreement dated July 25, 2016 between Broadcast Music, Inc. and Marshall Broadcasting Group, Inc. and pertaining to television station KLJB. (NOTE: CONTRACT EXPIRED 12/31/2017 AND WHILE STILL IN EFFECT HAVE NOT BEEN ABLE TO OBTAIN NEW AGREEMENT)

5.  License Agreement dated July 25, 2016 between Broadcast Music, Inc. and Marshall Broadcasting Group, Inc. and pertaining to television station KMSS-TV.  (NOTE: CONTRACT EXPIRED 12/31/2017 AND WHILE STILL IN EFFECT HAVE NOT BEEN ABLE TO OBTAIN NEW AGREEMENT)

6.  License Agreement dated July 25, 2016 between Broadcast Music, Inc. and Marshall Broadcasting Group, Inc. and pertaining to television station KPEJ-TV.  (NOTE: CONTRACT EXPIRED 12/31/2017 AND WHILE STILL IN EFFECT HAVE NOT BEEN ABLE TO OBTAIN NEW AGREEMENT)

7.  Licensing Agreements between SESAC and Marshall Broadcasting Group, Inc.  (NOTE: HAVE NOT BEEN ABLE TO OBTAIN COPIES OF AGREEMENTS)

8.  Administrative Services Agreement effective December 1, 2014 between UMR, Inc. and Marshall Broadcasting Group, Inc.

Tower Leases

1.  Master Antenna Site Lease between Pinnacle Towers Inc. and Comcorp of Lafayette, Inc. et al and governing lease terms for television stations KMSS-TV and KPEJ-TV.

2.  Second Amendment to that certain Lease Agreement dated August 2002 by and between American Towers Inc. and Quad Cities Television Acquisition Corp., as amended by that certain First Amendment to Lease dated June 16, 2008, by and between American Tower, L.P. and Marshall Broadcasting Group, Inc.

Real Property Leases

1.  Facilities Lease dated May 1, 2015 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. and pertaining to television station KLJB in Davenport, Iowa.

2.  Facilities Lease dated May 1, 2015 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. and pertaining to television station KMSS-TV in Shreveport, Louisiana.

3.  Facilities Lease dated May 1, 2015 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. and pertaining to television station KPEJ-TV in Odessa, Texas.

**SCHEDULE 2.1(l)**
**Taxes**

None.

**SCHEDULE 2.1(n)**
**Other Purchased Assets**

None.

**SCHEDULE 2.2(e)**
**Excluded Assets**

**Market TV**   **Corporate**

**Fixed asset group**   COMP

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| COMP | COMP000000033 | Laptop - LA Corp office | COMP012 | Value model | Open | 12/31/2019 | 06/30/2019 |
| COMP | COMP000000034 | IPads | COMP036 | Value model | Open | 12/31/2019 | 09/30/2019 |

**COMP Total**

**Fixed asset group**   FFX

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| FFX | FFX000000006 | CA Phone System upgrade | FFX060 | Value model | Open | 12/31/2019 | 09/01/2017 |
| FFX | FFX000000008 | iPad for P.Marshall | FFX060 | Value model | Open | 12/31/2019 | 12/01/2017 |

**FFX Total**

**Fixed asset group**   STD

| Fixed asset group | Fixed asset number | Name | Book | Book type | Status | Last dep run date | Placed in service date |
|---|---|---|---|---|---|---|---|
| STD | STD000000113 | Production Studio | STD060 | Value model | Open | 12/31/2019 | 12/01/2016 |
| STD | STD000000114 | eSports Computer | STD060 | Value model | Open | 12/31/2019 | 09/01/2017 |
| STD | STD000000115 | Streaming Equipment | STD060 | Value model | Open | 12/31/2019 | 12/01/2018 |
| STD | STD000000121 | Sony Monitor | STD060 | Value model | Open | 12/31/2019 | 06/30/2019 |
| VEH | VEH000000005 | 2007 MAZDA CX7 SPORT UTILITY V | VEH060 | Value model | Closed | 12/31/2019 | 01/01/2015 |

**SCHEDULE 3.2**
**Consents and Approvals**

None.

**SCHEDULE 3.4(a)(i)**
**Governmental Permits**

**Seller FCC Authorizations:**

| 1. | **KMSS-TV, Shreveport, Louisiana** |
|---|---|
| | Facility ID 12525 |
| | BLCDT-20050705AAB |
| | License Expires 6/1/2021 |
| | Channel 34 |
| | |
| | **Broadcast Auxiliary** |
| | WLF424, TV Studio Transmitter Link |
| 2. | **KPEJ-TV, Odessa, Texas** |
| | Facility ID 12524 |
| | BLCDT-20060629AGO |
| | License Expires 8/1/2022 |
| | Channel 23 |
| | |
| | **Broadcast Auxiliaries** |
| | WQEY386, TV Studio Transmitter Link |
| | WQEY387, TV Studio Transmitter Link |
| 3. | **KLJB, Davenport, Iowa** |
| | Facility ID 54011 |
| | License File No. 0000099537 |
| | License Expires 2/1/2022 |
| | Channel 30 |
| | |
| | **Broadcast Auxiliary** |
| | WLF385, TV Intercity Relay |

**SCHEDULE 3.4(c)**
**FCC Authorizations**

None.

**SCHEDULE 3.5(a)**
**Real Property Leases**

1.  Facilities Lease dated May 1, 2015 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. and pertaining to television station KLJB in Davenport, Iowa.

2.  Facilities Lease dated May 1, 2015 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. and pertaining to television station KMSS-TV in Shreveport, Louisiana.

3.  Facilities Lease dated May 1, 2015 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. and pertaining to television station KPEJ-TV in Odessa, Texas.

4.  Office Lease dated June 28, 2012, by and between Colonnade Wilshire Corp. and Wave Publications, Inc. and governing the lease of property located at 1730 West Olympic Blvd., Suite 500, Los Angeles, CA  90015, and First Amendment to Office Lease by and between Colonnade Wilshire Corp. and Marshall Broadcasting Group, Inc. as successor in interest to Wave Publications, Inc.

**SCHEDULE 3.5(b)**
**Real Property Leases**

None.

**SCHEDULE 3.7(a)**
**Contracts**

None.

**SCHEDULE 3.8**
**No Violation**

None.

**SCHEDULE 3.9**
**Insurance**

None.

**SCHEDULE 3.10(a)**
**Employees**

Bonus and Commission Plans

Station Manager, KLJB
- One half of 1% of net local airtime billings each month for achievement of billings equal to 75-98% of budget;
- 3.0% of net local airtime billings each month for achievement of billings equal to 98.1-105% of budget;
- 5.0% of net local airtime billings each month for achievement of billings equal to 105.1% or greater of budget;
- 1.9% of eMedia/Web billings each month;
- Up to $20,000 per annum in discretionary performance bonus.

Local Sales Manager, KLJB
- One half of 1% of net local airtime billings each month for achievement of billings equal to 75-98% of budget;
- 3.0% of net local airtime billings each month for achievement of billings equal to 98.1-105% of budget;
- 5.0% of net local airtime billings each month for achievement of billings equal to 105.1% or greater of budget;
- 1.9% of eMedia/Web billings each month;
- Up to $20,000 per annum in discretionary performance bonus.

Local Sales Representatives (4), KLJB
- $1,846 guaranteed commission per pay period.

Sales Assistant (1), KLJB
- Override of one half of 1% of Local Net Revenues.

Station Manager, KPEJ
- One half of 1% of net local and national airtime billings;
- One half of 1% of net Web billings;
- Up to $20,000 per annum in discretionary performance bonus;
- Use of station-provided motor vehicle plus gasoline allowance.

Local sales Representatives (2), KPEJ
- $1,250 guaranteed commission per pay period.

Local Sales Manager, KMSS
- One half of 1% of net local airtime billings each month for achievement of billings equal to 75-98% of budget;
- 3.0% of net local airtime billings each month for achievement of billings equal to 98.1-105% of budget;
- 5.0% of net local airtime billings each month for achievement of billings equal to 105.1% or greater of budget;
- 1.9% of eMedia/Web billings each month;
- Up to $15,000 per annum in discretionary performance bonus.

Local Sales Representatives (3), KMSS
- $1,250 guaranteed commission per pay period.

Sales Assistant (1), KMSS
- Override of one half of 1% of National Net Revenues.

<u>Other Employee Benefits</u>
The hyperlink below can be opened to view a summary of benefits available to employees of Marshall Broadcasting Group, Inc.

Employees\Employee Benefits Overview.pdf

Spreadsheet provided by Mission Broadcasting, Inc. with Details by Employee of Paid Time Off as of March 10, 2020.

**SCHEDULE 3.10(f)**
**Consultants**

None.

**SCHEDULE 3.11**
**Environmental Protection**

None.

**SCHEDULE 3.13**
**Affiliate Transactions**

None.

**SCHEDULE 3.14**
**MVPD**

Baldwin-Nashville Telephone Company, Inc.
Bernard Communications
Cablesouth Media III LLC
Central Scott Telephone Company
Cequel Communications, LLC
City of Bellevue
Comcast Cable Communications, LLC
CP-Tel Network Services, Inc.
DirecTV, LLC
Diverse Communications, Inc.
ETEX Communications, LLC
F&B Communications, Inc..
Fidelity Cablevision, Inc.
Grand Mound Cooperative Telephone Association
Grande Communications Networks, LLC
La Harpe Video and Data Services Company
LaMotte Telephone Company
Lost Nation-Elwood Telephone Company
Mediacom LLC and Mediacom Broadband
Mediapolis Telephone Company
Mid Century Telephone Cooperative
MTC Communications, Inc.
Muscatine Power & Water
New Wave Communications
New Windsor Telephone Co.
Nova Cablevision
Oneida Cablevision, Inc.
RB3, LLC
Red River Cable
Reynolds Cable, Inc.
Skitter, Inc.
Southwest Arkansas Telephone Cooperative, Inc.
TDS Broadband Service, LLC
Viola Communications, Inc.
Vyve Broadband, LLC
WEHCO Video, Inc.
Wes-Tex Telecommunications, LTD
WTC Communications, Inc.

**SCHEDULE 3.16(i)**
**Intellectual Property**


Domain Name:  www.mbgroup.tv

**SCHEDULE 3.16(ii)**
**Software Used in the Operation of the Business**

None.

**SCHEDULE 3.16(iii)**
**Intellectual Property Agreements**

Licensing Agreements

1. Television Station Licensing Agreement dated March 13, 2019 between Debmar-Mercury, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of Family Feud to television station KLJB.

2. License Agreement dated September 13, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Mike and Molly to television station KLJB.

3. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KLJB.

4. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KLJB commencing on September 7, 2020.

5. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KLJB.

6. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KLJB commencing on September 7, 2020.

7. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KLJB.

8. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KLJB commencing on September 7, 2020.

9. License Agreement dated June 12, 2017 between CBS Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Game to television station KLJB.

10. Preseason Television Agreement dated as of June 18, 2019 between The Chicago Bears Football Club, Inc. and Marshall Broadcasting Group, Inc.

11. License Agreement dated August 25, 2015 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Big Bang Theory to television station KLJB.

12. License Agreement dated June 4, 2019 between Entertainment Studios, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Funny You Should Ask to television station KLJB.

13. License Agreement dated June 6, 2018 between NBCUniversal Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Maury to television station KLJB.

14. License Agreement dated July 13, 2016 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of MOM to television station KLJB.

15. License Agreement dated February 19, 2019 between Buena Vista Television and Marshall Broadcasting Group, Inc. pertaining to the licensing of Tamron to television station KLJB.

16. License Agreement dated September 13, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two Broke Girls to television station KLJB.

17. License Agreement dated March 13, 2019 between Debmar-Mercury, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of Wendy Williams to television station KLJB.

18. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KMSS.

19. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KMSS commencing on September 7, 2020.

20. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KLJB.

21. License Agreement dated June 18, 2019 between Katz Broadcasting, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of The List to television station KLJB.

22. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KMSS commencing on September 7, 2020.

23. License Agreement dated May 10, 2011 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KMSS.

24. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KMSS.

25. License Agreement dated June 4, 2019 between Entertainment Studios, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Funny You Should Ask to television station KMSS.

26. License Agreement dated January 23, 2012 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Modern Family to television station KMSS.

27. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KMSS.

28.  License Agreement dated July 21, 2017 between CBS Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Game to television station KMSS.

29. License Agreement dated August 25, 2015 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Big Bang Theory to television station KMSS.

30. License Agreement dated November 2, 2016 between Buena Vista Television and Marshall Broadcasting Group, Inc. pertaining to the licensing of Black-ish to television station KMSS.

31. License Agreement dated March 12, 2019 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Divorce Court to television station KMSS.

32. License Agreement dated June 21, 2016 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Last Man Standing to television station KMSS.

33. License Agreement dated June 18, 2019 between Katz Broadcasting, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of The List to television station KMSS.

34. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KPEJ.

35. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KPEJ commencing on September 7, 2020.

36. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KPEJ.

37. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KPEJ commencing on September 7, 2020.

38. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KPEJ.

39. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KPEJ commencing on September 7, 2020.

40. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KPEJ.

41. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KPEJ commencing on September 7, 2020.

42. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KPEJ.

43. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KPEJ commencing on September 7, 2020.

44. License Agreement dated May 10, 2011 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KPEJ.

45. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KPEJ.

46. License Agreement dated August 21, 2019 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Simpsons to television station KPEJ

47. License Agreement dated August 8, 2012 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two Broke Girls to television station KPEJ.

48. License Agreement dated August 25, 2015 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Big Bang Theory to television station KPEJ.

49. License Agreement dated January 23, 2012 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Modern Family to television station KPEJ.

50. License Agreement dated August 17, 2016 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of MOM to television station KPEJ.

51. License Agreement dated February 20, 2019 between Buena Vista Television and Marshall Broadcasting Group, Inc. pertaining to the licensing of Tamron to television station KPEJ.

52. License Agreement dated March 12, 2019 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Divorce Court to television station KPEJ.

53. License Agreement dated June 4, 2019 between Entertainment Studios, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Funny You Should Ask to television station KPEJ.

54. License Agreement dated February 23, 2018 between CBS Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Hot Bench to television station KPEJ.

55. License Agreement dated June 18, 2019 between Katz Broadcasting, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of The List to television station KPEJ.

56. Letter Agreement, dated January 23, 2020 between the American Society of Composers, Authors and Publishers ("ASCAP") and Marshall Broadcasting Group, Inc.

57. License Agreement dated July 25, 2016 between Broadcast Music, Inc. and Marshall Broadcasting Group, Inc. and pertaining to television station KLJB. (NOTE: CONTRACT EXPIRED 12/31/2017 AND WHILE STILL IN EFFECT HAVE NOT BEEN ABLE TO OBTAIN NEW AGREEMENT)

58. License Agreement dated July 25, 2016 between Broadcast Music, Inc. and Marshall Broadcasting Group, Inc. and pertaining to television station KMSS-TV.  (NOTE: CONTRACT EXPIRED 12/31/2017 AND WHILE STILL IN EFFECT HAVE NOT BEEN ABLE TO OBTAIN NEW AGREEMENT)

59. License Agreement dated July 25, 2016 between Broadcast Music, Inc. and Marshall Broadcasting Group, Inc. and pertaining to television station KPEJ-TV.  (NOTE: CONTRACT EXPIRED 12/31/2017 AND WHILE STILL IN EFFECT HAVE NOT BEEN ABLE TO OBTAIN NEW AGREEMENT)

60. Licensing Agreements between SESAC and Marshall Broadcasting Group, Inc.  (NOTE: HAVE NOT BEEN ABLE TO OBTAIN COPIES OF AGREEMENTS)

**SCHEDULE 4.2**
**Buyer Consent**

None.

**SCHEDULE 5.4(b)**
**Operation of the Stations Prior to the Closing Date**

None.

**SCHEDULE 5.7(a)**
**Potential Assumed Contracts and Cure Amounts**

<u>Contracts with Nexstar Broadcasting, Inc. and Mission Broadcasting, Inc.</u>

1. Shared Services Agreement dated December 1, 2014 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. pertaining to television station KLJB.

   **Contract Cure Amount:**      **$12,414,834.00**

2. Shared Services Agreement dated January 1, 2015 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. pertaining to television station KMSS-TV.

   **Contract Cure Amount:**      **$9,633,682.00**

3. Shared Services Agreement dated January 1, 2015 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. pertaining to television station KPEJ-TV.

   **Contract Cure Amount:**      **$6,623,156.00**

4. Business Services Agreement dated as of May 1, 2015 by and between Mission Broadcasting, Inc. and Marshall Broadcasting Group, Inc.

   **Contract Cure Amount:**      **$5,064.84**

<u>Contracts with Fox Broadcasting Company, LLC</u>

1. Amended and Restated Station Affiliation Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

   **Contract Cure Amount:**      **$0**

2. Amended and Restated Station Affiliation Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

   **Contract Cure Amount:**      **$0**

3. Amended and Restated Station Affiliation Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

   **Contract Cure Amount:**      **$0**

4. Letter Agreement effective July 1, 2019 which amends and supplements the Amended and Restated Affiliation Agreement as of the same date between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

   **Contract Cure Amount:**      **$989,862.00**

5. Letter Agreement effective July 1, 2019 which amends and supplements the Amended and Restated Affiliation Agreement as of the same date between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

   **Contract Cure Amount:       $1,241,397.00**

6. Letter Agreement effective July 1, 2019 which amends and supplements the Amended and Restated Affiliation Agreement as of the same date between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

   **Contract Cure Amount:       $551,361.00**

7. Amended and Restated Equipment Usage Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

   **Contract Cure Amount:       $0**

8. Amended and Restated Equipment Usage Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

   **Contract Cure Amount:       $0**

9. Amended and Restated Equipment Usage Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

   **Contract Cure Amount:       $0**

10. Network Nonduplication Amendment to the Amended and Restated Station Affiliation Agreement dated July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

    **Contract Cure Amount:       $0**

11. Network Nonduplication Amendment to the Amended and Restated Station Affiliation Agreement dated July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

    **Contract Cure Amount:       $0**

12. Network Nonduplication Amendment to the Amended and Restated Station Affiliation Agreement dated July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

    **Contract Cure Amount:       $0**

13. News Agreement dated September 13, 2002 between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

**Contract Cure Amount:**       **$0**

14. Seventh Amendment to News Agreement as of September 5, 2019 by and between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

**Contract Cure Amount:**       **$12,903.00**

15. News Agreement dated April 24, 2007 between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

**Contract Cure Amount**       **$0**

16. Sixth Amendment to News Agreement as of September 5, 2019 by and between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

**Contract Cure Amount:**       **$13,966.00**

17. News Agreement dated February 9, 2016 between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

**Contract Cure Amount**       **$0**

18. Second Amendment to News Agreement as of September 5, 2019 by and between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

**Contract Cure Amount:**       **$10,452.00**

19. Fox Representation and Participation Agreement Amendment, effective as of July 1, 2019, and which amends that certain Fox Representation and Participation Agreement dated as of January 17, 2017 between Fox Cable Network Services, LLC and Fox Broadcasting Company, LLC on the one hand, and Nexstar Broadcasting, Inc., Marshall Broadcasting Group, Inc., Mission Broadcasting, Inc., Warwick Communications Inc., and WNAC, LLC on the other hand.

**Contract Cure Amount**       **$0**

20. [Reimbursement for World Series Tickets.]

**Contract Cure Amount**       **$3,550.00**

21. 2019 NFL Inventory Addendum dated August 9, 2019.

**Contract Cure Amount:**       **$20,177.00**

22. Splicer Modification Side Letter dated November 11, 2019.

**Contract Cure Amount:**       **$0**

23. Release of Claims Letter dated February 6, 2020.

**Contract Cure Amount:**       **$0**

24. SuperBowl Dynamic Ad Insertion Letter dated November 7, 2019.

   **Contract Cure Amount:**          **$0**

25. Nexstar Binding Term Sheet dated September 15, 2019.

   **Contract Cure Amount:**          **$0**

26. Thursday Night Football Term Sheet dated September 19, 2019.

   **Contract Cure Amount:**          **$0**

27. DirecTV Distribution Agreement dated January 31, 2018 and extension dated November 15, 2018.

   **Contract Cure Amount:**          **$0**

28. DirecTV Side Letter dated January 31, 2018.

   **Contract Cure Amount:**          **$0**

29. Fubo Distribution Agreement dated July 31, 2017 and interim extension dated December 10, 2019.

   **Contract Cure Amount:**          **$0**

30. Fubo Side Letter dated July 31, 2017.

   **Contract Cure Amount:**          **$0**

31. Hulu Distribution Agreement dated July 14, 2017.

   **Contract Cure Amount:**          **$0**

32. Hulu Side Letter dated July 14, 2017.

   **Contract Cure Amount:**          **$0**

33. YouTube Distribution Agreement dated July 5, 2017 and extension dated August 31, 2019.

   **Contract Cure Amount:**          **$0**

34. YouTube Side Letter dated July 5, 2017.

   **Contract Cure Amount:**          **$0**

<u>Programming Licensing Agreements</u>

1. Television Station Licensing Agreement dated March 13, 2019 between Debmar-Mercury, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of Family Feud to television station KLJB.

**Contract Cure Amount:**          **$4,416.66**

2.   License Agreement dated September 13, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Mike and Molly to television station KLJB.

**Contract Cure Amount:**          **$2,630.00**

3.   License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KLJB.

**Contract Cure Amount:**          **$1,210.00**

4.   License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KLJB commencing on September 7, 2020.

**Contract Cure Amount:**          **$0**

5.   License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KLJB.

**Contract Cure Amount:**          **$1,880.00**
**(Cure Cost aggregated for both TMZ Live and TMZ)**

6.   License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KLJB commencing on September 7, 2020.

**Contract Cure Amount:**          **$0**

7.   License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KLJB.

**Contract Cure Amount:**          **$1,880.00**
**(Cure Cost aggregated for both TMZ Live and TMZ)**

8.   License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KLJB commencing on September 7, 2020.

**Contract Cure Amount:**          **$0**

9.   License Agreement dated June 12, 2017 between CBS Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Game to television station KLJB.

**Contract Cure Amount:**          **$0**

10. Preseason Television Agreement dated as of June 18, 2019 between The Chicago Bears Football Club, Inc. and Marshall Broadcasting Group, Inc.

   **Contract Cure Amount:**        **$0**

11. License Agreement dated August 25, 2015 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Big Bang Theory to television station KLJB.

   **Contract Cure Amount:**        **$9,534.00**

12. License Agreement dated June 4, 2019 between Entertainment Studios, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Funny You Should Ask to television station KLJB.

   **Contract Cure Amount:**        **$1,733.29**

13. License Agreement dated June 6, 2018 between NBCUniversal Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Maury to television station KLJB.

   **Contract Cure Amount:**        **$1,083.32**

14. License Agreement dated July 13, 2016 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of MOM to television station KLJB.

   **Contract Cure Amount:**        **$1,734.00**

15. License Agreement dated February 19, 2019 between Buena Vista Television and Marshall Broadcasting Group, Inc. pertaining to the licensing of Tamron to television station KLJB.

   **Contract Cure Amount:**        **$866.66**

16. License Agreement dated September 13, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two Broke Girls to television station KLJB.

   **Contract Cure Amount:**        **$4,488.00**

17. License Agreement dated March 13, 2019 between Debmar-Mercury, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of Wendy Williams to television station KLJB.

   **Contract Cure Amount:**        **$662.50**

18. License Agreement dated March 5, 2013 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Modern Family to television station KLJB.

**Contract Cure Amount:**         **$9,533.34**

19. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KMSS.

**Contract Cure Amount:**         **$1,680.00**

20. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KMSS commencing on September 7, 2020.

**Contract Cure Amount:**         **$0**

21. License Agreement dated June 18, 2019 between Katz Broadcasting, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of The List to television station KLJB.

**Contract Cure Amount:**         **$520.00**

22. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KMSS.

**Contract Cure Amount:**         **$1,680.00**

23. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KMSS commencing on September 7, 2020.

**Contract Cure Amount:**         **$0**

24. License Agreement dated May 10, 2011 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KMSS.

**Contract Cure Amount:**         **$0**

25. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KMSS.

**Contract Cure Amount:**         **$5,200.00**

26. License Agreement dated June 4, 2019 between Entertainment Studios, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Funny You Should Ask to television station KMSS.

**Contract Cure Amount:**         **$2,600.00**

27. License Agreement dated January 23, 2012 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Modern Family to television station KMSS.

   **Contract Cure Amount:**      **$4,333.34**

28. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KMSS.

   **Contract Cure Amount:**      **$2,750.00**

29. License Agreement dated July 21, 2017 between CBS Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Game to television station KMSS.

   **Contract Cure Amount:**      **$656.00**

30. License Agreement dated August 25, 2015 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Big Bang Theory to television station KMSS.

   **Contract Cure Amount:**      **$8,234.00**

31. License Agreement dated November 2, 2016 between Buena Vista Television and Marshall Broadcasting Group, Inc. pertaining to the licensing of Black-ish to television station KMSS.

   **Contract Cure Amount:**      **$6,933.30**

32. License Agreement dated March 12, 2019 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Divorce Court to television station KMSS.

   **Contract Cure Amount:**      **$2,600.00**

33. License Agreement dated June 21, 2016 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Last Man Standing to television station KMSS.

   **Contract Cure Amount:**      **$2,600.00**

34. License Agreement dated June 18, 2019 between Katz Broadcasting, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of The List to television station KMSS.

   **Contract Cure Amount:**      **$640.00**

35. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KPEJ.

   **Contract Cure Amount:**      **$0**

36. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Judge Mathis to television station KPEJ commencing on September 7, 2020.

   **Contract Cure Amount:**       **$0**

37. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KPEJ.

   **Contract Cure Amount:**       **$0**

38. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Peoples Court to television station KPEJ commencing on September 7, 2020.

   **Contract Cure Amount:**       **$0**

39. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KPEJ.

   **Contract Cure Amount:**       **$0**

40. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Real to television station KPEJ commencing on September 7, 2020.

   **Contract Cure Amount:**       **$0**

41. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KPEJ.

   **Contract Cure Amount:       $800.00**
   **(Cure Cost aggregated for both TMZ Live and TMZ)**

42. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ to television station KPEJ commencing on September 7, 2020.

   **Contract Cure Amount:**       **$0**

43. License Agreement dated January 3, 2017 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KPEJ.

   **Contract Cure Amount:       $800.00**
   **(Cure Cost aggregated for both TMZ Live and TMZ)**

44. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of TMZ Live to television station KPEJ commencing on September 7, 2020.

   **Contract Cure Amount:**        **$0**

45. License Agreement dated May 10, 2011 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KPEJ.

   **Contract Cure Amount:**        **$0**

46. License Agreement dated June 26, 2019 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two and a Half men to television station KPEJ.

   **Contract Cure Amount:**        **$1,300.00**

47. License Agreement dated August 21, 2019 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Simpsons to television station KPEJ.

   **Contract Cure Amount:**        **$3,066.66**

48.  License Agreement dated August 8, 2012 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Two Broke Girls to television station KPEJ.

   **Contract Cure Amount:**        **$674.00**

49. License Agreement dated August 25, 2015 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of The Big Bang Theory to television station KPEJ.

   **Contract Cure Amount:**        **$2,774.00**

50. License Agreement dated January 23, 2012 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Modern Family to television station KPEJ.

   **Contract Cure Amount:**        **$2,166.66**

51. License Agreement dated August 17, 2016 between Warner Bros. Domestic Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of MOM to television station KPEJ.

   **Contract Cure Amount:**        **$866.00**

52. License Agreement dated February 20, 2019 between Buena Vista Television and Marshall Broadcasting Group, Inc. pertaining to the licensing of Tamron to television station KPEJ.

   **Contract Cure Amount:**        **$866.66**

53. License Agreement dated March 12, 2019 between Twentieth Television, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Divorce Court to television station KPEJ.

   **Contract Cure Amount:**          **$1,083.34**

54. License Agreement dated June 4, 2019 between Entertainment Studios, Inc. and Marshall Broadcasting Group, Inc. pertaining to the licensing of Funny You Should Ask to television station KPEJ.

   **Contract Cure Amount:**          **$0**

55. License Agreement dated February 23, 2018 between CBS Television Distribution and Marshall Broadcasting Group, Inc. pertaining to the licensing of Hot Bench to television station KPEJ.

   **Contract Cure Amount:**          **$486.00**

56. License Agreement dated June 18, 2019 between Katz Broadcasting, LLC and Marshall Broadcasting Group, Inc. pertaining to the licensing of The List to television station KPEJ.

   **Contract Cure Amount:**          **$280.00**

Retransmission Consent Agreements

**There are no Cure Amounts owing under any Retransmission Consent Agreements.**

1. Retransmission Consent Agreement dated as of December 27, 2017 between Marshall Broadcasting Group, Inc. and RB3, LLC dba Reach Broadband.

2. Retransmission Consent Agreement dated as of December 31, 2017 between Marshall Broadcasting Group, Inc. and Red River Cable.

3. Retransmission Consent Agreement dated as of December 29, 2017 between Marshall Broadcasting Group, Inc. and Muscatine Power & Water.

4. Retransmission Consent Agreement dated as of December 29, 2017 between Marshall Broadcasting Group, Inc. and Fidelity Cablevision, Inc.

5. Retransmission Consent Agreement dated as of December 31, 2018 between Marshall Broadcasting Group, Inc. and Cable One, Inc. and Telecommunications Management, LLC dba New Wave Communications.

6. Retransmission Consent Agreement dated as of January 1, 2017 between Marshall Broadcasting Group, Inc. and Mediacom LLC and Mediacom Broadband, as amended by First Amendment dated January 1, 2020 to the Retransmission Consent Agreement dated as of January 1, 2017 between Marshall Broadcasting Group, Inc. and Mediacom LLC and Mediacom Broadband.

7. Retransmission Consent Agreement dated as of July 3, 2015 between Marshall Broadcasting Group, Inc. and DIRECTV, LLC, as amended by Amendment dated November 16, 2019 to the Retransmission Consent Agreement dated as of July 3, 2015 between Marshall Broadcasting Group, Inc. and DIRECTV, LLC.

8. Retransmission Consent Agreement dated as of January 1, 2020 between Marshall Broadcasting Group, Inc. and Comcast Cable Communications, LLC.

9. First Amendment dated January 1, 2019 to Retransmission Consent Agreement dated as of December 31, 2015 between Marshall Broadcasting Group, Inc. and Cequel Communications, L.L.C.

10. Retransmission Consent Agreement dated as of December 20, 2017 between Marshall Broadcasting Group, Inc. and Skitter, Inc.

11. Retransmission Consent Agreement dated as of December 31, 2018 between Marshall Broadcasting Group, Inc. and City of Bellevue.

12. Retransmission Consent Agreement dated as of November 30, 2018 between Marshall Broadcasting Group, Inc. and Wes-Tex Telecommunications, LTD.

13. Retransmission Consent Agreement dated as of January 16, 2019 between Marshall Broadcasting Group, Inc. and WEHCO Video, Inc.

14. Retransmission Consent Agreement dated as of January 1, 2019 between Marshall Broadcasting Group, Inc. and TDS Broadband Service LLC.

15. Retransmission Consent Agreement dated as of December 20, 2018 between Marshall Broadcasting Group, Inc. and Grande Communications Networks, LLC.

16. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and WTC Communications, Inc.

17. Retransmission Consent Agreement dated as of January 1, 2018 between Marshall Broadcasting Group, Inc. and Vyve Broadband, LLC.

18. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Viola Communications, Inc.

19. Retransmission Consent Agreement dated as of December 17, 2017 between Marshall Broadcasting Group, Inc. and Southwest Arkansas Telephone Cooperative, Inc.

20. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Reynolds Cable, Inc.

21. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Oneida Cablevision, Inc.

22. Retransmission Consent Agreement dated as of December 31, 2017 between Marshall Broadcasting Group, Inc. and Nova Cablevision.

23. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and New Windsor Telephone Co.

24. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and MTC Communications, Inc.

25. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Mid Century Telephone Cooperative.

26. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Mediapolis Telephone Company dba MTC Technologies.

27. Retransmission Consent Agreement dated as of December 21, 2017 between Marshall Broadcasting Group, Inc. and Lost Nation-Elwood Telephone Company.

28. Retransmission Consent Agreement dated as of December 29, 2017 between Marshall Broadcasting Group, Inc. and LaMotte Telephone Company.

29. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and La Harpe Video and Data Services Company.

30. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Grand Mound Cooperative Telephone Association.

31. Retransmission Consent Agreement dated as of December 22, 2017 between Marshall Broadcasting Group, Inc. and F&B Communications, Inc.

32. Retransmission Consent Agreement dated as of October 29, 2018 between Marshall Broadcasting Group, Inc. and ETEX Communications, LLC.

33. Retransmission Consent Agreement dated as of December 28, 2017 between Marshall Broadcasting Group, Inc. and Diverse Communications, Inc.

34. Retransmission Consent Agreement dated as of December 21, 2017 between Marshall Broadcasting Group, Inc. and Central Scott Telephone Company.

35. Retransmission Consent Agreement dated as of December 31, 2017 between Marshall Broadcasting Group, Inc. and Cablesouth Media III LLC.

36. Retransmission Consent Agreement dated as of December 22, 2017 between Marshall Broadcasting Group, Inc. and Baldwin-Nashville Telephone Company, Inc.

37. Retransmission Consent Agreement dated as of January 1, 2018 between Marshall Broadcasting Group, Inc. and CP-Tel Network Services, Inc.

38. Retransmission Consent Agreement dated as of December 21, 2017 between Marshall Broadcasting Group, Inc. and Bernard Communications.

<u>Other Contracts</u>

1. Agreement for Sales Research Services between Research Director, Inc. and television stations KMSS-TV, KLJB, and KPEJ, commencing March 1, 2020 and ending February 28, 2021.

**Contract Cure Amount:**          **$0**

2.  Combined and Consolidated Amendment No. 1 to those certain Representation Agreements between, on the one hand, Katz Communications, Inc. and Katz Millennium Sales & Marketing, Inc., and on the other hand, Nexstar Broadcasting, Inc., Marshall Broadcasting Group, Inc. and Mission Broadcasting, Inc., effective February 1, 2017.

**Contract Cure Amount:** **$1,800.00 ($600 per station)**

3.  Network Affiliation and Representation Agreement dated August 10, 2017 between Liberman Television LLC and Marshall Broadcasting Group, Inc.

**Contract Cure Amount:** **$686.47**

4.  Letter Agreement, dated January 23, 2020 between the American Society of Composers, Authors and Publishers ("ASCAP") and Marshall Broadcasting Group, Inc.

**Contract Cure Amount:** **$1,111.00**

5.  License Agreement dated July 25, 2016 between Broadcast Music, Inc. and Marshall Broadcasting Group, Inc. and pertaining to television station KLJB. (NOTE: CONTRACT EXPIRED 12/31/2017 AND WHILE STILL IN EFFECT HAVE NOT BEEN ABLE TO OBTAIN NEW AGREEMENT)

**Contract Cure Amount:** **$5,591.00 (aggregate for all 3 stations)**

6.  License Agreement dated July 25, 2016 between Broadcast Music, Inc. and Marshall Broadcasting Group, Inc. and pertaining to television station KMSS-TV.  (NOTE: CONTRACT EXPIRED 12/31/2017 AND WHILE STILL IN EFFECT HAVE NOT BEEN ABLE TO OBTAIN NEW AGREEMENT)

**Contract Cure Amount:** **$5,591.00 (aggregate for all 3 stations)**

7.  License Agreement dated July 25, 2016 between Broadcast Music, Inc. and Marshall Broadcasting Group, Inc. and pertaining to television station KPEJ-TV.  (NOTE: CONTRACT EXPIRED 12/31/2017 AND WHILE STILL IN EFFECT HAVE NOT BEEN ABLE TO OBTAIN NEW AGREEMENT)

**Contract Cure Amount:** **$5,591.00 (aggregate for all 3 stations)**

8.  Licensing Agreements between SESAC and Marshall Broadcasting Group, Inc.  (NOTE: HAVE NOT BEEN ABLE TO OBTAIN COPIES OF AGREEMENTS)

**Contract Cure Amount:** **$0**

9.  Administrative Services Agreement effective December 1, 2014 between UMR, Inc. and Marshall Broadcasting Group, Inc.

**Contract Cure Amount:** **$0**

<u>Tower Leases</u>

1. Master Antenna Site Lease between Pinnacle Towers Inc. and Comcorp of Lafayette, Inc. et al and governing lease terms for television stations KMSS-TV and KPEJ-TV.

   **Contract Cure Amount:**        **$14,529.97**

2. Second Amendment to that certain Lease Agreement dated August 2002 by and between American Towers Inc. and Quad Cities Television Acquisition Corp., as amended by that certain First Amendment to Lease dated June 16, 2008, by and between American Tower, L.P. and Marshall Broadcasting Group.

   **Contract Cure Amount:**        **$0**

Real Property Leases

1. Facilities Lease dated May 1, 2015 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. and pertaining to television station KLJB in Davenport, Iowa.

   **Contract Cure Amount:**        **$0**

2. Facilities Lease dated May 1, 2015 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. and pertaining to television station KMSS-TV in Shreveport, Louisiana.

   **Contract Cure Amount:**        **$0**

3. Facilities Lease dated May 1, 2015 by and between Marshall Broadcasting Group, Inc. and Nexstar Broadcasting, Inc. and pertaining to television station KPEJ-TV in Odessa, Texas.

   **Contract Cure Amount:**        **$0**

4. Office Lease dated June 28, 2012, by and between Colonnade Wilshire Corp. and Wave Publications, Inc. and governing the lease of property located at 1730 West Olympic Blvd., Suite 500, Los Angeles, CA  90015, and First Amendment to Office Lease by and between Colonnade Wilshire Corp. and Marshall Broadcasting Group, Inc. as successor in interest to Wave Publications, Inc.

   **Contract Cure Amount:**        **$0**

**SCHEDULE 8.6**
**Other Consents**

Tower Leases

1. Master Antenna Site Lease between Pinnacle Towers Inc. and Comcorp of Lafayette, Inc. et al and governing lease terms for television stations KMSS-TV and KPEJ-TV.

2. Second Amendment to that certain Lease Agreement dated August 2002 by and between American Towers Inc. and Quad Cities Television Acquisition Corp., as amended by that certain First Amendment to Lease dated June 16, 2008, by and between American Tower, L.P. and Marshall Broadcasting Group, Inc.

Contracts with Fox Broadcasting Company, LLC

1. 2019 NFL Inventory Addendum dated August 9, 2019.

2. Amended and Restated Station Affiliation Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

3. Amended and Restated Station Affiliation Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

4. Amended and Restated Station Affiliation Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

5. Letter Agreement effective July 1, 2019 which amends and supplements the Amended and Restated Affiliation Agreement as of the same date between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

6. Letter Agreement effective July 1, 2019 which amends and supplements the Amended and Restated Affiliation Agreement as of the same date between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

7. Letter Agreement effective July 1, 2019 which amends and supplements the Amended and Restated Affiliation Agreement as of the same date between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

8. Amended and Restated Equipment Usage Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

9. Amended and Restated Equipment Usage Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

10. Amended and Restated Equipment Usage Agreement as of July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

11. Network Nonduplication Amendment to the Amended and Restated Station Affiliation Agreement dated July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

12. Network Nonduplication Amendment to the Amended and Restated Station Affiliation Agreement dated July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

13. Network Nonduplication Amendment to the Amended and Restated Station Affiliation Agreement dated July 1, 2019 by and between Fox Broadcasting Company, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

14. News Agreement dated September 13, 2002 between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

15. Seventh Amendment to News Agreement dated as of September 5, 2019 by and between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KLJB-TV.

16. News Agreement dated April 24, 2007 between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

17. Sixth Amendment to News Agreement as of September 5, 2019 by and between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KMSS-TV.

18. News Agreement dated February 9, 2016 between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

19. Second Amendment to News Agreement as of September 5, 2019 by and between Fox News Network, LLC and Marshall Broadcasting Group, Inc. pertaining to television station KPEJ-TV.

20. Fox Representation and Participation Agreement Amendment, effective as of July 1, 2019, and which amends that certain Fox Representation and Participation Agreement dated as of January 17, 2017 between Fox Cable Network Services, LLC and Fox Broadcasting Company, LLC on the one hand, and Nexstar Broadcasting, Inc., Marshall Broadcasting Group, Inc., Mission Broadcasting, Inc., Warwick Communications Inc., and WNAC, LLC on the other hand.

21. Release of Claims Letter dated February 6, 2020.

22. Splicer Modification Side Letter dated November 11, 2019.

23. SuperBowl Dynamic Ad Insertion Letter dated November 7, 2019.

24. Nexstar Binding Term Sheet dated September 15, 2019.

25. Thursday Night Football Term Sheet dated September 19, 2019.

26. DirecTV Distribution Agreement dated January 31, 2018 and extension dated November 15, 2018.

27. DirecTV Side Letter dated January 31, 2018.

28. Fubo Distribution Agreement dated July 31, 2017 and interim extension dated December 10, 2019.

29. Fubo Side Letter dated July 31, 2017.

30. Hulu Distribution Agreement dated July 14, 2017.

31. Hulu Side Letter dated July 14, 2017.

32. YouTube Distribution Agreement dated July 5, 2017 and extension dated August 31, 2019.

33. YouTube Side Letter dated July 5, 2017.

**Exhibit 2**

**Wind Down Budget**

# Marshall Broadcasting Group, Inc.

**Wind Down Budget**

| # | | Wind Down | Notes |
|---|---|---:|---|
| 1 | **General Operating Expenses:** | | *<====assumes one month accrual rolling for these expenses at closing. If any line items are not unpaid at closing, the wind down* |
| 2 | Retrans processing | 1,690 | *amount will be reduced on a dollar-for-dollar basis. These items were not paid/budget in December (the first month post-petition).* |
| 3 | Dues & Subs | 1,500 | *The amounts below represent an estimate of the May/June accrual that will come due in July.* |
| 4 | Insurance | 1,500 | |
| 5 | Music License fees | 16,000 | |
| 6 | Accounting support (Mission) | 2,600 | |
| 7 | Newswire service | 6,100 | |
| 8 | Property Tax | 65,000 | *Note: Based on monthly accrual; represents admin claim not assumed - see notes.* |
| 9 | Rent | 10,600 | |
| 10 | Tower rent | 42,344 | |
| 11 | Utility cost | 12,000 | |
| 12 | Digital Media Expense | 10,000 | |
| 13 | Transmitter Costs | - | |
| 14 | Other / Miscellaneous | 25,000 | |
| 15 | **Sub-total Operating Expense** | 194,334 | |
| 16 | **Other Expenses:** | | |
| 17 | Fox affiliate fees | - | *Included in cure (approx $1.2 million)* |
| 18 | Payroll - Regular | - | *Paid at month-end--- see notes* |
| 19 | Payroll - Bonus/Commission | 120,000 | *Reg paid at month-end; additional amounts accrued for annual bonus obligation; see notes.* |
| 20 | Medical claims | - | *Included in cure* |
| 21 | Film payments | - | *Included in cure ($48k)* |
| 22 | Repack | - | *Assumes no further repack costs* |
| 23 | **Sub-total Other Expense** | 120,000 | |
| 24 | **Admin/Lender/Director:** | | |
| 25 | BK Trustee Fee (UST) | 100,000 | *Assumes fees are assessed on 2nd quarter distributions only and not any portion of the credit bid.* |
| 26 | Professionals (Pre-Closing Fee Estimate) | - | *Assumes holdback and fees through earlier of June 30 or closing funded by cash collateral budget; see notes* |
| 27 | Professionals-post close | 200,000 | *Assumes $200k for Debtor counsel* |
| 28 | Tax preparation & wind down admin | 100,000 | *Assumes approx $50k for final tax prep and related matters and an $50k for potential unexpected (entity dissolution, etc).* |
| 29 | Directors Fees | 42,000 | *Contemplates one additional month for both Clyde & Drew plus deferral payments due to Clyde* |
| 30 | Investment Bankers | - | |
| 31 | Lender Interest | - | |
| 32 | Lender Professional Fees | - | |
| 33 | **Sub-total Admin/Lender/Director** | 442,000 | |
| 34 | **Other** | | |
| 35 | Tax obligation-Federal | - | *Est based on gain on sale of asset; actual amount will differ upon completion of returns* |
| 36 | Tax obligation-State | 125,000 | *Est based on gain on sale of asset; actual amount will differ upon completion of returns* |
| 37 | Other | 50,000 | *Contingency* |
| 38 | **Sub-total Admin/Lender/Director** | 175,000 | |
| 39 | **Wind Down Amount** | $ (931,334.00) | |

# Wind-Down Budget Notes

**General Notes:**

- All payments to professionals for any period remain subject to the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Estate Professionals [Docket No. 148])
- Certain of the Debtor's expenses are expected to be paid through the prior approved cash collateral budgets. To the extent timing issues result in expenses that were incurred but not yet paid as of the closing, the wind down budget shall be increased for such amounts.

**Line Item Notes:**

Line items 1 to 15: Represents approximately one month accrual rolling since petition. The general operating expenses were for the most part incurred but not paid (or budgeted) in December (first month post-petition), resulting in an accrued post-petition liability. The amounts represent an estimate of the May/June accrual that will come due post-close.

Line item 8: Represents the Debtor's annual personal property tax anticipated to be due at year end 2020. Obligation is deemed incurred as of January 1, 2020 and is thus considered a post-petition admin claim.

Line item 18: Payroll obligations are typically posted prior to month-end and it is contemplated that the liability will be funded prior to close. To the extent accrued but unpaid payroll is not funded prior to close, the payment will be paid consistent with the cash collateral budget but shall not come out of the Wind Down Amount.

Line item 19: The Wind Down Amount includes amounts for the station manager bonuses.

Line item 20: Included in contract cure obligations.

Line item 21: Included in contract cure obligations.

Line item 22: No further Repack costs are anticipated. To the extent costs are incurred the related benefits accrete to the buyer, obligations should not be paid from the wind down funds.

Line item 25: Assumes one quarter of UST fees calculated based on 2nd quarter disbursements only and excludes any portion of the credit bid.

Line item 26: At closing the Debtor shall provide an estimate of all accrued and unpaid fees, disbursements, costs, and expenses (the "Professional Fees") incurred by professionals or professional firms retained by the Debtor or its estate pursuant to sections 327, 328 or 363 of the Bankruptcy Code which Professional Fees were incurred (regardless of when invoiced or applied for) prior to the Closing and are expressly provided for in the Approved Budget (as defined in the Final Cash Collateral Order (the "Pre-Closing Fee Estimate"). An amount equal to the Pre-Closing Fee Estimate shall be added to the "Wind Down Amount" set forth in the APA and included in the Wind Down Budget, and such amounts

# Wind-Down Budget Notes

shall only be paid to such professionals in accordance with the Approved Budget and upon allowance by the Court. Any amounts in the Wind Down Budget budgeted for Professional Fees for the period after Closing shall only be distributed to such professionals upon further order of the Court upon motion.

Line item 27:  Assumes $200k for Debtor counsel.

Line item 28:  Represents Debtor's anticipated tax preparation and other administrative costs associated with closing out the estate.

Line item 29:  Contemplates one additional month for both Clyde & Drew plus deferral payments due to Clyde.

Line item 35-36:  Estimate of Federal and State income tax liability resulting from the proposed transaction structure (assuming approx. $50 million of gross sales proceeds).  Actual amounts of tax liability may differ substantially once the 2019 and 2020 tax returns are prepared.

Line item 37:  Represents a general contingency

**<u>Exhibit 3</u>**

**TSA**

## TRANSACTION SUPPORT AGREEMENT

This TRANSACTION SUPPORT AGREEMENT (this "<u>Agreement</u>") is dated as of March 30, 2020, by and between the undersigned hereto (the "<u>Supporting Party</u>") and Mission Broadcasting, Inc. ("<u>Mission</u>"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the APA (as defined below). The Supporting Party and Mission are each sometimes referred to herein as a "<u>Party</u>" and, collectively, as the "<u>Parties</u>".

**WHEREAS**, the Supporting Party is the record and beneficial owner of all of the equity interests in Marshall Broadcasting Group, Inc. ("<u>MBG</u>"), and on December 3, 2019, MBG filed a voluntary petition for relief in in the United States Bankruptcy Court for the Southern District of Texas, commencing voluntary proceedings pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq.; and

**WHEREAS**, contemporaneously with the execution and delivery of this Agreement, MBG and Mission entered into an Asset Purchase Agreement (as amended or modified from time to time, the "<u>APA</u>"), dated as of the date hereof, pursuant to which, among other matters, Mission will acquire certain assets and assume certain liabilities of MBG (the "<u>Transactions</u>"); and as a material inducement to Mission to enter into the APA and to consummate the Transactions, the Supporting Party agrees to undertake (and refrain from taking) certain actions as set forth in this Agreement.

**NOW**, **THEREFORE**, in consideration of the foregoing and the covenants and agreements set forth in this Agreement, and intending to be legally bound hereby, each Party hereby agrees as follows:

Support Covenants. In consideration of full execution and delivery of the APA only, and so long as Mission in not in breach of the APA, the Supporting Party hereby agrees and covenants, in his capacity as director, officer, employee, stockholder, or any other capacity (whether directly or indirectly), as applicable: (a) to use commercially reasonable efforts to cause MBG to implement the Transactions and to operate MBG in accordance with the APA (particularly Section 5.4 thereof); (b) not to, directly or indirectly, take, or fail to take, any action that would, or would reasonably be expected to, prevent, impair, delay or interfere with Mission's acquisition of the Purchased Assets in accordance with the terms of the APA, including any action that would result in any failure of MBG to comply with or satisfy in a timely manner any covenant, condition or agreement in the APA to be complied with or satisfied by MBG or would otherwise result in the failure of any condition set forth in Article VIII to be satisfied; (c) to take all actions and to do, or cause to be done, in such capacities (as applicable), all things reasonably necessary under applicable Law in order for Mission to consummate the Transactions on the terms and subject to the conditions set forth in the APA; (d) not to, directly or indirectly, take any action that is inconsistent with this Agreement or the Transactions; and (e) without limiting the generality of the foregoing, (1) not to, directly or indirectly, make any press release or other public announcement concerning the Transactions, except as and solely to the extent required by applicable Law, in which case the Supporting Party shall allow Mission a reasonable time to comment on such release or announcement and the Parties shall use their reasonable best efforts to cause a mutually agreeable release or announcement to be issued, and (2) not to take, or fail to take, any action that would reasonably be expected to have the effect of materially delaying the receipt of any required FCC Consent for the Transactions or causing the FCC to designate the FCC Applications for the Transactions for hearing, including but not limited to, filing any opposition, objection or petition to deny such FCC Applications.

Governing Law; Jurisdiction. This Agreement and all Causes of Action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement shall be governed and construed in accordance with the internal Laws of the State of

Delaware, except to the extent that the Laws of such state are superseded by the Bankruptcy Code.  The Bankruptcy Court shall have exclusive jurisdiction over the interpretation and enforcement of this Agreement.

      1.       <u>Enforcement; Specific Performance; Severability</u>.  The Supporting Party agrees that irreparable damage would occur in the event of any breach or nonobservance of this Agreement and that monetary damages would be an inadequate remedy therefor, and accordingly, that Mission shall be entitled to injunctive relief, specific performance or other equitable relief to enforce this Agreement and to prevent breaches of this Agreement (without any requirement to post any bond or security) in addition to any other remedies that may be available at law or in equity.  No other provisions of this Agreement shall be affected to the extent any provision hereof is invalid, illegal or unenforceable in any respect, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

**SUPPORTING PARTY:**

Name:  Pluria Marshall Jr.

**MISSION:**

MISSION BROADCASTING, INC.

By:  _____

Name: Dennis P. Thatcher

Title:  President

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first written above.

**SUPPORTING PARTY:**

_____

Name:  Pluria Marshall Jr.

**MISSION:**

MISSION BROADCASTING, INC.

By: _____

Name: Dennis P. Thatcher

Title:  President